IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROD & REEL, INC., et. al.                    *

                                         *

            Plaintiffs,          *

v.                                           *  Case No.: 8:20-cv-03388-DLB
                               Judge Deborah L. Boardman

STATE AUTOMOBILE MUTUAL INSURANCE  *
COMPANY

            Defendant.           *

*      *      *      *      *      *      *      *      *      *      *      *      *

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...............................................................................................................1

Statement of Material Facts to which there is no Genuine Dispute.................................1

Statement of Issues ..........................................................................................................1

STATEMENT OF FACTS NOT IN DISPUTE .................................................................5

The Policy .........................................................................................................................5

The Fire and the Claim .....................................................................................................6

State Auto has Agreed that the Period of Restoration Includes the shrink-wrapping of the building to reduce Wedding Revenue Loss .........................................................................8

The Reconstruction Work to Begin After the Wedding Season when the Shrink Wrapping was to be Removed .........................................................................................................10

State Auto's Lack of Good Faith .....................................................................................11

    a. State Auto's Lack of Good Faith Using the Rod & Reel Claim to Teach the Public Adjuster a Lesson ........................................................................................................11

Misrepresentations in Status Letters ...............................................................................16

    a. Misrepresentation as to payment of the amount of Business Interruption which was calculated by State Auto ...........................................................................................16

    b. Misrepresentation as to payment of the amount of Actual Cash Value of the Building Loss ..................................................................................................................18

    c. Bad Faith Claim Under Md. Code Courts and Judicial Proceedings Article § 3-1701(e); Insurance Article § 27-1001 ........................................................................19

STANDARD OF REVIEW ..............................................................................................19

CHOICE OF LAW ...........................................................................................................20

ARGUMENT .....................................................................................................................21

Background Facts..............................................................................................................21

State Auto has Agreed that the Period of Restoration Includes the Shrink-Wrapping of the Building to Reduce the Wedding Revenue loss.................................................................23

STATE AUTO'S LACK OF GOOD FAITH ...................................................................26

CONCLUSION..................................................................................................................37

i

## **TABLE OF AUTHORITIES**

**Cases**

All Class Const., LLC v. Mutual Bens. Ins. Co., 3 F. Supp. 3d 416 (D. Md. 2014) ...............28, 30

Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130 (2d Cir. 1997).......................................20

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).........................................................19, 20

Art Form Interiors, Inc. v. Columbia Homes, Inc., 92 Md. App. 587, 609 A.2d 370 (Md. Ct.
    Spec. App. 1992) ...............................................................................................................29

Barry v. Nationwide Mut. Ins. Co., JKB-17-3070, 298 F. Supp. 3d 826, 2018 U.S. Dist. LEXIS
    19300 (D. Md. Feb. 6, 2018).............................................................................................30

Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co., 2020 U.S. Dist. LEXIS 38427(D. Md.
Mar. 2020)...............................................................................................................................20

Betskoff v. Standard Guar. Ins. Co., No. 1444, 2018 Md. App. LEXIS 877
    (App. Sep. 18, 2018) ...........................................................................................................27


Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514 (4th Cir. 2003) ...............................20

Carlyle v. Travelers Home & Marine Ins. Co., No. WDQ-13-2964, 2014 U.S. Dist. LEXIS
    78890 (D. Md. June 5, 2014)...............................................................................................28

Catterton v. Coale, 84 Md. App. 337, 579 A.2d 781(Md. Ct. Spec. App. 1990) .........................29

Cecilia Schwaber Tr. Two v. Hartford Accident & Indem., Co., 636 F. Supp. 2d 481 (D. Md.
    2009)..........................................................................................................................28, 29, 30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................................................19

Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., Civil Action No. ELH-16-3431,
    2018 U.S. Dist. LEXIS 49023 (D. Md. Mar. 23, 2018) ................................................27, 28, 29

Def. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374 (4th Cir. 2014) ......................................20

Johnson v. Kemper Inc. Co., 74 Md. App. 243, 248, 536 A.2d 1211 (1988)................................26

State Auto. Mut. Ins. Co. v. Rod & Reel, Inc., No. PWG-18-340, 2018 U.S. Dist. LEXIS 190290,
    (D. Md. Nov. 7, 2018) .............................................................................................................3

State v. Booze, 334 Md. 64, 637 A.2d 1214 (Md. 1994)............................................................29

Thompson v. State Farm Mut. Auto Ins. Co., 9 A.3d 112 (Md. Ct. App. 2010)............................4

Unitrin Auto & Home Ins. Co. v. Karp, 481 F. Supp. 3d 514 (D. Md. 2020)................................4

Vanderhoof-Forschner v. McSweegan, 215 F.3d 1323 [published in full-text format at 2000 U.S. App. LEXIS 10682], 2000 WL 627644 (4th Cir. 2000)…………………………………..20

Zdravkovich v. Bell Atlantic-Tricon Leasing, Corp., 323 Md. 200, 592 A.2d 498 (Md. 1991) ...29

**Rules and Statutes**

Fed. R. Civ. P. 56(a) ........................................................................................................19

**Other Authorities**

10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. 2019) .............................................................................................................................20

Md. Ins. Art. 27-1001 and CJP § 3-1701 ............................................................. *passim*

## INDEX OF EXHIBITS

Exhibit 1 – Policy.

Exhibit 2 – Deposition of Sherri King, Claims Examiner for State Automobile Mutual Insurance Company.

Exhibit 3 – Deposition of Scott Terra, Large Loss Adjuster, Claims Manager and Claims Supervisor for State Automobile Mutual Insurance Company.

Exhibit 4 - March 31, 2015 Robertson & Associates shrink wrap estimate.

Exhibit 5 – Scheibel Construction Cost Tracking and Time for Shrink Wrapping of the Loss Location.

Exhibit 6 - Deposition of Kevin Collier, Employee of Wakalee Construction Co., vendor and expert witness named by State Automobile Mutual Insurance Company.

Exhibit 7 - Email string April 13, 2015 proposal for shrink wrapping of the building.

Exhibit 8 – Email string April 14, 2015 for approval of shrink wrapping of the building.

Exhibit 9 – Deposition of Neal Charktaz, Public Adjuster with Goodman-Gable-Gould Company hired by the Insureds.

Exhibit 10 – Deposition of Mark Chenetski Director of Property and Claim and Risk Engineering commercial lines for State Automobile Mutual Insurance Company.

Exhibit 11 – Memorandum Opinion – Judge Paul W. Grimm ruling on Motion to Dismiss filed by State Auto Mutual Insurance Company in this case – Docket No. 26.

Exhibit 12 – Deposition of Wesley Donovan, owner representative of the Plaintiff entities.

Exhibit 13 – January 20, 2017 Correspondence from Sherri King of State Auto Mutual Insurance Company.

Exhibit 14 – July 15, 2016 Meaden & Moore (forensic CPA for State Automobile Mutual Insurance Company) to Scott Terra.

Exhibit 15 – State Auto Mutual Insurance Company Check $71,639.00 (dated 5-30-2017) paying the undisputed portion of the business interruption claim.

Exhibit 16 –State Auto Mutual Insurance Company Check $26,500 (dated 5-30-2017) paying the remaining portion of the actual cash value for the building claim.

Exhibit 17 – January 20, 2017 Email thread from Neal Charkatz to Sherri King.

Exhibit 18 – May 25, 2017 Email thread related to the payment of the undisputed amount of BI and additional undisputed amount of Actual Cash Value.

Exhibit 19 – December 22, 2016 Email thread with Scott Terra, Carolyn Veahman and Mark Chenetski.

Exhibit 20 – Expert Report prepared by Kevin Collier (J.S. Held, LLC), construction vendor and expert witness for State Auto Mutual Insurance Company.

Exhibit 21 – July 25, 2017 Demand for Appraisal.

Exhibit 22 – Appraisal Award.

Exhibit 22A – Amount in Dispute Spreadsheet (demonstrative).

Exhibit 23 – Disclosure of Damage claim and Relief Sought-filing in this matter and part of the record as Docket No. 31.

Exhibit 24 –  Case Law State Auto. Mut. Ins. Co. v. Rod & Reel, Inc., No. PWG-18-340, (D. Md. 2018) prior case between parties.

Exhibit 25 - December 7, 2016 Email Thread confirming meeting between Neal Charkatz, Carolyn Veahman, Scott Terra and Christian Fox for December 12, 2016 settlement meeting.

Exhibit 26 – Log Notes of State Auto Mutual Insurance Company.

Exhibit 27 – Deposition of Carolyn Veahman, Large Loss Property Manager/Executive General Adjuster for State Automobile Mutual Insurance Company.

Plaintiffs, Rod & Reel, Inc., Chesapeake Beach Resort and Spa, Chesapeake Beach Hotel and Spa, Smokey Joe's Grill and Boardwalk Café, Chesapeake Amusement, Inc. t/a Rod-N-Reel Bingo (collectively "Insureds" or "Plaintiffs"), by and through their undersigned counsel, respectfully submits this Memorandum in Support of their Motion for Summary Judgment against the Defendant State Automobile Mutual Insurance Company (collectively "State Auto," "Defendant," or "Insurer"), and in support thereof states as follows:

## INTRODUCTION

### Statement of Material Facts to which there is no Genuine Dispute

The Plaintiffs file this Statement of Facts to Which there is no Genuine Dispute, and in support of its Motion for Summary Judgment as to State Automobile Mutual Insurance Company states as follows:

### Statement of Issues

This case involves a claim by which the Plaintiffs are seeking insurance coverage for Business Interruption and Extra Expenses.  The crux of the dispute between State Auto and its Insureds is the duration of the period of restoration that limits the amount of the recoverable loss. When a dispute arose primarily as to the business interruption and extra expense (BIEE), the parties agreed to have the matter resolved by Appraisal.  Appraisal has been found by this Court to be arbitration and subject to the Federal Arbitration Act.  Per the policy, the insureds selected an appraiser, the insurer selected an appraiser, and the appraisers selected The Honorable Richard Sothoron, a retired Circuit Court Judge for Prince George's County, as the umpire.  An appraisal award was agreed to.  The form of the Appraisal Award[1] sets out the amount of the award on the first page, and a matrix setting out a monthly amount for a period of 14 months. The matrix provides:

---

[1] See Plaintiffs' Summary Judgment Exhibit 22.

