# EXHIBIT 3



# Transcript of Scott Terra

**Date:** August 24, 2022
**Case:** Rod & Reel, Inc., et al. -v- State Automobile Mutual Insurance Company

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF MARYLAND
3    - - - - - - - - - - - - - -x
4   ROD & REEL, INC.,        :
5   et al.,                  :
6          Plaintiffs,       :
7     v.              :   Case No. PWG 20-cv-3388
8   STATE AUTOMOBILE         :
9   MUTUAL INSURANCE         :
10  COMPANY,                 :
11          Defendant.   :
12   - - - - - - - - - - - - - -x
13
14       Videotaped Deposition of SCOTT TERRA
15            Conducted Virtually
16          Wednesday, August 24, 2022
17              10:01 a.m. ET
18
19
20   Job No.: 454256
21   Pages: 1 - 132
22   Reported By: Victoria Lynn Wilson, RMR, CRR
```

**2**

```
1        Videotaped Deposition of SCOTT TERRA,
2   conducted virtually.
3
4
5
6
7
8
9        Pursuant to notice and subpoena, before
10  Victoria Lynn Wilson, Registered Merit Reporter,
11  Certified Realtime Reporter, Notary Public in and
12  for the State of Maryland.
13
14
15
16
17
18
19
20
21
22
```

**3**

```
1              A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3      C. THOMAS BROWN, ESQUIRE
4      SILVER & BROWN, PC
5      10621 Jones Street
6      Suite 101
7      Fairfax, VA 22030
8      (703) 591-6666
9
10  ON BEHALF OF THE DEFENDANT:
11     WILLIAM O. KREKSTEIN, ESQUIRE
12     HORST KREKSTEIN & RUNYON, LLC
13     610 W. Germantown Pike
14     Suite 350
15     Plymouth Meeting, PA 19462
16     (484) 243-6878
17
18  ALSO PRESENT:
19     Julio Mendieta, Planet Depos Remote Tech
20     Adam Nudelman, Videographer
21
22
```

**4**

1              C O N T E N T S
2   EXAMINATION OF SCOTT TERRA        PAGE
3      By Mr. Brown            7
4      By Mr. Krekstein        46
5      By Mr. Brown            107
6      By Mr. Krekstein        118
7      By Mr. Brown            123
8              E X H I B I T S
9         (Attached to transcript)
10  EXHIBITS                    PAGE
11  Exhibit 1   Claims Log            12
12  Exhibit 2   6/21/15 GA Status Report     20
13  Exhibit 3   3/31/15 Letter from Robertson
14          to Donovan              24
15  Exhibit 4   4/14/15 Email Chain from
16          Charkatz            26
17  Exhibit 5   King Deposition Exhibit 2
18          (Retained by counsel)     29
19  Exhibit 6   12/21/16 Email Chain from
20          Terra               34
21  Exhibit 7   4/12/16 Email Chain
22          (Plaintiffs' Production 000092)  74

**Page 5**

1     E X H I B I T S   C O N T I N U E D
2  EXHIBIT                         PAGE
3  Exhibit 8    7/15/16 Letter from Meaden &
4        Moore (Rod & Reel
5        3448-3453)               75
6  Exhibit 9    5/25/15 Email Chain from
7        Terra (R&R 3799-3802)    101
8  Exhibit 10   12/7/16 Email Chain from
9        Charkatz (King No. 7)    110
10 Exhibit 11   4/12/16 Email from Charkatz
11       (King No. 4)             113
12 Exhibit 12   Rollins Schedules      114
13 Exhibit 13   2/14/15 Wakelee Estimate   119
14
15
16
17
18
19
20
21
22

**Page 6**

1     P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins tape number
3  one in the videotaped deposition of Scott Terra in
4  the matter of Rod & Reel, Inc., et al., versus
5  State Automobile Mutual Insurance Company, in the
6  U.S. District Court for the District of Maryland,
7  Case Number PWG 20-CV-3388.
8        Today's date is August 24th, 2022.  Time
9  on the record is 10:01 a.m.
10       The videographer today is Adam Nudelman
11 representing Planet Depos.
12       This video deposition is taking place
13 remotely.
14       Would all counsel please voice identify
15 themselves and state whom they represent.
16       MR. BROWN:  C. Thomas Brown representing
17 the plaintiffs.
18       MR. KREKSTEIN:  William Krekstein for
19 State Auto.
20       THE VIDEOGRAPHER:  Court reporter today is
21 Vicky Wilson, also Planet Depos.  She will now
22 administer the oath and we can proceed.

**Page 7**

1              SCOTT TERRA,
2  having been duly sworn, testified as follows:
3        MR. KREKSTEIN:  Usual stipulations, Tom?
4        MR. BROWN:  Yes, usual stipulations.
5        MR. KREKSTEIN:  Thanks.
6  EXAMINATION BY COUNSEL ON BEHALF OF THE PLAINTIFFS
7  BY MR. BROWN:
8     Q  Mr. Terra, my name is Tom Brown.  I
9  represent Rod & Reel and a number of other
10 plaintiffs in a case involving a fire loss.  I
11 would like to -- have you been deposed before,
12 Mr. Terra?
13    A  I have.
14    Q  Okay.  So, you know the basic rules.  Let
15 me finish my question before you give me your
16 answer.  You'll have to give an audible response.
17 I may ask you if that's a "yes" or that's a "no"
18 if you shake your head one way or another.  Other
19 than that, let's move on and get it going.  Okay?
20    A  Okay.
21    Q  If you can state your name and address,
22 sir.

**Page 8**

1     A  Scott Terra.
2     Q  Mr. Terra, what is your occupation?
3     A  I'm a claims manager for Central Mutual
4  Insurance Company --
5     Q  How long --
6     A  -- and I'm being deposed as an adjuster
7  for State Auto Mutual Insurance Company.
8     Q  Okay.  How long have you worked for your
9  current employer?
10    A  I've been here two -- a little over
11 two-and-a-half years.
12    Q  And before that, who did you work with?
13    A  State Auto Mutual Insurance Company.
14    Q  In what capacity?
15    A  As the large loss adjuster, claims
16 manager, claims supervisor.
17    Q  Okay.  Are you familiar with a loss known
18 as "Rod & Reel"?
19    A  Yes, I am.
20    Q  And how did you become aware of that loss?
21    A  I was the handling adjuster back when the
22 loss occurred, and I was the adjuster that went

9

1  out there and initially inspected the loss and
2  resolved the contents and the building claim with
3  Neal Charkatz from Goodman, Gable & Gould.
4      Q  Okay.  Before we get into that, I guess I
5  jumped in a little too quick.  Let me -- let me
6  get a little bit -- what is your educational
7  background?
8      A  Springfield Technical Community College,
9  Associate's.
10     Q  All right.  And your professional
11 background before State Auto, who did you work
12 with?
13     A  I worked with The Hartford.
14     Q  Okay.
15     A  From The Hartford, I went to State Auto --
16 or from The Hartford, I went to Patrons Mutual
17 Insurance Company.
18     Q  Okay.
19     A  And from there, we affiliated with State
20 Auto Mutual Insurance Company.
21     Q  So, how long did you actually work with
22 State Auto?

10

1      A  With the affiliation, almost 20 years.
2      Q  Okay.  And what were your job duties at
3  the time you were assigned as the large loss
4  adjuster on the Rod & Reel case?
5      A  My job was to handle and resolve all
6  aspects of the claim with regards to sentimental
7  loss.
8      Q  Right.  Now, you mentioned a fellow named
9  Neal Charkatz.  Can you tell me who he is.
10     A  Neal Charkatz is the public adjuster for
11 Goodman, Gable & Gould.  He handles a lot of
12 larger claims in the Baltimore, Maryland Area.
13     Q  And then do you know what a public
14 adjuster is?
15     A  Yes.
16     Q  Can you explain it for me.
17     A  Public adjuster is someone who represents
18 the insured in the capacity of damages.
19     Q  Okay.  I'm going to take you through a
20 couple of documents before we -- we get into this
21 just so we can put some dates on this.  I know
22 it's been some time since this loss occurred.  And

11

1  the first thing I'm going to ask you to take a
2  look at are some claims notes.
3          When you worked with State Auto, did you
4  keep claims notes?
5      A  Yes.
6      Q  Okay.  Can you explain to me what claims
7  notes are.
8      A  Claim notes are typically a discussion of
9  what's taken place on the loss, where you stand on
10 the loss to date, and if there's any issues that
11 come up with the handling of the claim.
12 Typically, you're putting your log notes in
13 normally within five days or so of -- of a
14 conversation with an adjuster, public adjuster,
15 whoever it may be.
16     Q  I'm going to show you what's been marked
17 as Exhibit 82 in this case -- in this deposition.
18         MR. BROWN:  And, Bill, I'll just read for
19 the record this is going to be Rod & Reel page 17
20 through Rod & Reel page 1, 1 to 17.
21         MR. KREKSTEIN:  You're referring to the
22 Bates stamp numbers?

12

1          MR. BROWN:  I'm referring to the Bates
2  stamp numbers.
3          MR. KREKSTEIN:  Okay.  Okay.
4      Q  I apologize for the -- some reason, they
5  decided to take the landscapers in today, blowing
6  leaves outside my office.  If it gets too loud,
7  let me know.
8          Can you see a claim log up there now,
9  guys?
10     A  Yes, I can.
11     (Terra Exhibit 1 was marked for
12 identification and is attached to the transcript.)
13     Q  Okay.  Let me direct your attention to
14 this page 15 of the claims logs, Bates number
15 R&R15.  There is a note put in besides the name
16 Scott Terra on 2/11/2015.  Can you tell me what
17 that note is?
18     A  That's a note of me accepting the
19 reassignment of a loss on 2/10/2015.
20     Q  Okay.  And it indicates that the day
21 before, you'd made a contact with the insured's
22 PA.  Do you see that?

13

1    A  Yes.

2    Q  That would have been Neal Charkatz?

3    A  Initially, I don't know if it was Neal

4  Charkatz, but it could have been.

5    Q  Okay.  Whoops.  I'm now going to take you

6  to page 10 -- excuse me -- page 9 of the -- page

7  11 of the claims logs and note that there is a

8  claim log identified as "Scott Terra" on

9  11/3/2015.  Do you see that?

10    A  I do see that, yes.

11    Q  This appears to be a fairly lengthy claims

12  log.  And going to the top of that, it indicates,

13  "GA status report, referral and contact."  Can you

14  tell me what this is?

15    A  That was probably the initial status

16  report that was created on the claim.

17    Q  Okay.  And this is created, once again, on

18  November 3rd, 2015; correct?

19    A  That's correct.

20    Q  Okay.  And at that time -- I've

21  highlighted -- in the middle of this claims log --

22  and if you need to read the whole thing, let me

14

1  know, but it indicates at that time the time

2  element was open.  Can you -- do you see that?

3    A  Yeah.

4    Q  And can you tell me what that means?

5    A  Well, time element with regards to the

6  period of restoration would be something that

7  would be discussed with the public adjuster and,

8  typically, we -- we could agree on a time frame,

9  and sometimes we might not, but we would owe the

10  undisputed amount of whatever it was within that

11  time element, and at that point, we did not have

12  an agreement.

13    Q  Okay.  Now, there are different parts of a

14  claim.  That is, there's a building part, a

15  business personal property, time element claims.

16  You agree with that?

17    A  Yes, sir.

18    Q  Okay.  Tell me, when you first got this

19  assignment, what did you do, and by November

20  of 2015, where you were on each one of those --

21  those coverages.

22    A  I can't tell you where I was at with each

15

1  one of those coverages because I don't have the

2  original claims file, but based on what I see

3  here, as of 11/3/2015, "Work to be completed:

4  Agree on period of restoration with the insured;

5  monitor replacement cost -- replacement for BI

6  loss; withheld depreciation payment code."

7    So, it looks like I've paid the actual

8  cash value; I have withheld depreciation open; and

9  I have BI open.  And if you look at that monitor

10  replacement for BI loss, so that can be -- that

11  could be on a continuous basis.

12    Q  Okay.  Now, did you go out and look at the

13  loss?

14    A  Yes, sir, I did.

15    Q  Do you remember, basically, what you saw

16  and what the kind of a loss this was?

17    A  Going by memory, not looking at any

18  photographs that would have been attached to the

19  file, I know it was not a casino but more a bingo

20  type -- it was a bingo -- almost like a casino but

21  it wasn't called a "casino," and it had a hotel

22  attached to that.

16

1    So, I can tell you the restaurant that

2  caught on fire was next to a couple piers where

3  boats came in to fuel up their boats.

4    Q  Okay.  Did you work on this loss with

5  anybody else?

6    A  Up and to the point where it was

7  transferred to Caroline Veahman, I probably worked

8  with Christian Fox or had a discussion with

9  Christian Fox as it related to the business income

10  portion, but we had D&D -- it might have been D&D

11  Construction that worked on the consulting portion

12  of the building with us, and --

13    Q  Let me ask you -- you mentioned Caroline

14  Veahman.  Who is she?

15    A  Caroline Veahman is an adjuster that was

16  with State Auto.  She was a large loss adjuster

17  for State Auto, and then I think she left as a

18  claims manager.

19    Q  Do you know where she currently works?

20    A  She works for Central Mutual Insurance

21  Company.

22    Q  Okay.  Very good.  Now, I put on page

17

1 eight of the claims loss.  Do you see that?
2    **A  Yes, sir, I do.**
3    Q  And it indicates, the highlighting, claims
4 log at 11/22/2016 says, quote, "Met with --
5 meeting with PA scheduled for 12/12/2016 with PA
6 and CPA."  Do you see that?
7    **A  Yes, sir.**
8    Q  All right.  Do you recall a meeting with a
9 public adjuster and with CPAs on or about that
10 date?
11    **A  I do.  I ran the meeting.**
12    Q  Okay.  And did you go to the meeting, did
13 meeting come to you, was it by Zoom?
14    **A  Caroline Veahman, Christian Fox, and**
15 **myself met in Baltimore, drove together to Rod &**
16 **Reel, and they actually walked us through the**
17 **facility, all three of us, to explain why Rod &**
18 **Reel was what it was.**
19    Q  And she took you through the operations,
20 the pool tab bingos, all that good stuff?
21    **A  Yes, sir.**
22    Q  Okay.  And do you recall your

18

1 conversations with -- by the way, how long was the
2 meeting on 12/12 --
3    **A  I can't give you an exact time, but it was**
4 **north of an hour, probably an hour and a half,**
5 **maybe two hours.**
6    Q  Okay.  And Christian Fox was the CPA that
7 you mentioned?
8    **A  Yes.**
9    Q  Okay.  He was the CPA for State Auto;
10 right?
11    **A  Yes.**
12    Q  Neal Charkatz appeared for the insured;
13 right?
14    **A  Yes.**
15    Q  Did Neal Charkatz also bring a CPA with
16 him to the meeting, Jeremy Hogue?
17    **A  I don't recall that off the top of my**
18 **head.  I know the insured was there because the**
19 **insured wanted to be part of the process.**
20    Q  Okay.
21    **A  So, he may have had -- he probably did**
22 **have a CPA there.  I just don't remember the name.**

19

1    Q  Okay.  And this next log note down, okay,
2 which is now 8/12/16, indicates, "Working with CPA
3 and insured on BI loss."  Do you see that?
4    **A  Yes, sir, I do.**
5    Q  Okay.  So, the BI loss, do you know what a
6 "BI" is?
7    **A  Business income.**
8    Q  Okay.  Is that the same as a time element
9 loss?
10    **A  Yes.**
11    Q  Okay.  So, the business income was still
12 open at the time of your meeting; right?
13    **A  On 8/12/2016, yes, it was still open.**
14    Q  Okay.  Was that the main focus of the
15 meeting was the business interruption loss, the
16 time element loss?
17    **A  That was the only thing remaining on the**
18 **loss at that point that was not settled by myself.**
19    Q  Okay.  Now, let me talk a little bit
20 about -- strike.
21       Let me take you to another report and ask
22 if you can identify this.  Is it being shared or

20

1 not?
2    **A  I can't see it.  Yeah, oh, here we go.**
3    Q  Okay.  There you go.  Want me to make it a
4 little bigger?
5    **A  Yeah.  Here we go.**
6    Q  Let me just -- we'll scroll through it
7 slowly.  Let me know if you need me to stop any
8 time, Mr. Terra.
9       MR. KREKSTEIN:  Can you just read the
10 Bates stamp numbers for the record, Tom?
11       MR. BROWN:  Oh, this will be Exhibit 83.
12 The Bates stamp numbers are 235 through 240.
13       (Terra Exhibit 2 was marked for
14 identification and is attached to the transcript.)
15    Q  Let me go back to the beginning of it.
16 Okay.  It's dated 6/21/15.  Was this prepared by
17 you, Mr. Terra?
18    **A  Yeah.  It looks like a large loss report**
19 **that we were asked to complete when we were**
20 **resolving different aspects of the claim.**
21    Q  Okay.  And we go through payment
22 instructions and recommendations for the blanket

**Page 21**

1  building at the top --
2  **A  Yes.**
3  Q  -- correct?
4  Then the blanket personal property
5  coverage.
6  **A  Yes.**
7  Q  And if I'm reading this correctly, the
8  coverage is, that is the amount of the coverage,
9  is stated at the top in bold; is that correct?
10  **A  Yes.**
11  Q  And then the -- the agreed disposition and
12  payments are down below.  I just highlighted in
13  blue.
14  **A  Yes.**
15  Q  Okay.  So, you add in blanket personal
16  property we talked about.  And on the second page,
17  it says, "The loss was initially inspected on
18  2/19/2015 with named insured public adjuster Neal
19  Charkatz.  The named insured was present with his
20  restoration contractor and public adjuster."  All
21  right.  Do you recall going to that meeting?
22  **A  I recall the meeting, and if that's what**

**Page 22**

1  the date is, that's what the date is.  I just --
2  Q  Okay.  Then there's a coverage analysis;
3  correct?
4  **A  Yeah.**
5  Q  And we have risk values, titles and
6  interest, origin and cause, experts.  And then we
7  have the extent of damages, and we have building
8  and then time element.  And I've highlighted under
9  the time element.  Do you see that?
10  **A  Yes, sir.**
11  Q  Okay.  So, the building was -- was -- at
12  the time of this, you discussed it, but the time
13  element is what I'm focused on at this point.
14  **A  Okay.**
15  Q  You have written that, "We have agreed the
16  period of restoration will be approximately 10 to
17  12 months.  Business income will be for the same
18  period.  We are still awaiting tax returns for the
19  previous three years.  Public adjuster is working
20  with Christian Fox of Meaden & Moore"; correct?
21  **A  That's correct.**
22  Q  Okay.  And then we go down a little bit

**Page 23**

1  further, and it says, "Time element:  Open."
2  **A  Yes.**
3  Q  Okay.  So, let me go back to where the
4  highlighted was where it says, "We have agreed on
5  a period of restoration."  It says, "10 to
6  12 months."  When does that 10 to 12 months start?
7  **A  Can we -- can we go back to the top of the**
8  **form so I can look at the date again on the form?**
9  Q  Sure, 6/21/15, so this is six months
10  before your meeting in December.
11  **A  Okay.  Now go back down, please, to the --**
12  **okay.  So, what we typically do, and I was no**
13  **different than any other adjuster at State Auto at**
14  **the time, was we would put a value or our best**
15  **guess as to what the time element would be at that**
16  **time.**
17  Q  Okay.  So, this wasn't an agreed time
18  period with Mr. Charkatz.  That was still an open
19  issue; correct?
20  **A  We have at least agreed that it was at**
21  **least 10 to 12 months.**
22  Q  Okay.  So, that's the minimum period?

**Page 24**

1  **A  Yes.**
2  Q  Okay.  Let me take you to Exhibit 63.
3  (Terra Exhibit 3 was marked for
4  identification and is attached to the transcript.)
5  Q  Do you see something up there that says,
6  "Robertson & Associates"?
7  **A  Yes, I do.**
8  Q  Okay.  This is a -- it's a --
9  MR. BROWN:  Bill, it is plaintiffs'
10  production 811 through 813.  Okay?  It's
11  Exhibit 63.
12  Q  The re line is "Smokey Joe's," and this is
13  a -- do you recall receiving an estimate with
14  regard to shrink wrapping the building?
15  **A  Can you go back up so I can read it a**
16  **little bit?  Right there.**
17  Q  There you go.  Let me know when you're
18  done reading it.
19  **A  Okay.  This was on what date?  March --**
20  Q  March 2nd, 2015, before you got into the
21  loss.
22  **A  What was the date of my -- I didn't write**

25

1   it down, but what was the date of my report?

2      Q  Well, the report was 6 -- is the report up

3   there now or not?

4      A  Yeah, I see it right now, 6/21/2015.

5      Q  Okay.  So, let's go to this.  All right.

6   We have an estimate for -- right here it says,

7   "Replace and/or encapsulate all charred lumber as

8   a result of the recent fire," and that's part A;

9   and then part B, "Secure the building envelope

10  while making it esthetically acceptable to

11  clientele."

12      I refer to that as "shrink wrapping the

13  building," but do you recall discussing

14  encapsulating the building?

15      A  Yes, because there were two separate -- it

16  was on the same property, but there are

17  technically two separate venues.  Smokey Joe's was

18  a bar and grill type restaurant, and then you had

19  the hotel in -- I don't know if it was a

20  convention center, but they definitely held

21  weddings there.

22      Q  Okay.

26

1      A  So, I think we did this to protect against

2   losing any -- any further business income with

3   regard to their wedding venue.

4      Q  And let me see if I can't help you out

5   with that.  Oops.  I am in the wrong spot.  Hang

6   on.  Okay.  I'm now on Exhibit 64.

7      MR. BROWN:  Bill, for your records, it is

8   plaintiffs' production 808 and 809.

9      (Terra Exhibit 4 was marked for

10  identification and is attached to the transcript.)

11      Q  And -- hang on one second.  I may have to

12  go to the one before that.

13      Do you recall discussing in or about April

14  whether the insured had concerns about shrink

15  wrapping the building and with regard to

16  eliminating the smell?

17      A  I do remember it.  I don't remember the

18  exact conversation.

19      Q  Okay.  Do you remember receiving the

20  estimate that we just looked at?

21      A  Does it -- without seeing a corresponding

22  payment in the claims file, did we pay it?

27

1      Q  I believe you did, yes.

2      A  Okay.  Then I'm going to say we probably

3   agreed to it.

4      Q  Okay.  Do you recall on or about

5   April 14th speaking with Mr. Charkatz and

6   approving the work and shrink wrapping the

7   building?

8      A  I don't remember the exact date, but we

9   probably talked about it and I approved it.

10      Q  Do you recall how long the building was

11  going to be shrink wrapped?

12      A  No, not off the top of my head but a few

13  months, maybe.

14      Q  Do you recall whether there was any

15  discussion about the wedding season?

16      A  Yeah, that was the reason why we shrink

17  wrapped it, so we wouldn't lose any business

18  income loss associated with the hotel part of it.

19      Q  Okay.  And do you know how long the

20  wedding season ran -- runs, generally, in a

21  non-COVID year?

22      A  I would say anywhere from, like, April

28

1   to -- to October -- September, October, maybe

2   November.

3      Q  Do you remember having any discussions

4   with -- with Neal Charkatz about shrink wrapping

5   this for the wedding season?

6      A  I do.  That was part of us agreeing to

7   incur that cost.

8      Q  Okay.  Now, you indicate that there was an

9   agreement on the payment -- let me see if I can

10  find it real quick -- of the undisputed ACV,

11  actual cash value on the building; correct?

12      A  Yes.

13      Q  Do you know when the last payment of ACV

14  was paid, by any chance?

15      A  I do not know.

16      MR. KREKSTEIN:  Are we on a new exhibit,

17  Tom?

18      MR. BROWN:  We're going to be on

19  Exhibit 2, and I'm trying to get my dates on my --

20      MR. KREKSTEIN:  I'm sorry.  Say that

21  number again.

22      MR. BROWN:  Exhibit -- excuse me.

29

1  Exhibit -- yeah, this was Exhibit 2 from
2  Ms. King's deposition.
3     MR. KREKSTEIN:  Okay.
4     MR. BROWN:  And we'll use that.  I'm
5  trying to make it bigger so that we can all see it
6  a little bit better.
7        (Terra Exhibit 5 was marked for
8  identification and is retained by counsel.)
9     Q  Do you recognize this type of document,
10  Mr. Terra, from working at State Auto?
11     A  Okay.  I think it's an entry into the
12  check payment system —
13     Q  Okay.
14     A  — which shows payments made.  I haven't
15  worked in this system in quite some time.  So, I
16  think that's what it is.
17     Q  Did you have a discussion with Neal
18  Charkatz in or about December that an additional
19  amount would be due on the building -- an agreed
20  additional amount on the building and ACV?
21     A  December when?
22     Q  When you had your December of 2016

30

1  meeting, you drove down to Baltimore, you went to
2  the loss site.
3     A  I know we discussed settlement, but that's
4  not my authorization or signature on those —
5  those handwritten checks there.
6     Q  Let me see if I have something that
7  will help us out here.
8     A  When were those checks issued again?
9     Q  This is a check -- the top check on
10  Exhibit Number 2 is --
11     A  5 —
12     Q  -- dated 5 -- 5/30/2017.  Do you see that?
13  Do I need to make it bigger?
14     A  Yes, I see that.
15     Q  Okay.  And that says, "Additional agreed
16  ACV building"?
17     A  I was not handling the file at that time.
18     Q  Okay.
19     A  So, in 2017, I believe Sherri King was the
20  handling adjuster, and she must have authorized
21  those payments.
22     Q  Okay.  And this would be the same for the

31

1  undisputed ACV, it says, "ACV," but I believe this
2  was actually a check for the undisputed business
3  interruption payment.
4        Do you recall whether you paid or
5  authorized the payment of the undisputed business
6  interruption?
7     A  On 5/30/2017, I was not involved with the
8  file, so I did not authorize that.
9     Q  Okay.  Let's talk about, then, at the
10  meeting that you had with Mr. Charkatz in December
11  of 2016, you were still the adjuster on the file;
12  right?
13     A  No, Caroline Veahman was the adjuster on
14  the claim.  I was the claims manager on the claim.
15     Q  Okay.  Did Caroline Veahman attend that
16  meeting, as well?
17     A  Yes.
18     Q  Okay.  Was there any discussion as to how
19  the business or the time element coverages were
20  going to be resolved?
21     A  I don't remember the exact conversation,
22  but I know that Neal Charkatz and I sat and spoke

32

1  about working towards a global resolution on the
2  claim, and by the end of that meeting, I thought
3  we had a pretty good focus on what the global
4  settlement would be.
5     Q  Okay.  And was there any discussion of if
6  you were unable to resolve the business
7  interruption, how it would be resolved?
8     A  In my conversation with Neal, if he was
9  unable to get it agreed to with his client and we
10  were unable to come to a resolution, we would move
11  to the appraisal process.
12     Q  Okay.  That happened.  At the end of that
13  meeting, was it clear that you were still
14  adjusting this claim?
15     A  Yes.
16     Q  It was still open; it was being adjusted;
17  correct?
18     A  That's correct.
19     Q  Do you recall what happened next with
20  regard to this claim, from your point of view?
21     A  Well, I'll tell you, not -- from my
22  perspective, we left the meeting -- Christian Fox,

33

1   Caroline Veahman, and myself left the meeting in
2   the same vehicle.  Caroline reached out to Mark
3   Chenetski to go over the settlement information.
4   And Mark, on the call, said he'd get back to
5   Caroline to -- on the resolution that we came up
6   with, and that was the last part of the
7   conversation I was involved with with regards to
8   the damages.
9       Q   Okay.  Who is Mark Chenetski?
10      A   Mark Chenetski is the director of claims
11  for large loss.