| | Actual | Projected | | | | Appraisal Award $ 671,639 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Loss | Percent | Monthly |
| Feb-15 | $ 7,493,409 | $ 7,493,409 | 42% | 42% | 0% | - | 0.00% | $ - |
| Mar-15 | 10,328,330 | 10,328,330 | 44% | 44% | 0% | - | 0.00% | |
| Apr-15 | 8,270,767 | 9,054,244 | 26% | 38% | 12% | 783,477 | 6.86% | 46,074 |
| May-15 | 10,049,703 | 11,163,154 | 24% | 38% | 14% | 1,113,451 | 9.75% | 65,485 |
| Jun-15 | 7,593,022 | 8,671,911 | 20% | 38% | 17% | 1,078,889 | 9.45% | 63,470 |
| Jul-15 | 8,207,045 | 9,321,789 | 21% | 38% | 16% | 1,114,744 | 9.77% | 65,619 |
| Aug-15 | 10,519,411 | 12,009,972 | 20% | 38% | 17% | 1,490,561 | 13.06% | 87,716 |
| Sep-15 | 8,685,753 | 9,199,967 | 30% | 38% | 8% | 514,214 | 4.51% | 30,291 |
| Oct-15 | 10,904,889 | 11,234,278 | 34% | 38% | 4% | 329,389 | 2.89% | 19,410 |
| Nov-15 | 8,680,542 | 8,680,542 | 41% | 41% | 0% | - | 0.00% | |
| Dec-15 | 10,023,865 | 10,023,865 | 38% | 38% | 0% | - | 0.00% | |
| Jan-16 | 8,730,494 | 8,730,494 | 46% | 46% | 0% | - | 0.00% | |
| Feb-16 | 9,315,202 | 10,306,151 | 24% | 38% | 13% | 990,949 | 8.68% | 58,298 |
| Mar-16 | 12,876,242 | 14,205,193 | 25% | 38% | 13% | 1,328,951 | 11.64% | 78,179 |
| Apr-16 | 9,783,233 | 12,452,863 | 18% | 38% | 19% | 2,669,630 | 23.39% | 157,096 |
| | $141,461,907 | $152,876,163 | | | | $ 11,414,256 | 100.00% | $ 671,639 |
| | Difference | $11,414,256 | | | | | | |

In the above matrix (which is page 2 of the Award), the period of restoration is set between the date of loss on February 8, 2015.   State Auto contends that the period for which business interruption is owed runs for 12 months from February 2015 through February 2016, an amount which State Auto has now paid.   The Insureds contend that the correct period runs through April 2016 making the amount for which compensation is sought, an additional $235,275.   The attached chart demonstrates the same:

| Loss | Monthly | cummulative | |
|---|---|---|---|
| Feb-15 | $0.00 | $0.00 | |
| Mar-15 | $0.00 | $0.00 | |
| Apr-15 | $46,074.00 | $46,074.00 | |
| May-15 | $65,485.00 | $111,559.00 | |
| Jun-15 | $63,470.00 | $175,029.00 | |
| Jul-15 | $65,619.00 | $240,648.00 | |
| Aug-15 | $87,716.00 | $328,364.00 | |
| Sep-15 | $30,291.00 | $358,655.00 | |
| Oct-15 | $19,410.00 | $378,065.00 | |
| Nov-15 | $0.00 | $378,065.00 | |
| Dec-15 | $0.00 | $378,065.00 | |
| Jan-16 | $0.00 | $378,065.00 | |
| Feb-16 | $58,298.00 | $436,363.00 | 12 monrhs |
| Mar-16 | $78,179.00 | $514,542.00 | |
| Apr-16 | $157,096.00 | $671,638.00 | 14 months |
| | | | |
| Amount in issue is March and April 2-16 | Mar-16 | $78,179.00 | |
| | Apr-16 | $157,096.00 | |
| | AMOUNT IN DISPUTE | $235,275.00 | |

2

See Exhibit 22 (Award) and Exhibit 22A (demonstrative calculation).  See also Exhibit 23, the

Plaintiffs' filing with this Court as to "Disclosure of Damage Claims and Relief Sought."  As can

be seen, the amount of the award was $671,638, an amount which corresponds to a period of

restoration running from the date of the loss on 2-8-2015 through 4-8-2016.

State Auto filed an action challenging the award and seeking to vacate or modify the

award.  The Insureds sought to have the amount of the award confirmed.  The Court held that the

appraisal panel exceeded its authority by determining the period of restoration under the Award.

The court held that the appraisal panel agreed that they are determining the period of restoration

was beyond their authority.  The Court, however, did find that the Award properly adopted the

matrix by which different amounts for each of the 14 months were an enforceable Award.  The

court in State Auto. Mut. Ins. Co. v. Rod & Reel, Inc., No. PWG-18-340, 2018 U.S. Dist. LEXIS

190290, at 27 (D. Md. Nov. 7, 2018) (a copy of which opinion is attached hereto as Exhibit 11) in

which the Court ruled that "The Award is modified … to include only the month-to-month

calculations."  Explaining the ruling, the Court stated that:

> the month-to-month calculations enable ready calculation of the amount due under the
> Policy, once the period of restoration has been determined. Notably, if the Award is
> modified to include only the month-to-month calculations, and it is determined that the
> period of restoration is February 2015 through April 2016, then the amount due under
> the Policy, according to the modified Award, will be $671,639. If the period of
> restoration is determined to be a lesser time frame, then the monthly calculations
> determined by the appraisers will allow the appropriate calculation of the total amount
> of the covered loss. This modification accords with the intent of the parties, which was
> to calculate the total amount of loss without determining the period of restoration. Thus,
> this modification "effect[s] the intent" of the parties and certainly "promote[s] justice
> between the parties." 9 U.S.C. § 11. I will modify the Award accordingly.  Id at 26-27.

Given that modification, there are only 2 issues for this Court in the Cross-Motions for Summary

Judgment.

**First Issue**. The first issue is whether the claim properly runs through from February 8,

2015, to April 8, 2016, as the Plaintiff Insureds contend, or whether the claim runs for 12 months

from February 8, 2015, through February 7, 2016, as State Auto contends.  For the reasons stated below, it is undisputed that both the Plaintiffs and State Auto agree that the claim runs from February 8, 2015, to April 8, 2015.

**Second Issue**.  The Second Issue is whether State Auto has failed to act in good faith in adjusting this claim pursuant to Maryland Code § 27-1001 as a result of the lack of good faith of State Auto, including, but not limited to:

a.  expenses and litigation costs incurred by the Complainants in an action under this section or under § 27-1001 of the Insurance Article or both, including reasonable attorney's fees as may be necessary; and

b.  interest on all actual damages, expenses, and litigation costs incurred by the Complainants, computed; at the rate allowed under CJP § 11-107(a) from the date on which the Complainants' claim would have been paid if State Autos acted in good faith

While State Auto initially moved to dismiss this Complaint based upon a decision made by the Maryland Insurance Administration ("MIA") which the Insureds had filed, that motion was denied.[2]  This court in this matter has previously denied State Auto's Motion to Dismiss holding that the filing with the MIA was a condition precedent in compliance with Insurance Article § 27-1001[3], that the decision of the MIA is a nullity in this proceeding other than to show that an MIA decision was sought as a precondition to this suit, and that the Plaintiffs are not barred from pursuing this action under CJP § 3-1701 seeking the extra contractual damages above if the facts demonstrate that State Auto failed to act in good faith in determining the amount due.

---

[2] That Opinion is attached hereto as Exhibit 11.

[3] The Court cited <u>Thompson v. State Farm Mut. Auto Ins. Co.</u>, 9 A.3d 112 (Md. Ct. App. 2010), the Maryland Court of Special Appeals recognized that "the damage remedy/jury trial rights authorized by CJP § 3-1701 is independent from a true de novo review of the MIA administrative determination, **which is more appropriately characterized as a precondition to the civil suit**." (emphasis added).  The *Thompson* Court went on to note that the MIA's "decision appears to be a nullity once appellant has filed [a] civil action under CJP § 3-1701." *Id.*6 This Court has likewise concluded that the MIA decision under Insurance Article § 12-1001 does not bar a subsequent civil action under CJP § 3- 1701. See <u>Unitrin Auto & Home Ins. Co. v. Karp</u>, 481 F. Supp. 3d 514, 525–26 (D. Md. 2020), and other cases.

Here, the undisputed facts demonstrate that, instead of adjusting this loss in good faith, State Auto instead used Rod & Reel's claim for the improper purpose of advancing an ongoing dispute the insurer had with the Plaintiffs' public adjusters Goodman-Gable-Gould. In so doing, the management of State Auto removed the then current adjusters for the insurance company who were seeking to resolve the claim and installed new adjusters who utilized the Rod & Reel claim as a means of "teaching GGG a lesson."

## STATEMENT OF FACTS NOT IN DISPUTE

1.     The Plaintiffs operate a business located at 4160 Mears Ave., Chesapeake Beach, Md. 20732 (the "Property"), at which they operate various businesses including a hotel, restaurants, tackle shop, furniture storage, Pull Tab Bingo, Bingo, and various related enterprises. The insureds' location is also used for weddings that are conducted in close proximity to the loss location.

2.     The Plaintiffs insured their business, the buildings, and the personal property with an insurance policy written by State Auto, in which State Auto alone chose the wording of the Policy.[4]

## The Policy

3.     The Defendant State Auto issued a policy covering the Plaintiffs' property[5] and business and which provided blanket coverage for loss of business income and extra expense coverage.[6] Plaintiffs paid a premium of $133,985[7] for the combined coverages provided by State Auto and were provided $15,000,000 coverage limits for the business interruption and extra expense coverage (hereinafter "BI Coverage").[8]

---

[4] See Policy attached as Exhibit 1.
[5] See Exhibit 1 Policy at bates pgs. 1, 21, and 22.
[6] See Exhibit 1 Policy at bates pg. 23, with the coverage form being at pg. 82 et. seq.
[7] See Exhibit 1 Policy at bates pg. 2.
[8] See Exhibit 1 Policy at bates pg. 23.

4.      The Policy was issued, sold, and delivered to the Plaintiffs in the State of Maryland.[9]

5.      As to BI Coverage, the Policy provides blanket coverage limits of $15 million for Business Income including Extra Expense with Rental Value and included the following:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises . . . . The loss or damage must be caused by or result from a Covered Cause of Loss.