12      Q   Okay.  And why was that the last time you
13  were involved with the damages?
14      A   Within a few days of that meeting or
15  within a couple weeks of that meeting, Mark had
16  the re -- the file reassigned to Sherri King.
17      Q   All right.  Did he tell you why?
18      A   He did not tell me why at the time.  We
19  traded some emails in December, and I think we
20  kind of disagreed as to what the method would be
21  at that point.
22      Q   Okay.  Let me show you a couple of these

34

1   emails.  I'm going to show you what's been marked
2   as Exhibit 68.  This is Rod & Reel 3447 through
3   Rod & Reel 3444.  Backwards.  Let me open the
4   screen up and let you see.
5          (Terra Exhibit 6 was marked for
6   identification and is attached to the transcript.)
7       Q   Now, on Exhibit 68, Rod & Reel 3445,
8   there's an email from Caroline Veahman to your --
9   to a Mark Chenetski with a CC for you.  Do you see
10  that?
11      A   That's correct.
12      Q   All right.  This is dated December 21,
13  2016.
14      A   Yes.
15      Q   Did you -- were you still the adjuster on
16  this case as of this time?
17      A   I was not.  I was the claims manager.
18      Q   Okay.
19      A   Caroline Veahman up until probably the
20  December 21st or maybe December 20th was the
21  adjuster, and then it was transferred to Sherri
22  King.

35

1       Q   Okay.  Were you still the claims manager
2   as of this time?
3       A   Yes.
4       Q   Okay.  There's discussions about the --
5   the time element loss; correct?
6       A   Yeah.
7       Q   Let me take you to the next email in this
8   chain, the next day, December 22nd, same exhibit,
9   68, and it's spans two Bates pages, 344 -- 3444
10  and 3445.  And this is a Mark Chenetski to
11  Caroline Veahman with a CC to you.  Do you see
12  that?
13      A   I do see that.
14      Q   All right.  And he's talked about this
15  case.  He's having difficulty understanding how
16  the loss reached the numbers that it reached.  It
17  then says, "I've touched base with Sherri,
18  Christian, and Bill and discussed finding another
19  expert to work with Christian to review the
20  insured's most recent submission in detail to
21  determine the accuracy of the insured's claim.
22  I'm very comfortable with the handling of the

36

1   matter to date, but I'm not ready to compromise
2   this claim without some additional analysis of the
3   insured's submission."  Do you see that?
4       A   I see that.
5       Q   So, fair to say, at this point in time,
6   this claim is still open, and you guys are waiting
7   for more information from the insured, correct, or
8   at least Mr. Chenetski is?
9       A   Well, yes and no, because if I look at
10  this, I've touched base with Sherri, Christian,
11  and Bill Krekstein.  If this is an issue of
12  compromise on damages, with all due respect to
13  Bill, it was a damages claim, not a coverage
14  claim.  So, I don't know why Bill was involved
15  with that aspect of the damages, but that's what
16  it says there.  That's what happened.
17      Q   So the "Bill" was Bill Krekstein?
18      A   That's correct.
19      Q   Okay.  And Sherri is who?
20      A   She's the examiner --
21      Q   Okay.
22      A   -- that was assigned to handle the BI

**37**

1  portion of the loss.
2      Q  Did you have any conversation -- and, by
3  the way, I'll tell you, there is an email from you
4  back to Mr. Chenetski right above that, and I'll
5  let you read that, as well.  Let me know when
6  you're done, Mr. Terra.  Okay?
7      A  Yeah.
8      Q  Now, if you sum up this email, which is
9  also on Exhibit 68 and it's on the first page of
10 Exhibit 68, and you sum up -- it's an email from
11 you to Mr. Chenetski, and it says, "To sum this
12 up, we're looking for a difference -- we're
13 looking at a difference of 7 percent between our
14 numbers and the insured.  Seven percent, this is
15 normally not a huge variance between numbers, but
16 because of the amount, it's big.  If you need any
17 additional info, please do not hesitate to call."
18     Did you ever speak to Mr. Chenetski
19 following this email?
20     A  I spoke with Mr. Chenetski much later on
21 but not following this email.
22     Q  Okay.

**38**

1      A  We traded emails, and that was pretty much
2  it.  Nor did I speak with Sherri King about the
3  discussion we had while I was with Neal Charkatz,
4  Caroline, and Christian Fox.
5      Q  Did Ms. King ever reach out to you at all
6  about the status of this claim?
7      A  No.
8      Q  All right.  Did Mr. Chenetski ever reach
9  out to you about the status of the claim as of
10 December of 20 -- 2016?
11     A  As of December 2016, no.
12     Q  Okay.  When did you next talk to
13 Mr. Chenetski about this claim?
14     A  I went in for a supervisors' meeting in --
15 it was either late January or early February.
16 That's when State Auto had all of their managers
17 and supervisors in for meetings.
18     Q  Okay.  And tell me what happened at that
19 meeting.
20     A  We were going out to dinner.  The office
21 was right next to -- at the time, I think it was a
22 Sheraton Hotel, and I had met with Mark Chenetski

**39**

1  prior to us going to dinner, and we were up in the
2  hotel bar/restaurant area having a -- having a
3  drink.
4      Q  Okay.  And tell me what happened.  Who
5  said what to who?
6      A  I actually asked him about that in person,
7  "What's the deal with Rod & Reel?  It was
8  something that we had the ability to resolve.  As
9  the claims manager with a large loss adjuster, we
10 had resolved bigger claims than this one."  And he
11 said to me that, "It's not about this one claim.
12 There's a bigger overall issue," and that he
13 wanted to teach the three G's a lesson.
14     Q  Well, now, to begin with, who is the "he"
15 in this conversation?  Mark Chenetski?
16     A  Mark Chenetski.
17     Q  Okay.  So, your conversation with Mark
18 Chenetski; correct?
19     A  It was a direct conversation with him,
20 yes.
21     Q  Okay.  And Mark Chenetski at the time was
22 what position at State Auto?

**40**

1      A  He was the director of large loss.
2      Q  He was your boss?
3      A  No, Steve Pifer was my boss.
4      Q  Okay.
5      A  Mark Chenetski was Caroline's boss.
6      Q  Okay.  And had you had any claims with --
7  you know, let me take a step back.
8      When you say, "claims with GGG," what do
9  you mean?
10     A  I've been doing this for 28 years now.
11     Q  Okay.
12     A  And I can tell you that I run into the
13 three G's both in Maryland and in North Carolina,
14 in different areas of the country.  So, I've
15 worked with them quite often.
16     Q  Okay.  Now, when you say, "worked with
17 them," the three G's are Goodman-Gable-Gould;
18 correct?
19     A  That's correct.
20     Q  Neal Charkatz is a public adjuster with
21 Goodman-Gable-Gould on this claim; correct?
22     A  That's correct.

**41**

1     Q  And when you say, "claims with the three
2 G's," you mean claims in which the three G's are
3 representing an insured and you're representing an
4 insurance company.
5     A  Yes, that's correct.
6     Q  Okay. So, when Mr. Chenetski told you he
7 wanted to teach the three G's a lesson, what did
8 that mean to you?
9     A  Well, he had referenced that there was
10 three claims going on; one was with Sherri King
11 and Randy Goodman; the other was with Jeff Fink in
12 Tybee Island down in South Carolina; and then we
13 had this one up here in Maryland.
14     Q  Okay. So, it's three claims with three
15 different insureds of State Auto. All of those
16 three insureds had retained Goodman-Gable-Gould as
17 their public adjusters; right?
18     A  Yes.
19     Q  And when you adjust a claim with an
20 insured, is the focus on the insured or the focus
21 on the relationship with the public adjuster?
22     A  Theoretically, the PA doesn't mean

**42**

1 anything with regards to the handling of the loss.
2 There -- it's strictly there for damages, not
3 coverage, damages.
4     Q  So -- so, in adjusting a claim, in your
5 opinion, your duty is to be fair to the insured;
6 right?
7     A  Our contract is between us and the
8 insured, yes.
9     Q  Okay. And what happens to the insured in
10 a case where Mr. Chenetski has indicated State
11 Auto wants to teach GGG a lesson?
12     A  I couldn't tell you. You're going to have
13 to ask Mr. Chenetski.
14     Q  And we will do that. Did he ever explain
15 to you what he meant by that?
16     A  I don't think he went into great detail,
17 but I got the impression that we had three claims
18 with three G's and he wanted to make sure that --
19 that he was involved in -- in teaching them a
20 lesson. What that means, I don't think it's
21 positive, but he didn't elaborate any further.
22     Q  Now, at this point in time -- excuse me.

**43**

1 Were you ever removed as the supervisor on this
2 claim?
3     A  Once it got transferred to Sherri King,
4 Sherri King was in control of the file, working
5 directly for Mark Chenetski.
6     Q  Okay. And when did that happen?
7     A  Probably December 21st, along with that --
8 kind of coordinated with that email that we just
9 looked at.
10     Q  That's the email which is part of
11 Exhibit 68 that we were just looking at?
12     A  Yes.
13     Q  Okay. As of your conversation with
14 Mr. Chenetski, from the insured's point of view,
15 that is Mr. Charkatz, the public adjuster and the
16 insured, Mr. Donovan, for Rod & Reel, was this
17 just a claim that was still being adjusted?
18     A  Yes.
19     Q  Was it a claim in which State Auto had
20 said, "We're not going to pay anymore money. Sue
21 us"?
22     A  As of when I was last -- last involved

**44**

1 with the claims function on 12/16 or 12/21 or when
2 I sent that email --
3     Q  Right.
4     A  -- yes.
5     Q  That is, it was still an open claim.
6 There was -- there was no -- this wasn't a case
7 where the insured was left with a, "State Auto has
8 made its position clear and sue us"?
9     A  We've never talked about -- as of 12/21
10 when that email was sent, we've never talked about
11 suit.
12     Q  Okay. So, just so we're clear, this is --
13 this email that we're looking at, Exhibit 68,
14 12/22/2016.
15     A  12 -- yes, 2016, that's correct.
16     Q  Okay. And it was shortly after that that
17 Ms. King was assigned to the case?
18     A  That's correct.
19     Q  All right. In your meeting that you had
20 just left with Mr. Charkatz, you were still trying
21 to reach a global resolution?
22     A  I thought we had one.

45

1    Q  Okay.  And what was the global resolution
2  from your -- your --
3    A  I don't remember numbers at this point,
4  but -- but we walked away -- Caroline, myself, and
5  I believe Christian Fox walked away pretty
6  comfortable.  That's why Caroline reached out to
7  Mark in the car to tell him and update him as to
8  what we felt the value was.
9    Q  Okay.  And that was set forth in this
10 email, also Exhibit 68, December 21, 2016, with
11 Caroline Veahman, as identified to, "Hi, Mark,"
12 this email here?
13   A  Yeah, but I think we would be -- whatever
14 the date of the meeting was, that same day,
15 Caroline reached out to Mark.
16   Q  And to be clear, from the time Ms. King
17 was assigned to this case, she never called you to
18 find out what your -- what the status was in
19 December when this meeting occurred?
20   A  Never had a conversation with Sherri and
21 never had a conversation with Mark.
22   Q  Other than the ones we've just talked

46

1  about, the conversation with Mark.
2    A  Right.
3       MR. BROWN:  Okay.  That's all I have,
4  Mr. Terra.  Thank you.
5       THE WITNESS:  You're welcome.
6  EXAMINATION BY COUNSEL ON BEHALF OF THE DEFENDANT
7  BY MR. KREKSTEIN:
8    Q  Why did you leave State Auto?
9    A  I left State Auto to pursue a job with
10 Central Mutual.
11   Q  There was no other reason?
12   A  No.
13   Q  You had no problems or issues with State
14 Auto?
15   A  If you look back at my track record with
16 State Auto, it's pretty impressive, and I think I
17 even have emails the day I left from Josh Thompson
18 saying what an awesome job I did for State Auto.
19   Q  My question was did you have any problems
20 or issues with State Auto that played a part in
21 you leaving State Auto.
22   A  No, I left for more money.

47

1    Q  Okay.  That was it?
2    A  Better opportunity, yeah.
3    Q  Okay.  No other reasons?
4    A  No.
5    Q  Okay.  At the time of the December 2016
6  meeting with Goodman-Gable-Gould, you said that
7  you were not Caroline Veahman's supervisor;
8  correct?
9    A  We -- the company switched roles in
10 different capacities, so she was either reporting
11 directly to Mark Chenetski -- because at one point
12 she was reporting to me.  I don't remember the
13 date on when that changed, whether it was before
14 that or after that.
15   Q  I believe you said that following the
16 meeting, she reached out directly to
17 Mr. Chenetski, who was her -- her supervisor; is
18 that correct?
19   A  That's correct.
20   Q  Okay.  So, you were not Ms. -- I'm sorry.
21   A  She reached out to him because he was the
22 director of large loss.

48

1    Q  Understood.  So, at the time of the
2  meeting, you were not her supervisor.
3    A  I don't believe so, no.  I was the claims
4  supervisor for that region.
5    Q  Okay.
6    A  I was asked to go there to direct a
7  settlement conference.
8    Q  Who asked you to go there?
9    A  I believe Mark Chenetski.
10   Q  Okay.  Did he give you a reason why he
11 asked you to go there?
12   A  It was in an attempt to settle the loss.
13   Q  Did he give you a reason why you needed to
14 go there along with Ms. Veahman rather than
15 Ms. Veahman just attending alone?
16   A  Because I believe that I was involved in
17 the claims process and settlement of the contents,
18 as well as the building portion of the loss.
19   Q  Do you recall at the time of the
20 December 2016 meeting what Caroline Veahman's
21 authority was?
22   A  That I don't know.

49

1   Q  Do you know at the time of the
2  December 2016 meeting what your authority was?
3   **A  Might have been $250,000.**
4   Q  Okay.  You stated that at that meeting,
5  you and Ms. Veahman and Mr. Charkatz had been
6  talking about the potential for a global
7  settlement.  Is that a fair way to characterize
8  it?
9   **A  Yes.**
10   Q  Was there an agreement made at that
11  meeting on a -- on a number?
12   **A  We had a number in mind, but I wasn't —**
13  **I'm not sure of the exact number, and being**
14  **two-and-a-half years later, I can't remember the**
15  **exact number.**
16   Q  Did that number that you can't remember
17  exceed yours and/or Ms. Veahman's authority?
18   **A  I know it exceeded my authority, yes.**
19   Q  Okay.  So, the number that you were
20  contemplating exceeded $250,000.
21   **A  Yes.**
22   Q  And is it fair to state that at that

50

1  meeting, neither you nor Ms. Veahman had
2  sufficient authority to agree on a settlement
3  number as far as the numbers you were talking
4  about at that meeting?
5   **A  That's correct, that's the reason why she**
6  **reached out to Mark Chenetski.**
7   Q  So, in other words, in order to settle the
8  claim for an amount above what your authority was,
9  $250,000, you would need to seek approval from
10  Mr. Chenetski, and this is what prompted
11  Ms. Veahman's phone call.
12   **A  That's correct.**
13   Q  Okay.  And Mr. Chenetski, based on that
14  phone call and a subsequent email and your
15  conversations with him, did not extend that
16  authority.
17   **A  He did not.**
18   Q  Okay.  Other than Mr. Chenetski, did you
19  or Ms. Veahman tell anybody else from State Auto
20  or was anybody else kept apprised as far as you
21  going to this meeting in December of 2016?
22   **A  I believe Mark Chenetski was aware of it;**

51

1  **Steve Pifer was probably aware of it; outside of**
2  **that, Caroline, Christian Fox, and myself.**
3   Q  And Steve Pifer was your boss at the time?
4   **A  That's correct.**
5   MR. KREKSTEIN:  Tom, is it possible for
6  you to put back an exhibit?  If not, I can do it.
7   MR. BROWN:  Sure, I can do it.  Which one?
8   MR. KREKSTEIN:  Exhibit 83.
9   MR. BROWN:  Is that the one you want,
10  Bill?
11   MR. KREKSTEIN:  Yes, I'm sorry, I jumped
12  the gun.  We can go back.  I apologize.
13   Q  Since December of 2016, have you had other
14  claims with Mr. Charkatz or Goodman-Gable-Gould?
15   **A  No.**
16   Q  No claims with -- with Goodman-Gable-Gould
17  since December of 2016?
18   **A  No.**
19   Q  Prior to today, have you had any
20  communications with Mr. Brown or anybody from his
21  office?
22   **A  Yeah, Mr. Brown reached out to me, I don't**

52

1  **know, originally a couple years ago, maybe —**
2  **yeah, probably a year -- year-and-a-half, two**
3  **years ago after I left State Auto.**
4   Q  And what was the purpose of him reaching
5  out to you?
6   **A  Because Neal Charkatz had reached out to**
7  **me before that.**
8   Q  Okay.  When did Mr. Charkatz reach out to
9  you?
10   **A  I don't remember the exact date.  It was**
11  **sometime after I left.**
12   Q  Okay.  Let's go back.  After the meeting
13  on -- in December of 2016, did you ever have
14  occasion before -- between that time and the time
15  you left State Auto, did you ever have occasion to
16  have a conversation or any contact with
17  Mr. Charkatz?
18   **A  No, it wasn't until after I left.**
19   Q  Okay.  And you didn't have any contact
20  with Mr. Brown or his office until after you left,
21  as well; correct?
22   **A  Correct.**

53

1    Q  Okay.  So, you left State Auto, you said,
2  approximately two years ago?
3    A  A little over two-and-a-half year -- over,
4  yeah, two-and-a-half years ago or just about
5  two-and-a-half years.
6    Q  Okay.  And after you left, Mr. Charkatz
7  reached out to you?
8    A  He did.
9    Q  Okay.  And at the time he reached out to
10  you, you had not spoken to him since your
11  December 2016 meeting?
12    A  Around sometime in December, yes.  I don't
13  know if it was exactly on 12/16 or 12/21, but yes.
14    Q  Okay.  And what was the purpose of him
15  reaching out to you?
16    A  He reached out to me because of a claim he
17  had with Jason Hawk and asked if I was still the
18  supervisor on that claim because they had a claim
19  with Jason Hawk, and I told him I was no longer
20  with State Auto.
21    Q  And did anything else occur during that
22  conversation?

54

1    A  He was just talking to me about the claim
2  that you guys have going on right now.  I don't
3  remember the specifics, but we just chatted about
4  it and I said, "Neal, this -- this is not just
5  about this insured.  Haven't been involved with
6  the claim, but I can tell you what Mark Chenetski
7  had explained to me."
8    Q  And then you relayed the conversation that
9  you said you had with Mr. Chenetski at the
10  Sheraton?
11    A  Not said I had, I did have.
12    Q  That you said you had earlier.
13    A  Yes, I did have that conversation.
14    Q  Understood that's what you said.  And did
15  you initiate the conversation about the Rod & Reel
16  claim or did Mr. Charkatz?
17    A  I think Mr. Charkatz did.
18    Q  Okay.  And what did Mr. Charkatz tell you
19  about the status of the claim at that time?
20    A  I don't remember the specifics.  Maybe you
21  guys were in appraisal or you had resolved
22  appraisal.  I don't know the specifics of -- of

55

1  that part of the conversation.
2    Q  Okay.  Going back to your December
3  meeting, I believe you said that your
4  understanding with Mr. Charkatz is that -- was
5  that either you would have a global resolution of
6  the claim, which involved the loss of business
7  income claim, or if the dispute could not be
8  resolved, the parties would go to appraisal;
9  correct?
10    A  That's correct.
11    Q  Okay.  And, so, Mr. Charkatz told you that
12  the parties ended up going to appraisal.
13    A  They were either in appraisal or they had
14  finished appraisal.  I think by the time we
15  talked, they might have been through appraisal.
16    Q  Okay.  So, what ended up happening was
17  what you and Mr. Charkatz spoke about in December
18  of 2016, either it gets resolved or you go to
19  appraisal.
20    A  No, that's not actually correct.
21    Q  Okay.  Which part?
22    A  We had discussed the fact of going to

56

1  appraisal, but Sherri King was brought in as an
2  examiner for coverage to look at coverage.
3    Q  Okay.  Where -- where are you getting that
4  from?  Where -- why was she brought in to examine
5  coverage?
6    A  Because there was a discussion with Sherri
7  King, Mark Chenetski, and you about --
8    Q  I'm going to object and direct you not to
9  answer if you're referring to attorney-client
10  communications that were made between State Auto
11  and its attorney during your employment with State
12  Auto or if those conversations were relayed to you
13  in the context of a current or former employee of
14  State Auto.
15    A  I'm being deposed -- I'm being deposed as
16  an employee of State Auto right now; correct?
17    Q  Well, you're being deposed as Scott Terra.
18  What I am instructing you, for the record, is that
19  any communications that involve counsel in the
20  context of rendering advice to State Auto is
21  protected by the attorney-client privilege, and
22  that privilege is State Auto's, and that privilege

57

1 has not been waived.

2     So, I'm going to instruct you not to relay

3 those conversations. If there were conversations

4 that you were involved in without counsel, you can

5 certainly testify to those.

6     **A I'm referring to statements without**

7 **counsel. I'm referring to an email that had --**

8     Q No, you're referring to -- let me correct

9 you -- conversations that were had -- you

10 identified Ms. King; you identified Mr. Chenetski

11 and you identified me, who is State Auto's

12 attorney. So, if you're referring to emails,

13 that's different.

14     **A That's what I'm referring to.**

15     Q If they were emails -- if they were emails

16 to and from counsel, then I would instruct you

17 that that is attorney-client protected and that

18 you can't testify to that.

19     **A Bill, I don't know anything about your**

20 **communications with State Auto, nothing. Wasn't**

21 **involved in a single conversation with you, Sherri**

22 **King, or Marc Lovrak. Didn't happen.**

58

1     Q Okay.

2     MR. KREKSTEIN: Can we go back and say the

3 question again?

4     (The reporter read the record beginning at

5 page 55, line 16, through and including page 56,

6 line 6.)

7     **A I was referring to the email.**

8     Q Okay. We can -- we can go back. You're

9 referring to the email that Mr. Brown marked in

10 evidence?

11     **A Yes.**

12     Q Okay. And you're referring to the email

13 where Mr. Chenetski advised you that he was

14 reassigning the file to Ms. King?

15     **A I don't know if it says that in the email,**

16 **but yes, that file was reassigned to Sherri King.**

17     MR. KREKSTEIN: Tom, are you able to pull

18 up the email?

19     MR. BROWN: Yeah, I got it.

20     MR. KREKSTEIN: I appreciate it. I think

21 it's Exhibit 68.

22     MR. BROWN: Is that it? Hold on. It's

59

1 the one before that. Down here.

2 BY MR. KREKSTEIN:

3     Q Is that the email you're referring to,

4 Mr. Terra?

5     **A Yes.**

6     Q Okay. And you're -- so, what about this

7 email leads you to state that Ms. King was

8 reviewing coverage?

9     **A Because Sherri King is an examiner and**

10 **examiners review coverage.**

11     Q That's all they do?

12     **A Predominantly, yes, they review coverage.**

13 **Damages go back to the general adjuster handling**

14 **the loss. State Auto has broken that out in two**

15 **separate phases; examiners handle coverage and the**

16 **GAs handle the damages.**

17     Q Okay. Did you tell anyone at your current

18 employer that you were being deposed today?

19     **A No.**

20     Q Okay. Did you talk to anybody about your

21 deposition today?

22     **A No.**

60

1     Q Okay. Are you familiar with Kevin

2 Collier?

3     **A Kevin Collier, I'm not sure who that is.**

4     Q You're -- you've heard -- are you familiar

5 with a company called Wakelee?

6     **A Oh, Wakelee, yes.**

7     Q Does that refresh your recollection as to

8 who Kevin Collier is?

9     **A He might have been with Wakelee in**

10 **adjusting the claim.**

11     Q Was -- does it help refresh your

12 recollection that Mr. Collier was the building

13 consultant on the claim?

14     **A Yes.**

15     Q And Mr. Wakelee would have prepared an

16 estimate to repair the damage?

17     MR. BROWN: Mr. Collier.

18     MR. KREKSTEIN: What did I say?

19 "Mr. Wakelee"?

20     MR. BROWN: You said, "Mr. Wakelee."

21     MR. KREKSTEIN: Yeah. Thanks, Tom.

22     MR. BROWN: I assume you meant

61

1  "Mr. Collier."

2      MR. KREKSTEIN: You're right. You're

3  right.

4      Q  Mr. Collier was the building consultant

5  retained by State Auto to prepare an estimate?

6      **A  Yes.**

7      Q  In addition or as part of his duties as

8  preparing an estimate, is -- do you also rely on

9  Mr. Collier to give you an indication as to how

10 long construction should take?

11     **A  Yeah, we probably had a conversation,**

12 **being the building consultant, about that, yes.**

13     Q  Okay. Have you ever been licensed as a

14 public adjuster?

15     **A  I am licensed as a public adjuster.**

16     Q  When did you get your license?

17     **A  I've had it for probably four or five**

18 **years.**

19     Q  Okay. And what state are you licensed in?

20     **A  Connecticut.**

21     Q  And is that license current?

22     **A  It is.**

62

1      Q  Have you ever used it?

2      **A  I have never worked as a public adjuster.**

3      Q  Okay. Why did you get your license?

4      **A  Because I wanted to take the test and see**

5  **if I could pass it, and then I did, but never**

6  **started a business with it and never had any**

7  **clients.**

8      Q  Have you ever told anybody other than

9  family that you are a licensed public adjuster?

10     **A  I could have told -- potentially, yeah. I**

11 **don't recall any conversation off the top of my**

12 **head.**

13     Q  I mean have you told anybody at your

14 current employer or, at the time you were at State

15 Auto, anybody at State Auto?

16     **A  It comes up when you do your license**

17 **review, and I know it came up with State Auto, but**

18 **no one had a concern about that.**

19     Q  When you say, "it came up," what do you

20 mean?

21     **A  Well, when they pull your licenses to do**

22 **your license, that comes up because there's a**

63

1  **corporate area of State Auto that renews your**

2  **licenses.**

3      Q  Okay. So, did anybody at State Auto say

4  anything to you about having a public adjuster's

5  license?

6      **A  No.**

7      Q  Okay. You stated earlier when Mr. Brown

8  was questioning you that in or around of April

9  of 2015, you had agreed with Mr. Charkatz's

10 recommendation that the building -- or the

11 undam -- or the damaged portion of the building be

12 shrink wrapped so as to kind of keep it separated

13 from the remainder of the -- of the building; is

14 that -- is that correct?

15     **A  That's correct.**

16     Q  Okay. And that shrink wrap was really

17 meant so that Rod & Reel could use the other parts

18 of their building and, from an esthetic

19 standpoint, you know, customers wouldn't see the

20 burned-out remnants of the restaurant; correct?

21     **A  That is correct.**

22     Q  And is it my understanding that the -- the

64

1  restaurant was not part of the gaming area, that

2  they were separate parts of the building?

3      **A  No, that's not true. There were -- as I**

4  **remember, there were some bingo games in the area**

5  **of the restaurant. So, I think there were three**

6  **separate areas. One was in the restaurant; one**

7  **was kind of connected to the restaurant; and there**

8  **may have been a few in the hotel.**

9      Q  And as a result of the fire, that certain

10 machines needed to be relocated to other parts of

11 the ho -- of the building; is that fair?

12     **A  Correct.**

13     Q  Okay.

14     **A  Yes.**

15     Q  And that a big part of the loss-of-

16 business-income claim being presented on behalf of

17 Rod & Reel involved the relocation of those

18 machines and whether or not they would be impacted

19 by the relocation; is that -- is that a fair

20 statement?

21     **A  That's correct.**

22     Q  Okay. And that was a big part of the

65

1  dispute that Meaden & Moore on behalf of State
2  Auto and Goodman-Gable-Gould were trying to work
3  out; is that fair?