6.      The Policy Effective Date was 4/1/2014 and expiration date of 4/1/2015.[10]

7.      The Policy includes as a "Loss Condition" for "Appraisal" which can be triggered by either the Insurer or the Insureds as follows:[11]



**The Fire and the Claim**

8.      A fire occurred on February 8, 2015, at the Smokey Joe's Grill and Boardwalk Café,

---

[9]  See Exhibit 1 Policy at bates pgs. 1, 3, and 21.
[10] See Exhibit 1 Policy at bates pg. 21.
[11] See Exhibit 1 Policy at Bates pg. 85.

located at the Insured Property, which damaged the Property and caused a loss of business income, and incurred extra expenses.[12]

9.      The Plaintiffs made a claim for the damages to the buildings, and BIEE.   In connection with the claim, Rod & Reel hired Goodman-Gable-Gould Company ("GGG"), who are licensed public adjusters in Maryland.[13]  GGG appointed Neal Charkatz, a licensed public adjuster to the claim.[14]

10.     State Auto initially assigned Scott Terra to adjust the claim.[15]  Scott Terra had been with State Auto for 20 years[16] and was a large loss adjuster, claims manager, and claims supervisor.[17]  Mr. Terra's job was to handle and resolve all aspects of the claim.[18]  The claim was later re-assigned to Caroline Veahman who was a large loss adjuster and claims manager for State Auto.[19]

11.     The claim was accepted by State Auto as covered under the Policy.[20]  In particular, the BIEE loss was accepted by State Auto,[21] however, there was not an agreement on the payment due under the Policy's loss of business income and extra expense coverage.

12.     Scott Terra, the claims manager for State Auto who first adjusted the loss, was the one who determined the period of restoration for the loss for the Insurance Company.[22]  Mr. Terra determined the period along with State Auto's consultant Kevin Collier from Wakelee

---

[12] Deposition of Neal Charkatz Exhibit 9, pg. 11.
[13] Deposition of Neal Charkatz Exhibit 9, pg. 10.
[14] Deposition of Neal Charkatz Exhibit 9, pg. 10.
[15] Deposition of Sherri King Exhibit 2, pg. 13.  Deposition of Charkatz at Exhibit 9, pg. 20.
[16] Deposition of Scott Terra Exhibit 3, pg. 9-10.
[17] Deposition of Scott Terra Exhibit 3, pg. 8.
[18] Deposition of Scott Terra Exhibit 3, pg. 10.
[19] Deposition of Scott Terra Exhibit 3  pg. 16.
[20] See State Auto's Answer to paragraph 36 of the Amended Complaint.
[21] See State Auto's Answer to paragraph 37 of the Amended Complaint.
[22] Deposition of Sherri King Exhibit 2, pgs. 20-21.

Construction.[23]  State Auto determined the period of restoration to be 12 months based upon their construction consultant.[24]

13.     State Auto took into account the shrink-wrapping of the building and then doing repairs to put the building back into like kind and quality condition in determining the period of restoration.[25]

### State Auto has Agreed that the Period of Restoration Includes the shrink-wrapping of the building to reduce Wedding Revenue loss

14.     There were at least 2 venues on the Insureds' property, to wit:  the restaurant and a hotel or meeting center where the Insureds held weddings.[26]

15.     The sight and smell of the burned building would negatively impact the revenue from weddings conducted at the insureds' location, and Rod & Reel requested that the building be encapsulated (shrink-wrapped) for the wedding season.[27]   Mr. Charkatz discussed shrink-wrapping the building with Mr. Terra and testified that the Insureds:

> was about to enter into its wedding season and how it had an unsightly and smelly building that was going to A. pose challenges for its business, but B.  potentially ruin their wedding season out there over the course of the spring, summer and fall and so we discussed putting together  … a shrink wrapping of the building so that we could maintain that building, mitigate our lost business interruption claim for the summer and start the reconstruction sometime in the fall or late fall or winter….See Deposition of Neal Charkatz at Exhibit 9, pgs. 20-21.

16.     On April 13, 2015, Mr. Charkatz sent an email[28] to State Auto's adjuster Scott Terra which stated as follows:

---

[23] Deposition of Sherri King Exhibit 2, pg.  21.
[24] Deposition of Sherri King Exhibit 2, pg.  21
[25] Deposition of Sherri King Exhibit 2, pg. 22.
[26] Deposition of Scott Terra Exhibit 3, pg. 25.
[27] Deposition of Sherri King, Exhibit 2, pgs. 22-23.  Deposition of Terra deposition, Exhibit 3, pgs. 25-28. See Deposition of Wesley Donovan, Exhibit 12 at pgs. 25-26 and 27-28.
[28]  See Exhibit 7 for the email.  The shrink wrapping building proposal attached to the email is Exhibit 4 and the time sheets for doing the work is Exhibit 5.

From: Neal Charkatz <ncharkatz@gggco.com>
Sent: Monday, April 13, 2015 11:20 AM
To: Scott Terra (Scott.Terra@StateAuto.com) <Scott.Terra@StateAuto.com>
Subject: Rod & Reel Inc Temp Structure
Importance: High

Scott,

Attached is the proposal for the work the insured urgently wants to perform. It is a not to exceed
price of $60,850.00 with $7,200.00 for the construction manager/ permit expediter.

Please review the attached and let me know if you have any questions. It took some time for the
CM to get this agreed with the city, that's why it took longer to obtain the bid than originally
anticipated and the reason why we need your approval urgently. They need to get this work
completed before wedding season starts shortly.

Regards,

Neal M. Charkatz
General Adjuster
Goodman-Gable-Gould/ Adjusters International

17.     Mr. Terra for State Auto agreed to the proposal to shrink-wrapping the building in April

2015, which starts as soon as possible, and would remain shrink-wrapped through the wedding

season.[29]  Mr. Terra agreed to the shrink wrapping of the building to protect against losing any

further business income with regard to the wedding venue[30] and the hotel revenues.[31]  State Auto

agreed to pay for the shrink-wrapping in part because of the weddings.[32]

18.     Attached to that email were estimates that Rod & Reel had obtained to shrink-wrap the

building.[33]  The encapsulation work would "seal the structure and make it water tight" during

which time it was shrink wrapped, and work could not go on at the site.  The anticipated work

was as follows:  a.) Replace and/or encapsulate all charred lumber as a result of the recent fire

and b.) Secure the building envelope while making it esthetically acceptable to clientele.[34]

19.     The shrink-wrapping is "covering a building in plastic and using heat to . . . constrict or

---

[29] Deposition of Neal Charkatz Exhibit 9, pg. 22.  See also Exhibit 8 in which Mr. Charkatz noted State
Auto's approval of the shrink wrapping on April 14, 2015.
[30] Deposition of Terra Exhibit 3, pgs. 25-26
[31] Deposition of Terra Exhibit 3, pg. 27-28
[32] Deposition of  Terra Exhibit 3, pg. 28.
[33] See Exhibit 4 Scheibel Construction's March 2, 2015, estimate, and Robertson & Associates, Inc. (for
supervision) estimate dated March 31, 2015.
[34] Exhibit 4.

contract the plastic around the building."[35]

20.     Restoration work could not go on during the time the building was encapsulated or shrink wrapped.[36]

21.     State Auto informed its consultant Kevin Collier that they had allowed an additional 6 months' time for the shrink-wrapping of the building.[37]

22.     The shrink wrapping began on April 27, 2015, with the contractor being last on site on June 11, 2015.[38]  6 months from the shrink wrap approval on April 14, 2015, would be October 14, 2014, near the end of the wedding season.

23.     State Auto approved, and paid for, the shrink wrapping and agreed that the time period for which the building was to be shrink wrapped would be part of the period of restoration.[39]

24.     It is undisputed that the building would remain shrink wrapped for the wedding season and that the wedding season ran from early spring through late Fall.[40]  Mr. Terra for State Auto believed the time would run through November at the latest.[41]  Mr. Donovan believed the wedding season was mid-October.[42]

### The Reconstruction Work to Begin After the Wedding Season when the Shrink Wrapping was to be Removed

---

[35] Deposition of Kevin Collier State, State Auto's expert, Exhibit 6, pg. 21.

[36] Deposition of Kevin Collier State, Exhibit 6, pg. 23.

[37] Deposition of Kevin Collier State, Exhibit 6, pgs. 22 and 31. See also Scheibel Construction time sheets for shrink-wrapping work at Exhibit 5.

[38] Deposition of Kevin Collier, Exhibit 6 at pg. 30. See also Exhibit 5 for the time for the shrink-wrapping of the building.

[39] Deposition of Scott Terra Exhibit 3, pgs. 27-28.

[40] Deposition of Neal Charkatz Exhibit 9, pg. 21.  See also deposition of Terra at Exhibit 3, pgs. 27-28. Deposition of Wesley Donovan, Exhibit 12, pgs. 27-28.

[41] Deposition of Scott Terra Exhibit 3, pgs. 27-28.

[42] See Deposition of Wesley Donovan Exhibit 12, pg. 41 (To me when we remove the shrink wrap, you know, everyone agreed that the shrink wrap of the building had to go through the wedding season of 2015 which to me is October you know.  After that is when the period of restoration to me started); Deposition of Wesley Donovan Exhibit 12, pg. 44 (the end of the wedding season was "the second or third week of October.").

25.     State Auto's consultant believed the rebuild time would be 6 months[43] starting after the wedding season and the removal of the shrink wrap.[44]

26.     According to State Auto's corporate designee, the period of time necessary to rebuild the building was determined by Scott Terra in conjunction with Kevin Collier the Insurer's consultant.[45]  Kevin Collier determined that from the time the shrink wrap was removed until the time the period of restoration was over 6 months.[46]

27.     Accordingly, according to State Auto, the period of restoration would conclude 6 months after the shrink wrap was removed from Mid-October, which would result in the period of restoration running through mid-April.

**State Auto's Lack of Good Faith**

(a)     State Auto's Lack of Good Faith Using the Rod & Reel Claim to Teach the Public Adjuster a Lesson.

28.     In December 2016, State Auto's claim manager Scott Terra, and the Claim adjuster Caroline Veahman sought settlement authority because the case had no coverage issues, and the only issues were related to the amount of damages.[47]  Ms. Veahman was also clear that no coverage issues were involved when she testified as follows:

> Q      *Okay. And from your point of view, when you were on this file working with Mr. Terra on the Rod & Reel case, were there coverage issues involved?*
>
> A      *No.*

---

[43] Prior to being retained as an expert, State Auto's consultant Kevin Collier had not given an opinion on the time needed to reconstruct the building.  See Exhibit 6 Collier at 19.

[44] Deposition of Kevin Collier Exhibit 6, pg. 32.

[45] Deposition of Sherri King Exhibit 2, pg. 21.

[46] Deposition of Kevin Collier Exhibit 6, pg. 32.  See also Kevin Collier's report Exhibit 20, pg. 3.