4  **A  Yes.**
5  Q  Okay.  If you go back to --
6      MR. KREKSTEIN:  And I'm going to ask you
7  again to put this up, Tom -- this time I really
8  mean it -- Exhibit 83.
9      MR. BROWN:  83?  Okay.  Hang on.
10     MR. KREKSTEIN:  Yeah.
11     MR. BROWN:  The report.
12     MR. KREKSTEIN:  Yeah, if we could go to
13  the third page of that report.
14     MR. BROWN:  Hang tight.
15     MR. KREKSTEIN:  I appreciate it.
16     MR. BROWN:  I'll make it a little bigger.
17     MR. KREKSTEIN:  Thank you.
18     MR. BROWN:  You want me to make it smaller
19  so we can get the --
20     MR. KREKSTEIN:  Actually, one more page.
21  That's fine.  That highlighted area is perfect.
22     MR. BROWN:  All right.

66

1  BY MR. KREKSTEIN:
2      Q  I believe when Mr. Brown was questioning
3  you, you had testified that the term "we have
4  agreed" there means that you didn't have an
5  agreement with the policyholder or their public
6  adjuster but that that was what State Auto's
7  determination of the period of restoration was;
8  correct?
9  **A  That's correct.**
10     Q  And that was after State Auto had agreed
11  to the shrink wrapping; correct?
12 **A  That -- well, I've got to look at the date**
13 **again, but that could be, yes.**
14     Q  Okay.  And at that period of restoration
15  being approximately 10 to 12 months, that was --
16  that took into account the shrink wrapping and
17  whatever recommendation that Mr. Collier had made
18  as State Auto's building consultant; correct?
19 **A  I don't know that to be true.**
20     Q  Okay.  Which part?
21 **A  The fact that the shrink wrapping was**
22 **included or not included with -- I don't remember**

67

1  the specific conversation.
2      Q  Okay.
3  **A  What I read here is, "We have agreed to**
4  **the period of restoration, which will be**
5  **approximately 10 to 12 months."**
6      Q  Okay.  And based on your recollection of
7  State Auto policies, the period of restoration is
8  a defined term in those policies?
9  **A  Yes, it is.**
10     Q  Okay.  And, so, what you were saying in
11  this report is, "We've agreed that the period of
12  restoration is 10 to 12 months."  I assume at this
13  point that Mr. Charkatz and/or the policyholder
14  did not agree to this?
15 **A  That was -- be my undisputed**
16 **recommendation, and I would have had a**
17 **conversation with Neal Charkatz at least agreeing**
18 **to this as what the period of restoration could**
19 **be.  That's why I have, "10 to 12 months."**
20     Q  Okay.  So, I -- I -- I was wrong.  When
21  you say, "we have agreed," you're referring to an
22  agreement with Mr. Charkatz?

68

1  **A  I'm referring to we have agreed that the**
2  **cost of -- the period of restoration would be 10**
3  **to 12 months, but in every single claim, this**
4  **early on in the process, that can change because**
5  **it's --**
6      Q  That can change or can't change?
7  **A  It can change.**
8      Q  Can.  Okay.  No "T."
9  **A  Yes.**
10     Q  Okay.
11 **A  Can.**
12     Q  Okay.  But at this time, as of the date of
13  this report in June 2015, it's your testimony that
14  Mr. Charkatz had agreed to that period of
15  restoration.
16 **A  At a minimum, yes, 10 to 12 months.**
17     Q  Okay.  And did your evaluation of the
18  period of restoration change subsequent to June
19  of 2015?
20 **A  Change?**
21     Q  Yeah.
22 **A  Repeat the question.**

---

69

1    Q  Did your evaluation of the period of
2  restoration change between June of 2015 and the
3  last time you were involved in the file, which I
4  believe was December of 2016?
5    **A  I don't -- the answer --**
6    Q  '16 is correct.
7    **A  Sorry, I don't know the answer to that**
8  **question because I don't know when repairs**
9  **actually started on the building.**
10    Q  Okay.
11    **A  I don't -- I don't know the answer to**
12  **that.**
13    Q  Okay.  Did Mr. Charkatz or the
14  policyholder ever indicate to you during your
15  handling of this claim whether or not they were
16  going to repair the restaurant or do something
17  else?
18    **A  They were going to repair the restaurant**
19  **or move it on the same property to a different**
20  **location, if I'm correct.**
21    Q  Anybody ever mention to you about putting
22  a parking lot there?

---

70

1    **A  No.**
2    Q  Okay.  Now, assuming those repairs would
3  be made, there was recoverable depreciation taken
4  on the building claim; correct?
5    **A  Yes.**
6    Q  Do you know, sitting here today, whether
7  Rod & Reel ever presented a claim for the
8  recoverable depreciation?
9    **A  I don't know.**
10    Q  If they didn't do that, would it be fair
11  to assume that either they didn't make repairs or
12  that the repairs that they made did not exceed the
13  actual cash value that State Auto paid them on the
14  building?
15    **A  I don't know the answer to that question**
16  **because they could have replaced -- in some**
17  **policies, and I don't recall in this one, but they**
18  **could have replaced a different location and still**
19  **spent the RCV money.  If they relocated on the**
20  **premises, for example, if they spent or allocated**
21  **the money, they may be entitled to it.**
22    Q  Okay.  So, you don't know what they did.

---

71

1    **A  I don't know what they did.**
2    Q  Okay.  Are you saying what they ended up
3  doing would impact the period of restoration?
4    **A  It could.**
5    Q  Okay.  During your involvement in the Rod
6  & Reel claim, did Mr. Charkatz ever relay to you
7  or anyone on behalf of Rod & Reel that the period
8  of restoration was in excess of 12 months?
9    **A  I'd have to look at what the -- what Neal**
10  **Charkatz presented.**
11    Q  But sitting here today, do you recall any
12  conversation or any communication with
13  Mr. Charkatz, Goodman-Gable-Gould, or the
14  policyholder where they relayed to you their
15  belief that the period of restoration exceeded
16  12 months?
17    **A  I don't recall --**
18    Q  Okay.
19    **A  -- but, typically, PAs present something**
20  **and I may present something and we work together**
21  **to get it resolved.  So --**
22    Q  Do you recall ever being presented with

---

72

1  any type of documentation on behalf of Rod &
2  Reel supporting a period of restoration in excess of
3  12 months?
4    **A  I'd have to look at the file.  I don't**
5  **know.**
6    Q  Okay.  So, sitting here today, you can't
7  recall that.
8    **A  Is there any information you can pull up**
9  **for me that -- I don't know what they presented.**
10  **I don't remember what they presented.**
11    Q  Understood.  So, sitting here today, you
12  can't recall them presenting any documentation to
13  support a period of restoration in excess of
14  12 months.
15    **A  No.**
16    Q  Okay.
17    MR. KREKSTEIN:  Tom, either if you can put
18  it on or you can let me put it on, I'm -- I'm
19  going to refer to -- I believe you had marked it.
20  It's plaintiffs' production of documents number
21  92.
22    MR. BROWN:  92.  Hang on.

---

73

1    MR. KREKSTEIN: I have it if you want to
2 let me put it up.
3    MR. BROWN: No, you can go ahead and put
4 it on because I don't -- I don't think I have 90.
5 Let me see. No, I didn't put 92 up.
6    MR. KREKSTEIN: All right. If you can
7 take your screen off and go back to the video.
8    MR. BROWN: Yep.
9    MR. KREKSTEIN: I think I can do it.
10    This is the amended complaint. This is
11 not what I wanted.
12    MR. BROWN: I don't think I have
13 Exhibit 92, Bill, just to let you know.
14    MR. KREKSTEIN: Can you guys see this?
15    MR. BROWN: Yep.
16    MR. KREKSTEIN: Plaintiffs' production of
17 documents 92, can everybody see that?
18    MR. BROWN: Go back to the top of it.
19 That's page 92. I think that's a different
20 exhibit but --
21    MR. KREKSTEIN: Yeah, page 92. I'm just
22 reading the Bates stamp number.

74

1    MR. BROWN: Right, it's not Exhibit 92. I
2 just want to --
3    MR. KREKSTEIN: Plaintiffs' production of
4 documents 00092.
5    MR. BROWN: Yep, we see that.
6    MR. KREKSTEIN: All right. Can we mark
7 this? What -- what number can we mark this as?
8    MR. BROWN: Hang on a second. Let me tell
9 you. Let's mark it as 84.
10    MR. KREKSTEIN: Okay. Done.
11    (Terra Exhibit 7 was marked for
12 identification and is attached to the transcript.)
13 BY MR. KREKSTEIN:
14    Q Mr. Terra, this is an email from
15 Mr. Charkatz to you, copy to Jeremy Hogue and
16 Christian Fox, dated April 12th, 2016.
17    A Yes.
18    Q Is it a fair characterization that this
19 email is Mr. Charkatz telling you that Rod & Reel
20 is presenting a loss-of-business-income claim
21 totaling $1.456 million?
22    A That's correct.

75

1    Q Okay. What was your reaction when you
2 received this submission?
3    A I can't remember at the time. I mean
4 that's their submission.
5    Q Okay.
6    A They can submit what they want as the
7 public adjuster. I'm going to adjust it based on
8 what we have.
9    Q Do you recall what Meaden & Moore's
10 calculation of the loss-of-business-income claim
11 was?
12    A I do not.
13    MR. KREKSTEIN: Okay. I'm going to jump
14 to another. Here we go. Can everybody see this
15 Meaden & Moore letter dated July 15, 2016?
16    MR. BROWN: Yep.
17    MR. KREKSTEIN: Okay. And I will -- for
18 the record, it's Rod & Reel 3448 through 3453, and
19 we'll mark this as Exhibit 85.
20    (Terra Exhibit 8 was marked for
21 identification and is attached to the transcript.)
22    Q So, Meaden & Moore, specifically Mr. Fox,

76

1 was retained by State Auto to calculate the loss-
2 of-business-income claim; correct?
3    A That's correct.
4    Q Okay. If you look at the second
5 paragraph, it says, "Under your guidance our
6 calculation considers a 12-month period of
7 restoration from February 8, 2015, through
8 February 7, 2016." Do you see that?
9    A I do.
10    Q Okay. So, would that have been
11 information you provided to Mr. Fox?
12    A That would have been information provided
13 at some point in the claims process to Mr. Fox. I
14 can't tell you when that was.
15    Q Okay. Would that have been provided by
16 you?
17    A It probably would have been in conjunction
18 with my conversation with the building consultant.
19    Q That would be Mr. Collier; correct?
20    A That's correct.
21    Q Okay. So, you and Mr. Collier, in
22 consultation, tell Mr. Fox, the accountant, to

77

1  please calculate the loss-of-business-income claim
2  based on a 12-month period of restoration.
3     **A  Yeah, that's initially based on a 12-month**
4  **period of restoration.**
5     Q  Yeah.  Okay.  And if you look at the first
6  paragraph, I believe Mr. Fox says, over that
7  periods, the business income loss measurement
8  totals $71,639.
9     **A  Yes, that's what it says.**
10    Q  Okay.  So, at or around this time, you had
11  a $1.4 million loss-of-business-income claim
12  presented on behalf of Rod & Reel, and State
13  Auto's accountant is saying that the number is
14  71,639.
15    **A  Yes.**
16    Q  Okay.  And, so, the purpose of that
17  December 2016 meeting was to see if the parties
18  could come to some agreement somewhere between
19  $71,639 and in excess of $1.4 million; is that
20  fair?
21    **A  Yes.**
22    Q  Okay.  And if a resolution couldn't have

78

1  been reached, then the parties would resolve it in
2  appraisal.
3     **A  That was my discussion, yes.**
4     Q  Okay.  Would it be fair to say that yours
5  and Ms. Veahman's thought process was that, in
6  order to resolve the claim at that December 2006
7  meeting, State Auto was going to have to pay some
8  money that it didn't necessarily owe to resolve
9  the claim?  Is that fair?
10    **A  No, that's not -- that's not fair.**
11    Q  Okay.  So, State Auto was only looking to
12  pay money that it owed under the policy in order
13  to resolve the claim?
14    **A  That's subjective because the accountant**
15  **puts together the numbers but also was there to**
16  **listen to the insured, their accountant, as to**
17  **what things may or may not have been considered**
18  **with regards to the business income claim.**
19    Q  And based -- I'm sorry.  I didn't mean to
20  cut you off.
21    **A  Okay.  So, that's why they wanted the**
22  **walk-through on the facility, to show Christian**

79

1     **Fox, Caroline Veahman, and myself that where the**
2  **machines were located played a huge part into what**
3  **the business income claim was.**
4     Q  And did Mr. Fox tell you at that meeting
5  that he needed to change his numbers?
6     **A  I think there was discussion over that,**
7  **yes.**
8     Q  Okay.  What was the discussion?
9     **A  I don't remember off the top of my head,**
10  **but they were going back and forth, or he was**
11  **talking about maybe changing some numbers, and**
12  **that's where the 7 percent came up with -- all**
13  **those conversations, and I don't remember the**
14  **exact conversation, but it was based on percentage**
15  **of -- of what we were talking about, which I had**
16  **in that email about a 7 percent.  I don't remember**
17  **the exact conversation.**
18    Q  And wasn't that in an effort to compromise
19  the claim?
20    **A  No, I think when you talk about**
21  **compromise, you're talking about adjusting.**
22    Q  Okay.  You told Mr. Chenetski in your

80

1  email to him on December 22nd, 2016, that the
2  $1.4 million claim from Goodman-Gable-Gould was
3  excessive; correct?
4     **A  Yes.**
5     Q  Why did you think it was excessive?
6     **A  Because we were far apart.  It doesn't**
7  **mean that either one of us were wrong.  You have**
8  **to go back through the adjusting process to see if**
9  **something was missed.**
10    Q  Did you believe that the $1.4 million
11  submission from Goodman-Gable-Gould was correct?
12    **A  No.**
13    Q  Why not?
14    **A  Because a PA is going to submit what they**
15  **think is fair, and we're going to evaluate it to**
16  **what we think may be fair, but there's -- there's**
17  **always discussion that's had between the adjuster**
18  **and the PA about facts pertaining to the business**
19  **income loss.**
20    Q  My question was why did you think the $1.4
21  million submission was excessive.
22    **A  Because it was a large number --**

81

1   Q  No other reason?

2   A  -- compared to what we had written.  No, I
3   don't think so.

4   Q  Other than the disparity in the numbers,
5   you had no other reason to question the
6   $1.4 million submission by the three G?

7   A  Well, I mean I -- it could have been their
8   period of restoration.  I don't know.

9   Q  Okay.  So, what other factors went into
10  you calling that $1.4 million number "excessive"?

11  A  As I sit here today, I don't remember the
12  exact breakdown because I've never received a copy
13  of -- of your file, so -- or my file, I should
14  say.

15  Q  Okay.

16  A  So, I don't know what factors went into
17  that.

18  Q  Okay.  And in response to your email, I
19  believe -- or, I'm sorry, in the email that
20  prompted your email from Mr. Chenetski that you
21  just discussed during Mr. Brown's questioning, was
22  Mr. Chenetski saying he's not ready to compromise

82

1   the claim until additional analysis has been done
2   of the insured's submission?  Is that a fair
3   recitation of what he was saying?

4   A  If Mr. Chenetski is talking about
5   compromise as adjust, I don't know what he's
6   referring to.

7   Q  I'm just saying is that what he said in
8   the email.  I mean we could pull it up.

9   A  That's what he said, yes.

10  Q  Okay.  And, so, what he wanted was some
11  additional analysis of that $1.4 million number
12  and what went into it; correct?

13  A  That's correct, and that, typically, on
14  damages, would have been handled by the large loss
15  adjuster.

16  Q  And what analysis did you do of that
17  $1.4 million submission by the three Gs between, I
18  believe, June or July of 2016 when it was
19  submitted and the December 2016 meeting?

20  A  I think I would have transferred or sent
21  the information from Neal Charkatz -- or from
22  Christian Fox to Meaden & Moore.

83

1   Q  Right.  So, you would have been relying on
2   Christian Fox in order to provide you with
3   information as far as whether or not that $1.4
4   million submission makes sense, doesn't make
5   sense, or whether more information is required;
6   correct?

7   A  That's correct, that's what we do in the
8   adjusting process.

9   Q  Okay.  And after Ms. King was handling the
10  claim, was it your understanding that Mr. Fox
11  continued to be involved in the claim?

12  A  I don't know.  I just know what the email
13  says about bringing someone completely separate
14  from Christian to make an analysis.

15  Q  Okay.  Would it be fair to say that during
16  your handling of the claim, that you had
17  confidence in Mr. Fox's ability?

18  A  During my handling of the claim.  I don't
19  know when I relinquished handling to Caroline but
20  during my handling, yes.

21  Q  All right.  Well, I assume that, by virtue
22  of the fact that Mr. Fox accompanied you and

84

1   Ms. Veahman to that December 2016 meeting, can I
2   assume that you still had confidence in Mr. Fox's
3   ability to review the submissions by
4   Goodman-Gable-Gould and the policyholder --

5   A  Yeah.

6   Q  -- and evaluate the loss-of-business-
7   income claim?

8   A  Yes.

9   Q  Okay.  And did anybody on behalf of State
10  Auto tell you that they were unhappy or critical
11  of Mr. Fox's work on the file?

12  A  Other than the email from March Chenetski
13  talking about bringing someone else in, no.

14  Q  And I believe Mr. Chenetski referred to
15  bringing in a fresh set of eyes; correct?

16  A  Yes.

17  Q  Okay.  Has that ever happened before?

18  A  To me on a specific claim, no.

19  Q  Okay.  Have you ever seen that happen
20  before on any claim?

21  A  Yeah.

22      MR. KREKSTEIN:  Hey, Tom, can we go back

85

1 to those email exchanges, I think Exhibit 68.
2      MR. BROWN:  Sure.  Hang on.
3      MR. KREKSTEIN:  Thank you.
4      MR. BROWN:  Oops.  I think you've got to
5 stop sharing.
6      MR. KREKSTEIN:  I will do that.  You're
7 right.  Thank you.  Sorry.
8      MR. BROWN:  Not a problem.
9      MR. KREKSTEIN:  You know, I could have --
10 I could have pulled that up.
11      MR. BROWN:  Here it is.
12      MR. KREKSTEIN:  Thank you.  Perfect.  And
13 that's -- that's the right one.
14      Q  So, I'm looking at Rod & Reel 3445, which
15 is an email from Caroline Veahman and Mark
16 Chenetski, copied to Mr. Terra, dated
17 December 21st, 2016.
18      **A  Yes, I see that.**
19      Q  Do you know what prompted this email from
20 Ms. Veahman to Mr. Chenetski?
21      **A  I assume Mark and her had a conversation**
22 **about the claim.**

86

1      Q  Okay.  And was this Ms. Veahman's
2 explanation as to why -- why a compromise might
3 work?
4      **A  Yes.**
5      Q  Okay.  Would it be fair to say that
6 just -- just based on this email, that one of the
7 big disagreements between State Auto and Rod &
8 Reel on the loss-of-business-income claim was
9 trying to project a growth rate for the gaming
10 part of the business?
11      **A  Yes, that was -- that was part of it.**
12      Q  Okay.  And given the fact that the parties
13 would need to project that growth over -- in the
14 future, how you project that growth is one of
15 those kind of uncertain issues that adjusters
16 face.
17      **A  Yes.**
18      Q  And that, typically, in a loss-of-
19 business-income claim, accountants may have
20 different ways in order to project future growth.
21      **A  They could, yes.  I would say a lot of**
22 **accountants may use different methods, not always**

87

1 the exact same.
2      Q  Okay.  If you look at the second paragraph
3 of Ms. Veahman's email, she says, "Although we
4 think it is difficult to support a loss in the
5 gaming area" -- do you know what she's referring
6 to there?
7      **A  When she says, "gaming area," I'm not sure**
8 **if she's talking about the restaurant or about the**
9 **areas attached to the restaurant or the hotel.**
10      Q  Okay.  If you look down one, two, three,
11 fourth paragraph, just that one line, it says,
12 "Also, the RC holdback for the building will come
13 into play."  Do you know what she's talking about
14 there?
15      **A  I'm assuming that the replacement of the**
16 **building, "RC," "replacement cost holdback for the**
17 **building will come into play."**
18      Q  Now, earlier you had testified that the
19 issue there for the parties to resolve at that
20 December 2016 meeting was solely related to the
21 loss-of-business-income claim.  Did I get that
22 correct?

88

1      **A  Yeah, that's correct.  We had a discussion**
2 **about the replacement cost, but I think, in my**
3 **conversation with Neal, it would have to be**
4 **incurred or the building would have to be replaced**
5 **in some capacity.**
6      Q  And is it fair to say that as of
7 December 2016, that the building hadn't been
8 replaced and repairs hadn't taken place?
9      **A  I -- I don't know the answer to that**
10 **question.**
11      Q  Okay.  So, why is Ms. Veahman mentioning
12 the RC holdback coming into play?
13      **A  Because at some point, she'd be**
14 **responsible for paying that out as damages.**
15      Q  Did you and/or Ms. Veahman make any
16 representations to Mr. Charkatz at that
17 December 2016 meeting that, as a way to compromise
18 the claim, that State Auto would be willing to pay
19 any portion of that holdback even though repairs
20 had not been completed?
21      **A  I don't know the answer to that question.**
22 **We would have had a conversation about if they got**

89

1    the repairs started, that we may owe some withheld
2    depreciation based on what repairs were done, but
3    I don't remember the specifics around that
4    conversation.
5       Q    Did you or Ms. Veahman ever mention, or
6    did Mr. Charkatz ever mention, payment of any
7    portion of that recoverable depreciation --
8       A    I think Mr. Charkatz --
9       Q    -- being paid -- being paid as part of a
10   compromise settlement?
11      A    I think Mr. Charkatz represented that,
12   yes.
13      Q    Okay.  And that would be money that State
14   Auto did not owe at that time; correct?
15      A    At the time, no, you're correct.  Yes,
16   you're correct.
17      Q    And at the time of that meeting, your
18   accountant or State Auto's accountant, Mr. Fox,
19   had issued a report saying that the total amount
20   owed on the loss-of-business-income claim was a
21   little over $71,000; correct?
22      A    Prior to that meeting, yes, but I know

90

1    that there was conversations at the meeting about
2    increasing that.  The specifics I don't recall.
3       Q    And you don't recall how much.  Now,
4    Ms. Veahman is referencing a figure in the third
5    paragraph of her email of 320,000.  Do you see
6    that?
7       A    I do see that.
8       Q    Do you know what that number represents?
9       A    Let me read it.
10      Q    Sure.
11      A    She's saying, "I believe the difference of
12   34 percent would be our max of 320."  I don't know
13   what she refers to.  "I believe the difference of
14   34 percent would be the max of 300" -- I can't
15   speak for her.
16      Q    Do you recall that figure of 320,000 ever
17   being discussed during that meeting?
18      A    No, I don't recall.  I don't know at this
19   moment.  It might have been discussed, but I don't
20   remember the specifics.
21      Q    You don't remember numbers discussed
22   during that meeting; correct?

91

1       A    I don't remember exact numbers discussed,
2    no.
3       Q    Do you remember general numbers?
4       A    I want to say it was somewhere north of
5    $500,000.
6       Q    And that would have been a number -- a
7    number to resolve the entire claim?
8       A    I don't know if it was the entire claim
9    because we actually talked about going to
10   appraisal if we disagreed.
11      Q    Okay.  So, you don't know who raised --
12   who mentioned that number?
13      A    I don't.
14      Q    Okay.  The last line of Ms. --
15   Ms. Veahman's email says, "The insured/public
16   adjuster has a global policyholder release."  Do
17   you know what she's talking about there?
18      A    That the public adjuster would -- could be
19   recommending a policyholder's release.  "The
20   insured public adjuster has a global policyholder
21   release."  Probably looking to resolve the entire
22   claim.

92

1       Q    Okay.  So, if the idea was to resolve the
2    entire claim, wouldn't that also involve State
3    Auto paying amounts that it didn't necessarily
4    owe?
5       A    No, Bill, I disagree with you on that
6    because the evaluation for business income is
7    subjective.  When we, as adjusters, put forth
8    numbers, we do revise them as to what the value
9    may be depending on information we receive.
10      Q    Did Christian Fox ever tell you at that
11   meeting whether or not he revised his $71,639
12   evaluation to a different number?
13      A    I don't know if he ever revised that
14   because I wasn't involved after that process of
15   December.  I don't --
16      Q    I asked at the meeting did he ever inform
17   you that his number was going to be revised.
18      A    Yes, I believe he said he would look at
19   some numbers and, I think, based on what he was
20   talking about, he was working on some revised
21   numbers.  I don't know what they are.
22      Q    Okay.

93

1    MR. KREKSTEIN: Can you go back up, Tom,
2 to Mr. Terra's email. Thanks.
3    Q  The second paragraph of your email to
4 Mr. Chenetski on December 22nd, 2016, at
5 12:05 p.m., states, "However, the gaming-related
6 loss is subjective based on the placement of the
7 machines." What did you mean by that?
8    A  The way it was set up with the restaurant
9 is they had gaming machines in the restaurant that
10 certain clientele would visit more on a regular
11 basis because it wasn't part of the hotel but was
12 more a part of the restaurant operation.
13    So, a lot of times the place — well, a
14 lot of times people come in and, what was
15 explained to me, and we kind of verified that
16 during our walk-through, was that individuals
17 would come in with their boats, get fueled up, and
18 go into the bar section of the restaurant versus
19 the hotel section of the restaurant.
20    So, placement of those machines played a
21 big part in the loss-of-business income.
22    Q  The next paragraph begins, "I would agree

94

1 that we have a very solid value based on 12 months
2 from Christian Fox." Do you see that?
3    A  Yeah.
4    Q  Aren't you referring to Mr. Fox's report
5 that we spoke about earlier?
6    A  I am, yes.
7    Q  And that was the report valuing the loss-
8 of-business-income claim at $71,639?
9    A  It could have been based on that or
10 discussions with Christian and Caroline that day.
11 I don't — because this email was December 22nd, I
12 don't know if I was referring to the Christian Fox
13 breakdown that he gave us or the discussions that
14 we had when we were there.
15    Q  Well, I believe later on in this
16 paragraph, you say, "Christian Fox has based his
17 numbers on a 30 percent grow trend." I think you
18 were trying to say, "growth trend."
19    A  We were talking about that at the meeting.
20 So, that was definitely a result of the meeting
21 with Neal Charkatz.
22    Q  Was it your understanding that that report

95

1 that Mr. Fox sent to you in July of 2016 was based
2 on a 30 percent growth trend?
3    A  I don't remember. It could have been
4 based on this email.
5    Q  Okay.
6    A  I don't remember what went into the
7 report.
8    Q  So, if Christian Fox was going to revise
9 his numbers, it probably would have involved
10 changing that growth trend percentage; correct?
11    A  Yes, or the placement — or the placement
12 of the machines.
13    Q  Okay.
14    A  I just don't —
15    Q  As of the time of this email, which was
16 after your meeting, the growth trend that Mr. Fox
17 had adopted was 30 percent.
18    A  It could have been, yes.
19    Q  Okay. I'm going to read you one of the
20 allegations in plaintiffs' amended complaint. It
21 says, "At the December 12th, 2016, meeting, the
22 insured and State Auto made progress on coming to

96

1 an agreement on the building claim and the period
2 of restoration and the BI/EE claim but failed to
3 come to an agreement on all aspects of the claim."
4 Do you agree with that statement?
5    A  "Failed to come to an agreement" — can
6 you read it again, Bill.
7    Q  Sure. "At the December 12th, 2016,
8 meeting, the insured and State Auto made progress
9 on coming to an agreement on the building claim,
10 the period of restoration, and the BI/EE claim but
11 failed to come to an agreement on all aspects of
12 the claim."
13    A  I agree with that statement.
14    Q  What agreement did you come to on the
15 building claim at the meeting?
16    A  We didn't have a set agreement regarding
17 the building at the — at the meeting.