[47] See testimony of Scott Terra Exhibit 3, pg. 36 in which he stated, "with all due respect to Bill (State Auto's attorney), it was a damages claim, not a coverage claim…".  See also Deposition of Veahman, Exhibit 27 at page 22 and 42.

> Q    *Was it fair to say that what was involved was loss measurement issues?*
>
> A    *Correct.[48]*

29.    State Auto's representative Scott Terra (as Claims Manager[49]) and Caroline Veahman (the adjuster for State Auto[50]) met with the Insureds and its public adjuster on December 12, 2016[51] in an attempt to reach a global resolution[52] on the claim.[53]

30.    Terra and Veahman for State Auto and Mr. Charkatz for the Insureds agreed that if the Business Income claim could not be resolved, it would be the subject of appraisal.[54]

31.    Although no agreement on the BI claim was reached at the meeting, Veahman and Terra discussed settlement at that meeting and felt that the claim was able to be settled.[55]

32.    Ms. Veahman and Mr. Terra left the meeting in the same vehicle[56] and made a call to Mark Chenetski, Director of Claims for large loss with State Auto, to go over the numbers and to seek settlement authority on a resolution Terra and Veahman had come up with in an effort to resolve the BI claim.[57]  During that call Ms. Veahman was requesting authority to settle the case with Rod & Reel.[58]  Terra and Veahman believe that, once authority was given, they had a resolution of the claim.[59]  While Mr. Chenetski cannot recall the conversation, he testified that he had no reason to believe it did not occur.[60]

---

[48] Deposition of Caroline Veahman Exhibit 27, pg. 22.
[49] Deposition of Scott Terra Exhibit 3, pg. 31.
[50] Deposition of Scott Terra Exhibit 3, pg. 31.
[51] The December 12, 2016, meeting was confirmed in an email at Exhibit 25, and in the log note entry by Ms. Veahman on page 8 of the log notes attached as Exhibit 26.  See also Veahman deposition Exhibit 27, pgs. 26-28.
[52] Deposition of Veahman Exhibit 27 at 30-31.
[53] Deposition of Scott Terra, Exhibit 3, pgs. 31-32 and Ms. Veahman's deposition at Exhibit 27, pg. 28-30
[54] Deposition of Scott Terra, Exhibit 3, pg. 32.
[55] Deposition of Caroline Veahman Exhibit 27, pgs. 30 and 31.
[56] Deposition of Scott Terra, Exhibit 3 pgs. 32-33
[57] Deposition of Scott Terra Exhibit 3, pg. 32-33, deposition of Caroline Veahman Exhibit 27, pgs. 33-35.
[58] Deposition of Caroline Veahman Exhibit 27, pgs. 39-40.
[59] Deposition of Scott Terra Exhibit 3 at pgs. 44-45.
[60] Deposition of Mark Chenetski Exhibit 10, at pg. 21, line 22 – page 22, line 15.

33.     In connection with the meeting, Ms. Veahman prepared a write-up of the meeting which she sent to Mr. Chenetski which included settlement recommendations.[61]   Ms. Veahman prepared a table and notes and either texted or sent the same to Mr. Chenetski.[62]   In her December 21, 2016, Ms. Veahman references the attached email.[63]  Ms. Veahman is positive that she prepared and sent the same to Mr. Chenetski.[64]

34.     State Auto has failed to produce that document and has either failed to preserve evidence or has secreted the same from discovery.[65]

35.     In his conversation with Ms. Veahman who was requesting authority to settle, Mr. Chenetski told her he needed to think about it.[66]

36.     On December 22, 2016, Mr. Chenetski sent an email to Ms. Veahman telling her that while he was comfortable with the manner in which the case had been handled, he was not ready to compromise the claim, and was bringing in a coverage claims examiner Sherri [King] and State Auto's attorney Bill Krekstein, both of whom were on the email, to review the claim.[67] Ms. Veahman had a conversation with Mr. Chenetski following that email in which she told him that he was owed an explanation as to why he was taking the file and giving it to an examiner when there was no coverage issue and Ms. Veahman believed she could get the claim resolved.[68]

37.     The involvement of Sherri King, a claims examiner,[69] and Bill Krekstein, the attorney for State Auto, meant that Mr. Chenetski no longer viewed this as a damage measure claim as did

---

[61] Deposition of Caroline Veahman, Exhibit 27 pgs. 34-37 and pgs. 38-40.
[62] Deposition of Caroline Veahman, Exhibit 27 pgs. 35-37, and 40.
[63] Exhibit 19.  Deposition of Caroline Veahman Exhibit 27, pg. 40.
[64] Deposition of Caroline Veahman,  Exhibit 27 pg. 37.
[65] A description of the document was given by Ms. Veahman who was positive she sent this chart to Mr. Chenetski and discussed it with him.  Deposition of Caroline Veahman,  Exhibit 27, pgs. 35-37.
[66] Deposition of Caroline Veahman, Exhibit 27 pgs. 40-42.
[67] Exhibit 19 and Deposition of Caroline Veahman Exhibit 27, pgs. 40-41.
[68]  Deposition of Caroline Veahman Exhibit 27, pg. 42.
[69] Sheri King, as a claims examiner, did not adjust loss measurements, but dealt with coverage issues and litigation.  Deposition of Caroline Veahman Exhibit 27, pg. 43, and at pgs. 21-22.

Mr. Terra and Ms. Veahman, but it meant some other issue was involved.[70]

38.     Ms. Veahman called Mr. Chenetski seeking an explanation from him as to why he was

taking the file and giving the file to a claims examiner when there was no coverage involved.[71]

In response, Mr. Chenetski told here that "this claim was bigger or the issues surrounding this

claim were bigger than just [her] loss."[72]  When she asked him to explain the following colloquy

occurred:

> A He told me that this claim was bigger or the issues surrounding this claim
>   was bigger than just my loss.
>
> Q What did you take that to mean?
>
> A I asked him what he meant by that and he said that there were other
>   claims with similar issues that they can leverage against trying to get this
>   claim resolved with the other ones.
>
> Q When he said other claims, you mean other claims by this insured? Did
>   he explain to you what he was talking about?
>
> A Other claims within the region.
>
> Q Other claims presented by who?
>
> A Other claims presented by the three G's.
>
> Q Goodman-Gable-Gould?
>
> A Yes.
>
> * * *
>
> A He explained to me that this claim was bigger than -- the issue was bigger
>   than this claim and that there were other claims that they could use to
>   leverage their claims against, try to get them resolved.[73]

39.     Ms. Veahman asked to be removed from the claim completely because the claim didn't

involve coverage or litigation, she felt she could resolve the claim without any examiner or

---

[70] Deposition of Scott Terra, Exhibit 3, pg. 36.
[71] Deposition of Caroline Veahman Exhibit 27, pg.  42.
[72] Deposition of Caroline Veahman, Exhibit 27, pg. 43.
[73] Deposition of Caroline Veahman, Exhibit 27 pgs. 43-44

attorney involvement.[74]

40.     Shortly after the claim had been reassigned to Ms. King and Mr. Krekstein, Terra attended a supervisors meeting for State Auto along with all other managers and supervisors.[75] Mr. Terra testified that:

Q   Okay. When did you next talk to Mr. Chenetski about this claim?

A   I went in for a supervisors' meeting in --it was either late January or early February.  That's when State Auto had all of their managers and supervisors in for meetings.

Q   Okay. And tell me what happened at that meeting.

A   We were going out to dinner. The office was right next to -- at the time, I think it was a Sheraton Hotel, and I had met with Mark Chenetski prior to us going to dinner, and we were up in the hotel bar/restaurant area having a -- having a drink.

Q.   Okay. And tell me what happened. Who said what to who?

A   I actually asked him about that in person, "What's the deal with Rod & Reel? It was something that we had the ability to resolve. As the claims manager with a large loss adjuster, we had resolved bigger claims than this one." And he said to me that, "It's not about this one claim.  There's a bigger overall issue," and that he wanted to teach the three G's a lesson.

Q   Well, now, to begin with, who is the "he" in this conversation? Mark Chenetski?

A   Mark Chenetski.  See Deposition of Scott Terra Exhibit 3 at page 38-39.

* * *

Q   And when you say, "claims with the three G's," you mean claims in which the three G's are representing an insured and you're representing an insurance company.

A   Yes, that's correct.

Q   Okay. So, when Mr. Chenetski told you he wanted to teach the three G's a lesson, what did that mean to you?

A   Well, he had referenced that there was three claims going on; one was with Sherri King and Randy Goodman; the other was with Jeff Fink in

---

[74] Deposition of Caroline Veahman, Exhibit 27 pg. 45.
[75] Deposition of Scott Terra, Exhibit 3, pg. 38.

Tybee Island down in South Carolina; and then we had this one up here in Maryland.

Q      Okay. So, it's three claims with three different insureds of State Auto. All of those three insureds had retained Goodman-Gable-Gould as their public adjusters; right?

A Yes.[76]

41.     Mr. Terra further testified that it would be improper to use a claim with an insured, to

teach a public adjuster involved a lesson.  The following colloquy occurred:

Q      Okay. Let me go back to the conversation that you had with Mr. Chenetski at the hotel.  You're sure you had that conversation with him; correct?

A      I'm positive.

Q      You have a recollection here sitting today of meeting with Mr. Chenetski and Mr. Chenetski saying that they needed to teach GGG a lesson on this file.

A      That's correct.

Q      All right. Have you ever thought it proper to teach a public adjuster a lesson at the expense of an insured?

A      I would never do that.

Q      It would be totally improper, would it not?

A      We adjust claims with the insured even though the vessel to resolving the claim is through the PA because they were hired to represent damages, not coverage, the value – the value of the loss.[77]

42.     Mr. Chenetski doesn't recall the meeting with Mr. Terra but does confirm that the

Sheraton, where Mr. Terra said the meeting occurred, is right next to his office.[78]

**Misrepresentations in Status Letters**

a.      Misrepresentation as to payment of the amount of Business Interruption which was calculated by State Auto.