18    Q  My understanding is -- from your earlier
19 testimony is that the purpose of the meeting was
20 to resolve the loss-of-business-income claim.
21 What aspect of the building claim were you
22 attempting to resolve at the meeting?

97

1    A  I believe that there was a discussion from
2  Neal Charkatz about getting some withheld
3  depreciation or paying a portion of withheld
4  depreciation, but there was no agreement.
5    Q  What was Mr. Charkatz basing that claim
6  on?
7    A  I think they were talking about relocating
8  the restaurant to a different area of the property
9  or -- I don't know what repairs were done at the
10  point of the December meeting.
11    Q  Did you or Ms. Veahman ever represent to
12  Mr. Charkatz that State Auto would be willing to
13  pay a portion of the recoverable depreciation
14  without being provided proof that the restaurant
15  was either relocated or repaired?
16    A  Yeah, we -- we could have had that
17  conversation.  I don't remember exactly.
18    Q  Okay.  So, why -- why were you having that
19  conversation?
20    A  Because they were looking to start the
21  repairs to the restaurant, as I understand, and if
22  they got a certain way through the project, we

98

1  could release some withheld depreciation.
2    Q  Had they given you any indication that
3  they had started or are in the process of doing
4  that?
5    A  I don't recall.  I don't know.
6    Q  Okay.  Did you reach an agreement, meaning
7  State Auto and Rod & Reel reach an agreement, on
8  any aspect of the claim at that December 12, 2016,
9  meeting?
10    A  No.
11    Q  Okay.  I'm going to read you an allegation
12  in the amended complaint, paragraph 48.
13  "Following that meeting, upon information and
14  belief, and unknown to the plaintiff until after
15  the filing of the instant action, a State Auto's
16  director of claims placed a call to the Mr. Terra
17  and informed him that State Auto was removing him
18  from the case since the insurer wanted to use this
19  case to, quote, 'teach GGG a lesson,' end quote,
20  and to play hard ball on the claim and, in that
21  regard, that Mr. Terra was being removed from the
22  case and Ms. King was being installed as State

99

1  Auto's representative going forward."
2    Do you agree with that statement?
3    A  That's not entirely accurate because I
4  didn't have a conversation with Mark Chenetski on
5  the phone; I had a conversation with him in
6  January of the following year, which was a couple
7  months later.
8    Q  And that was after Ms. King had already
9  been assigned; correct?
10    A  That's correct.
11    Q  And the only thing that Mr. Chenetski told
12  you, if I got this correct, is after you asked him
13  what the deal is with Rod & Reel, he replied,
14  "It's not about this one claim.  It's about
15  teaching the three Gs a lesson."
16    A  That's correct.
17    Q  And there was no other discussion with
18  Mr. Chenetski about why you were removed, why
19  Ms. King was assigned, or what he was going to do
20  on this claim; is that correct?
21    A  I wasn't removed from the claim.  Caroline
22  was an adjuster reporting to Mark Chenetski.  They

100

1  asked me to get involved to help resolve the
2  claim.  That's why I was there.
3    Q  Okay.  Other than what you testified your
4  conversation was with Mr. Chenetski at the
5  Sheraton --
6    A  Yes.
7    Q  -- there was no other discussion between
8  you and Mr. Chenetski concerning Ms. King's
9  assignment to the claim or Ms. Veahman's removal
10  from the claim; is that correct?
11    A  That's correct.
12    Q  Okay.  Do you have any documentation,
13  emails, copies of emails, text messages, any
14  communications from anyone concerning Rod & Reel
15  or any of the testimony that you've presented
16  today?
17    A  No.
18    Q  Do you have any recordings of any
19  conversations concerning any of the issues
20  discussed today?
21    A  No.
22    Q  Okay.  I'm going to try to find -- okay.

101

1  Can you see my screen?
2  **A  Yeah.**
3  Q  Okay.  I'm going to show you a series of
4  emails.  The Bate numbers are Rod & Reel 3799
5  through 3802.  And I'll start at the bottom.
6  MR. KREKSTEIN:  And we'll mark this as 86.
7  Is that correct?
8  MR. BROWN:  I believe that's where we are.
9  MR. KREKSTEIN:  Okay.
10  (Terra Exhibit 9 was marked for
11 identification and is attached to the transcript.)
12  MR. KREKSTEIN:  Go up for a second.
13  Q  So, there's an email from Mr. Charkatz to
14 Ms. King dated May 24th, 2017, which is attaching
15 an email and document sent to Scott Terra on the
16 building compromise agreement and then says,
17 "Thank you for meeting with us today.  Please let
18 me know if you need anything from me to issue the
19 $26,500 and the $71,639 at this time."
20  Then Ms. King forwards you the email on
21 May 25th, and says, "Scott, are these -- these
22 figures you all agreed to on the building/BPP?"

102

1  Do you see that?
2  **A  I do.**
3  Q  Okay.  Earlier you had said that once
4  Ms. King was assigned to the claim, you never
5  discussed the claim with Ms. King.  Is that fair?
6  **A  That's correct.**
7  Q  Okay.  But here Ms. King is asking if you
8  agreed on the figures that Mr. Charkatz was asking
9  for; correct?
10  **A  That's correct.**
11  Q  Okay.  So, you did have some communication
12 with her.
13  **A  With regards to the handling of the claim**
14 **or damages, no.  I think she's bringing back up**
15 **figures that were already presented that I agreed**
16 **to.**
17  Q  Okay.
18  **A  I think that's what that represents.**
19  Q  Okay.  So, then you write back to Ms. King
20 on May 25th, and I'm referring to the document
21 Bates stamped number Rod & Reel 3800, "Sherri,
22 what does the $26,500 represent and the 71,639?"

103

1  Do you see that?
2  **A  I do see that.**
3  Q  And then it looks like Ms. King replied to
4  you and then put her responses in red.  Does that
5  make sense?
6  **A  Yeah, I would say that's correct.**
7  Q  Okay.  Because then Ms. King, if you look
8  above, sends you an email back, and I believe her
9  responses are in red.
10  So, is it fair to say that Mr. Charkatz
11 was asking Ms. King for money that you would agree
12 to pay them but didn't, and she was asking you to
13 confirm whether or not you would agree to those
14 payments?
15  **A  Can you go back down a second, Bill?**
16  Q  Sure.
17  **A  Yes.**
18  Q  Okay.  So, at the top of the page, at the
19 top of this email chain, you write back to
20 Ms. King, "Okay.  Not sure on the BI claim,
21 however, that looks right considering the original
22 completion by Meaden & Moore."  You're referring

104

1  to Meaden & Moore's report; correct?
2  **A  Yes.**
3  Q  Okay.  And that's that 71,000-and-change
4  number.
5  **A  Yes.**
6  Q  Okay.  So, again, we're in May 2017, and
7  you're not telling Sherri King that Meaden & Moore
8  has revised its calculation of the business-income
9  claim; correct?
10  **A  I'm not telling Sherri King that?**
11  Q  Yeah, that this email doesn't say that;
12 correct?
13  **A  No.**
14  Q  Okay.  Then you say, "The $26,500 was
15 something the PA mentioned at the meeting last
16 year.  It was an oversight on his part.  The
17 insured caught through accounting.  I didn't agree
18 with the difference unless he can show me the
19 error.  The claim was removed from Caroline --
20 Caroline and myself shortly after the meeting.
21 Neal never sent a follow-up email, letter, or
22 additional documentation on the issue.  Thank

105

1 you."
2      So, you're telling Ms. King that on
3 that -- let me just check that number -- on that
4 $26,500 number, that you were expecting some
5 additional documentation from Mr. Charkatz to
6 support the accounting error.
7      **A Yes.**
8      Q Okay. And do you know why you didn't pay
9 the $71,000-and-change that Mister -- Mr. Fox had
10 calculated?
11      **A I wasn't handling the claim. I didn't**
12 **have the authority to pay that.**
13      Q Okay. At that time.
14      **A Yeah.**
15      Q I'm saying how about before that.
16      **A I don't know when Caroline took over the**
17 **handling of the file.**
18      Q Okay. Regarding the conversation you had
19 with Mr. Chenetski at the Sheraton, did you ever
20 relay that conversation to anyone other than
21 Mr. Charkatz?
22      **A I don't think so, no.**

106

1      Q So, between the time you had that
2 conversation sometime in, I believe, January
3 of 2017 and when you spoke to Mr. Charkatz about
4 it after you had left State Auto, you had not
5 mentioned that conversation to anyone?
6      **A I don't think so.**
7      Q Other than Mr. Charkatz, have you
8 discussed the Rod & Reel claim with anyone since
9 you left State Auto?
10      **A No.**
11      MR. KREKSTEIN: I'm just going to go
12 through my notes, but I don't have anything
13 further at this time. Let me just check.
14      MR. BROWN: I'll have some follow-up
15 questions, Bill.
16      MR. KREKSTEIN: Go ahead, Tom. I'll --
17      MR. BROWN: Can you put your Exhibit 86
18 back up. Turnabout's fair play. Here we go.
19      MR. KREKSTEIN: Yeah. Which --
20      MR. BROWN: Scroll down, or I think it's
21 down. Stop right there. No, up where the red is,
22 and stop right here.

107

1 RE-EXAMINATION BY COUNSEL ON BEHALF OF PLAINTIFFS
2 BY MR. BROWN:
3      Q Now, Mr. Terra, let's just take a look at
4 Exhibit 86. There's an email from you to Sherri
5 King dated May 25th, and I believe the testimony
6 was that this was an email back to you with
7 Ms. King's comments to your comments but hers are
8 in red; is that fair?
9      **A Yes.**
10      Q Okay. And let's talk first about the
11 BI/EE, the 71,639.
12      **A That's correct.**
13      Q Now, that is an amount based upon a
14 12-month period as determined by Meaden & Moore,
15 the accountants for State Auto; right?
16      **A Yes.**
17      Q Okay. Is that what is known, I think, in
18 the industry as the undisputed amount of the BI/EE
19 loss?
20      **A Yes.**
21      Q That's the minimum amount; we're going to
22 pay that to the insured now; and we're going to

108

1 dispute as to whether any additional amounts are
2 owed; right?
3      **A Yes.**
4      Q Okay. That wasn't paid, clearly, at least
5 by May 25th, 2017; right --
6      **A Yes.**
7      Q -- what she's asking about. Okay.
8      The next part down was an additional
9 actual cash value. Now, the actual cash value is
10 an amount that's paid right after the loss but it
11 doesn't require replacement of anything; right? I
12 mean that's the depreciated amount of the loss;
13 correct?
14      **A That's correct.**
15      Q Okay. And, clearly, at least by May 25th,
16 2017, the full ACV that had been paid did not
17 include this $26,500; correct?
18      **A That's correct.**
19      Q Okay. Now, let me go to the business
20 interruption and expert expense and let's -- we
21 have a lot of testimony about that, and let me
22 just go to, fundamentally, in order to determine

109

1 business interruption, there's certain variables
2 that you need to consider. One is the period --
3 the period during which the -- the business
4 interruption is measured; right?
5 **A That's correct.**
6 Q All right. So, if it's 12 months, that's
7 one number. If it's 14 months, it's going to be a
8 different number; right?
9 **A Yes.**
10 Q Okay. One of the other things is we have
11 to project what your business income would be
12 during a period when you've been interrupted
13 because of a casualty loss, and that will include
14 a trend analysis: Were you making more money or
15 were you making less money and how much more, how
16 much less, in order to predict what you would have
17 made had there been no loss; right?
18 **A Yes.**
19 Q And that's where we were talking about
20 30 percent, 37 percent. It's -- this is the trend
21 amount. It's not something that -- subject to
22 opinion, I mean it's not a black-and-white issue;

110

1 correct?
2 **A That's correct.**
3 Q Okay.
4 MR. BROWN: Now, Bill, if you can take
5 that off, I'm going to go back through a couple of
6 things. Thank you, sir.
7 Q And I'm going to take you back -- see if I
8 can bring this up real quick. I'm going to take
9 you to an exhibit that was marked as Exhibit 7 in
10 the King deposition.
11 (Terra Exhibit 10 was marked for
12 identification and is attached to the transcript.)
13 Q Do you see a document up there that says,
14 "Plaintiff production 008 -- 00008"? And there's
15 a -- an email up here, it's between Christian Fox
16 and Caroline Veahman, and it says, "Business
17 income breakdown." Do you see that?
18 **A Yes.**
19 Q Okay. And Christian Fox is sending an
20 email to Caroline Veahman, and he's -- he's
21 identified an updated or revised presentation
22 showing -- setting forth the current business

111

1 income claim demand utilizing actual results for
2 any periods which have been completed.
3 Preliminary claim had significant estimates for
4 2016, 2015." Right?
5     This is during the time period when,
6 internally, State Auto is trying to figure out
7 what the business interruption claim should be;
8 correct?
9 **A Yes.**
10 Q Okay. Do you recall that the claims that
11 were put forth by Mr. Charkatz on behalf of the
12 insured all included a time period longer than
13 12 months but theirs ran -- remember the loss in
14 this case was in February of 2015, and the insured
15 ran their loss period through April of 2016. Do
16 you recall that or not?
17 MR. KREKSTEIN: Objection to the form.
18 You can answer.
19 **A Yes, if that was what was submitted.**
20 Q Okay. Now, I'll go through -- I'll pull a
21 few of those up so you can take a look at them.
22 Same exhibit, an email from Neal Charkatz to you

112

1 dated Monday, November 14, 2016, where Neal says,
2 "Scott, it's my understanding that Jeremy" -- do
3 you remember an adjuster -- a CPA for Neal
4 Charkatz, a fellow named Jeremy Hogue, does that
5 name sound familiar or not?
6 **A Doesn't ring a bell, but if --**
7 Q Okay.
8 **A -- that's the CPA, I just don't -- doesn't**
9 **ring a bell.**
10 Q It says, "My understanding that Jeremy has
11 sent the actual dam -- December through April
12 figures to Christian, which were sent on 9/14."
13     Does that refresh your recollection as to
14 whether the insured was running a period of
15 restoration through April of 2016?
16 MR. KREKSTEIN: Objection to the form.
17 You can answer.
18 **A Sounds very conceivable that's what they**
19 **did, yes.**
20 Q Okay.
21 MR. BROWN: Let's stop this one. Let me
22 move on. Bear with me. Bear with me one second,

113

1  Bill.
2     Q  I'm going to show you what's been marked
3  as Exhibit 4 in the King deposition.
4       (Terra Exhibit 11 was marked for
5  identification and is attached to the transcript.)
6       MR. BROWN:  Come on now.
7     Q  Okay.  Do you see an April 12th, 2016,
8  email from Neal Charkatz to yourself?
9     A  Yes.
10    Q  CC'd to Jeremy Hogue and Christian Fox, do
11 you see that?
12    A  Yes, I do.
13    Q  Okay.  And it says, "Attached to this
14 email please find the insured's claim in the
15 amount of $1,456,009."  Do you recognize that
16 number as the number that was being sought by the
17 insured for the business interruption; correct?
18    A  Yes.
19    Q  Is that correct, Mr. Terra?
20    A  Yes.
21    Q  Okay.  Okay.  Now, hang on.  I'll bring
22 up -- bear with me.  Okay.  Let me show you what's

114

1  been marked as Exhibit 4 in the King deposition.
2       (Terra Exhibit 12 was marked for
3  identification and is attached to the transcript.)
4     Q  Do you recall the loss summary that went
5  with that email as being reflected on the screen,
6  and I can move it over and make it a little
7  better, but there's the 1 million -- down here,
8  1,456,009 claim.
9     A  Yes.
10    Q  Do you see that?
11    A  Yes.
12    Q  And that was for the loss period through
13 April of 2016; correct?
14    A  Yes.
15    Q  Right here.
16    A  Yeah.
17    Q  Is it fair to say that there was a dispute
18 between the insured -- when you were adjusting the
19 claim or when you were supervising this claim,
20 there was a dispute between the insured and State
21 Auto as to both the trend and the period of time
22 for which the restoration would occur?

115

1     A  Yes.
2       MR. KREKSTEIN:  Objection to the form.
3  You can answer.
4     A  I'm sorry.  They're submitting for
5  14 months.
6     Q  Correct.
7     A  Yes.
8     Q  They're submitting for 14.  You were
9  working 10 to 12.  They were submitting on a
10 higher trend.  You were working on a lower trend;
11 correct?
12    A  That's not uncommon.  Correct.
13    Q  And that's why your report -- let me bring
14 this one back up for you -- which was the Exhibit
15 Number 83 -- in your report, you indicate that
16 there was an agreed period of restoration 10 to
17 12, but you also noted that the time element claim
18 was open; correct?
19    A  That's correct.
20    Q  That is, you didn't have an agreement with
21 Mr. Charkatz on either the trend -- or let's put
22 it this way:  You didn't have an agreement with

116

1  Mr. Charkatz or the insured on the trend, the
2  percentage; correct?
3     A  Not with the insured, and it says, "Agreed
4  to," so that would have been what I felt the
5  minimum time would have been to resolve the
6  business income.  So, I think I had 12 months, and
7  it looks like they had 14.
8     Q  Okay.  Now, do you know that the appraisal
9  award which occurred did not set the period of
10 restoration?
11    A  I don't know anything —
12    Q  Do you know about that?
13    A  I don't know anything about the appraisal
14 award.
15    Q  Okay.  That's fine.  Fair enough.
16       When you were initially subpoenaed for
17 this deposition -- you received a subpoena for
18 today's deposition; correct?
19    A  Yes, sir.
20    Q  It was for a time period before and we had
21 to move that, and it's now today.  Did you ask
22 State Farm to provide you a copy of your file so

117

1 that you could prepare for the deposition?
2    A  I actually did. I spoke with, I think it
3 was, Michael Malamud or Malamud, and he said that
4 they would not give me a copy.
5    Q  Okay. Any reason why they wouldn't give
6 you a copy of your file?
7    A  I'm kind of shocked, given the fact that
8 I've been there -- I was there almost 20 years and
9 I was a great representation of State Auto and --
10 but, you know, it is what it is.
11    Q  Did he tell you why?
12    A  No, he just said, "No, we're not doing
13 that."
14    Q  Okay. Let me go back to the conversation
15 that you had with Mr. Chenetski at the hotel.
16 You're sure you had that conversation with him;
17 correct?
18    A  I'm positive.
19    Q  You have a recollection here sitting today
20 of meeting with Mr. Chenetski and Mr. Chenetski
21 saying that they needed to teach GGG a lesson on
22 this file.

118

1    A  That's correct.
2    Q  All right. Have you ever thought it
3 proper to teach a public adjuster a lesson at the
4 expense of an insured?
5    A  I would never do that.
6    Q  It would be totally improper, would it
7 not?
8    A  We adjust claims with the insured even
9 though the vessel to resolving the claim is
10 through the PA because they were hired to
11 represent damages, not coverage, the value -- the
12 value of the loss.
13      MR. BROWN: That's all I have for you,
14 Mr. Terra. Thank you very much.
15      MR. KREKSTEIN: Real, real quick.
16 RE-EXAMINATION BY COUNSEL ON BEHALF OF THE
17 DEFENDANT
18 BY MR. KREKSTEIN:
19    Q  I'm going to show you a document which
20 we'll mark as Exhibit 88, which is Bates
21 stamped -- should have been Bates stamped but it's
22 just the copy I have is not.

119

1      MR. BROWN: Okay. This is the Wakelee
2 estimate; right?
3      MR. KREKSTEIN: Yeah.
4      MR. BROWN: Okay.
5      MR. KREKSTEIN: I don't know why it's not.
6 I apologize.
7      (Terra Exhibit 13 was marked for
8 identification and is attached to the transcript.)
9    Q  It's an estimate dated March 24, 2015,
10 Client: Rod & Reel; Estimator: Kevin Collier.
11 Does this look familiar, Mr. Terra?
12    A  Looks like an estimate I would have
13 received from Wakelee, yes.
14    Q  Okay. And this would have been an
15 estimate that you asked Mr. Collier to prepare?
16    A  As an adjuster, one of my functions, if we
17 were to bring in a building consultant, they would
18 produce the estimate and provide that to me, so
19 yes.
20    Q  Okay. I'm going to go down to -- sorry.
21 I had it -- page 23 of Mr. Collier's estimate.
22 You see the subject line, "General Conditions"?

120

1    A  General conditions --
2    Q  Do you see it where the cursor is?
3    A  Oh, yeah, yeah. Yes. Yes. I'm sorry.
4    Q  That's okay. You've reviewed a few
5 estimates in your time. Do you have an
6 understanding of what general conditions are?
7    A  General conditions are time that they
8 would attribute to a loss, yes.
9    Q  And line 548 of the estimate refers to
10 "Supervision, coordination, administration and
11 management/project oversight - per month." Would
12 that be an allocation for construction management
13 for the repairs, basically?
14    A  It would attribute hours to it, and I
15 believe that's what they did here, yes.
16    Q  Okay. And am I correct that Mr. Collier
17 included in his estimate a five-month --
18 five-month period?
19    A  Yes, it's five months, but I don't -- "I
20 calculated an average of 15 hours per week,
21 60 hours per month."
22    Q  I'm looking at the quantity. It says, I

121

1 believe, "5.00," then a capital "M," capital "O."
2     **A Yes.**
3     Q Is it your understanding that that's
4 referring to five months?
5     **A It's referring to five months of**
6 **supervision, but it also says, "Draft," on the**
7 **estimate, so I don't know if I had discussions**
8 **afterwards about it, but it says, "Five months" --**
9     Q Yeah.
10     **A -- "of supervision at 15 hours per week."**
11     Q Okay. And would that five-month period,
12 generally, based on your familiarity with
13 estimates of this kind, be re -- being a reference
14 to the time it would take for the construction?
15     **A Not necessarily. Yes, in two parts. One,**
16 **it could mean that they're attributing a total of**
17 **five months based on man-hours, but the actual**
18 **repair could be longer.**
19     Q Okay. But at least that's what
20 Mr. Collier is including in his line item for
21 general conditions, a five-month period.
22     **A Yes.**

122

1     Q Okay. And then site labor, as well, the
2 actual people doing the construction, he also
3 attributed five months to that; correct?
4     **A Yes, but it's not attributed to people**
5 **doing the construction. It's attributed to**
6 **probably cleanup, daily cleanup, those types of**
7 **situations.**
8     Q And that would be a common occurrence
9 during construction; correct?
10     **A Yes.**
11     Q And then that's line 549. And then line
12 550 refers to, "Material only, temporary
13 protection, masking, covering, barriers." And,
14 again, that would be an incidental cost relating
15 to the construction, that when you're doing active
16 construction, typically you put fencing or some
17 other type of protective covering around the
18 construction you're doing; correct?
19     **A Yes.**
20     Q And that's also Mr. Collier saying that
21 that was going to be occurring over a five-month
22 period; correct?

123

1     **A That's correct.**
2     Q And, also, if you jump down to line 552,
3 "Site Storage," it also refers to five months;
4 correct?
5     **A Yes.**
6     MR. KREKSTEIN: Okay. I have nothing
7 further.
8 FURTHER RE-EXAMINATION BY COUNSEL ON BEHALF OF THE
9 PLAINTIFF
10 BY MR. BROWN:
11     Q I have just a couple in follow-up on that,
12 Mr. Terra. Now, in the --
13     MR. BROWN: Bill, I'm going go ahead and
14 put his estimate up because I -- I can manipulate
15 through it. So, let me look -- you can stop
16 screen sharing and let me screen share. There you
17 go. Thank you, sir.
18     Q Okay. Let's take a look at Mr. Wakelee's
19 estimate real quick -- Mister -- see, I did the
20 same thing as you -- Mr. Collier, who worked for
21 Mr. Wakelee's, estimate. I'll make it a little
22 bigger so we can see it.

124

1     And you see this was entered on 2/14/15.
2 You see that?
3     **A Yes.**
4     Q Okay. Now, as before, you had the
5 agreement to do the shrink wrap; correct?
6     **A That's correct.**
7     Q So, there's no time in this estimate, fair
8 to say, for either shrink wrapping or removing the
9 shrink wrapping; correct?
10     **A That's correct.**
11     Q All right. So, the period, the five
12 months, that Mister -- Mr. Krekstein was asking
13 you about, wouldn't -- would have been to be
14 lengthened to account for shrink wrapping the
15 building, the time period it's shrink wrapped, and
16 then un-shrink wrapping the building; correct?
17     **A Yes, now, I would never leave it up to the**
18 **contractor solely -- solely to determine my period**
19 **of restoration, but yes.**
20     Q Why is that?
21     **A Why is that? Because we adjust through**
22 **the process, and if I see something where I think**

125

1 it's going to be longer, I'm going to recommend
2 longer because I --
3    Q   Okay.
4    A   -- that's --
5    Q   For example, in this case, was it -- A --
6 was the insured able to begin restoration the day
7 after the fire?
8    A   No, I don't believe so.
9    Q   Was there a cause-and-origin investigation
10 going on to your knowledge?
11   A   Yes, sir.
12   Q   Was there a time period before the insured
13 even had access to the building?
14   A   I believe so.
15   Q   Is there also time periods before labor,
16 before hammers are swung, where you have to get
17 permits?
18   A   Yes.
19   Q   Okay.  That would either be permits for
20 demolition or permits to rebuild; right?
21   A   That's correct.
22   Q   All of those numbers go into the time

126

1 period for the period of restoration, do they not?
2       MR. KREKSTEIN:  Objection to the form.
3 You can answer.
4    A   Yes.
5    Q   That is the time period during which the
6 site's unavailable because either the -- the local
7 fire authority, the authority having jurisdiction,
8 or the insured's cause-and-origin guy has the
9 building taped off, that gets added to the period
10 of restoration; right?
11   A   Yes.
12   Q   The time period to obtain permits gets
13 added to the period of restoration; correct?
14      MR. KREKSTEIN:  Objection to the form.
15   Q   Is that right?
16   A   Yes.
17   Q   In this case, the agreement to allow the
18 building to be shrink wrapped to avoid loss due to
19 the -- the wedding season, that would be a period
20 that would be had -- have to be added to the
21 period of restoration; correct?
22      MR. KREKSTEIN:  Objection to the form.

127

1    Q   Is that correct, Mister --
2    A   Yes.
3    Q   Is that correct, Mister --
4    A   Yes.
5    Q   Okay.  And you agree that for a time
6 period, during the period of restoration -- or for
7 a time period, the building would be allowed to be
8 shrink wrapped during the wedding season; correct?
9    A   Yes.
10   Q   Right.  That wedding season would last
11 through, I believe you said, October and November;
12 correct?
13   A   I'm not exactly positive on that, but it
14 could.
15   Q   Okay.  So, let's go October, November, we
16 add a little bit of time period in to de-shrink
17 wrap the building.  Add five months to it, that
18 takes you out to April of 2016, does it not?
19   A   What's the date again?
20   Q   So, let's take it October 30th, end of the
21 wedding season.  So, we go October to November to
22 December to January to February to March, mark the

128

1 end of March, that's five months, but we also have
2 a time period and we have to de-shrink wrap the
3 building.  We have to remove the shrink wrapping.
4 That's not built into Mr. Wakelee's --
5 Mr. Collier's estimate; correct?
6    A   No.
7    Q   So, it takes you somewhere into the middle
8 of April for the period of restoration, would it
9 not?
10   A   Yes, it could.
11      MR. BROWN:  Okay.  That's all I have.
12      MR. KREKSTEIN:  I have nothing further.
13      MR. BROWN:  Thank you, Mr. Terra.
14      Thank you, Bill.  I appreciate it.  Thank
15 you for cooperating with the exhibits.
16      MR. KREKSTEIN:  Thanks, everyone.
17      MR. BROWN:  Let's talk about the exhibits.
18 We're done with the deposition at this point.  We
19 can go off the record.
20      THE VIDEOGRAPHER:  Let's officially go
21 off.  This ends today's deposition.  We're going
22 off the record at 12:14.

---

129

1    (A discussion was held off the record.)
2    MR. BROWN:  At this point, we'll take a
3 copy of the transcript, and I'm going to hold off
4 on the video.  I'll let you know.
5    COURT REPORTER:  And do you want the
6 exhibits attached to the transcript, Mr. Brown?
7    MR. BROWN:  Yeah, I think so.  Might just
8 help make it easier.