43.     When an insurance company is involved in a claim to which there is a dispute as to the

measurement of the loss, the insurance company should pay at a minimum the undisputed

---

[76] See Deposition of Scott Terra Exhibit 3, pg. 41.
[77] See Deposition of Scott Terra Exhibit 3, pgs. 117-118.
[78] See Deposition of Mark Chenetski Exhibit 10, pg. 73 lines 13-22 and pg. 74 lines 1-2.

portion of the Business Interruption and Extra Expense claim.[79]

44.    By letter dated July 15, 2016, State Auto's forensic accountant had provided the insurer with that amount of the Business Interruption loss which the insurer did not dispute.  See Exhibit 14.  That letter concluded on pages 5 and 6  the following:  "Based on the above information we have calculated the Insured's business income loss to be $71,639 for the period of February 8, 2015 through February 7, 2016."[80]

45.    Sherri King, as the representative of State Auto, within a month after taking over the case from Ms. Veahman, by letter dated January 20, 2017, sent the Plaintiffs a letter that stated "As you are aware we have determined the period of restoration from February 8, 2015 from February 7, 2016.  We have evaluated the business income loss for this period and have paid that amount."[81]    This was over 6 months after State Auto had made its determination of the undisputed amount of Business Income.[82]

46.    State Auto's statement that the business interruption had been paid in its January 20, 2017 letter was false[83] since as of January 20, 2017, not a penny had been paid on the BI claim.[84]

47.    The amount of the BI claim at $71,639 was not paid until May of 2017 after the public adjuster made a demand for the same.[85]

48.    On May 24, 2017, the Public Adjuster for the insured sent an email to King which stated in part "please let me know if you need anything from me to issue the … $71,639 [undisputed

---

[79]  Deposition of Sherri King Exhibit 2, pg. 69.
[80]  Exhibit 14.  Deposition of Sherri King Exhibit 2, pg. 75 (referencing "the amount 71,639" Ms. King responded, "I believe that is what Christian Fox calculated a 12 month business income interruption loss at, yes.").
[81]  Exhibit 13.
[82]  In response, Mr. Charkatz sent an email referencing the December meeting with Ms. Veahman and Mr. Terra and stating that State Auto had said State Auto had made representations about a global settlement at that time.  See Exhibit 17.
[83]  Deposition of Neal Charkatz Exhibit 9, pg. 110
[84]  Deposition of Sherri King Exhibit 2, pgs. 68-69.
[85]  Deposition of Sherri King, Exhibit 2, pgs. 69-70.

amount of business interruption] at this time.[86]

49.     When Ms. King sent an email to Scott Terra on May 25, 2017, asking Scott Terra what the 71,639 represented, Terra responded back and confirmed that the "71,639 was "BI/EE that was never paid."[87]

50.     Despite being told that the Business Interruption payment had been made by January 20, 2017, that payment was not paid until check dated 5-30-17.[88]

          b.   <u>Misrepresentation as to payment of the amount of Actual Cash Value of the Building Loss</u>.

51.     In State Auto's January 20, 2017, letter to the insured State Auto stated that "… we have paid the actual cash value of the building repairs…".[89]

52.     That representation was false in that State Auto still owed additional monies on the actual cash value of the building.

53.     Four (4) months after the January letter, on May 24, 2017, the Public Adjuster for the insureds sent an email to King which stated in part "please let me know if you need anything from me to issue the $26,500 [actual cash value balance] … at this time.[90]

54.     When King sent an email to Scott Terra on May 25, 2017, asking Scott Terra what the $26,500 represented, Terra responded back and confirmed that this was "Additional ACV [actual cash value] that you guys agreed to ?  I think the total acv is what you agreed to but the payment is $26,500 short?"[91]

---

[86] Exhibit. 28.  See also Deposition of Sherri King Exhibit 2, pgs. 71-72.
[87] Exhibit 28.  Sherri King Deposition Exhibit 2, pgs. 76-77.
[88] See deposition of King at Exhibit 2, pgs. 77-78.  While the check says "undisputed ACV" above the signature, that was incorrect.  See deposition of Sherri King, Exhibit 2, pgs. 80-82.  See Exhibit 15
[89] Exhibit 13.
[90] See Exhibit 18 and Deposition of Sherri King Exhibit 2, pg. 72.
[91] See Exhibit 18 and Deposition of Sherri King, Exhibit 2, pgs. 76-77.

55.    That ACV amount was not paid until May 30, 2017.[92]

      c.   <u>Bad Faith Claim Under Md. Code Courts and Judicial Proceedings Article § 3- 1701(e); Insurance Article § 27-1001</u>.

56.    Rod & Reel filed a complaint with the MIA in accordance with § 12-1001(d)(1) on January 27, 2020.  The MIA issued a decision within the 90-day window prescribed by the statute.  Previously determined by the Court.[93]

57.    Rod & Reel complied with the preliminary administrative procedure that is outlined in Insurance Article § 12-1001. Because those procedures are statutorily prerequisite to filing an action in the Maryland Circuit Court under CJP § 3-1701.[94]

58.    This Court has ruled that Rod & Reel's compliance with Insurance Article § 27-1001 does not bar Rod & Reel from pursuing the instant action under CJP § 3-1701, and that Rod & Reel have met the statutory preconditions to seeking an award for extra contractual damages related to State Auto's failure to act in good faith. [95]

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-324 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 255 (1986). The Court may rely only on facts

---

[92] See Exhibit 16.  See Deposition of Sherri King, Exhibit 2, pgs. 79-80.
[93] Memorandum Opinion of Judge Grimm ruling on State Auto's Motion to Dismiss, Exhibit 11, pg. 4.
[94] Memorandum Opinion of Judge Grimm ruling on State Auto's Motion to Dismiss, Exhibit 11, pg. 14.
[95] Memorandum Opinion of Judge Grimm ruling on State Auto's Motion to Dismiss, Exhibit 11, pgs. 14-16.

supported in the record, not simply assertions in the pleadings. <u>Bouchat v. Balt. Ravens Football Club, Inc</u>., 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. <u>Id</u>. at 248-49.  When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" <u>Def. of Wildlife v. N.C. Dep't of Transp</u>., 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" <u>Id</u>. at 393.  Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. 2019).  <u>Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.</u>, 2020 U.S. Dist. LEXIS 38427, *14, 2020 WL 1063060

## <u>CHOICE OF LAW</u>

The parties agree that Maryland Choice of Law provisions apply.  However, the parties seem to suggest that Maryland law applies.  The policy was delivered in Maryland and covered Maryland properties.   Notably, "because the parties implicitly agree that Maryland law governs [*16]  their claims, [the Court] need not inquire further into the choice-of-law questions." <u>Vanderhoof-Forschner v. McSweegan</u>, 215 F.3d 1323 [published in full-text format at 2000 U.S. App. LEXIS 10682], 2000 WL 627644, at n.3 (4th Cir. 2000) (<u>citing Am. Fuel Corp. v. Utah Energy Dev. Co</u>., 122 F.3d 130, 134 (2d Cir. 1997)).  <u>Bethany Boardwalk Grp.</u>

LLC v. Everest Sec. Ins. Co., 2020 U.S. Dist. LEXIS 38427, *15-16, 2020 WL 1063060. Indeed, the Court in ruling on the Motion to Dismiss determined that Maryland law applied.

## **ARGUMENT**

The sole Policy issue presented as to the Plaintiffs' request for compensatory damages following the appraisal award, is whether the period of restoration runs from February 8, 2015, through at least April 8, 2016, or longer, or whether it runs from February 8, 2015 to February 8, 2016. Here it is undisputed that the appropriate time for restoration of the building runs through and beyond April 2016. Moreover, since the appropriate period of restoration in this matter runs from the date of loss (2-8-2015) through mid to late April 2016, the amount due is a simple matter of applying that fact to the matrix which binds both parties, and which in this case requires payment at $671,638[96] per the Appraisal Awarded matrix. This is established by the testimony of State Auto, the testimony of the Insured, the testimony of the public adjuster hired by the insureds, and the testimony of State Auto's expert.

*Background Facts*

In this case a February 8, 2015, fire damaged a restaurant leaving a burned and charred building. In connection with the claim, Rod & Reel hired Goodman-Gable-Gould Company, who are licensed public adjusters in Maryland. Goodman-Gable-Gould appointed Neal Charkatz to the claim. The Plaintiffs made a claim with State Auto, which the insurer initially assigned Scott Terra to adjust the claim.[97] Scott Terra had been with State Auto for 20 years[98] and was a large loss adjuster, claims manager, and claims supervisor.[99] Mr. Terra's job was to handle and

---

[96] Obviously, the insurer is entitled to a credit for prior payments made.
[97] Deposition of Sherri King Exhibit 2, pg. 13.
[98] Deposition of Scott Terra Exhibit 3, pg. 9-10.
[99] Deposition of Scott Terra Exhibit 3, pg. 8.

resolve all aspects of the claim.[100]   The claim was later re-assigned to Caroline Veahman who was a large loss adjuster and claims manager for State Auto.[101]   Scott Terra, determined the period of restoration for the loss for the Insurance Company[102] along with State Auto's consultant Kevin Collier.[103]   Coverage for the claim was accepted by State Auto,[104] with the only open issue to determine the business interruption being the time period for which the BI calculation would run.[105]   In determining the applicable time for the Business Interruption loss there are 2 germane time periods: (1) the time during which the building was shrink wrapped so as not to impair the wedding season; and (2) once the shrink wrap was removed, the time to effect the repairs.   The shrink wrapping involved "covering a building in plastic and using heat to . . . constrict or contract the plastic around the building."[106]   State Auto agreed to take into account the shrink-wrapping of the building and then doing repairs in determining the period of restoration.[107]

The fire damaged building was unsightly and smelled,[108] which would have created wedding cancellations at the insured location.   In order to avoid increasing the amount of business income loss that would result from the negative impact on the wedding business, the Plaintiffs and State Auto agreed that the building could be encapsulated and left in that state until the end of the wedding season.[109]   It is not disputed that State Auto agreed to this and that the building was in essence shrink wrapped, during which time restoration work could not occur.   In

---

[100] Deposition of Scott Terra Exhibit 3, pg. 10.
[101] Deposition of Scott Terra, Exhibit 3, pg. 16
[102] Deposition of Scott Terra Exhibit 3, pgs. 20-21.
[103] Deposition of Sherri King Exhibit 2, pg. 21.
[104] See State Auto's Answer to paragraph 36 of the Amended Complaint
[105] See State Auto's Answer to paragraph 37 of the Amended Complaint.
[106] See State Auto's expert Kevin Collier's deposition at Exhibit 6, pg. 21.
[107] Deposition of Sherri King Exhibit 2 pg. 22.
[108] Deposition of Wesley Donovan Exhibit 12, pg. 28.
[109] Deposition of Wesley Donovan Exhibit 12, pg. 28.

this case, it is undisputed that the end of the wedding season was either mid-October or November.  State Auto took into account the shrink-wrapping of the building and then doing repairs in determining the period of restoration.[110]

<u>**State Auto has Agreed that the Period of Restoration Includes the shrink-wrapping of the building to reduce Wedding Revenue loss**</u>

There were at least 2 venues on the Insureds' property, to wit:  the restaurant and a hotel or meeting center where the Insureds held weddings.[111]  The sight and smell of the burned building would negatively impact the revenue from weddings conducted at the insureds' location, and Rod & Reel requested that the building be encapsulated (shrink-wrapped) for the wedding season.[112]  Mr. Charkatz discussed shrink-wrapping the building with Mr. Terra and testified that the Insureds:

> [the Insured] was about to enter into its wedding season and how it had an unsightly and smelly building that was going to A. pose challenges for its business, but B.  potentially ruin their wedding season out there over the course of the spring, summer and fall and so we discussed putting together  … a shrink wrapping of the building so that we could maintain that building, mitigate our lost business interruption claim for the summer and start the reconstruction sometime in the fall or late fall or winter…[113]

On April 13, 2015, Mr. Charkatz sent an email[114] to State Auto's adjuster Scott Terra which attached the estimates to encapsulate or shrink wrap the building,[115] and which stated as follows:

> Attached is the proposal for the work the insured urgently wants to perform …. It took some time for the CM to get this agreed with the city, that's why it took longer to obtain the bid than originally anticipated, and the reason why we need

---

[110] Deposition of Sherri King Exhibit 2, pg. 22.