9    COURT REPORTER:  Okay.  Thank you.
10    And, Mr. Krekstein, are you ordering a
11 copy of the transcript?
12    MR. KREKSTEIN:  Yeah, just a mini.
13    COURT REPORTER:  With the exhibits?
14    MR. KREKSTEIN:  Sure.
15    COURT REPORTER:  Okay.  Thank you.
16    THE VIDEOGRAPHER:  No video for you?
17    MR. KREKSTEIN:  And then I'll add mine.
18 If I could get a quick copy of the transcript so I
19 can line up the exhibits, and then I'll send you
20 the exhibits.
21    COURT REPORTER:  So, are you ordering a
22 rough draft of the transcript?

---

130

1    MR. KREKSTEIN:  No, just whenever you get
2 it, and I'll supplement it with the exhibits.
3    (Off the record at 12:15 p.m. ET.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

131

1         ACKNOWLEDGEMENT OF DEPONENT
2    I, SCOTT TERRA, do hereby acknowledge that
3 I have read and examined the foregoing testimony,
4 and the same is a true, correct and complete
5 transcription of the testimony given by me, and
6 any corrections appear on the attached Errata
7 sheet signed by me.
8
9 _____  _____
10   (DATE)        (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

---

132

1 CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2    I, Victoria L. Wilson, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the foregoing transcript is a true
5 and correct record of the testimony given; that
6 said testimony was taken by me stenographically
7 and thereafter reduced to typewriting under my
8 direction; that reading and signing was not
9 discussed; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13    IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 27th day of
15 August, 2022.
16 My commission expires February 3, 2024.
17
18
19 _Victoria L. Wilson_
20 VICTORIA L. WILSON
21 NOTARY PUBLIC IN AND FOR
22 THE STATE OF MARYLAND

**A**

**ability**
39:8, 83:17,
84:3
**able**
58:17, 125:6
**about**
17:9, 19:20,
21:16, 26:13,
26:14, 27:4,
27:9, 27:15,
28:4, 29:18,
31:9, 32:1,
35:4, 35:14,
38:2, 38:6,
38:9, 38:13,
39:6, 39:11,
44:9, 44:10,
46:1, 49:6,
50:4, 53:4,
54:1, 54:3,
54:5, 54:15,
54:19, 55:17,
56:7, 57:19,
59:6, 59:20,
61:12, 62:18,
63:4, 69:21,
79:11, 79:15,
79:16, 79:20,
79:21, 80:18,
82:4, 83:13,
84:13, 85:22,
87:8, 87:13,
88:2, 88:22,
90:1, 91:9,
91:17, 92:20,
94:5, 94:19,
97:2, 97:7,
99:14, 99:18,
105:15, 106:3,
107:10, 108:7,
108:21, 109:19,
116:12, 116:13,
121:8, 124:13,
128:17
**above**
37:4, 50:8,

103:8
**acceptable**
25:10
**accepting**
12:18
**access**
125:13
**accompanied**
83:22
**account**
66:16, 124:14
**accountant**
76:22, 77:13,
78:14, 78:16,
89:18
**accountants**
86:19, 86:22,
107:15
**accounting**
104:17, 105:6
**accuracy**
35:21
**accurate**
99:3
**acknowledge**
131:2
**acknowledgement**
131:1
**action**
98:15
**active**
122:15
**actual**
15:7, 28:11,
70:13, 108:9,
111:1, 112:11,
121:17, 122:2
**actually**
9:21, 17:16,
31:2, 39:6,
55:20, 65:20,
69:9, 91:9,
117:2
**acv**
28:10, 28:13,
29:20, 30:16,
31:1, 108:16
**adam**
3:20, 6:10

**add**
21:15, 127:16,
127:17, 129:17
**added**
126:9, 126:13,
126:20
**addition**
61:7
**additional**
29:18, 29:20,
30:15, 36:2,
37:17, 82:1,
82:11, 104:22,
105:5, 108:1,
108:8
**address**
7:21
**adjust**
41:19, 75:7,
82:5, 118:8,
124:21
**adjusted**
32:16, 43:17
**adjuster**
8:6, 8:15,
8:21, 8:22,
10:4, 10:10,
10:14, 10:17,
11:14, 14:7,
16:15, 16:16,
17:9, 21:18,
21:20, 22:19,
23:13, 30:20,
31:11, 31:13,
34:15, 34:21,
39:9, 40:20,
41:21, 43:15,
59:13, 61:14,
61:15, 62:2,
62:9, 66:6,
75:7, 80:17,
82:15, 91:16,
91:18, 91:20,
99:22, 112:3,
118:3, 119:16
**adjuster's**
63:4
**adjusters**
41:17, 86:15,

92:7
**adjusting**
32:14, 42:4,
60:10, 79:21,
80:8, 83:8,
114:18
**administer**
6:22
**administration**
120:10
**adopted**
95:17
**advice**
56:20
**advised**
58:13
**affiliated**
9:19
**affiliation**
10:1
**affixed**
132:14
**after**
44:16, 47:14,
52:3, 52:11,
52:12, 52:18,
52:20, 53:6,
66:10, 83:9,
92:14, 95:16,
98:14, 99:8,
99:12, 104:20,
106:4, 108:10,
125:7
**afterwards**
121:8
**again**
13:17, 23:8,
28:21, 30:8,
58:3, 65:7,
66:13, 96:6,
104:6, 122:14,
127:19
**against**
26:1
**ago**
52:1, 52:3,
53:2, 53:4
**agree**
14:8, 14:16,

15:4, 50:2,
67:14, 93:22,
96:4, 96:13,
99:2, 103:11,
103:13, 104:17,
127:5
**agreed**
21:11, 22:15,
23:4, 23:17,
23:20, 27:3,
29:19, 30:15,
32:9, 63:9,
66:4, 66:10,
67:3, 67:11,
67:21, 68:1,
68:14, 101:22,
102:8, 102:15,
115:16, 116:3
**agreeing**
28:6, 67:17
**agreement**
14:12, 28:9,
49:10, 66:5,
67:22, 77:18,
96:1, 96:3,
96:5, 96:9,
96:11, 96:14,
96:16, 97:4,
98:6, 98:7,
101:16, 115:20,
115:22, 124:5,
126:17
**ahead**
73:3, 106:16,
123:13
**al**
1:5, 6:4
**all**
6:14, 9:10,
10:5, 17:8,
17:17, 17:20,
21:20, 25:5,
25:7, 29:5,
33:17, 34:12,
35:14, 36:12,
38:5, 38:8,
38:16, 41:15,
44:19, 46:3,

59:11, 65:22,
73:6, 74:6,
79:12, 83:21,
96:3, 96:11,
101:22, 109:6,
111:12, 118:2,
118:13, 124:11,
125:22, 128:11
**allegation**
98:11
**allegations**
95:20
**allocated**
70:20
**allocation**
120:12
**allow**
126:17
**allowed**
127:7
**almost**
10:1, 15:20,
117:8
**alone**
48:15
**along**
43:7, 48:14
**already**
99:8, 102:15
**also**
3:18, 6:21,
18:15, 37:9,
45:10, 61:8,
78:15, 87:12,
92:2, 115:17,
121:6, 122:2,
122:20, 123:2,
123:3, 125:15,
128:1
**although**
87:3
**always**
80:17, 86:22
**amended**
73:10, 95:20,
98:12
**amount**
14:10, 21:8,

29:19, 29:20,
37:16, 50:8,
89:19, 107:13,
107:18, 107:21,
108:10, 108:12,
109:21, 113:15
**amounts**
92:3, 108:1
**analysis**
22:2, 36:2,
82:1, 82:11,
82:16, 83:14,
109:14
**and-change**
104:3, 105:9
**another**
7:18, 19:21,
35:18, 75:14
**answer**
7:16, 56:9,
69:5, 69:7,
69:11, 70:15,
88:9, 88:21,
111:18, 112:17,
115:3, 126:3
**any**
11:10, 15:17,
20:7, 23:13,
26:2, 27:14,
27:17, 28:3,
28:14, 31:18,
32:5, 37:2,
37:16, 40:6,
42:21, 46:19,
51:19, 52:16,
52:19, 56:19,
62:6, 62:11,
71:11, 71:12,
72:1, 72:8,
72:12, 84:20,
88:15, 88:19,
89:6, 98:2,
98:8, 100:12,
100:13, 100:15,
100:18, 100:19,
108:1, 111:2,
117:5, 131:6,
132:10

**anybody**
16:5, 50:19,
50:20, 51:20,
59:20, 62:8,
62:13, 62:15,
63:3, 69:21,
84:9
**anymore**
43:20
**anyone**
59:17, 71:7,
100:14, 105:20,
106:5, 106:8
**anything**
42:1, 53:21,
57:19, 63:4,
101:18, 106:12,
108:11, 116:11,
116:13
**anywhere**
27:22
**apart**
80:6
**apologize**
12:4, 51:12,
119:6
**appear**
131:6
**appeared**
18:12
**appears**
13:11
**appraisal**
32:11, 54:21,
54:22, 55:8,
55:12, 55:13,
55:14, 55:15,
55:19, 56:1,
78:2, 91:10,
116:8, 116:13
**appreciate**
58:20, 65:15,
128:14
**apprised**
50:20
**approval**
50:9
**approved**
27:9

approving
27:6
approximately
22:16, 53:2,
66:15, 67:5
april
26:13, 27:5,
27:22, 63:8,
74:16, 111:15,
112:11, 112:15,
113:7, 114:13,
127:18, 128:8
area
10:12, 39:2,
63:1, 64:1,
64:4, 65:21,
87:5, 87:7, 97:8
areas
40:14, 64:6,
87:9
aren't
94:4
around
53:12, 63:8,
77:10, 89:3,
122:17
asked
20:19, 39:6,
48:6, 48:8,
48:11, 53:17,
92:16, 99:12,
100:1, 119:15
asking
102:7, 102:8,
103:11, 103:12,
108:7, 124:12
aspect
36:15, 96:21,
98:8
aspects
10:6, 20:20,
96:3, 96:11
assigned
10:3, 36:22,
44:17, 45:17,
99:9, 99:19,
102:4
assignment
14:19, 100:9

associate's
9:9
associated
27:18
associates
24:6
assume
60:22, 67:12,
70:11, 83:21,
84:2, 85:21
assuming
70:2, 87:15
attached
4:9, 12:12,
15:18, 15:22,
20:14, 24:4,
26:10, 34:6,
74:12, 75:21,
87:9, 101:11,
110:12, 113:5,
113:13, 114:3,
119:8, 129:6,
131:6
attaching
101:14
attempt
48:12
attempting
96:22
attend
31:15
attending
48:15
attention
12:13
attorney
56:11, 57:12
attorney-client
56:9, 56:21,
57:17
attribute
120:8, 120:14
attributed
122:3, 122:4,
122:5
attributing
121:16
audible
7:16

august
1:16, 6:8,
132:15
authority
48:21, 49:2,
49:17, 49:18,
50:2, 50:8,
50:16, 105:12,
126:7
authorization
30:4
authorize
31:8
authorized
30:20, 31:5
auto
6:19, 8:7,
8:13, 9:11,
9:15, 9:20,
9:22, 11:3,
16:16, 16:17,
18:9, 23:13,
29:10, 38:16,
39:22, 41:15,
42:11, 43:19,
44:7, 46:8,
46:9, 46:14,
46:16, 46:18,
46:20, 46:21,
50:19, 52:3,
52:15, 53:1,
53:20, 56:10,
56:12, 56:14,
56:16, 56:20,
57:20, 59:14,
61:5, 62:15,
62:17, 63:1,
63:3, 65:2,
66:10, 67:7,
70:13, 76:1,
78:7, 78:11,
84:10, 86:7,
88:18, 89:14,
92:3, 95:22,
96:8, 97:12,
98:7, 98:17,
106:4, 106:9,
107:15, 111:6,

114:21, 117:9
auto's
56:22, 57:11,
66:6, 66:18,
77:13, 89:18,
98:15, 99:1
automobile
1:8, 6:5
average
120:20
avoid
126:18
awaiting
22:18
award
116:9, 116:14
aware
8:20, 50:22,
51:1
away
45:4, 45:5
awesome
46:18

B

back
8:21, 20:15,
23:3, 23:7,
23:11, 24:15,
33:4, 37:4,
40:7, 46:15,
51:6, 51:12,
52:12, 55:2,
58:2, 58:8,
59:13, 65:5,
73:7, 73:18,
79:10, 80:8,
84:22, 93:1,
102:14, 102:19,
103:8, 103:15,
103:19, 106:18,
107:6, 110:5,
110:7, 115:14,
117:14
background
9:7, 9:11
backwards
34:3

**ball**
98:20
**baltimore**
10:12, 17:15,
30:1
**bar**
25:18, 39:2,
93:18
**barriers**
122:13
**base**
35:17, 36:10
**based**
15:2, 50:13,
67:6, 75:7,
77:2, 77:3,
78:19, 79:14,
86:6, 89:2,
92:19, 93:6,
94:1, 94:9,
94:16, 95:1,
95:4, 107:13,
121:12, 121:17
**basic**
7:14
**basically**
15:15, 120:13
**basing**
97:5
**basis**
15:11, 93:11
**bate**
101:4
**bates**
11:22, 12:1,
12:14, 20:10,
20:12, 35:9,
73:22, 102:21,
118:20, 118:21
**bear**
112:22, 113:22
**because**
15:1, 18:18,
25:15, 36:9,
37:16, 47:11,
47:21, 48:16,
52:6, 53:16,
53:18, 56:6,

59:9, 62:4,
62:22, 68:4,
69:8, 70:16,
73:4, 78:14,
80:6, 80:14,
80:22, 81:12,
88:13, 91:9,
92:6, 92:14,
93:11, 94:11,
97:20, 99:3,
103:7, 109:13,
118:10, 123:14,
124:21, 125:2,
126:6
**become**
8:20
**been**
7:2, 7:11,
8:10, 10:22,
11:16, 13:2,
13:4, 15:18,
16:10, 34:1,
40:10, 49:3,
49:5, 54:5,
55:15, 57:1,
60:9, 61:13,
64:8, 76:10,
76:12, 76:15,
76:17, 78:1,
78:17, 81:7,
82:1, 82:14,
83:1, 88:7,
88:20, 90:19,
91:6, 94:9,
95:3, 95:18,
99:9, 108:16,
109:12, 109:17,
111:2, 113:2,
114:1, 116:4,
116:5, 117:8,
118:21, 119:14,
124:13
**before**
2:9, 7:11,
7:15, 8:12, 9:4,
9:11, 10:20,
12:21, 23:10,
24:20, 26:12,

47:13, 52:7,
52:14, 59:1,
84:17, 84:20,
105:15, 116:20,
124:4, 125:12,
125:15, 125:16,
132:2
**begin**
39:14, 125:6
**beginning**
20:15, 58:4
**begins**
6:2, 93:22
**behalf**
3:2, 3:10, 7:6,
46:6, 64:16,
65:1, 71:7,
72:1, 77:12,
84:9, 107:1,
111:11, 118:16,
123:8
**being**
8:6, 19:22,
32:16, 43:17,
49:13, 56:15,
56:17, 59:18,
61:12, 64:16,
66:15, 71:22,
89:9, 90:17,
97:14, 98:21,
98:22, 113:16,
114:5, 121:13
**belief**
71:15, 98:14
**believe**
27:1, 30:19,
31:1, 45:5,
47:15, 48:3,
48:9, 48:16,
50:22, 55:3,
66:2, 69:4,
72:19, 77:6,
80:10, 81:19,
82:18, 84:14,
90:11, 90:13,
92:18, 94:15,
97:1, 101:8,
103:8, 106:2,

107:5, 120:15,
121:1, 125:8,
125:14, 127:11
**bell**
112:6, 112:9
**below**
21:12
**besides**
12:15
**best**
23:14
**better**
29:6, 47:2,
114:7
**between**
37:13, 37:15,
42:7, 52:14,
56:10, 69:2,
77:18, 80:17,
82:17, 86:7,
100:7, 106:1,
110:15, 114:18,
114:20
**bi**
15:5, 15:9,
15:10, 19:3,
19:5, 19:6,
36:22, 96:2,
96:10, 103:20,
107:11, 107:18
**big**
37:16, 64:15,
64:22, 86:7,
93:21
**bigger**
20:4, 29:5,
30:13, 39:10,
39:12, 65:16,
123:22
**bill**
11:18, 24:9,
26:7, 35:18,
36:11, 36:13,
36:14, 36:17,
51:10, 57:19,
73:13, 92:5,
96:6, 103:15,
106:15, 110:4,

113:1, 123:13,
128:14
**bingo**
15:19, 15:20,
64:4
**bingos**
17:20
**bit**
9:6, 19:19,
22:22, 24:16,
29:6, 127:16
**black-and-white**
109:22
**blanket**
20:22, 21:4,
21:15
**blowing**
12:5
**blue**
21:13
**boats**
16:3, 93:17
**bold**
21:9
**boss**
40:2, 40:3,
40:5, 51:3
**both**
40:13, 114:21
**bottom**
101:5
**bpp**
101:22
**breakdown**
81:12, 94:13,
110:17
**bring**
18:15, 110:8,
113:21, 115:13,
119:17
**bringing**
83:13, 84:13,
84:15, 102:14
**broken**
59:14
**brought**
56:1, 56:4
**brown**
3:3, 3:4, 4:3,

4:5, 4:7, 6:16,
7:4, 7:7, 7:8,
11:18, 12:1,
20:11, 24:9,
26:7, 28:18,
28:22, 29:4,
46:3, 51:7,
51:9, 51:20,
51:22, 52:20,
58:9, 58:19,
58:22, 60:17,
60:20, 60:22,
63:7, 65:9,
65:11, 65:14,
65:16, 65:18,
65:22, 66:2,
72:22, 73:3,
73:8, 73:12,
73:15, 73:18,
74:1, 74:5,
74:8, 75:16,
85:2, 85:4,
85:8, 85:11,
101:8, 106:14,
106:17, 106:20,
107:2, 110:4,
112:21, 113:6,
118:13, 119:1,
119:4, 123:10,
123:13, 128:11,
128:13, 128:17,
129:2, 129:6,
129:7
**brown's**
81:21
**building**
9:2, 14:14,
16:12, 21:1,
22:7, 22:11,
24:14, 25:9,
25:13, 25:14,
26:15, 27:7,
27:10, 28:11,
29:19, 29:20,
30:16, 48:18,
60:12, 61:4,
61:12, 63:10,
63:11, 63:13,

63:18, 64:2,
64:11, 66:18,
69:9, 70:4,
70:14, 76:18,
87:12, 87:16,
87:17, 88:4,
88:7, 96:1,
96:9, 96:15,
96:17, 96:21,
101:16, 101:22,
119:17, 124:15,
124:16, 125:13,
126:9, 126:18,
127:7, 127:17,
128:3
**built**
128:4
**burned-out**
63:20
**business**
14:15, 16:9,
19:7, 19:11,
19:15, 22:17,
26:2, 27:17,
31:2, 31:5,
31:19, 32:6,
55:6, 62:6,
77:7, 78:18,
79:3, 80:18,
86:10, 92:6,
108:19, 109:1,
109:3, 109:11,
110:16, 110:22,
111:7, 113:17,
116:6
**business-income**
64:16, 86:19,
104:8

**C**

**calculate**
76:1, 77:1
**calculated**
105:10, 120:20
**calculation**
75:10, 76:6,
104:8
**call**
33:4, 37:17,

50:11, 50:14,
98:16
**called**
15:21, 45:17,
60:5
**calling**
81:10
**came**
16:3, 33:5,
62:17, 62:19,
79:12
**can't**
14:22, 18:3,
20:2, 26:4,
49:14, 49:16,
57:18, 68:6,
72:6, 72:12,
75:3, 76:14,
90:14
**capacities**
47:10
**capacity**
8:14, 10:18,
88:5
**capital**
121:1
**car**
45:7
**carolina**
40:13, 41:12
**caroline**
16:7, 16:13,
16:15, 17:14,
31:13, 31:15,
33:1, 33:2,
33:5, 34:8,
34:19, 35:11,
38:4, 45:4,
45:6, 45:11,
45:15, 47:7,
48:20, 51:2,
79:1, 83:19,
85:15, 94:10,
99:21, 104:19,
104:20, 105:16,
110:16, 110:20
**caroline's**
40:5

case
1:7, 6:7, 7:10,
10:4, 11:17,
34:16, 35:15,
42:10, 44:6,
44:17, 45:17,
98:18, 98:19,
98:22, 111:14,
125:5, 126:17,
132:11
cash
15:8, 28:11,
70:13, 108:9
casino
15:19, 15:20,
15:21
casualty
109:13
caught
16:2, 104:17
cause
22:6
cause-and-origin
125:9, 126:8
cc
34:9, 35:11
cc'd
113:10
center
25:20
central
8:3, 16:20,
46:10
certain
64:9, 93:10,
97:22, 109:1
certainly
57:5
certificate
132:1
certified
2:11
certify
132:4
chain
4:15, 4:19,
4:21, 5:6, 5:8,
35:8, 103:19

chance
28:14
change
68:4, 68:6,
68:7, 68:18,
68:20, 69:2,
79:5
changed
47:13
changing
79:11, 95:10
characterization
74:18
characterize
49:7
charkatz
4:16, 5:9,
5:10, 9:3, 10:9,
10:10, 13:2,
13:4, 18:12,
18:15, 21:19,
23:18, 27:5,
28:4, 29:18,
31:10, 31:22,
38:3, 40:20,
43:15, 44:20,
49:5, 51:14,
52:6, 52:8,
52:17, 53:6,
54:16, 54:17,
54:18, 55:4,
55:11, 55:17,
67:13, 67:17,
67:22, 68:14,
69:13, 71:6,
71:10, 71:13,
74:15, 74:19,
82:21, 88:16,
89:6, 89:8,
89:11, 94:21,
97:2, 97:5,
97:12, 101:13,
102:8, 103:10,
105:5, 105:21,
106:3, 106:7,
111:11, 111:22,
112:4, 113:8,
115:21, 116:1

charkatz's
63:9
charred
25:7
chatted
54:3
check
29:12, 30:9,
31:2, 105:3,
106:13
checks
30:5, 30:8
chenetski
33:3, 33:9,
33:10, 34:9,
35:10, 36:8,
37:4, 37:11,
37:18, 37:20,
38:8, 38:13,
38:22, 39:15,
39:16, 39:18,
39:21, 40:5,
41:6, 42:10,
42:13, 43:5,
43:14, 47:11,
47:17, 48:9,
50:6, 50:10,
50:13, 50:18,
50:22, 54:6,
54:9, 56:7,
57:10, 58:13,
79:22, 81:20,
81:22, 82:4,
84:12, 84:14,
85:16, 85:20,
93:4, 99:4,
99:11, 99:18,
99:22, 100:4,
100:8, 105:19,
117:15, 117:20
christian
16:8, 16:9,
17:14, 18:6,
22:20, 32:22,
35:18, 35:19,
36:10, 38:4,
45:5, 51:2,
74:16, 78:22,

82:22, 83:2,
83:14, 92:10,
94:2, 94:10,
94:12, 94:16,
95:8, 110:15,
110:19, 112:12,
113:10
claims
4:11, 8:3,
8:15, 8:16,
10:12, 11:2,
11:4, 11:6,
12:14, 13:7,
13:11, 13:21,
14:15, 15:2,
16:18, 17:1,
17:3, 26:22,
31:14, 33:10,
34:17, 35:1,
39:9, 39:10,
40:6, 40:8,
41:1, 41:2,
41:10, 41:14,
42:17, 44:1,
48:3, 48:17,
51:14, 51:16,
76:13, 98:16,
111:10, 118:8
cleanup
122:6
clear
32:13, 44:8,
44:12, 45:16
clearly
108:4, 108:15
client
32:9, 119:10
clientele
25:11, 93:10
clients
62:7
code
15:6
college
9:8
collier
60:2, 60:3,
60:8, 60:12,

60:17, 61:1,
61:4, 61:9,
66:17, 76:19,
76:21, 119:10,
119:15, 120:16,
121:20, 122:20,
123:20
**collier's**
119:21, 128:5
**come**
11:11, 17:13,
32:10, 77:18,
87:12, 87:17,
93:14, 93:17,
96:3, 96:5,
96:11, 96:14,
113:6
**comes**
62:16, 62:22
**comfortable**
35:22, 45:6
**coming**
88:12, 95:22,
96:9
**comments**
107:7
**commission**
132:16
**common**
122:8
**communication**
71:12, 102:11
**communications**
51:20, 56:10,
56:19, 57:20,
100:14
**community**
9:8
**company**
1:10, 6:5, 8:4,
8:7, 8:13, 9:17,
9:20, 16:21,
41:4, 47:9, 60:5
**compared**
81:2
**complaint**
73:10, 95:20,
98:12

**complete**
20:19, 131:4
**completed**
15:3, 88:20,
111:2
**completely**
83:13
**completion**
103:22
**compromise**
36:1, 36:12,
79:18, 79:21,
81:22, 82:5,
86:2, 88:17,
89:10, 101:16
**conceivable**
112:18
**concern**
62:18
**concerning**
100:8, 100:14,
100:19
**concerns**
26:14
**conditions**
119:22, 120:1,
120:6, 120:7,
121:21
**conducted**
1:15, 2:2
**conference**
48:7
**confidence**
83:17, 84:2
**confirm**
103:13
**conjunction**
76:17
**connected**
64:7
**connecticut**
61:20
**consider**
109:2
**considered**
78:17
**considering**
103:21

**considers**
76:6
**construction**
16:11, 61:10,
120:12, 121:14,
122:2, 122:5,
122:9, 122:15,
122:16, 122:18
**consultant**
60:13, 61:4,
61:12, 66:18,
76:18, 119:17
**consultation**
76:22
**consulting**
16:11
**contact**
12:21, 13:13,
52:16, 52:19
**contemplating**
49:20
**contents**
9:2, 48:17
**context**
56:13, 56:20
**continued**
83:11
**continuous**
15:11
**contract**
42:7
**contractor**
21:20, 124:18
**control**
43:4
**convention**
25:20
**conversation**
11:14, 26:18,
31:21, 32:8,
33:7, 37:2,
39:15, 39:17,
39:19, 43:13,
45:20, 45:21,
46:1, 52:16,
53:22, 54:8,
54:13, 54:15,
55:1, 57:21,

61:11, 62:11,
67:1, 67:17,
71:12, 76:18,
79:14, 79:17,
85:21, 88:3,
88:22, 89:4,
97:17, 97:19,
99:4, 99:5,
100:4, 105:18,
105:20, 106:2,
106:5, 117:14,
117:16
**conversations**
18:1, 50:15,
56:12, 57:3,
57:9, 79:13,
90:1, 100:19
**cooperating**
128:15
**coordinated**
43:8
**coordination**
120:10
**copied**
85:16
**copies**
100:13
**copy**
74:15, 81:12,
116:22, 117:4,
117:6, 118:22,
129:3, 129:11,
129:18
**corporate**
63:1
**corrections**
131:6
**correctly**
21:7
**corresponding**
26:21
**cost**
15:5, 28:7,
68:2, 87:16,
88:2, 122:14
**could**
13:4, 14:8,
15:11, 55:7,

62:5, 62:10,
63:17, 65:12,
66:13, 67:18,
70:16, 70:18,
71:4, 77:18,