[111] Deposition of Scott Terra Exhibit 3, pg. 25.

[112] Deposition of Sherri King, Exhibit 2, pgs. 22-23.  Deposition of Scott Terra, Exhibit 3, pgs. 25-28.

[113] Deposition of Neal Charkatz Exhibit 9, pgs. 20-21.

[114] Attached to that email were estimates that Rod & Reel had obtained to shrink-wrap the building.  See Exhibit 4 Scheibel Construction's March 2, 2015 estimate, and Robertson & Associates, Inc. (for supervision) estimate dated March 31, 2015.  The encapsulation work would "seal the structure and make it water tight" during which time it was shrink wrapped, work could not go on at the site.  The anticipated work was as follows: (a.) Replace and/or encapsulate all charred lumber as a result of the recent fire and (b.) Secure the building envelope while making it esthetically acceptable to clientele

[115] Exhibit 4 for the estimate, Exhibit 7 for the email from Charkatz forwarding the shrink wrap estimate.

your approval urgently.  They need to get this work completed before the wedding season starts shortly.

State Auto agreed to the proposal to shrink-wrapping the building in April 2015, to start as soon as possible, and agreed that the building would remain shrink wrapped through the wedding season to avoid further business disruption.[116]  State Auto agreed to the shrink wrapping of the building to protect against losing any further business income with regard to the wedding venue[117] and the hotel revenues.[118]  State Auto agreed to pay the shrink-wrapping in part because of the weddings.[119]  The shrink wrapping began on April 27, 2015 with the contractor being last on site on June 11, 2015.[120]  State Auto approved, and paid for, the shrink wrapping and agreed that the time period for which the building was to be shrink wrapped would be part of the period of restoration.[121]

It is not contested that during the time period the building is shrink wrapped no work could be undertaken to make repairs to the building,[122] and that upon removal of the shrink wrapping the time to make the repairs would be 6 months.[123]  State Auto agreed that the building would remain shrink wrapped for the wedding season and that the wedding season ran from early spring through late Fall.[124]  Mr. Terra for State Auto testified that he had agreed that the shrink wrapping would remain through the wedding season until November at the latest.[125]   Mr.

---

[116] Deposition of Neal Charkatz, Exhibit 9, pg. 22.  See Exhibit 8 in which Charkatz noted State Auto's approval of the shrink wrapping on April 14, 2015.
[117] Deposition of Scott Terra Exhibit 3, pgs. 25-26
[118] Deposition of Scott Terra, Exhibit 3, pg. 27
[119] Deposition of Scott Terra, Exhibit 3, pg. 28.
[120] Deposition of Kevin Collier Exhibit 6, pg. 30.
[121] Deposition of Sherri King Exhibit 2, pg. 22.
[122] Deposition of Kevin Collier, Exhibit 6, pg. 23.
[123] Kevin Collier determined that from the time the shrink wrap was removed until the time the period of restoration was over was 6 months.  Deposition of Kevin Collier, Exhibit 6 pg. 32.
[124] Deposition of Neal Charkatz Exhibit 9, pg. 21.
[125] Deposition of Scott Terra, Exhibit 3, pgs. 27-28.

Donovan for the insured believed the wedding season was mid-October,[126] but further stated that the insureds' location was used to shoot an episode of *Say Yes to the Dress* the first weekend of November 2015.[127]

As a result, it is not disputed that the time period of restoration runs from the date of loss on February 8, 2015, through April/May 2016, and that as a result the Plaintiffs are entitled to a payment of Business Interruption of $671,638, less any prior payments made. This is clear under the matrix which this Court ruled determines the amount of the loss, and which has been supplemented in the chart below to show the time of shrink wrapping and the time of repair of the building.

As noted above, the period of restoration for determining the business interruption payment is broken into 2 general categories. First is the shrink wrapping of the damaged building for the 2015 during the wedding season. State Auto agrees that they (1) approved the shrink wrapping of the building;[128] (2) agreed that no construction could occur until after the shrink wrap was removed at the end of the wedding season;[129] (3) agreed that the wedding season would run through mid-October to November, after which the shrink wrap could be removed and repair work started,[130] and (4) agreed that the time to repair the building after removal of the shrink wrapping was 6 months.[131] Under these undisputed facts, the Plaintiffs are

---

[126] Deposition of Wesley Donovan Exhibit 12, pg. 41 (To me when we remove the shrink wrap, you know, everyone agreed that the shrink wrap of the building had to go through the wedding season of 2015 which to me is October you know. After that is when the period of restoration to me started); Donovan at pg. 44 (the end of the wedding season was "the second or third week of October.").

[127] Deposition of Wesley Donovan Exhibit 12, pg. 45.

[128] Deposition of Sherri King Exhibit 2, pg. 22.

[129] Deposition of Scott Terra Exhibit 3, pgs. 25-28.

[130] Deposition of Scott Terra Exhibit 3, pgs. 27-28. Deposition of Wesley Donovan Exhibit 9, pgs. 41, 44. See Mr. Charkatz's deposition at Exhibit 9, pg. 21.

[131] With repair work starting after the wedding season and the removal of the shrink wrap. See State Auto's expert Kevin Collier's deposition at Exhibit 6, pg. 32.

entitled to business interruption through mid – April of 2016 since this is 6 months following the end of the wedding season.  The Appraisal Award Matrix is as follows:

| Loss | Monthly | cummulative | Period of Restoration |
|------|---------|-------------|-----------------------|
| Feb-15 | $0.00 | $0.00 | |
| Mar-15 | $0.00 | $0.00 | |
| Apr-15 | $46,074.00 | $46,074.00 | Time during |
| May-15 | $65,485.00 | $111,559.00 | Which Bldg |
| Jun-15 | $63,470.00 | $175,029.00 | is Shrink |
| Jul-15 | $65,619.00 | $240,648.00 | Wrapped or |
| Aug-15 | $87,716.00 | $328,364.00 | Encapsulated |
| Sep-15 | $30,291.00 | $358,655.00 | |
| Oct-15 | $19,410.00 | $378,065.00 | |
| Nov-15 | $0.00 | $378,065.00 | |
| Dec-15 | $0.00 | $378,065.00 | 6 Months during |
| Jan-16 | $0.00 | $378,065.00 | which repairs |
| Feb-16 | $58,298.00 | $436,363.00 | to the building |
| Mar-16 | $78,179.00 | $514,542.00 | could occur |
| Apr-16 | $157,096.00 | $671,638.00 | |

The Plaintiffs are entitled to entry of summary judgment in accordance with the Court approved matrix of damages.  The only remaining issue is whether State Auto failed to act in good faith in adjusting this claim

## STATE AUTO'S LACK OF GOOD FAITH

"Maryland does not recognize a specific tort action against an insurer for bad faith failure to pay an insurance claim." Johnson v. Kemper Inc. Co., 74 Md. App. 243, 248, 536 A.2d 1211, 1212 (1988), cert. denied, 313 Md. 8, 542 A.2d 844 (Table) (1988).  However, failure to act in good faith in a civil action to (i) determine the coverage that exists under a policy; or (ii). To determine the extent to which the insured is entitled to receive payment from the insurer for a covered loss.  See CJP 3-1701(d)(1).

C.J.P. § 3-1701 and its companion, Ins. § 27-1001, comprise a State statutory cause of action created in 2007. *See* 2007 Md. Laws, ch. 150 allowing an insured civil relief if an insurer fails to act in good faith in considering, adjusting and paying an insurance claim.  Taken together, the two statutes require an insurer to make "an informed judgment based on honesty

26

and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." C.J.P. § 3-1701(a)(5); Md. Ins. § 27-1001(a) (same). The statutes authorize a cause of action against an insurer that fails to act in good faith in acting to "determine the extent to which the insured is entitled to receive payment from the insurer for a covered loss" and which authorize the insured to recover "actual damages," up to the limits of the applicable insurance policy, along with attorneys' fees, expenses, other litigation costs, and interest. C.J.P. § 3-1701(e).  Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., Civil Action No. ELH-16-3431, 2018 U.S. Dist. LEXIS 49023, at *23 (D. Md. Mar. 23, 2018).  With the passage of CJP § 3-1701, the General Assembly created a statutory cause of action for "first-party claims under property and casualty insurance policies or individual disability insurance policies issued, sold, or delivered in the State." CJP § 3-1701(b). Betskoff v. Standard Guar. Ins. Co., No. 1444, 2018 Md. App. LEXIS 877, at *8-9 (App. Sep. 18, 2018).  Here since the policy was delivered in Maryland, to an insured in Maryland, and insuring a property located in Maryland, the statutes apply.