81:7, 82:8,
85:9, 85:10,
86:21, 91:18,
94:9, 95:3,
95:18, 97:16,
98:1, 117:1,
121:16, 121:18,
127:14, 128:10,
129:18
**couldn't**
42:12, 77:22
**counsel**
4:18, 6:14,
7:6, 29:8, 46:6,
56:19, 57:4,
57:7, 57:16,
107:1, 118:16,
123:8, 132:9
**country**
40:14
**couple**
10:20, 16:2,
33:15, 33:22,
52:1, 99:6,
110:5, 123:11
**court**
1:1, 6:6, 6:20,
129:5, 129:9,
129:13, 129:15,
129:21
**coverage**
21:5, 21:8,
22:2, 36:13,
42:3, 56:2,
56:5, 59:8,
59:10, 59:12,
59:15, 118:11
**coverages**
14:21, 15:1,
31:19
**covering**
122:13, 122:17
**cpa**
17:6, 18:6,

18:9, 18:15,
18:22, 19:2,
112:3, 112:8
**cpas**
17:9
**created**
13:16, 13:17
**critical**
84:10
**crr**
1:22
**current**
8:9, 56:13,
59:17, 61:21,
62:14, 110:22
**currently**
16:19
**cursor**
120:2
**customers**
63:19
**cut**
78:20
**cv**
1:7, 6:7

**D**

**d&d**
16:10
**daily**
122:6
**dam**
112:11
**damage**
60:16
**damaged**
63:11
**damages**
10:18, 22:7,
33:8, 33:13,
36:12, 36:13,
36:15, 42:2,
42:3, 59:13,
59:16, 82:14,
88:14, 102:14,
118:11
**date**
6:8, 11:10,

17:10, 22:1,
23:8, 24:19,
24:22, 25:1,
27:8, 36:1,
45:14, 47:13,
52:10, 66:12,
68:12, 127:19,
131:10
**dated**
20:16, 30:12,
34:12, 74:16,
75:15, 85:16,
101:14, 107:5,
112:1, 119:9
**dates**
10:21, 28:19
**day**
12:20, 35:8,
45:14, 46:17,
94:10, 125:6,
132:14
**days**
11:13, 33:14
**de-shrink**
127:16, 128:2
**deal**
39:7, 99:13
**december**
23:10, 29:18,
29:21, 29:22,
31:10, 33:19,
34:12, 34:20,
35:8, 38:10,
38:11, 43:7,
45:10, 45:19,
47:5, 48:20,
49:2, 50:21,
51:13, 51:17,
52:13, 53:11,
53:12, 55:2,
55:17, 69:4,
77:17, 78:6,
80:1, 82:19,
84:1, 85:17,
87:20, 88:7,
88:17, 92:15,
93:4, 94:11,
95:21, 96:7,

97:10, 98:8,
112:11, 127:22
**decided**
12:5
**defendant**
1:11, 3:10,
46:6, 118:17
**defined**
67:8
**definitely**
25:20, 94:20
**demand**
111:1
**demolition**
125:20
**depending**
92:9
**deponent**
131:1
**depos**
3:19, 6:11,
6:21
**deposed**
7:11, 8:6,
56:15, 56:17,
59:18
**deposition**
1:14, 2:1,
4:17, 6:3, 6:12,
11:17, 29:2,
59:21, 110:10,
113:3, 114:1,
116:17, 116:18,
117:1, 128:18,
128:21, 132:3
**depreciated**
108:12
**depreciation**
15:6, 15:8,
70:3, 70:8,
89:2, 89:7,
97:3, 97:4,
97:13, 98:1
**detail**
35:20, 42:16
**determination**
66:7
**determine**
35:21, 108:22,

| | | | |
|---|---|---|---|
| 124:18 | discussion | 22:22, 23:11, | 107:11, 107:18 |
| **determined** | 11:8, 16:8, | 25:1, 30:1, | **effort** |
| 107:14 | 27:15, 29:17, | 41:12, 59:1, | 79:18 |
| **difference** | 31:18, 32:5, | 87:10, 103:15, | **eight** |
| 37:12, 37:13, | 38:3, 56:6, | 106:20, 106:21, | 17:1 |
| 90:11, 90:13, | 78:3, 79:6, | 108:8, 114:7, | **either** |
| 104:18 | 79:8, 80:17, | 119:20, 123:2 | 38:15, 47:10, |
| **different** | 88:1, 97:1, | **draft** | 55:5, 55:13, |
| 14:13, 20:20, | 99:17, 100:7, | 121:6, 129:22 | 55:18, 70:11, |
| 23:13, 40:14, | 129:1 | **drink** | 72:17, 80:7, |
| 41:15, 47:10, | **discussions** | 39:3 | 97:15, 115:21, |
| 57:13, 69:19, | 28:3, 35:4, | **drove** | 124:8, 125:19, |
| 70:18, 73:19, | 94:10, 94:13, | 17:15, 30:1 | 126:6 |
| 86:20, 86:22, | 121:7 | **due** | **elaborate** |
| 92:12, 97:8, | **disparity** | 29:19, 36:12, | 42:21 |
| 109:8 | 81:4 | 126:18 | **element** |
| **difficult** | **disposition** | **duly** | 14:2, 14:5, |
| 87:4 | 21:11 | 7:2 | 14:11, 14:15, |
| **difficulty** | **dispute** | **during** | 19:8, 19:16, |
| 35:15 | 55:7, 65:1, | 53:21, 56:11, | 22:8, 22:9, |
| **dinner** | 108:1, 114:17, | 69:14, 71:5, | 22:13, 23:1, |
| 38:20, 39:1 | 114:20 | 81:21, 83:15, | 23:15, 31:19, |
| **direct** | **district** | 83:18, 83:20, | 35:5, 115:17 |
| 12:13, 39:19, | 1:1, 1:2, 6:6 | 90:17, 90:22, | **eliminating** |
| 48:6, 56:8 | **document** | 93:16, 109:3, | 26:16 |
| **direction** | 29:9, 101:15, | 109:12, 111:5, | **else** |
| 132:8 | 102:20, 110:13, | 122:9, 126:5, | 16:5, 50:19, |
| **directly** | 118:19 | 127:6, 127:8 | 50:20, 53:21, |
| 43:5, 47:11, | **documentation** | **duties** | 69:17, 84:13 |
| 47:16 | 72:1, 72:12, | 10:2, 61:7 | **email** |
| **director** | 100:12, 104:22, | **duty** | 4:15, 4:19, |
| 33:10, 40:1, | 105:5 | 42:5 | 4:21, 5:6, 5:8, |
| 47:22, 98:16 | **documents** | | 5:10, 34:8, |
| **disagree** | 10:20, 72:20, | **E** | 35:7, 37:3, |
| 92:5 | 73:17, 74:4 | **each** | 37:8, 37:10, |
| **disagreed** | **doing** | 14:20, 14:22 | 37:19, 37:21, |
| 33:20, 91:10 | 40:10, 71:3, | **earlier** | 43:8, 43:10, |
| **disagreements** | 98:3, 117:12, | 54:12, 63:7, | 44:2, 44:10, |
| 86:7 | 122:2, 122:5, | 87:18, 94:5, | 44:13, 45:10, |
| **discussed** | 122:15, 122:18 | 96:18, 102:3 | 45:12, 50:14, |
| 14:7, 22:12, | **done** | **early** | 57:7, 58:7, |
| 30:3, 35:18, | 24:18, 37:6, | 38:15, 68:4 | 58:9, 58:12, |
| 55:22, 81:21, | 74:10, 82:1, | **easier** | 58:15, 58:18, |
| 90:17, 90:19, | 89:2, 97:9, | 129:8 | 59:3, 59:7, |
| 90:21, 91:1, | 128:18 | **educational** | 74:14, 74:19, |
| 100:20, 102:5, | **donovan** | 9:6 | 79:16, 80:1, |
| 106:8, 132:9 | 4:14, 43:16 | **ee** | 81:18, 81:19, |
| **discussing** | **down** | 96:2, 96:10, | 81:20, 82:8, |
| 25:13, 26:13 | 19:1, 21:12, | | |

83:12, 84:12,
85:1, 85:15,
85:19, 86:6,
87:3, 90:5,
91:15, 93:2,
93:3, 94:11,
95:4, 95:15,
101:13, 101:15,
101:20, 103:8,
103:19, 104:11,
104:21, 107:4,
107:6, 110:15,
110:20, 111:22,
113:8, 113:14,
114:5
**emails**
33:19, 34:1,
38:1, 46:17,
57:12, 57:15,
100:13, 101:4
**employed**
132:10
**employee**
56:13, 56:16
**employer**
8:9, 59:18,
62:14
**employment**
56:11
**encapsulate**
25:7
**encapsulating**
25:14
**end**
32:2, 32:12,
98:19, 127:20,
128:1
**ended**
55:12, 55:16,
71:2
**ends**
128:21
**enough**
116:15
**entered**
124:1
**entire**
91:7, 91:8,

91:21, 92:2
**entirely**
99:3
**entitled**
70:21
**entry**
29:11
**envelope**
25:9
**errata**
131:6
**error**
104:19, 105:6
**esquire**
3:3, 3:11
**esthetic**
63:18
**esthetically**
25:10
**estimate**
5:13, 24:13,
25:6, 26:20,
60:16, 61:5,
61:8, 119:2,
119:9, 119:12,
119:15, 119:18,
119:21, 120:9,
120:17, 121:7,
123:14, 123:19,
123:21, 124:7,
128:5
**estimates**
111:3, 120:5,
121:13
**estimator**
119:10
**et**
1:5, 1:17, 6:4,
130:3
**evaluate**
80:15, 84:6
**evaluation**
68:17, 69:1,
92:6, 92:12
**even**
46:17, 88:19,
118:8, 125:13
**ever**
37:18, 38:5,

38:8, 42:14,
43:1, 52:13,
52:15, 61:13,
62:1, 62:8,
69:14, 69:21,
70:7, 71:6,
71:22, 84:17,
84:19, 89:5,
89:6, 90:16,
92:10, 92:13,
92:16, 97:11,
105:19, 118:2
**every**
68:3
**everybody**
73:17, 75:14
**everyone**
128:16
**evidence**
58:10
**exact**
18:3, 26:18,
27:8, 31:21,
49:13, 49:15,
52:10, 79:14,
79:17, 81:12,
87:1, 91:1
**exactly**
53:13, 97:17,
127:13
**examination**
4:2, 7:6, 46:6
**examine**
56:4
**examined**
131:3
**examiner**
36:20, 56:2,
59:9
**examiners**
59:10, 59:15
**example**
70:20, 125:5
**exceed**
49:17, 70:12
**exceeded**
49:18, 49:20,
71:15

**excess**
71:8, 72:2,
72:13, 77:19
**excessive**
80:3, 80:5,
80:21, 81:10
**exchanges**
85:1
**excuse**
13:6, 28:22,
42:22
**exhibit**
4:11, 4:12,
4:13, 4:15,
4:17, 4:19,
4:21, 5:2, 5:3,
5:6, 5:8, 5:10,
5:12, 5:13,
11:17, 12:11,
20:11, 20:13,
24:2, 24:3,
24:11, 26:6,
26:9, 28:16,
28:19, 28:22,
29:1, 29:7,
30:10, 34:2,
34:5, 34:7,
35:8, 37:9,
37:10, 43:11,
44:13, 45:10,
51:6, 51:8,
58:21, 65:8,
73:13, 73:20,
74:1, 74:11,
75:19, 75:20,
85:1, 101:10,
106:17, 107:4,
110:9, 110:11,
111:22, 113:3,
113:4, 114:1,
114:2, 115:14,
118:20, 119:7
**exhibits**
4:10, 128:15,
128:17, 129:6,
129:13, 129:19,
129:20, 130:2
**expecting**
105:4

expense
108:20, 118:4
expert
35:19, 108:20
experts
22:6
expires
132:16
explain
10:16, 11:6,
17:17, 42:14
explained
54:7, 93:15
explanation
86:2
extend
50:15
extent
22:7
eyes
84:15

**F**

face
86:16
facility
17:17, 78:22
fact
55:22, 66:21,
83:22, 86:12,
117:7
factors
81:9, 81:16
facts
80:18
failed
96:2, 96:5,
96:11
fair
36:5, 42:5,
49:7, 49:22,
64:11, 64:19,
65:3, 70:10,
74:18, 77:20,
78:4, 78:9,
78:10, 80:15,
80:16, 82:2,
83:15, 86:5,

88:6, 102:5,
103:10, 106:18,
107:8, 114:17,
116:15, 124:7
fairfax
3:7
fairly
13:11
familiar
8:17, 60:1,
60:4, 112:5,
119:11
familiarity
121:12
family
62:9
far
50:3, 50:20,
80:6, 83:3
farm
116:22
february
38:15, 76:7,
76:8, 111:14,
127:22, 132:16
fellow
10:8, 112:4
felt
45:8, 116:4
fencing
122:16
few
27:12, 33:14,
64:8, 111:21,
120:4
figure
90:4, 90:16,
111:6
figures
101:22, 102:8,
102:15, 112:12
file
15:2, 15:19,
26:22, 30:17,
31:8, 31:11,
33:16, 43:4,
58:14, 58:16,
69:3, 72:4,

81:13, 84:11,
105:17, 116:22,
117:6, 117:22
filing
98:15
financial
132:11
find
28:10, 45:18,
100:22, 113:14
finding
35:18
fine
65:21, 116:15
finish
7:15
finished
55:14
fink
41:11
fire
7:10, 16:2,
25:8, 64:9,
125:7, 126:7
first
11:1, 14:18,
37:9, 77:5,
107:10
five
11:13, 61:17,
120:19, 121:4,
121:5, 121:8,
121:17, 122:3,
123:3, 124:11,
127:17, 128:1
five-month
120:17, 120:18,
121:11, 121:21,
122:21
focus
19:14, 32:3,
41:20
focused
22:13
follow-up
104:21, 106:14,
123:11
following
37:19, 37:21,

47:15, 98:13,
99:6
follows
7:2
foregoing
131:3, 132:3,
132:4
form
23:8, 111:17,
112:16, 115:2,
126:2, 126:14,
126:22
former
56:13
forth
45:9, 79:10,
92:7, 110:22,
111:11
forward
99:1
forwards
101:20
four
61:17
fourth
87:11
fox
16:8, 16:9,
17:14, 18:6,
22:20, 32:22,
38:4, 45:5,
51:2, 74:16,
75:22, 76:11,
76:13, 76:22,
77:6, 79:1,
79:4, 82:22,
83:2, 83:10,
83:22, 89:18,
92:10, 94:2,
94:12, 94:16,
95:1, 95:8,
95:16, 105:9,
110:15, 110:19,
113:10
fox's
83:17, 84:2,
84:11, 94:4
frame
14:8

fresh
84:15
fuel
16:3
fueled
93:17
full
108:16
function
44:1
functions
119:16
fundamentally
108:22
further
23:1, 26:2,
42:21, 106:13,
123:7, 123:8,
128:12
future
86:14, 86:20

**G**

g's
39:13, 40:13,
40:17, 41:2,
41:7, 42:18
ga
4:12, 13:13
gable
9:3, 10:11
games
64:4
gaming
64:1, 86:9,
87:5, 87:7, 93:9
gaming-related
93:5
gas
59:16
gave
94:13
general
59:13, 91:3,
119:22, 120:1,
120:6, 120:7,
121:21
generally
27:20, 121:12

germantown
3:13
getting
56:3, 97:2
ggg
40:8, 42:11,
98:19, 117:21
give
7:15, 7:16,
18:3, 48:10,
48:13, 61:9,
117:4, 117:5
given
86:12, 98:2,
117:7, 131:5,
132:5
global
32:1, 32:3,
44:21, 45:1,
49:6, 55:5,
91:16, 91:20
go
15:12, 17:12,
20:2, 20:3,
20:5, 20:15,
20:21, 22:22,
23:3, 23:7,
23:11, 24:15,
24:17, 25:5,
26:12, 33:3,
48:6, 48:8,
48:11, 48:14,
51:12, 52:12,
55:8, 55:18,
58:2, 58:8,
59:13, 65:5,
65:12, 73:3,
73:7, 73:18,
75:14, 80:8,
84:22, 93:1,
93:18, 101:12,
103:15, 106:11,
106:16, 106:18,
108:19, 108:22,
110:5, 111:20,
117:14, 119:20,
123:13, 123:17,
125:22, 127:15,

127:21, 128:19,
128:20
going
7:19, 10:19,
11:1, 11:16,
11:19, 13:5,
13:12, 15:17,
21:21, 27:2,
27:11, 28:18,
31:20, 34:1,
38:20, 39:1,
41:10, 42:12,
43:20, 50:21,
54:2, 55:2,
55:12, 55:22,
56:8, 57:2,
65:6, 69:16,
69:18, 72:19,
75:7, 75:13,
78:7, 79:10,
80:14, 80:15,
91:9, 92:17,
95:8, 95:19,
98:11, 99:1,
99:19, 100:22,
101:3, 106:11,
107:21, 107:22,
109:7, 110:5,
110:7, 110:8,
113:2, 118:19,
119:20, 122:21,
123:13, 125:1,
125:10, 128:21,
129:3
good
16:22, 17:20,
32:3
goodman
9:3, 10:11,
41:11
goodman-gable-go-
uld
40:17, 40:21,
41:16, 47:6,
51:14, 51:16,
65:2, 71:13,
80:2, 80:11,
84:4

gould
9:3, 10:11
great
42:16, 117:9
grill
25:18
grow
94:17
growth
86:9, 86:13,
86:14, 86:20,
94:18, 95:2,
95:10, 95:16
gs
82:17, 99:15
guess
9:4, 23:15
guidance
76:5
gun
51:12
guy
126:8
guys
12:9, 36:6,
54:2, 54:21,
73:14

**H**

half
18:4
hammers
125:16
hand
132:14
handle
10:5, 36:22,
59:15, 59:16
handled
82:14
handles
10:11
handling
8:21, 11:11,
30:17, 30:20,
35:22, 42:1,
59:13, 69:15,
83:9, 83:16,

83:18, 83:19,
83:20, 102:13,
105:11, 105:17
**handwritten**
30:5
**hang**
26:5, 26:11,
65:9, 65:14,
72:22, 74:8,
85:2, 113:21
**happen**
43:6, 57:22,
84:19
**happened**
32:12, 32:19,
36:16, 38:18,
39:4, 84:17
**happening**
55:16
**happens**
42:9
**hard**
98:20
**hartford**
9:13, 9:15,
9:16
**hawk**
53:17, 53:19
**head**
7:18, 18:18,
27:12, 62:12,
79:9
**heard**
60:4
**held**
25:20, 129:1
**help**
26:4, 30:7,
60:11, 100:1,
129:8
**here**
6:2, 8:10,
15:3, 20:2,
20:5, 25:6,
30:7, 41:13,
45:12, 59:1,
67:3, 70:6,
71:11, 72:6,

72:11, 75:14,
81:11, 85:11,
102:7, 106:18,
106:22, 110:15,
114:7, 114:15,
117:19, 120:15
**hereby**
131:2, 132:3
**hereunto**
132:13
**hesitate**
37:17
**hey**
84:22
**hi**
45:11
**higher**
115:10
**highlighted**
13:21, 21:12,
22:8, 23:4,
65:21
**highlighting**
17:3
**hired**
118:10
**ho**
64:11
**hogue**
18:16, 74:15,
112:4, 113:10
**hold**
58:22, 129:3
**holdback**
87:12, 87:16,
88:12, 88:19
**horst**
3:12
**hotel**
15:21, 25:19,
27:18, 38:22,
39:2, 64:8,
87:9, 93:11,
93:19, 117:15
**hour**
18:4
**hours**
18:5, 120:14,

120:20, 120:21,
121:10
**however**
93:5, 103:21
**huge**
37:15, 79:2

**I**

**idea**
92:1
**identification**
12:12, 20:14,
24:4, 26:10,
29:8, 34:6,
74:12, 75:21,
101:11, 110:12,
113:5, 114:3,
119:8
**identified**
13:8, 45:11,
57:10, 57:11,
110:21
**identify**
6:14, 19:22
**impact**
71:3
**impacted**
64:18
**impression**
42:17
**impressive**
46:16
**improper**
118:6
**inc**
1:4, 6:4
**incidental**
122:14
**include**
108:17, 109:13
**included**
66:22, 111:12,
120:17
**including**
58:5, 121:20
**income**
16:9, 19:7,
19:11, 22:17,

26:2, 27:18,
55:7, 77:7,
78:18, 79:3,
80:19, 84:7,
92:6, 93:21,
109:11, 110:17,
111:1, 116:6
**increasing**
90:2
**incur**
28:7
**incurred**
88:4
**indicate**
28:8, 69:14,
115:15
**indicated**
42:10
**indicates**
12:20, 13:12,
14:1, 17:3, 19:2
**indication**
61:9, 98:2
**individuals**
93:16
**industry**
107:18
**info**
37:17
**inform**
92:16
**information**
33:3, 36:7,
72:8, 76:11,
76:12, 82:21,
83:3, 83:5,
92:9, 98:13
**informed**
98:17
**initial**
13:15
**initially**
9:1, 13:3,
21:17, 77:3,
116:16
**initiate**
54:15
**inspected**
9:1, 21:17

installed
98:22
instant
98:15
instruct
57:2, 57:16
instructing
56:18
instructions
20:22
insurance
1:9, 6:5, 8:4,
8:7, 8:13, 9:17,
9:20, 16:20,
41:4
insured
10:18, 15:4,
18:12, 18:18,
18:19, 19:3,
21:18, 21:19,
26:14, 36:7,
37:14, 41:3,
41:20, 42:5,
42:8, 42:9,
43:16, 44:7,
54:5, 78:16,
91:15, 91:20,
95:22, 96:8,
104:17, 107:22,
111:12, 111:14,
112:14, 113:17,
114:18, 114:20,
116:1, 116:3,
118:4, 118:8,
125:6, 125:12
insured's
12:21, 35:20,
35:21, 36:3,
43:14, 82:2,
113:14, 126:8
insureds
41:15, 41:16
insurer
98:18
interest
22:6, 132:11
internally
111:6

interrupted
109:12
interruption
19:15, 31:3,
31:6, 32:7,
108:20, 109:1,
109:4, 111:7,
113:17
investigation
125:9
involve
56:19, 92:2
involved
31:7, 33:7,
33:13, 36:14,
42:19, 43:22,
48:16, 54:5,
55:6, 57:4,
57:21, 64:17,
69:3, 83:11,
92:14, 95:9,
100:1
involvement
71:5
involving
7:10
island
41:12
issue
23:19, 36:11,
39:12, 87:19,
101:18, 104:22,
109:22
issued
30:8, 89:19
issues
11:10, 46:13,
46:20, 86:15,
100:19
item
121:20

**J**

january
38:15, 99:6,
106:2, 127:22
jason
53:17, 53:19

jeff
41:11
jeremy
18:16, 74:15,
112:2, 112:4,
112:10, 113:10
job
1:20, 10:2,
10:5, 46:9,
46:18
joe's
24:12, 25:17
jones
3:5
josh
46:17
julio
3:19
july
75:15, 82:18,
95:1
jump
75:13, 123:2
jumped
9:5, 51:11
june
68:13, 68:18,
69:2, 82:18
jurisdiction
126:7

**K**

keep
11:4, 63:12
kept
50:20
kevin
60:1, 60:3,
60:8, 119:10
kind
15:16, 33:20,
43:8, 63:12,
64:7, 86:15,
93:15, 117:7,
121:13
king
4:17, 5:9,
5:11, 30:19,

33:16, 34:22,
38:2, 38:5,
41:10, 43:3,
43:4, 44:17,
45:16, 56:1,
56:7, 57:10,
57:22, 58:14,
58:16, 59:7,
59:9, 83:9,
98:22, 99:8,
99:19, 101:14,
101:20, 102:4,
102:5, 102:7,
102:19, 103:3,
103:7, 103:11,
103:20, 104:7,
104:10, 105:2,
107:5, 110:10,
113:3, 114:1
king's
29:2, 100:8,
107:7
know
7:14, 10:13,
10:21, 12:7,
13:3, 14:1,
15:19, 16:19,
18:18, 19:5,
20:7, 24:17,
25:19, 27:19,
28:13, 28:15,
30:3, 31:22,
36:14, 37:5,
40:7, 48:22,
49:1, 49:18,
52:1, 53:13,
54:22, 57:19,
58:15, 62:17,
63:19, 66:19,
69:7, 69:8,
69:11, 70:6,
70:9, 70:15,
70:22, 71:1,
72:5, 72:9,
73:13, 81:8,
81:16, 82:5,
83:12, 83:19,
85:9, 85:19,

87:5, 87:13,
88:9, 88:21,
89:22, 90:8,
90:12, 90:18,
91:8, 91:11,
91:17, 92:13,
92:21, 94:12,
97:9, 98:5,
101:18, 105:8,
105:16, 116:8,
116:11, 116:12,
116:13, 117:10,
119:5, 121:7,
129:4
**knowledge**
125:10
**known**
8:17, 107:17
**krekstein**
3:11, 3:12,
4:4, 4:6, 6:18,
7:3, 7:5, 11:21,
12:3, 20:9,
28:16, 28:20,
29:3, 36:11,
36:17, 46:7,
51:5, 51:8,
51:11, 58:2,
58:17, 58:20,
59:2, 60:18,
60:21, 61:2,
65:6, 65:10,
65:12, 65:15,
65:17, 65:20,
66:1, 72:17,
73:1, 73:6,
73:9, 73:14,
73:16, 73:21,
74:3, 74:6,
74:10, 74:13,
75:13, 75:17,
84:22, 85:3,
85:6, 85:9,
85:12, 93:1,
101:6, 101:9,
101:12, 106:11,
106:16, 106:19,
111:17, 112:16,

115:2, 118:15,
118:18, 119:3,
119:5, 123:6,
124:12, 126:2,
126:14, 126:22,
128:12, 128:16,
129:10, 129:12,
129:14, 129:17,
130:1

---
L
---

**labor**
122:1, 125:15
**landscapers**
12:5
**large**
8:15, 10:3,
16:16, 20:18,
33:11, 39:9,
40:1, 47:22,
80:22, 82:14
**larger**
10:12
**last**
28:13, 33:6,
33:12, 43:22,
69:3, 91:14,
104:15, 127:10
**late**
38:15
**later**
37:20, 49:14,
94:15, 99:7
**leads**
59:7
**least**
23:20, 23:21,
36:8, 67:17,
108:4, 108:15,
121:19
**leave**
46:8, 124:17
**leaves**
12:6
**leaving**
46:21
**left**
16:17, 32:22,

33:1, 44:7,
44:20, 46:9,
46:17, 46:22,
52:3, 52:11,
52:15, 52:18,
52:20, 53:1,
53:6, 106:4,
106:9
**lengthened**
124:14
**lengthy**
13:11
**less**
109:15, 109:16
**lesson**
39:13, 41:7,
42:11, 42:20,
98:19, 99:15,
117:21, 118:3
**let's**
7:19, 25:5,
31:9, 52:12,
74:9, 107:3,
107:10, 108:20,
112:21, 115:21,
123:18, 127:15,
127:20, 128:17,
128:20
**letter**
4:13, 5:3,
75:15, 104:21
**license**
61:16, 61:21,
62:3, 62:16,
62:22, 63:5
**licensed**
61:13, 61:15,
61:19, 62:9
**licenses**
62:21, 63:2
**line**
24:12, 58:5,
58:6, 87:11,
91:14, 119:22,
120:9, 121:20,
122:11, 123:2,
129:19
**listen**
78:16

**little**
8:10, 9:5, 9:6,
19:19, 20:4,
22:22, 24:16,
29:6, 53:3,
65:16, 89:21,
114:6, 123:21,
127:16
**llc**
3:12
**local**
126:6
**located**
79:2
**location**
69:20, 70:18
**log**
4:11, 11:12,
12:8, 13:8,
13:12, 13:21,
17:4, 19:1
**logs**
12:14, 13:7
**long**
8:5, 8:8, 9:21,
18:1, 27:10,
27:19, 61:10
**longer**
53:19, 111:12,
121:18, 125:1,
125:2
**look**
11:2, 15:9,
15:12, 23:8,
36:9, 46:15,
56:2, 66:12,
71:9, 72:4,
76:4, 77:5,
87:2, 87:10,
92:18, 103:7,
107:3, 111:21,
119:11, 123:15,