A claim under C.J. § 3-1701 is ordinarily subject to an administrative exhaustion requirement with the MIA. See C.J. § 3-1701(c)(1); see also Ins. § 27-1001(c)-(g).  Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., Civil Action No. ELH-16-3431, 2018 U.S. Dist. LEXIS 49023, at *23 (D. Md. Mar. 23, 2018).  While there is an administrative exhaustion requirement, the Plaintiffs met that precondition when Rod & Reel filed a Complaint with the MIA in accordance with § 12-1001(d)(1) on January 28, 2020.  The MIA issued a decision within the 90-day window prescribed by the statute.  This was already the subject of a challenge by State Auto in a Motion to Dismiss which was ruled upon by this Court in a Memorandum Opinion dated 2-24-2022.  In denying State Auto's Motion to Dismiss, the Court

noted that CJP § 3-1701 and Insurance Article § 27-1001 mandate that claims against an insurer for failing to act in good faith must be brought in the MIA before an insured may file such claims in the Maryland Circuit Court. As this Court has already ruled, the Plaintiffs have met the preconditions to seeking the extra contractual recoveries mandated when an insurer fails to act in good faith in a first-party claim like that at bar. Indeed, the Plaintiffs have met all preconditions for this action and has already been the subject of a Motion to Dismiss by the Defendants, which was denied with a comprehensive memorandum opinion.

The only question, therefore, is whether State Auto has acted in Good Faith in determining the extent to which Rod & Reel is entitled to receive payment from the insurer for a covered loss in this matter. There is a paucity of guidance as to what could constitute a lack of good faith. As was noted in Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., Civil Action No. ELH-16-3431, 2018 U.S. Dist. LEXIS 49023, at *25-26 (D. Md. Mar. 23, 2018), "[c]ases construing section 3-1701's good-faith standard are sparse." All Class Const., LLC, 3 F. Supp. 3d at 416. However, consideration of the statutory definition of "Good faith" it routinely the starting point. The definition of "good faith" has the same definition under § 27-1001(a) and § 3-1701(a)(4), to wit:—"an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." Carlyle v. Travelers Home & Marine Ins. Co., No. WDQ-13-2964, 2014 U.S. Dist. LEXIS 78890, at *14 n.18 (D. Md. June 5, 2014). In Cecilia Schwaber Tr. Two v. Hartford Accident & Indem., Co., 636 F. Supp. 2d 481, 485-86 (D. Md. 2009) the Court considering that definition, rejected a narrow "fairly debatable standard"[132], but instead noted that the above

---

[132] "Under the 'fairly debatable' standard [rejected in Schwaber], a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." Schwaber at 482.

statutory definition of "good faith" focuses on the actions taken by the insurer in forming a judgment as to coverage, as well as what the insurer knew or should have known at the time it denied coverage to its insured.[133]   The Court went on to observe that while good faith may be defined, "the action here is for failure to act in "good faith," as opposed to an action for "bad faith." Maryland courts have indicated that the two are not the same. See State v. Booze, 334 Md. 64, 637 A.2d 1214, 1222 (Md. 1994) (noting that "not acting in bad faith is not the same as acting in good faith and/or with good cause"); Zdravkovich v. Bell Atlantic-Tricon Leasing, Corp., 323 Md. 200, 592 A.2d 498, 503 (Md. 1991) ("The District Court's finding that Zdravkovich 'has not shown good faith' is not the equivalent of a finding of 'bad faith' . . . ."); Art Form Interiors, Inc. v. Columbia Homes, Inc., 92 Md. App. 587, 609 A.2d 370, 376 (Md. Ct. Spec. App. 1992) (noting that "a finding that a party has not shown good faith is not the functional equivalent of a finding of bad faith"). But see Catterton v. Coale, 84 Md. App. 337, 579 A.2d 781, 783 (Md. Ct. Spec. App. 1990) ("To further illuminate the definition of 'good-faith,' we found it most instructive to compare the definition of 'bad-faith.' 'Bad-faith' is the opposite of good faith . . . ."). Cecilia Schwaber at 486 (D. Md. 2009).  The Court went on to explain the standard as follows:

> An evaluation of whether an insurer made an "informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time" of its coverage decision requires, for example, an evaluation of the insurer's efforts to obtain information related to the loss, accurately and honestly assess this information, and support its conclusion regarding coverage with evidence obtained or reasonably available. Cecilia Schwaber Tr. at 487.

---

[133] The Court noted that the only other guidance as to the meaning of failure to act in good faith is provided in subsection (f) of the statute: "An insurer may not be found to have failed to act in good faith under this section solely on the basis of delay in determining coverage or the extent of payment to which the insured is entitled if the insurer acted within the time period specified by statute or regulation for investigation of a claim by an insurer." Id 482.  In this case, the lack of good faith is not based "solely" on delay in determining the extent of the payment.

While most of the cases on lack of good faith revolved around coverage issues, the statutes are clear that the duty also applies to determining the amount owed with regard to a covered loss.  In this case, the sworn testimony of State Auto's own claims manager and claims adjuster demonstrates that the insurer utterly failed to act in good faith as is discussed below.   On multiple occasions, judges in this District have adopted a "totality of the circumstances" test. Id. at 25-26, citing, <u>Barry v. Nationwide Mut. Ins. Co.</u>, JKB-17-3070, 298 F. Supp. 3d 826, 2018 U.S. Dist. LEXIS 19300, 2018 WL 724068, at *3 (D. Md. Feb. 6, 2018) (quoting <u>All Class Const., LLC</u>, 3 F. Supp. 3d at 416); see also <u>Cecilia Schwaber Trust Two v. Hartford Acc. and Indem. Co</u>., 636 F. Supp. 2d 481, 486-87 (D. Md. 2009). While the "totality of circumstances test" typically only focuses on determinations of Coverage, that test is flexible enough to allow consideration of the motives of State Auto in this case which clearly demonstrate a lack of good faith to the insureds, while attempting to teach the public adjuster involved a lesson. Under the totality of circumstances test, for example, "an evaluation of whether an insurer investigated a claim in good faith "'requires, for example, an evaluation of the insurer's efforts to obtain information related to the loss, accurately and honestly assess this information, and support its conclusion regarding coverage with evidence obtained or reasonably available.'" <u>All Class Const., LLC</u>, 3 F. Supp. 3d at 416 (quoting <u>Cecilia Schwaber</u>, 636 F. Supp. 2d at 487). And, notably, "the determination as to good faith focuses on the time at which the insurer's decision was made, not at a later point in subsequent litigation when all involved have the benefit of additional evidence." <u>Id</u>. (quoting <u>Cecilia Schwaber</u>, 636 F. Supp. 2d at 487-88).

Here the facts clearly indicate that State Auto had determined that there were no coverage issues as to the Plaintiffs' claim.[134]  The only issues involved were measuring the loss.[135]  In

---

[134] See testimony of State Auto claim's manager Scott Terra, Exhibit 3 at pg. 36 in which stated, "with all due respect to Bill (Krekstein State Auto's attorney), it was a damages claim, not a coverage claim…".

December State Auto employees Scott Terra and Caroline Veahman had met with the Plaintiff and their public adjusters in an attempt to reach a global settlement.[136]  Veahman and Terra left the meeting in the same vehicle and made a call to Mark Chenetski, director of claims for State Auto, to go over the numbers and to seek settlement authority to resolve the BI claim.[137]  Ms. Veahman prepared a write up of the meeting with a table and notes to support her request for settlement authority, however, State Auto has failed to produce the document in discovery.[138]  Mr. Chenetski told Ms. Veahman he would have to think about it.[139]

On December 22, 2016, Mr. Chenetski sent an email to Ms. Veahman telling her that while he was comfortable with the manner in which the case had been handled, he was not ready to compromise the claim, and was bringing in a coverage claims examiner Sherri [King] and State Auto's attorney Bill Krekstein, both of whom were on the email, to review the claim.[140]  The involvement of Ms. King and Mr. Krekstein made no sense since there were no coverage issues, and their involvement would only be necessary if there was a coverage issue.[141]  Ms. Veahman called Mr. Chenetski seeking an explanation from him as to why he was taking the file

---

See also testimony Caroline Veahman that no coverage issues were involved.  Deposition of Caroline Veahman, Exhibit 27 pg. at 22 (there were no coverage issues involved, on the loss measurement).

[135] Deposition of Caroline Veahman, Exhibit 27 pg. 22.  See also testimony of Scott Terra Exhibit 3, at pg. 36 "it was a damages claim, not a coverage claim."

[136] Deposition of Scott Terra's Exhibit 3, pgs. 31-32 and Deposition of Caroline Veahman, Exhibit 27, pg. 28.  The December 12, 2016, meeting was confirmed in an email at Exhibit 25, and in the log note entry by Ms. Veahman on page 7 of the log notes attached as Exhibit 26.

[137] Deposition of Scott Terra Exhibit 3 pg.  33, Deposition of Caroline Veahman, Exhibit 27 pgs. 33-35.

[138] In connection with the meeting, Ms. Veahman prepared a write-up of the meeting which she sent to Chenetski which included the settlement recommendations.   See Deposition of Caroline Veahman, Exhibit 27 at pg. 33.  Ms. Veahman prepared a table and notes and either texted or sent the same to Mr. Chenetski.  See Deposition of Caroline Veahman, Exhibit 27, pgs. 35-36, and 40.  In her December 21, 2016, Ms. Veahman references the attached email.  See Exhibit 19.  Ms. Veahman is positive that she prepared and sent the document to Mr. Chenetski.  Deposition of Caroline Veahman, Exhibit 27, pg. 37.

[139] Deposition of Caroline Veahman, Exhibit 27, pg.  40.

[140] Exhibit 19.  Deposition of Caroline Veahman, Exhibit 27, pgs. 40-41.

[141] Deposition of Scott Terra Exhibit 3, pg. 36.

and giving the file to a claims examiner when there was no coverage involved.[142]   In response, Mr. Chenetski told here that "this claim was bigger or the issues surrounding this claim were bigger than just [her] loss."[143]   When she asked him to explain the following colloquy occurred:

> A He told me that this claim was bigger or the issues surrounding this claim was bigger than just my loss.
>
> Q What did you take that to mean?
>
> A I asked him what he meant by that and he said that there were other claims with similar issues that they can leverage against trying to get this claim resolved with the other ones.
>
> Q When he said other claims, you mean other claims by this insured? Did he explain to you what he was talking about?
>
> A Other claims within the region.
>
> Q Other claims presented by who?
>
> A Other claims presented by the three G's.
>
> Q Goodman-Gable-Gould?
>
> A Yes.
>
> * * *
>
> A He explained to me that this claim was bigger than -- the issue was bigger than this claim and that there were other claims that they could use to leverage their claims against, try to get them resolved.[144]

Ms. Veahman asked to be removed from the claim completely because the claim didn't involve coverage or litigation, she felt she could resolve the claim without any examiner or attorney involvement.[145]   Shortly after the claim had been reassigned to Ms. King and Mr. Krekstein, and shorly after Ms. Veahman asked to be removed from the claim, Scott Terra attended a supervisors meeting for State Auto along with all other managers and supervisors. Terra at pg.