123:18
**looked**
26:20, 43:9
**looking**
15:17, 37:12,
37:13, 43:11,

44:13, 78:11,
85:14, 91:21,
97:20, 120:22
**looks**
15:7, 20:18,
103:3, 103:21,
116:7, 119:12
**lose**
27:17
**losing**
26:2
**loss**
7:10, 8:15,
8:17, 8:20,
8:22, 9:1, 10:3,
10:7, 10:22,
11:9, 11:10,
12:19, 15:6,
15:10, 15:13,
15:16, 16:4,
16:16, 17:1,
19:3, 19:5,
19:9, 19:15,
19:16, 19:18,
20:18, 21:17,
24:21, 27:18,
30:2, 33:11,
35:5, 35:16,
37:1, 39:9,
40:1, 42:1,
47:22, 48:12,
48:18, 55:6,
59:14, 76:1,
77:7, 80:19,
82:14, 87:4,
93:6, 94:7,
107:19, 108:10,
108:12, 109:13,
109:17, 111:13,
111:15, 114:4,
114:12, 118:12,
120:8, 126:18
**loss-of**
64:15, 86:18
**loss-of-business**
84:6, 93:21
**loss-of-business-**
**-income**
74:20, 75:10,

77:1, 77:11,
86:8, 87:21,
89:20, 96:20
**lot**
10:11, 69:22,
86:21, 93:13,
93:14, 108:21
**loud**
12:6
**lovrak**
57:22
**lower**
115:10
**lumber**
25:7
**lynn**
1:22, 2:10

### M

**m**
121:1
**machines**
64:10, 64:18,
79:2, 93:7,
93:9, 93:20,
95:12
**made**
12:21, 29:14,
44:8, 49:10,
56:10, 66:17,
70:3, 70:12,
95:22, 96:8,
109:17
**main**
19:14
**make**
20:3, 29:5,
30:13, 42:18,
65:16, 65:18,
70:11, 83:4,
83:14, 88:15,
103:5, 114:6,
123:21, 129:8
**makes**
83:4
**making**
25:10, 109:14,
109:15

**malamud**
117:3
**man-hours**
121:17
**management**
120:11, 120:12
**manager**
8:3, 8:16,
16:18, 31:14,
34:17, 35:1,
39:9
**managers**
38:16
**manipulate**
123:14
**marc**
57:22
**march**
24:19, 24:20,
84:12, 119:9,
127:22, 128:1
**mark**
33:2, 33:4,
33:9, 33:10,
33:15, 34:9,
35:10, 38:22,
39:15, 39:16,
39:17, 39:21,
40:5, 43:5,
45:7, 45:11,
45:15, 45:21,
46:1, 47:11,
48:9, 50:6,
50:22, 54:6,
56:7, 74:6,
74:7, 74:9,
75:19, 85:15,
85:21, 99:4,
99:22, 101:6,
118:20, 127:22
**marked**
11:16, 12:11,
20:13, 24:3,
26:9, 29:7,
34:1, 34:5,
58:9, 72:19,
74:11, 75:20,
101:10, 110:9,

110:11, 113:2,
113:4, 114:1,
114:2, 119:7
**maryland**
1:2, 2:12, 6:6,
10:12, 40:13,
41:13, 132:22
**masking**
122:13
**material**
122:12
**matter**
6:4, 36:1
**max**
90:12, 90:14
**maybe**
18:5, 27:13,
28:1, 34:20,
52:1, 54:20,
79:11
**meaden**
5:3, 22:20,
65:1, 75:9,
75:15, 75:22,
82:22, 103:22,
104:1, 104:7,
107:14
**mean**
40:9, 41:2,
41:8, 41:22,
62:13, 62:20,
65:8, 75:3,
78:19, 80:7,
81:7, 82:8,
93:7, 108:12,
109:22, 121:16
**meaning**
98:6
**means**
14:4, 42:20,
66:4
**meant**
42:15, 60:22,
63:17
**measured**
109:4
**measurement**
77:7

meeting
3:15, 17:5,
17:8, 17:11,
17:12, 17:13,
18:2, 18:16,
19:12, 19:15,
21:21, 21:22,
23:10, 30:1,
31:10, 31:16,
32:2, 32:13,
32:22, 33:1,
33:14, 33:15,
38:14, 38:19,
44:19, 45:14,
45:19, 47:6,
47:16, 48:2,
48:20, 49:2,
49:4, 49:11,
50:1, 50:4,
50:21, 52:12,
53:11, 55:3,
77:17, 78:7,
79:4, 82:19,
84:1, 87:20,
88:17, 89:17,
89:22, 90:1,
90:17, 90:22,
92:11, 92:16,
94:19, 94:20,
95:16, 95:21,
96:8, 96:15,
96:17, 96:19,
96:22, 97:10,
98:9, 98:13,
101:17, 104:15,
104:20, 117:20
meetings
38:17
memory
15:17
mendieta
3:19
mention
69:21, 89:5,
89:6
mentioned
10:8, 16:13,
18:7, 91:12,

104:15, 106:5
mentioning
88:11
merit
2:10
messages
100:13
met
17:4, 17:15,
38:22
method
33:20
methods
86:22
michael
117:3
middle
13:21, 128:7
might
14:9, 16:10,
49:3, 55:15,
60:9, 86:2,
90:19, 129:7
million
74:21, 77:11,
77:19, 80:2,
80:10, 80:21,
81:6, 81:10,
82:11, 82:17,
83:4, 114:7
mind
49:12
mine
129:17
mini
129:12
minimum
23:22, 68:16,
107:21, 116:5
missed
80:9
mister
105:9, 123:19,
124:12, 127:1,
127:3
moment
90:19
monday
112:1

money
43:20, 46:22,
70:19, 70:21,
78:8, 78:12,
89:13, 103:11,
109:14, 109:15
monitor
15:5, 15:9
month
76:6, 77:2,
77:3, 107:14,
120:11, 120:21
months
22:17, 23:6,
23:9, 23:21,
27:13, 66:15,
67:5, 67:12,
67:19, 68:3,
68:16, 71:8,
71:16, 72:3,
72:14, 94:1,
99:7, 109:6,
109:7, 111:13,
115:5, 116:6,
120:19, 121:4,
121:5, 121:8,
121:17, 122:3,
123:3, 124:12,
127:17, 128:1
moore
5:4, 65:1,
75:15, 75:22,
82:22, 103:22,
104:7, 107:14
moore"
22:20
moore's
75:9, 104:1
more
15:19, 36:7,
46:22, 65:20,
83:5, 93:10,
93:12, 109:14,
109:15
most
35:20
move
7:19, 32:10,

69:19, 112:22,
114:6, 116:21
much
37:20, 38:1,
90:3, 109:15,
109:16, 118:14
must
30:20
mutual
1:9, 6:5, 8:3,
8:7, 8:13, 9:16,
9:20, 16:20,
46:10
myself
17:15, 19:18,
33:1, 45:4,
51:2, 79:1,
104:20

## N

name
7:8, 7:21,
12:15, 18:22,
112:5
named
10:8, 21:18,
21:19, 112:4
nd
35:8, 80:1,
93:4, 94:11
neal
9:3, 10:9,
10:10, 13:2,
13:3, 18:12,
18:15, 21:18,
28:4, 29:17,
31:22, 32:8,
38:3, 40:20,
52:6, 54:4,
67:17, 71:9,
82:21, 88:3,
94:21, 97:2,
104:21, 111:22,
112:1, 112:3,
113:8
necessarily
78:8, 92:3,
121:15

**need**
13:22, 20:7,
30:13, 37:16,
50:9, 86:13,
101:18, 109:2
**needed**
48:13, 64:10,
79:5, 117:21
**neither**
50:1, 132:9
**never**
44:9, 44:10,
45:17, 45:20,
45:21, 62:2,
62:5, 62:6,
81:12, 102:4,
104:21, 118:5,
124:17
**new**
28:16
**next**
16:2, 19:1,
32:19, 35:7,
35:8, 38:12,
38:21, 93:22,
108:8
**non-covid**
27:21
**normally**
11:13, 37:15
**north**
18:4, 40:13,
91:4
**notarial**
132:14
**notary**
2:11, 132:21
**note**
12:15, 12:17,
12:18, 13:7,
19:1
**noted**
115:17
**notes**
11:2, 11:4,
11:7, 11:8,
11:12, 106:12
**nothing**
57:20, 123:6,

**notice**
2:9
**november**
13:18, 14:19,
28:2, 112:1,
127:11, 127:15,
127:21
**nudelman**
3:20, 6:10
**number**
6:2, 6:7, 7:9,
12:14, 28:21,
30:10, 49:11,
49:12, 49:13,
49:15, 49:16,
49:19, 50:3,
72:20, 73:22,
74:7, 77:13,
80:22, 81:10,
82:11, 90:8,
91:6, 91:7,
91:12, 92:12,
92:17, 102:21,
104:4, 105:3,
105:4, 109:7,
109:8, 113:16,
115:15
**numbers**
11:22, 12:2,
20:10, 20:12,
35:16, 37:14,
37:15, 45:3,
50:3, 78:15,
79:5, 79:11,
81:4, 90:21,
91:1, 91:3,
92:8, 92:19,
92:21, 94:17,
95:9, 101:4,
125:22

**O**

**o**
121:1
**oath**
6:22
**object**
56:8

**objection**
111:17, 112:16,
115:2, 126:2,
126:14, 126:22
**obtain**
126:12
**occasion**
52:14, 52:15
**occupation**
8:2
**occur**
53:21, 114:22
**occurred**
8:22, 10:22,
45:19, 116:9
**occurrence**
122:8
**occurring**
122:21
**october**
28:1, 127:11,
127:15, 127:20,
127:21
**of-business-inco-
me**
76:2, 94:8
**office**
12:6, 38:20,
51:21, 52:20
**officer**
132:2
**officially**
128:20
**often**
40:15
**oh**
20:2, 20:11,
60:6, 120:3
**once**
13:17, 43:3,
102:3
**one**
6:3, 7:18,
14:20, 15:1,
26:11, 26:12,
39:10, 39:11,
41:10, 41:13,
44:22, 47:11,

51:7, 51:9,
59:1, 62:18,
64:6, 65:20,
70:17, 80:7,
85:13, 86:6,
86:14, 87:10,
87:11, 95:19,
99:14, 109:2,
109:7, 109:10,
112:21, 112:22,
115:14, 119:16,
121:15
**ones**
45:22
**only**
19:17, 78:11,
99:11, 122:12
**oops**
26:5, 85:4
**open**
14:2, 15:8,
15:9, 19:12,
19:13, 23:1,
23:18, 32:16,
34:3, 36:6,
44:5, 115:18
**operation**
93:12
**operations**
17:19
**opinion**
42:5, 109:22
**opportunity**
47:2
**order**
50:7, 78:6,
78:12, 83:2,
86:20, 108:22,
109:16
**ordering**
129:10, 129:21
**origin**
22:6
**original**
15:2, 103:21
**originally**
52:1
**other**
7:9, 7:18,

23:13, 41:11,
45:22, 46:11,
47:3, 50:7,
50:18, 51:13,
62:8, 63:17,
64:10, 81:1,
81:4, 81:5,
81:9, 84:12,
99:17, 100:3,
100:7, 105:20,
106:7, 109:10,
122:17
**otherwise**
132:12
**out**
9:1, 15:12,
26:4, 30:7,
33:2, 38:5,
38:9, 38:20,
45:6, 45:15,
45:18, 47:16,
47:21, 50:6,
51:22, 52:5,
52:6, 52:8,
53:7, 53:9,
53:15, 53:16,
59:14, 65:3,
88:14, 111:6,
127:18
**outcome**
132:12
**outside**
12:6, 51:1
**over**
8:10, 33:3,
53:3, 77:6,
79:6, 86:13,
89:21, 105:16,
114:6, 122:21
**overall**
39:12
**oversight**
104:16, 120:11
**owe**
14:9, 78:8,
89:1, 89:14,
92:4
**owed**
78:12, 89:20,

108:2

**P**

**pa**
3:15, 12:22,
17:5, 41:22,
80:14, 80:18,
104:15, 118:10
**page**
4:2, 4:10, 5:2,
11:19, 11:20,
12:14, 13:6,
16:22, 21:16,
37:9, 58:5,
65:13, 65:20,
73:19, 73:21,
103:18, 119:21
**pages**
1:21, 35:9
**paid**
15:7, 28:14,
31:4, 70:13,
89:9, 108:4,
108:10, 108:16
**paragraph**
76:5, 77:6,
87:2, 87:11,
90:5, 93:3,
93:22, 94:16,
98:12
**parking**
69:22
**part**
14:14, 18:19,
25:8, 25:9,
27:18, 28:6,
33:6, 43:10,
46:20, 55:1,
55:21, 61:7,
64:1, 64:15,
64:22, 66:20,
79:2, 86:10,
86:11, 89:9,
93:11, 93:12,
93:21, 104:16,
108:8
**parties**
55:8, 55:12,

77:17, 78:1,
86:12, 87:19,
132:10
**parts**
14:13, 63:17,
64:2, 64:10,
121:15
**pas**
71:19
**pass**
62:5
**patrons**
9:16
**pay**
26:22, 43:20,
78:7, 78:12,
88:18, 97:13,
103:12, 105:8,
105:12, 107:22
**paying**
88:14, 92:3,
97:3
**payment**
15:6, 20:21,
26:22, 28:9,
28:13, 29:12,
31:3, 31:5, 89:6
**payments**
21:12, 29:14,
30:21, 103:14
**pc**
3:4
**people**
93:14, 122:2,
122:4
**percent**
37:13, 37:14,
79:12, 79:16,
90:12, 90:14,
94:17, 95:2,
95:17, 109:20
**percentage**
79:14, 95:10,
116:2
**perfect**
65:21, 85:12
**period**
14:6, 15:4,

22:16, 22:18,
23:5, 23:18,
23:22, 66:7,
66:14, 67:4,
67:7, 67:11,
67:18, 68:2,
68:14, 68:18,
69:1, 71:3,
71:7, 71:15,
72:2, 72:13,
76:6, 77:2,
77:4, 81:8,
96:1, 96:10,
107:14, 109:2,
109:3, 109:12,
111:5, 111:12,
111:15, 112:14,
114:12, 114:21,
115:16, 116:9,
116:20, 120:18,
121:11, 121:21,
122:22, 124:11,
124:15, 124:18,
125:12, 126:1,
126:5, 126:9,
126:12, 126:13,
126:19, 126:21,
127:6, 127:7,
127:16, 128:2,
128:8
**periods**
77:7, 111:2,
125:15
**permits**
125:17, 125:19,
125:20, 126:12
**person**
39:6
**personal**
14:15, 21:4,
21:15
**perspective**
32:22
**pertaining**
80:18
**phases**
59:15
**phone**
50:11, 50:14,

99:5
**photographs**
15:18
**piers**
16:2
**pifer**
40:3, 51:1,
51:3
**pike**
3:13
**place**
6:12, 11:9,
88:8, 93:13
**placed**
98:16
**placement**
93:6, 93:20,
95:11
**plaintiff**
98:14, 110:14,
123:9
**plaintiffs**
1:6, 3:2, 4:22,
6:17, 7:6, 7:10,
24:9, 26:8,
72:20, 73:16,
74:3, 95:20,
107:1
**planet**
3:19, 6:11,
6:21
**play**
87:13, 87:17,
88:12, 98:20,
106:18
**played**
46:20, 79:2,
93:20
**please**
6:14, 23:11,
37:17, 77:1,
101:17, 113:14
**plymouth**
3:15
**point**
14:11, 16:6,
19:18, 22:13,
32:20, 33:21,

36:5, 42:22,
43:14, 45:3,
47:11, 67:13,
76:13, 88:13,
97:10, 128:18,
129:2
**policies**
67:7, 67:8,
70:17
**policy**
78:12
**policyholder**
66:5, 67:13,
69:14, 71:14,
84:4, 91:16,
91:20
**policyholder's**
91:19
**pool**
17:20
**portion**
16:10, 16:11,
37:1, 48:18,
63:11, 88:19,
89:7, 97:3,
97:13
**position**
39:22, 44:8
**positive**
42:21, 117:18,
127:13
**possible**
51:5
**potential**
49:6
**potentially**
62:10
**predict**
109:16
**predominantly**
59:12
**preliminary**
111:3
**premises**
70:20
**prepare**
61:5, 117:1,
119:15

**prepared**
20:16, 60:15
**preparing**
61:8
**present**
3:18, 21:19,
71:19, 71:20
**presentation**
110:21
**presented**
64:16, 70:7,
71:10, 71:22,
72:9, 72:10,
77:12, 100:15,
102:15
**presenting**
72:12, 74:20
**pretty**
32:3, 38:1,
45:5, 46:16
**previous**
22:19
**prior**
39:1, 51:19,
89:22
**privilege**
56:21, 56:22
**probably**
13:15, 16:7,
18:4, 18:21,
27:2, 27:9,
34:19, 43:7,
51:1, 52:2,
61:11, 61:17,
76:17, 91:21,
95:9, 122:6
**problem**
85:8
**problems**
46:13, 46:19
**proceed**
6:22
**process**
18:19, 32:11,
48:17, 68:4,
76:13, 78:5,
80:8, 83:8,
92:14, 98:3,

124:22
**produce**
119:18
**production**
4:22, 24:10,
26:8, 72:20,
73:16, 74:3,
110:14
**professional**
9:10
**progress**
95:22, 96:8
**project**
86:9, 86:13,
86:14, 86:20,
97:22, 109:11,
120:11
**prompted**
50:10, 81:20,
85:19
**proof**
97:14
**proper**
118:3
**property**
14:15, 21:4,
21:16, 25:16,
69:19, 97:8
**protect**
26:1
**protected**
56:21, 57:17
**protection**
122:13
**protective**
122:17
**provide**
83:2, 116:22,
119:18
**provided**
76:11, 76:12,
76:15, 97:14
**public**
2:11, 10:10,
10:13, 10:17,
11:14, 14:7,
17:9, 21:18,
21:20, 22:19,

40:20, 41:17,
41:21, 43:15,
61:14, 61:15,
62:2, 62:9,
63:4, 66:5,
75:7, 91:15,
91:18, 91:20,
118:3, 132:1,
132:21
**pull**
58:17, 62:21,
72:8, 82:8,
111:20
**pulled**
85:10
**purpose**
52:4, 53:14,
77:16, 96:19
**pursuant**
2:9
**pursue**
46:9
**put**
10:21, 12:15,
16:22, 23:14,
51:6, 65:7,
72:17, 72:18,
73:2, 73:3,
73:5, 92:7,
103:4, 106:17,
111:11, 115:21,
122:16, 123:14
**puts**
78:15
**putting**
11:12, 69:21
**pwg**
1:7, 6:7

**Q**

**quantity**
120:22
**question**
7:15, 46:19,
58:3, 68:22,
69:8, 70:15,
80:20, 81:5,
88:10, 88:21

**questioning**
63:8, 66:2,
81:21
**questions**
106:15
**quick**
9:5, 28:10,
110:8, 118:15,
123:19, 129:18
**quite**
29:15, 40:15
**quote**
17:4, 98:19

**R**

**r&r**
5:7, 12:15
**raised**
91:11
**ran**
17:11, 27:20,
111:13, 111:15
**randy**
41:11
**rate**
86:9
**rather**
48:14
**rc**
87:12, 87:16,
88:12
**rcv**
70:19
**re-examination**
107:1, 118:16,
123:8
**reach**
38:5, 38:8,
44:21, 52:8,
98:6, 98:7
**reached**
33:2, 35:16,
45:6, 45:15,
47:16, 47:21,
50:6, 51:22,
52:6, 53:7,
53:9, 53:16,
78:1

**reaching**
52:4, 53:15
**reaction**
75:1
**read**
11:18, 13:22,
20:9, 24:15,
37:5, 58:4,
67:3, 90:9,
95:19, 96:6,
98:11, 131:3
**reading**
21:7, 24:18,
73:22, 132:8
**ready**
36:1, 81:22
**real**
28:10, 110:8,
118:15, 123:19
**really**
63:16, 65:7
**realtime**
2:11
**reason**
12:4, 27:16,
46:11, 48:10,
48:13, 50:5,
81:1, 81:5,
117:5
**reasons**
47:3
**reassigned**
33:16, 58:16
**reassigning**
58:14
**reassignment**
12:19
**rebuild**
125:20
**recall**
17:8, 17:22,
18:17, 21:21,
21:22, 24:13,
25:13, 26:13,
27:4, 27:10,
27:14, 31:4,
32:19, 48:19,
62:11, 70:17,

**reaching**
71:11, 71:17,
71:22, 72:7,
72:12, 75:9,
90:2, 90:3,
90:16, 90:18,
98:5, 111:10,
111:16, 114:4
**receive**
92:9
**received**
75:2, 81:12,
116:17, 119:13
**receiving**
24:13, 26:19
**recent**
25:8, 35:20
**recitation**
82:3
**recognize**
29:9, 113:15
**recollection**
60:7, 60:12,
67:6, 112:13,
117:19
**recommend**
125:1
**recommendation**
63:10, 66:17,
67:16
**recommendations**
20:22
**recommending**
91:19
**record**
6:9, 11:19,
20:10, 46:15,
56:18, 58:4,
75:18, 128:19,
128:22, 129:1,
130:3, 132:5
**recordings**
100:18
**records**
26:7
**recoverable**
70:3, 70:8,
89:7, 97:13
**red**
103:4, 103:9,

106:21, 107:8
**reduced**
132:7
**reel**
1:4, 5:4, 6:4,
7:9, 8:18, 10:4,
11:19, 11:20,
17:16, 17:18,
34:2, 34:3,
34:7, 39:7,
43:16, 54:15,
63:17, 64:17,
70:7, 71:6,
71:7, 72:1,
74:19, 75:18,
77:12, 85:14,
86:8, 98:7,
99:13, 100:14,
101:4, 102:21,
106:8, 119:10
**refer**
25:12, 72:19
**reference**
121:13
**referenced**
41:9
**referencing**
90:4
**referral**
13:13
**referred**
84:14
**referring**
11:21, 12:1,
56:9, 57:6,
57:7, 57:8,
57:12, 57:14,
58:7, 58:9,
58:12, 59:3,
67:21, 68:1,
82:6, 87:5,
94:4, 94:12,
102:20, 103:22,
121:4, 121:5
**refers**
90:13, 120:9,
122:12, 123:3
**reflected**
114:5

**refresh**
60:7, 60:11,
112:13
**regard**
24:14, 26:3,
26:15, 32:20,
98:21
**regarding**
96:16, 105:18
**regards**
10:6, 14:5,
33:7, 42:1,
78:18, 102:13
**region**
48:4
**registered**
2:10
**regular**
93:10
**related**
16:9, 87:20,
132:10
**relating**
122:14
**relationship**
41:21
**relay**
57:2, 71:6,
105:20
**relayed**
54:8, 56:12,
71:14
**release**
91:16, 91:19,
91:21, 98:1
**relinquished**
83:19
**relocated**
64:10, 70:19,
97:15
**relocating**
97:7
**relocation**
64:17, 64:19
**rely**
61:8
**relying**
83:1

**remainder**
63:13
**remaining**
19:17
**remember**
15:15, 18:22,
26:17, 26:19,
27:8, 28:3,
31:21, 45:3,
47:12, 49:14,
49:16, 52:10,
54:3, 54:20,
64:4, 66:22,
72:10, 75:3,
79:9, 79:13,
79:16, 81:11,
89:3, 90:20,
90:21, 91:1,
91:3, 95:3,
95:6, 97:17,
111:13, 112:3
**remnants**
63:20
**remote**
3:19
**remotely**
6:13
**removal**
100:9
**remove**
128:3
**removed**
43:1, 98:21,
99:18, 99:21,
104:19
**removing**
98:17, 124:8
**rendering**
56:20
**renews**
63:1
**repair**
60:16, 69:16,
69:18, 121:18
**repaired**
97:15
**repairs**
69:8, 70:2,

70:11, 70:12,
88:8, 88:19,
89:1, 89:2,
97:9, 97:21,
120:13
**repeat**
68:22
**replace**
25:7
**replaced**
70:16, 70:18,
88:4, 88:8
**replacement**
15:5, 15:10,
87:15, 87:16,
88:2, 108:11
**replied**
99:13, 103:3
**report**
4:12, 13:13,
13:16, 19:21,
20:18, 25:1,
25:2, 65:11,
65:13, 67:11,
68:13, 89:19,
94:4, 94:7,
94:22, 95:7,
104:1, 115:13,
115:15
**reported**
1:22
**reporter**
2:10, 2:11,
6:20, 58:4,
129:5, 129:9,
129:13, 129:15,
129:21
**reporter-notary**
132:1
**reporting**
47:10, 47:12,
99:22
**represent**
6:15, 7:9,
97:11, 102:22,
118:11
**representation**
117:9

**representations**
88:16
**representative**
99:1
**represented**
89:11
**representing**
6:11, 6:16,
41:3
**represents**
10:17, 90:8,
102:18
**require**
108:11
**required**
83:5
**resolution**
32:1, 32:10,
33:5, 44:21,
45:1, 55:5,
77:22
**resolve**
10:5, 32:6,
39:8, 78:1,
78:6, 78:8,
78:13, 87:19,
91:7, 91:21,
92:1, 96:20,
96:22, 100:1,
116:5
**resolved**
9:2, 31:20,
32:7, 39:10,
54:21, 55:8,
55:18, 71:21
**resolving**
20:20, 118:9
**respect**
36:12
**response**
7:16, 81:18
**responses**
103:4, 103:9
**responsible**
88:14
**restaurant**
16:1, 25:18,
39:2, 63:20,

64:1, 64:5,
64:6, 64:7,
69:16, 69:18,
87:8, 87:9,
93:8, 93:9,
93:12, 93:18,
93:19, 97:8,
97:14, 97:21
**restoration**
14:6, 15:4,
21:20, 22:16,
23:5, 66:7,
66:14, 67:4,
67:7, 67:12,
67:18, 68:2,
68:15, 68:18,
69:2, 71:3,
71:8, 71:15,
72:2, 72:13,
76:7, 77:2,
77:4, 81:8,
96:2, 96:10,
112:15, 114:22,
115:16, 116:10,
124:19, 125:6,
126:1, 126:10,
126:13, 126:21,
127:6, 128:8
**result**
25:8, 64:9,
94:20
**results**
111:1
**retained**
4:18, 29:8,
41:16, 61:5,
76:1
**returns**
22:18
**review**
35:19, 59:10,
59:12, 62:17,
84:3
**reviewed**
120:4
**reviewing**
59:8
**revise**
92:8, 95:8

**revised**
92:11, 92:13,
92:17, 92:20,
104:8, 110:21
**right**
9:10, 10:8,
17:8, 18:10,
18:13, 19:12,
21:21, 24:16,
25:4, 25:5,
25:6, 31:12,
33:17, 34:12,
35:14, 37:4,
38:8, 38:21,
41:17, 42:6,
44:3, 44:19,
46:2, 54:2,
56:16, 61:2,
61:3, 65:22,
73:6, 74:1,
74:6, 83:1,
83:21, 85:7,
85:13, 103:21,
106:21, 106:22,
107:15, 108:2,
108:5, 108:10,
108:11, 109:4,
109:6, 109:8,
109:17, 111:4,
114:15, 118:2,
119:2, 124:11,
125:20, 126:10,
126:15, 127:10
**ring**
112:6, 112:9
**risk**
22:5
**rmr**
1:22
**robertson**
4:13, 24:6
**rod**
1:4, 5:4, 6:4,
7:9, 8:18, 10:4,
11:19, 11:20,
17:15, 17:17,
34:2, 34:3,
34:7, 39:7,

43:16, 54:15,
63:17, 64:17,
70:7, 71:5,
71:7, 72:1,
74:19, 75:18,
77:12, 85:14,
86:7, 98:7,
99:13, 100:14,
101:4, 102:21,
106:8, 119:10
**roles**
47:9
**rollins**
5:12
**rough**
129:22
**rules**
7:14
**run**
40:12
**running**
112:14
**runs**
27:20
**runyon**
3:12

**S**

**said**
33:4, 39:5,
39:11, 43:20,
47:6, 47:15,
53:1, 54:4,
54:9, 54:11,
54:12, 54:14,
55:3, 60:20,