---

[142] Deposition of Caroline Veahman Exhibit 27, pg. 42.
[143] Deposition of Caroline Veahman Exhibit 27, pg. 43.
[144] Deposition of Caroline Veahman Exhibit 27, pgs. 43-44
[145] Deposition of Caroline Veahman Exhibit 27, pg. 45

38.  Mr. Terra testified that:

Q   Okay. When did you next talk to Mr. Chenetski about this claim?

A   I went in for a supervisors' meeting in --it was either late January or early February.  That's when State Auto had all of their managers and supervisors in for meetings.

Q   Okay. And tell me what happened at that meeting.

A   We were going out to dinner. The office was right next to -- at the time, I think it was a Sheraton Hotel, and I had met with Mark Chenetski prior to us going to dinner, and we were up in the hotel bar/restaurant area having a -- having a drink.

Q.  Okay. And tell me what happened. Who said what to who?

A   I actually asked him about that in person, "What's the deal with Rod & Reel? It was something that we had the ability to resolve. As the claims manager with a large loss adjuster, we had resolved bigger claims than this one." And he said to me that, "It's not about this one claim.  There's a bigger overall issue," and that he wanted to teach the three G's a lesson.

Q   Well, now, to begin with, who is the "he" in this conversation? Mark Chenetski?

A   Mark Chenetski.


Mr. Terra further testified that it would be improper to use a claim with an insured, to teach a public adjuster involved a lesson.  The following colloquy occurred:

Q   Okay. Let me go back to the conversation that you had with Mr. Chenetski at the hotel.  You're sure you had that conversation with him; correct?

A   I'm positive.

Q   You have a recollection here sitting today of meeting with Mr. Chenetski and Mr. Chenetski saying that they needed to teach GGG a lesson on this file.

A   That's correct.

Q   All right. Have you ever thought it proper to teach a public adjuster a lesson at the expense of an insured?

A   I would never do that.

Q   It would be totally improper, would it not?

> A    We adjust claims with the insured even though the vessel to resolving the
> claim is through the PA because they were hired to represent damages, not
> coverage, the value – the value of the loss

There is simply no explanation which could account for the behavior of State Auto as outlined above.  The insurer has an affirmative duty is to act in good faith in determining the extent to which the insured is entitled to receive payment from the insurer for a covered loss.  See CJP 3-1701(d)(1).  Good faith required State Auto to use informed judgment based on honesty and diligence supported by evidence in caring out that duty.  There is simply no way that State Auto can square its decision not to pay the Insureds' claim in order to "teach a lesson" to the insureds' public adjuster, with the affirmative duty of good faith.  Public Adjusters are licensed in Maryland and an insured has an absolute right to use the same.  An insurer's decision to abdicate its duty of good faith to its insured in order to penalize its public adjuster is a clear violation of the Insurer's duty of good faith.

State Auto's lack of good faith following its decision to remove the adjusters from the claim and to use Rod & Reel's claim for the "bigger picture" of teaching the public adjuster a lesson continued.  Shortly after the meeting between Mr. Chenetski and Mr. Terra where State Auto's illicit plan was discussed, State Auto sent a letter to the Insureds which was rife with admitted misrepresentations and by which State Auto withheld payments due to Rod & Reel.  State Auto does not dispute that when an insurance company is involved in a claim to which there is a dispute as to the measurement of the loss, the insurance company should pay at a minimum the undisputed portion of the Business Interruption and Extra Expense claim.[146]  By letter dated July 15, 2016, State Auto's forensic accountant had provided the insurer with that amount of the Business Interruption loss which the insurer did not dispute.[147]   That letter

---

[146] Deposition of Sherri King Exhibit 2, pg.  69.
[147] Exhibit 14.

concluded on pages 5 and 6  the following:  "Based on the above information we have calculated the Insured's business income loss to be $71,639 for the period of February 8, 2015 through February 7, 2016."[148]  By its own admission State Auto had a duty to pay this undisputed amount sometime shortly after it was determined in mid-July of 2016.   However, this amount was withheld from payment.

On January 20, 2017, within a month after taking over the case from Ms. Veahman, Sherri King as the representative of State Auto, sent the Plaintiffs a letter that stated

> As you are aware we have determined the period of restoration from February 8, 2015 from February 7, 2016.  We have evaluated the business income loss for this period and have paid that amount.[149]

State Auto's statement that the business interruption had been paid in its January 20, 2017 letter was false since as of January 20, 2017 not a penny had been paid on the BI claim.[150]  Significantly that letter was sent to the Public Adjuster with a copy to Rod & Reel, leading the insureds to believe that their public adjuster had received funds and not remitted the same to the insured.  Far from complying with its duty of good faith owed to Rod & Reel, State Auto simply ignored its obligations to its insureds, and instead began an attack on the Public Adjuster.  The amount of the BI claim at $71,639 was not paid until May of 2017 after the public adjuster made a demand for the same.[151]  Ten (10) months after State Auto determined the minimum Business Interruption payment amount, and 4 months after having misrepresented to the insured that

---

[148] Exhibit 14.  Deposition of Sherri King Exhibit 2, pg. 75 (referencing "the amount 71,639" King responded, "I believe that is what Christian Fox calculated a 12 months business income interruption loss at, yes.").
[149] Exhibit 13.
[150] Deposition of Sherri King Exhibit 2, pgs. 68-69.
[151] Deposition of Sherri King, Exhibit 2 at pgs. 69-70.  On May 24, 2017, the Public Adjuster for the insured sent an email to King which stated in part "please let me know if you need anything from me to issue the … $71,639 [undisputed amount of business interruption] at this time.  See Exhibit. 28.  See also Deposition of Sherri King Exhibit 2, pg. 72

Business Interruption payment had been, that payment was made by check dated 5-30-17.[152]

The January 20, 2016, letter also misrepresented that the Actual Cash Value of the building had been paid.  In State Auto's January 20, 2017, letter to the insured State Auto stated that "… we have paid the actual cash value of the building repairs…".[153]  Again, the Insured was falsely led to believe that the Public Adjuster had received the full actual cash value of the claim when such payment had not been made.  On May 24, 2017, the Public Adjuster for the insured sent an email to King which stated in part "please let me know if you need anything from me to issue the $26,500 [actual cash value balance] … at this time.[154]  That agreed upon ACV was not paid until May 30, 2017, months after State Auto told the insured that it had been paid.[155]

There can be no question that State Auto has breached its affirmative duty to treat Rod & Reel in good faith.  When the claim was on the verge of settlement, management at State Auto conceived of a scheme to use the claim of Rod & Reel to teach GGG a lesson.  They did this by refusing to offer a reasonable settlement, and instead, withholding payments which were due, by misrepresenting facts to the Insured to lead them to believe that a payment had been made to their public adjuster when in fact no such payment had been made, and by requiring the insured to institute this suit to be paid on a claim in which there are no cove rage issues.  State Auto's scheme was conceived of in December 2016 and now, over 6 years later, the claim has yet to be resolved.  Indeed, there is absolutely no way to square State Auto's decision to use Rod & Reel's case to teach a public adjuster a lesson with the insurer's duty to Rod & Reel to make an "informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time" it made its decision not to authorize settlement of this claim.

---

[152] Exhibit 15. While the check says "undisputed ACV" above the signature, that was incorrect.  See Deposition of Sherri King Exhibit 2, pgs. 80-81.
[153] Exhibit 13.
[154] Exhibit 18.  Deposition of Sherri King, Exhibit 2 at pg. 72.
[155] Exhibit 16.

Part of the lesson was to send a letter to Rod & Reel which misrepresented that it had paid the undisputed portion of the BI claim, when in fact no payment had been made at all. This is even more suspect when State Auto knew on July 16, 2016, the amount that it would eventually pay in May/June of 2017, almost a year later. If further misrepresented that it had paid the full Actual Cash Value of the loss when it had not. Finally, State Auto has either concealed or destroyed evidence in this case which was prepared by Caroline Veahman and described the amounts she recommended for payment in this matter. There is simply no way that State Auto can square its treatment of the insured with meeting its affirmative duty to treat the insured in good faith.

## **CONCLUSION**

WHEREFORE for the reasons stated herein, and for any reasons advanced at the argument hereon, it is requested that the Court grant summary judgment for the Plaintiffs and against the Defendant  State Automobile Mutual Insurance Company, and award the Plaintiffs as their "actual damages" of $671,638 as to the Business Interruption claim, less any payments made on the business interruption claim by State Automobile Mutual Insurance Company; plus find that State Automobile Mutual Insurance Company has failed to act in good faith in this matter and award the Plaintiffs their attorneys' fees, expenses, other litigation costs, and prejudgment interest pursuant to C.J.P. § 3-1701(e), and for such other relief as to this Court may seem just and fair.

> CHESAPEAKE BEACH RESORT AND SPA, CHESAPEAKE BEACH HOTEL AND SPA SMOKEY JOE'S GRILL AND BOARDWALK CAFÉ, AND CHESAPEAKE AMUSEMENT, INC. T/A ROD-N-REEL BINGO
> By Counsel

*/s/ C. Thomas Brown, Esquire*
C. Thomas Brown, Esquire
Erik B. Lawson, Esquire
SILVER & BROWN, P.C.
10621 Jones Street, Suite 101
Fairfax, Virginia 22030
tom@virginia-lawyers.net
erik@virginia-lawyers.net
(703) 591-6666 /  (703) 591-5618 – Facsimile
*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on the 2nd day of February 2023, I electronically filed the *Memorandum in Support of Motion for Summary Judgment* with the Clerk of Court using CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Matthew Malamud, Esquire
William Owen Krekstein, Esquire
HORST KREKSTEIN & RUNYON, LLC
610 W Germantown Pike, Suite 350
Plymouth Meeting, PA 19462
(484) 243-6868 / (484) 351-8214 – Facsimile
Email: wkrekstein@timoneyknox.com
Email: mmalamud@timoneyknox.com
*Attorney for State Automobile Mutual Insurance Company*


*/s/ C. Thomas Brown*
C. Thomas Brown, Esquire
Erik B. Lawson, Esquire
SILVER & BROWN, P.C.
10621 Jones Street, Suite 101
Fairfax, Virginia 22030
tom@virginia-lawyers.net
erik@virginia-lawyers.net
(703) 591-6666 / (703) 591-5618 – Facsimile
*Attorneys for Plaintiffs*