82:7, 82:9,
92:18, 102:3,
117:3, 117:12,
127:11, 132:6
**same**
19:8, 22:17,
25:16, 30:22,
33:2, 35:8,
45:14, 69:19,
87:1, 111:22,
123:20, 131:4
**sat**
31:22

saw
15:15
say
27:2, 27:22,
28:20, 36:5,
40:8, 40:16,
41:1, 58:2,
60:18, 62:19,
63:3, 67:21,
78:4, 81:14,
83:15, 86:5,
86:21, 88:6,
91:4, 94:16,
94:18, 103:6,
103:10, 104:11,
104:14, 114:17,
124:8
saying
46:18, 67:10,
71:2, 77:13,
81:22, 82:3,
82:7, 89:19,
90:11, 105:15,
117:21, 122:20
says
17:4, 21:17,
23:1, 23:4,
23:5, 24:5,
25:6, 30:15,
31:1, 35:17,
36:16, 37:11,
58:15, 76:5,
77:6, 77:9,
83:13, 87:3,
87:7, 87:11,
91:15, 95:21,
101:16, 101:21,
110:13, 110:16,
112:1, 112:10,
113:13, 116:3,
120:22, 121:6,
121:8
scheduled
17:5
schedules
5:12
scott
1:14, 2:1, 4:2,

6:3, 7:1, 8:1,
12:16, 13:8,
56:17, 101:15,
101:21, 112:2,
131:2
screen
34:4, 73:7,
101:1, 114:5,
123:16
scroll
20:6, 106:20
seal
132:14
season
27:15, 27:20,
28:5, 126:19,
127:8, 127:10,
127:21
second
21:16, 26:11,
74:8, 76:4,
87:2, 93:3,
101:12, 103:15,
112:22
section
93:18, 93:19
secure
25:9
see
12:8, 12:22,
13:9, 13:10,
14:2, 15:2,
17:1, 17:6,
19:3, 20:2,
22:9, 24:5,
25:4, 26:4,
28:9, 29:5,
30:6, 30:12,
30:14, 34:4,
34:9, 35:11,
35:13, 36:3,
36:4, 62:4,
63:19, 73:5,
73:14, 73:17,
74:5, 75:14,
76:8, 77:17,
80:8, 85:18,
90:5, 90:7,

94:2, 101:1,
102:1, 103:1,
103:2, 110:7,
110:13, 110:17,
113:7, 113:11,
114:10, 119:22,
120:2, 123:19,
123:22, 124:1,
124:2, 124:22
seeing
26:21
seek
50:9
seen
84:19
send
129:19
sending
110:19
sends
103:8
sense
83:4, 83:5,
103:5
sent
44:2, 44:10,
82:20, 95:1,
101:15, 104:21,
112:11, 112:12
sentimental
10:6
separate
25:15, 25:17,
59:15, 64:2,
64:6, 83:13
separated
63:12
september
28:1
series
101:3
set
45:9, 84:15,
93:8, 96:16,
116:9, 132:13
setting
110:22
settle
48:12, 50:7

settled
19:18
settlement
30:3, 32:4,
33:3, 48:7,
48:17, 49:7,
50:2, 89:10
seven
37:14
shake
7:18
share
123:16
shared
19:22
sharing
85:5, 123:16
she'd
88:13
sheet
131:7
sheraton
38:22, 54:10,
100:5, 105:19
sherri
30:19, 33:16,
34:21, 35:17,
36:10, 36:19,
38:2, 41:10,
43:3, 43:4,
45:20, 56:1,
56:6, 57:21,
58:16, 59:9,
102:21, 104:7,
104:10, 107:4
shocked
117:7
shorthand
132:1
shortly
44:16, 104:20
should
61:10, 81:13,
111:7, 118:21
show
11:16, 33:22,
34:1, 78:22,
101:3, 104:18,

113:2, 113:22,
118:19
**showing**
110:22
**shows**
29:14
**shrink**
24:14, 25:12,
26:14, 27:6,
27:11, 27:16,
28:4, 63:12,
63:16, 66:11,
66:16, 66:21,
124:5, 124:8,
124:9, 124:14,
124:15, 126:18,
127:8, 128:3
**signature**
30:4, 131:10
**signature-8g8ru**
132:18
**signed**
131:7
**significant**
111:3
**signing**
132:8
**silver**
3:4
**since**
10:22, 51:13,
51:17, 53:10,
98:18, 106:8
**single**
57:21, 68:3
**sir**
7:22, 14:17,
15:14, 17:2,
17:7, 17:21,
19:4, 22:10,
110:6, 116:19,
123:17, 125:11
**sit**
81:11
**site**
30:2, 122:1,
123:3
**site's**
126:6

**sitting**
70:6, 71:11,
72:6, 72:11,
117:19
**situations**
122:7
**six**
23:9
**slowly**
20:7
**smaller**
65:18
**smell**
26:16
**smokey**
24:12, 25:17
**solely**
87:20, 124:18
**solid**
94:1
**some**
10:21, 10:22,
11:2, 12:4,
29:15, 33:19,
36:2, 64:4,
70:16, 76:13,
77:18, 78:7,
79:11, 82:10,
88:5, 88:13,
89:1, 92:19,
92:20, 97:2,
98:1, 102:11,
105:4, 106:14,
122:16
**someone**
10:17, 83:13,
84:13
**something**
14:6, 24:5,
30:6, 39:8,
69:16, 71:19,
71:20, 80:9,
104:15, 109:21,
124:22
**sometime**
52:11, 53:12,
106:2
**sometimes**
14:9

**somewhere**
77:18, 91:4,
128:7
**sorry**
28:20, 47:20,
51:11, 69:7,
78:19, 81:19,
85:7, 115:4,
119:20, 120:3
**sought**
113:16
**sound**
112:5
**sounds**
112:18
**south**
41:12
**spans**
35:9
**speak**
37:18, 38:2,
90:15
**speaking**
27:5
**specific**
67:1, 84:18
**specifically**
75:22
**specifics**
54:3, 54:20,
54:22, 89:3,
90:2, 90:20
**spent**
70:19, 70:20
**spoke**
31:22, 37:20,
55:17, 94:5,
106:3, 117:2
**spoken**
53:10
**spot**
26:5
**springfield**
9:8
**st**
34:20, 43:7,
85:17
**stamp**
11:22, 12:2,

20:10, 20:12,
73:22
**stamped**
102:21, 118:21
**stand**
11:9
**standpoint**
63:19
**start**
23:6, 97:20,
101:5
**started**
62:6, 69:9,
89:1, 98:3
**state**
1:8, 2:12, 6:5,
6:15, 6:19,
7:21, 8:7, 8:13,
9:11, 9:15,
9:19, 9:22,
11:3, 16:16,
16:17, 18:9,
23:13, 29:10,
38:16, 39:22,
41:15, 42:10,
43:19, 44:7,
46:8, 46:9,
46:13, 46:16,
46:18, 46:20,
46:21, 49:22,
50:19, 52:3,
52:15, 53:1,
53:20, 56:10,
56:11, 56:14,
56:16, 56:20,
56:22, 57:11,
57:20, 59:7,
59:14, 61:5,
61:19, 62:14,
62:15, 62:17,
63:1, 63:3,
65:1, 66:6,
66:10, 66:18,
67:7, 70:13,
76:1, 77:12,
78:7, 78:11,
84:9, 86:7,
88:18, 89:13,

89:18, 92:2,
95:22, 96:8,
97:12, 98:7,
98:15, 98:17,
98:22, 106:4,
106:9, 107:15,
111:6, 114:20,
116:22, 117:9,
132:22
**stated**
21:9, 49:4,
63:7
**statement**
64:20, 96:4,
96:13, 99:2
**statements**
57:6
**states**
1:1, 93:5
**status**
4:12, 13:13,
13:15, 38:6,
38:9, 45:18,
54:19
**stenographically**
132:6
**step**
40:7
**steve**
40:3, 51:1,
51:3
**still**
19:11, 19:13,
22:18, 23:18,
31:11, 32:13,
32:16, 34:15,
35:1, 36:6,
43:17, 44:5,
44:20, 53:17,
70:18, 84:2
**stipulations**
7:3, 7:4
**stop**
20:7, 85:5,
106:21, 106:22,
112:21, 123:15
**storage**
123:3

**street**
3:5
**strictly**
42:2
**strike**
19:20
**stuff**
17:20
**subject**
109:21, 119:22
**subjective**
78:14, 92:7,
93:6
**submission**
35:20, 36:3,
75:2, 75:4,
80:11, 80:21,
81:6, 82:2,
82:17, 83:4
**submissions**
84:3
**submit**
75:6, 80:14
**submitted**
82:19, 111:19
**submitting**
115:4, 115:8,
115:9
**subpoena**
2:9, 116:17
**subpoenaed**
116:16
**subsequent**
50:14, 68:18
**sue**
43:20, 44:8
**sufficient**
50:2
**suit**
44:11
**suite**
3:6, 3:14
**sum**
37:8, 37:10,
37:11
**summary**
114:4
**supervising**
114:19

**supervision**
120:10, 121:6,
121:10
**supervisor**
8:16, 43:1,
47:7, 47:17,
48:2, 48:4,
53:18
**supervisors**
38:14, 38:17
**supplement**
130:2
**support**
72:13, 87:4,
105:6
**supporting**
72:2
**sure**
23:9, 42:18,
49:13, 51:7,
60:3, 85:2,
87:7, 90:10,
96:7, 103:16,
103:20, 117:16,
129:14
**switched**
47:9
**sworn**
7:2
**swung**
125:16
**system**
29:12, 29:15

**T**

**t**
68:8
**tab**
17:20
**take**
10:19, 11:1,
12:5, 13:5,
19:21, 24:2,
35:7, 40:7,
61:10, 62:4,
73:7, 107:3,
110:4, 110:7,
110:8, 111:21,

121:14, 123:18,
127:20, 129:2
**taken**
11:9, 70:3,
88:8, 132:3,
132:6
**takes**
127:18, 128:7
**taking**
6:12
**talk**
19:19, 31:9,
38:12, 59:20,
79:20, 107:10,
128:17
**talked**
21:16, 27:9,
35:14, 44:9,
44:10, 45:22,
55:15, 91:9
**talking**
49:6, 50:3,
54:1, 79:11,
79:15, 79:21,
82:4, 84:13,
87:8, 87:13,
91:17, 92:20,
94:19, 97:7,
109:19
**tape**
6:2
**taped**
126:9
**tax**
22:18
**teach**
39:13, 41:7,
42:11, 98:19,
117:21, 118:3
**teaching**
42:19, 99:15
**tech**
3:19
**technical**
9:8
**technically**
25:17
**tell**
10:9, 12:16,

13:14, 14:4,
14:18, 14:22,
16:1, 32:21,
33:17, 33:18,
37:3, 38:18,
39:4, 40:12,
42:12, 45:7,
50:19, 54:6,
54:18, 59:17,
74:8, 76:14,
76:22, 79:4,
84:10, 92:10,
117:11

**telling**
74:19, 104:7,
104:10, 105:2

**temporary**
122:12

**term**
66:3, 67:8

**terra**
1:14, 2:1, 4:2,
4:20, 5:7, 6:3,
7:1, 7:8, 7:12,
8:1, 8:2, 12:11,
12:16, 13:8,
20:8, 20:13,
20:17, 24:3,
26:9, 29:7,
29:10, 34:5,
37:6, 46:4,
56:17, 59:4,
74:11, 74:14,
75:20, 85:16,
98:16, 98:21,
101:10, 101:15,
107:3, 110:11,
113:4, 113:19,
114:2, 118:14,
119:7, 119:11,
123:12, 128:13,
131:2

**terra's**
93:2

**test**
62:4

**testified**
7:2, 66:3,

87:18, 100:3

**testify**
57:5, 57:18

**testimony**
68:13, 96:19,
100:15, 107:5,
108:21, 131:3,
131:5, 132:5,
132:6

**text**
100:13

**th**
6:8, 27:5,
34:20, 74:16,
95:21, 96:7,
101:14, 101:21,
102:20, 107:5,
108:5, 108:15,
113:7, 127:20,
132:14

**thank**
46:4, 65:17,
85:3, 85:7,
85:12, 101:17,
104:22, 110:6,
118:14, 123:17,
128:13, 128:14,
129:9, 129:15

**thanks**
7:5, 60:21,
93:2, 128:16

**theirs**
111:13

**themselves**
6:15

**theoretically**
41:22

**thereafter**
132:7

**thing**
11:1, 13:22,
19:17, 99:11,
123:20

**things**
78:17, 109:10,
110:6

**think**
16:17, 26:1,

29:11, 29:16,
33:19, 38:21,
42:16, 42:20,
45:13, 46:16,
54:17, 55:14,
58:20, 64:5,
73:4, 73:9,
73:12, 73:19,
79:6, 79:20,
80:5, 80:15,
80:16, 80:20,
81:3, 82:20,
85:1, 85:4,
87:4, 88:2,
89:8, 89:11,
92:19, 94:17,
97:7, 102:14,
102:18, 105:22,
106:6, 106:20,
107:17, 116:6,
117:2, 124:22,
129:7

**third**
65:13, 90:4

**thomas**
3:3, 6:16

**thompson**
46:17

**thought**
32:2, 44:22,
78:5, 118:2

**three**
17:17, 22:19,
39:13, 40:13,
40:17, 41:1,
41:2, 41:7,
41:10, 41:14,
41:16, 42:17,
42:18, 64:5,
81:6, 82:17,
87:10, 99:15

**through**
10:19, 11:20,
17:16, 17:19,
20:6, 20:12,
20:21, 24:10,
34:2, 55:15,
58:5, 75:18,

76:7, 80:8,
97:22, 101:5,
104:17, 106:12,
110:5, 111:15,
111:20, 112:11,
112:15, 114:12,
118:10, 123:15,
124:21, 127:11

**tight**
65:14

**time**
6:8, 10:3,
10:22, 13:20,
14:1, 14:5,
14:8, 14:11,
14:15, 18:3,
19:8, 19:12,
19:16, 20:8,
22:8, 22:9,
22:12, 23:1,
23:14, 23:15,
23:16, 23:17,
29:15, 30:17,
31:19, 33:12,
33:18, 34:16,
35:2, 35:5,
36:5, 38:21,
39:21, 42:22,
45:16, 47:5,
48:1, 48:19,
49:1, 51:3,
52:14, 53:9,
54:19, 55:14,
62:14, 65:7,
68:12, 69:3,
75:3, 77:10,
89:14, 89:15,
89:14, 95:15,
101:19, 105:13,
106:1, 106:13,
111:5, 111:12,
114:21, 115:17,
116:5, 116:20,
120:5, 120:7,
121:14, 124:7,
124:15, 125:12,
125:15, 125:22,
126:5, 126:12,

127:5, 127:7,
127:16, 128:2
**times**
93:13, 93:14
**titles**
22:5
**today**
6:10, 6:20,
12:5, 51:19,
59:18, 59:21,
70:6, 71:11,
72:6, 72:11,
81:11, 100:16,
100:20, 101:17,
116:21, 117:19
**today's**
6:8, 116:18,
128:21
**together**
17:15, 71:20,
78:15
**told**
41:6, 53:19,
55:11, 62:8,
62:10, 62:13,
79:22, 99:11
**tom**
7:3, 7:8,
20:10, 28:17,
51:5, 58:17,
60:21, 65:7,
72:17, 84:22,
93:1, 106:16
**took**
17:19, 66:16,
105:16
**top**
13:12, 18:17,
21:1, 21:9,
23:7, 27:12,
30:9, 62:11,
73:18, 79:9,
103:18, 103:19
**total**
89:19, 121:16
**totaling**
74:21
**totally**
118:6

**totals**
77:8
**touched**
35:17, 36:10
**towards**
32:1
**track**
46:15
**traded**
33:19, 38:1
**transcript**
4:9, 12:12,
20:14, 24:4,
26:10, 34:6,
74:12, 75:21,
101:11, 110:12,
113:5, 114:3,
119:8, 129:3,
129:6, 129:11,
129:18, 129:22,
132:4
**transcription**
131:5
**transferred**
16:7, 34:21,
43:3, 82:20
**trend**
94:17, 94:18,
95:2, 95:10,
95:16, 109:14,
109:20, 114:21,
115:10, 115:21,
116:1
**true**
64:3, 66:19,
131:4, 132:4
**try**
100:22
**trying**
28:19, 29:5,
44:20, 65:2,
86:9, 94:18,
111:6
**turnabout's**
106:18
**two**
8:10, 18:5,
25:15, 25:17,

35:9, 52:2,
53:2, 59:14,
87:10, 121:15
**two-and-a-half**
8:11, 49:14,
53:3, 53:4, 53:5
**tybee**
41:12
**type**
15:20, 25:18,
29:9, 72:1,
122:17
**types**
122:6
**typewriting**
132:7
**typically**
11:8, 11:12,
14:8, 23:12,
71:19, 82:13,
86:18, 122:16

**U**

**un-shrink**
124:16
**unable**
32:6, 32:9,
32:10
**unavailable**
126:6
**uncertain**
86:15
**uncommon**
115:12
**undam**
63:11
**under**
22:8, 76:5,
78:12, 132:7
**understand**
97:21
**understanding**
35:15, 55:4,
63:22, 83:10,
94:22, 96:18,
112:2, 112:10,
120:6, 121:3
**understood**
48:1, 54:14,

72:11
**undisputed**
14:10, 28:10,
31:1, 31:2,
31:5, 67:15,
107:18
**unhappy**
84:10
**united**
1:1
**unknown**
98:14
**unless**
104:18
**until**
34:19, 52:18,
52:20, 82:1,
98:14
**update**
45:7
**updated**
110:21
**use**
29:4, 63:17,
86:22, 98:18
**usual**
7:3, 7:4
**utilizing**
111:1

**V**

**va**
3:7
**value**
15:8, 23:14,
28:11, 45:8,
70:13, 92:8,
94:1, 108:9,
118:11, 118:12
**values**
22:5
**valuing**
94:7
**variables**
109:1
**variance**
37:15
**veahman**
16:7, 16:14,

16:15, 17:14,
31:13, 31:15,
33:1, 34:8,
34:19, 35:11,
45:11, 48:14,
48:15, 49:5,
50:1, 50:19,
79:1, 84:1,
85:15, 85:20,
88:11, 88:15,
89:5, 90:4,
97:11, 110:16,
110:20
**veahman's**
47:7, 48:20,
49:17, 50:11,
78:5, 86:1,
87:3, 91:15,
100:9
**vehicle**
33:2
**venue**
26:3
**venues**
25:17
**verified**
93:15
**versus**
6:4, 93:18
**vessel**
118:9
**vicky**
6:21
**victoria**
1:22, 2:10,
132:2, 132:20
**video**
6:12, 73:7,
129:4, 129:16
**videographer**
3:20, 6:2,
6:10, 6:20,
128:20, 129:16
**videotaped**
1:14, 2:1, 6:3
**view**
32:20, 43:14
**virtually**
1:15, 2:2

**virtue**
83:21
**visit**
93:10
**voice**
6:14

**W**

**waiting**
36:6
**waived**
57:1
**wakelee**
5:13, 60:5,
60:6, 60:9,
60:15, 60:19,
60:20, 119:1,
119:13
**wakelee's**
123:18, 123:21,
128:4
**walk-through**
78:22, 93:16
**walked**
17:16, 45:4,
45:5
**want**
20:3, 51:9,
65:18, 73:1,
74:2, 75:6,
91:4, 129:5
**wanted**
18:19, 39:13,
41:7, 42:18,
62:4, 73:11,
78:21, 82:10,
98:18
**wants**
42:11
**way**
7:18, 18:1,
37:3, 49:7,
88:17, 93:8,
97:22, 115:22
**ways**
86:20
**we'll**
20:6, 29:4,

75:19, 101:6,
118:20, 129:2
**we're**
28:18, 37:12,
43:20, 44:12,
44:13, 80:15,
104:6, 107:21,
107:22, 117:12,
128:18, 128:21
**we've**
44:9, 44:10,
45:22, 67:11
**wedding**
26:3, 27:15,
27:20, 28:5,
126:19, 127:8,
127:10, 127:21
**weddings**
25:21
**wednesday**
1:16
**week**
120:20, 121:10
**weeks**
33:15
**welcome**
46:5
**went**
8:22, 9:15,
9:16, 30:1,
38:14, 42:16,
81:9, 81:16,
82:12, 95:6,
114:4
**whatever**
14:10, 45:13,
66:17
**whenever**
130:1
**whereof**
132:13
**whether**
26:14, 27:14,
31:4, 47:13,
64:18, 69:15,
70:6, 83:3,
83:5, 92:11,
103:13, 108:1,

112:14
**whoever**
11:15
**whole**
13:22
**whoops**
13:5
**william**
3:11, 6:18
**willing**
88:18, 97:12
**wilson**
1:22, 2:10,
6:21, 132:2,
132:20
**withheld**
15:6, 15:8,
89:1, 97:2,
97:3, 98:1
**within**
11:13, 14:10,
33:14, 33:15
**without**
26:21, 36:2,
57:4, 57:6,
97:14
**witness**
46:5, 132:13
**words**
50:7
**work**
8:12, 9:11,
9:21, 15:3,
16:4, 27:6,
35:19, 65:2,
71:20, 84:11,
86:3
**worked**
8:8, 9:13,
11:3, 16:7,
16:11, 29:15,
40:15, 40:16,
62:2, 123:20
**working**
19:2, 22:19,
29:10, 32:1,
43:4, 92:20,
115:9, 115:10

**works**
16:19, 16:20
**wouldn't**
27:17, 63:19,
92:2, 117:5,
124:13
**wrap**
63:16, 124:5,
127:17, 128:2
**wrapped**
27:11, 27:17,
63:12, 124:15,
126:18, 127:8
**wrapping**
24:14, 25:12,
26:15, 27:6,
28:4, 66:11,
66:16, 66:21,
124:8, 124:9,
124:14, 124:16,
128:3
**write**
24:22, 102:19,
103:19
**written**
22:15, 81:2
**wrong**
26:5, 67:20,
80:7

**X**

**x**
1:3, 1:12

**Y**

**yeah**
14:3, 20:2,
20:5, 20:18,
22:4, 25:4,
27:16, 29:1,
35:6, 37:7,
45:13, 47:2,
51:22, 52:2,
53:4, 58:19,
60:21, 61:11,
62:10, 65:10,
65:12, 68:21,
73:21, 77:3,

77:5, 84:5,
84:21, 88:1,
94:3, 97:16,
101:2, 103:6,
104:11, 105:14,
106:19, 114:16,
119:3, 120:3,
121:9, 129:7,
129:12
**year**
27:21, 52:2,
53:3, 99:6,
104:16
**year-and-a-half**
52:2
**years**
8:11, 10:1,
22:19, 40:10,
49:14, 52:1,
52:3, 53:2,
53:4, 53:5,
61:18, 117:8
**yep**
73:8, 73:15,
74:5, 75:16
**yourself**
113:8

**Z**

**zoom**
17:13

**$**

**$1,456,009**
113:15
**$1.4**
77:11, 77:19,
80:2, 80:10,
80:20, 81:6,
81:10, 82:11,
82:17, 83:3
**$1.456**
74:21
**$250,000**
49:3, 49:20,
50:9
**$26,500**
101:19, 102:22,

104:14, 105:4,
108:17
**$500,000**
91:5
**$71,000**
89:21, 105:9
**$71,639**
77:8, 77:19,
92:11, 94:8,
101:19

**0**

**00**
110:14
**00008**
110:14
**000092**
4:22
**00092**
74:4
**008**
110:14
**01**
1:17, 6:9
**05**
93:5

**1**

**1,456,009**
114:8
**1/3/2015**
13:9, 15:3
**10**
1:17, 5:8, 6:9,
12:19, 13:6,
22:16, 23:5,
23:6, 23:21,
66:15, 67:5,
67:12, 67:19,
68:2, 68:16,
110:11, 115:9,
115:16
**101**
3:6, 5:7
**10621**
3:5
**107**
4:5

**11**
5:10, 12:16,
13:7, 17:4,
113:4
**110**
5:9
**113**
5:11
**114**
5:12
**118**
4:6
**119**
5:13
**12**
4:11, 4:19,
4:21, 5:10,
5:12, 17:5,
18:2, 19:2,
19:13, 22:17,
23:6, 23:21,
44:1, 44:9,
44:14, 44:15,
53:13, 66:15,
67:5, 67:12,
67:19, 68:3,
68:16, 71:8,
71:16, 72:3,
72:14, 74:16,
76:6, 77:2,
77:3, 93:5,
94:1, 95:21,
96:7, 98:8,
107:14, 109:6,
111:13, 113:7,
114:2, 115:9,
115:17, 116:6,
128:22, 130:3
**123**
4:7
**13**
5:13, 119:7
**132**
1:21
**14**
4:15, 5:13,
27:5, 109:7,
112:1, 112:12,

115:5, 115:8,
116:7, 124:1,
128:22
**15**
4:12, 4:13,
4:15, 5:3, 5:6,
5:13, 12:14,
12:15, 20:16,
23:9, 75:15,
120:20, 121:10,
124:1, 130:3
**16**
4:19, 4:21,
5:3, 5:10, 19:2,
38:10, 44:1,
53:13, 58:5,
69:6
**17**
11:19, 11:20
**19**
21:18
**19462**
3:15

---
**2**

**2/7/16**
5:8
**20**
1:7, 4:12, 6:7,
10:1, 34:20,
38:10, 117:8
**2006**
78:6
**2015**
12:16, 12:19,
13:18, 14:20,
21:18, 24:20,
25:4, 63:9,
68:13, 68:19,
69:2, 76:7,
111:4, 111:14,
119:9
**2016**
17:4, 17:5,
19:13, 29:22,
31:11, 34:13,
38:10, 38:11,
44:14, 44:15,

45:10, 47:5,
48:20, 49:2,
50:21, 51:13,
51:17, 52:13,
53:11, 55:18,
69:4, 74:16,
75:15, 76:8,
77:17, 80:1,
82:18, 82:19,
84:1, 85:17,
87:20, 88:7,
88:17, 93:4,
95:1, 95:21,
96:7, 98:8,
111:4, 111:15,
112:1, 112:15,
113:7, 114:13,
127:18
**2017**
30:12, 30:19,
31:7, 101:14,
104:6, 106:3,
108:5, 108:16
**2022**
1:16, 6:8,
132:15
**2024**
132:16
**21**
4:12, 4:19,
20:16, 23:9,
25:4, 34:12,
34:20, 43:7,
44:1, 44:9,
45:10, 53:13,
85:17
**22**
17:4, 35:8,
44:14, 80:1,
93:4, 94:11
**22030**
3:7
**23**
119:21
**235**
20:12
**24**
1:16, 4:14,

6:8, 101:14,
119:9
**240**
20:12
**243**
3:16
**25**
5:6, 101:21,
102:20, 107:5,
108:5, 108:15
**26**
4:16
**27**
132:14
**28**
40:10
**29**
4:18
**2nd**
24:20

---
**3**

**30**
30:12, 31:7,
94:17, 95:2,
95:17, 109:20,
127:20
**300**
90:14
**31**
4:13
**320**
90:12
**320,000**
90:5, 90:16
**3388**
1:7, 6:7
**34**
4:20, 90:12,
90:14
**344**
35:9
**3444**
34:3, 35:9
**3445**
34:7, 35:10,
85:14
**3447**
34:2

**3448**
5:5, 75:18
**3453**
5:5, 75:18
**350**
3:14
**37**
109:20
**3799**
5:7, 101:4
**3800**
102:21
**3802**
5:7, 101:5
**3rd**
13:18

---
**4**

**4**
5:11
**454256**
1:20
**46**
4:4
**48**
98:12
**484**
3:16

---
**5**

**5.00**
121:1
**548**
120:9
**549**
122:11
**55**
58:5
**550**
122:12
**552**
123:2
**56**
58:5
**591**
3:8

---
**6**

**60**
120:21

**610**
3:13
**63**
24:2, 24:11
**64**
26:6
**6666**
3:8
**68**
34:2, 34:7,
35:9, 37:9,
37:10, 43:11,
44:13, 45:10,
58:21, 85:1
**6878**
3:16

**7**

**7**
5:9
**703**
3:8
**71,000**
104:3
**71,639**
77:14, 102:22,
107:11
**74**
4:22
**75**
5:5

**8**

**808**
26:8
**809**
26:8
**811**
24:10
**813**
24:10
**82**
11:17
**83**
20:11, 51:8,
65:8, 65:9,
115:15
**84**
74:9

**85**
75:19
**86**
101:6, 106:17,
107:4
**88**
118:20

**9**

**90**
73:4
**92**
72:21, 72:22,
73:5, 73:13,
73:17, 73:19,
73:21, 74:1