# EXHIBIT 10



# Transcript of Mark Chenetski

**Date:** September 22, 2022
**Case:** Rod & Reel, Inc., et al. -v- State Automobile Mutual Insurance Company

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MARYLAND
 3    - - - - - - - - - - - - x
 4   ROD & REEL, INC., et   :
 5   al.,                   :
 6        Plaintiffs,       :   Case No.
 7     v.                   :   PWG 20-cv-3388
 8   STATE AUTOMOBILE       :
 9   MUTUAL INSURANCE       :
10   COMPANY,               :
11        Defendant.        :
12    - - - - - - - - - - - - x
13
14          Deposition of MARK CHENETSKI
15             REMOTE DEPOSITION
16         Thursday, September 22, 2022
17                10:04 a.m.
18
19
20   Job No.: 459761
21   Pages: 1 - 105
22   Reported By:  Mary Vazquez-Jaime, CCR
```

**2**

```
 1      Deposition of MARK CHENETSKI, held remotely.
 2
 3
 4
 5
 6
 7
 8
 9      Pursuant to notice, before Mary Vazquez-Jaime,
10   Certified Court Reporter for the State of
11   New Jersey.
12
13
14
15
16
17
18
19
20
21
22
```

**3**

```
 1                A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3       C. THOMAS BROWN, ESQUIRE
 4       SILVER & BROWN
 5       10621 Jones Street
 6       Suite 101
 7       Fairfax, Virginia 22030
 8       703-591-6666
 9
10
11   ON BEHALF OF THE DEFENDANT:
12       WILLIAM O. KREKSTEIN, ESQUIRE
13       HORST KREKSTEIN & RUNYON
14       Suite 350
15       610 W. Germantown Pike
16       Plymouth Meeting, Pennsylvania 19462
17       484-243-6862
18
19
20   ALSO PRESENT:
21       JULIO MENDIETA, TECHNICIAN
22
```

**4**

```
 1                    INDEX
 2    WITNESS      DIRECT   CROSS   REDIRECT   RECROSS
 3   MARK CHENETSKI
 4   BY MR. BROWN       6
 5
 6                E X H I B I T S
 7    NUMBER        DESCRIPTION           PAGE
 8   Chenetski 7   E-mail dated May 19, 2022      56
 9                 Bates stamped Plaintiffs'
10                 Production of Documents
11                 000092-000093
12   Chenetski 8   Preliminary business income    58
13                 and extra expense
14                 evaluation, Bates stamped
15                 Plaintiffs' Production of
16                 Documents 000012-000091
17   Chenetski 4   Claim notes                    66
18   Chenetski 28.1  E-mail dated January 20,     92
19                 2017
20   Chenetski 5   Check                          97
21
22
```

**5**

P R O C E E D I N G S

THE REPORTER:  Will counsel please
stipulate that, in lieu of formally swearing in
the witness, the reporter will, instead, ask the
witness to acknowledge that their testimony will
be true and under penalty of perjury, that counsel
will not object to the admissibility of the
transcript based on proceeding in this way, and
that the witness has verified that he is, in fact,
Mark Chenetski.  Counsel?

MR. BROWN:  Plaintiff agrees.

MR. KREKSTEIN:  Defendant and counsel for
Mr. Chenetski agree.

MARK CHENETSKI, the witness, after having agreed
to the stipulation to tell the truth, was examined
and testified as follows:

MR. KREKSTEIN:  Usual stipulations, Tom.

MR. BROWN:  Usual stipulations.  I guess,
that is to all the deposition that we are taking,
Bill?

MR. KREKSTEIN:  Agreed.

**6**

DIRECT EXAMINATION BY MR. BROWN:

Q  Good morning, Mr. Chenetski.  Did I say
your name correctly?

A  You did.

Q  Have you been deposed before,
Mr. Chenetski?

A  I have.

Q  Okay.  I am just going to go over some
brief rules.  I am going to ask you a series of
questions.  Let me get my question out before you
make your answer, I will try to do likewise, so
that we are not talking over top of each other.
Okay?

A  Yes.

Q  And as you know, you have to answer yes,
no or give an audible response, rather than a
shake of the head.  And I may ask you at some
point in time, was that a yes, was that a no, but
I am doing that just so we have a clear record.
Okay?

A  Yes, sir.

Q  Okay.  Can you state your name and give us

**7**

your address, sir?

A  My name is Mark Chenetski.  My address is
8180 Lilium, L-I-L-I-U-M, Way, Plain City, Ohio.

Q  Mr. Chenetski, who are you currently
employed with?

A  State Auto Insurance Company.

Q  And in what capacity?

A  My title is commercial lines -- CARE
commercial lines, director of property.

Q  Commercial lines, director of property.
You said something, what was the very beginning of
that?

A  C-A-R-E, CARE, which is an acronym for
Claim and Risk Engineering.

Q  Okay.  And in that capacity, what are your
job duties?

A  I lead a team of commercial centralized
property adjusters, desk adjusters, a team -- two
teams of property general adjusters, and a team of
property examiners.

Q  And before we get into what all those
things are, how long have you been in that

**8**

position?

A  In this position with this title
approximately seven years.

Q  Okay.  Did you have this position when you
first became aware or involved in the Rod & Reel
case?

A  I don't know if I had this title when I
first became aware of the Rod & Reel case.  Prior
to this title, my title was general adjuster
manager.  So I was either in this title or at the
initiation of the case, the general adjuster
manager.

Q  Maybe we can go at it this way, it might
be easier.

You are familiar with the Rod & Reel case,
correct?

A  Correct.

Q  Okay.  When did you first become involved
with the Rod & Reel case?

A  Define involved.  What do you mean by
involved?

Q  When did you become aware of it,

9

1  Mark Chenetski, become aware that this was a case
2  being adjusted by State Auto?
3       MR. KREKSTEIN:  You're talking about the
4  claim, right, Tom, not the litigation?
5       MR. BROWN:  I am talking about the claim.
6       THE WITNESS:  I would have been aware of
7  the claim from the very beginning of the claim.
8  BY MR. BROWN:
9    Q   Okay.  And what is your relationship to
10 the claim?  That is, we will go at it this way and
11 try to figure out what you were with respect to
12 the claim; were you the general adjuster; were you
13 supervising the general adjuster; what was your
14 position?
15   A   I would have been -- it would have fallen
16 under my -- it depends on what my position was
17 when the claim came in the door.  So I either
18 would have been supervising the general adjuster
19 handling the claim or supervising the manager who
20 supervised the adjuster handling the claim or been
21 the director -- well, I guess, it's just those two
22 or's.

10

1    Q   So let me do this, let me show you what's
2  been previously marked as King 24.
3    A   Okay.
4    Q   Maybe.  Let's see if I can do it.
5        Is there a thing up there that says
6  King 24?
7    A   Yes.
8    Q   Okay.  Let me move you over here so I can
9  see you.  Now, the second page of King 24 that
10 goes onto the first page of King 24, is an e-mail
11 from yourself to Caroline Veahman, with a cc to
12 Scott Terra, Sheri King and Bill Krekstein.
13 Do you see that?
14   A   Yes.
15   Q   And this is Rod & Reel 3444 and Rod & Reel
16 3445.  This identifies you as a CARE manager.
17 Does that help your recollection as to what your
18 position was at least as of the time of this
19 e-mail?
20   A   No.  Because I had the title -- well, we
21 had a leadership change, okay, and prior to the
22 leadership change I was -- I had the title of CARE

11

1  manager and I directly supervised general
2  adjusters.  As we transitioned into the leadership
3  change and a reorganization, I continued to have
4  the title CARE manager, but I did have a general
5  adjuster supervisor between myself and the direct
6  supervision of general adjusters.  So my title
7  didn't change, but my function changed at some
8  point in there.
9    Q   Okay.  And let's just take a look at some
10 of the people who are on this e-mail string.  What
11 was Scott Terra in relationship to you?
12   A   At one time he was a general adjuster
13 reporting directly to me.  Later on, he became a
14 supervisor of a field property group.
15   Q   How about on December 22, 2016?
16   A   I don't remember on that date what his
17 current status would have been.
18   Q   Let's go up.  There is an e-mail from him.
19 Does that help you in any way, where he's called
20 himself a CARE supervisor?
21   A   So if he was called a CARE supervisor at
22 that point, he was probably leading a property

12

1  field team in the northeast.
2    Q   How about Caroline Veahman, what was she?
3    A   She was a general adjuster.
4    Q   And we have an e-mail from her down here.
5  Doesn't have anything on it as to what her name
6  is, but again referring to this exhibit, she was a
7  general adjuster?
8    A   Correct.
9    Q   Okay.  Now, other than yourself, Mr. Terra
10 and Ms. Veahman -- well, strike that.
11       Is it fair to say that you were
12 supervising the claim overall, underneath you
13 would have been Scott Terra and underneath
14 Scott Terra would have been Caroline Veahman, at
15 least as of December 2016?
16   A   No.
17   Q   Okay.  Then tell me, tell me what the
18 chain of command was in December of 2016 with
19 regard to the Rod & Reel claim?
20   A   I'm not sure what the chain of command was
21 on that particular date.
22   Q   Okay.  Do you know what the chain of

---

**13**

1  command was in December of 2016, not in this
2  particular day, but --
3      **A   No, no, I don't.  I will tell you that,**
4  **ultimately, it would have -- the chain of command**
5  **would have boiled up or filtered up to me,**
6  **ultimately, on all of those dates.  But the**
7  **players between the handler and me could have been**
8  **different at different dates in that period of**
9  **time.**
10      Q   Okay.  Well then tell me what you know
11  about what Caroline Veahman's position was; what
12  were her job duties with regard to the Rod & Reel
13  claim?
14      **A   She was a general adjuster.  She was in**
15  **the field investigating claims, handling large**
16  **complex general adjuster type claims that would**
17  **have been escalated from field teams up to the**
18  **general adjuster claim teams.**
19      Q   Okay.  And what was Scott Terra's
20  relationship to the claim at the time that
21  Caroline Veahman was a general adjuster on the
22  claim?

---

**14**

1      **A   I don't know if he would have had any**
2  **official association with the claim.  It looks**
3  **like, because of the title, it's listed as**
4  **supervisor, I believe he supervised a field**
5  **property team at that time.  So I don't know that**
6  **he was at all directly in the chain at that point.**
7      Q   Have you looked at the file before your
8  deposition today?
9      **A   I reviewed portions of the file.**
10      Q   Okay.  Do you know who the main contact,
11  prior to December of 2016, who the main contact
12  for Rod & Reel was from State Auto; who did they
13  contact, who did they talk to?
14      **A   When the claim was initially reported, I**
15  **believe that it was assigned to a field adjuster.**
16  **It quickly escalated to the general adjuster team,**
17  **and at that time, I believe, Scott Terra was the**
18  **general adjuster who took that escalation.**
19      Q   Do you know what time, if any, did
20  Scott Terra cease to be the general adjuster on
21  the Rod & Reel claim?
22      **A   Likely, when he became the supervisor of**

---

**15**

1  **the field team.**
2      Q   Okay.  And would he then have supervised
3  Caroline Veahman?
4      **A   He would not have.  She, I believe,**
5  **reported in still through the general adjuster**
6  **team.**
7      Q   Okay.  Who did she report to, give me a
8  name or a, you know?
9      **A   It would have been either myself and,**
10  **again, there was a lot of transition during this**
11  **time and I don't know the exact dates, but it**
12  **would either have been myself or the general**
13  **adjuster manager, who would have been Jeff Fink.**
14      Q   You said Jeff Fink?
15      **A   Jeff Fink.**
16      Q   Okay.  And he is the general adjuster
17  manager?
18      **A   He was sometime during the period of time**
19  **since this claim has been opened.**
20      Q   How about in December of 2016, do you have
21  any idea?
22      **A   I don't know.  It would have been myself**

---

**16**

1  or Jeff Fink.
2      Q   Okay.  And where is Jeff Fink today; do
3  you know?
4      **A   Jeff Fink is, I believe, with**
5  **Chubb Insurance today.**
6      Q   Do you know where, in what state?
7      **A   I don't.  He is a virtual employee.**
8      Q   Okay.  When was the last time that you had
9  any contact with Mr. Fink?
10      **A   When he left State Auto.**
11      Q   Which was when?
12      **A   I don't remember exactly.  I think it was**
13  **early this spring of '22.**
14      Q   Okay.  And do you know the circumstances
15  under which he left?
16      **A   He left for an opportunity with another**
17  **carrier.**
18      Q   Chubb?
19      **A   Yes.**
20      Q   Okay.  Now, let's talk about December of
21  2016.  Once again, I am talking about the
22  Rod & Reel, which I believe your number is

---

17

1 PR-083485. That would have been your claim
2 number. That is what's referenced in the subject
3 lines of these e-mails. Do you see that?
4 **A Yes, sir.**
5 Q Okay. Can you tell me what
6 Caroline Veahman's authority was for settling
7 claims?
8 **A No, I don't remember what the authority**
9 **was on that date.**
10 Q Do you know approximately what it was?
11 **A I don't know approximately what it was. I**
12 **know what my authority was on that date.**
13 Q Okay. What was your authority in December
14 of 2016?
15 **A It would have been $750,000.**
16 Q Okay. Now, do you know what Scott Terra's
17 authority was?
18 **A I don't.**
19 Q Was it more or less than $750,000?
20 **A It would have absolutely been less.**
21 Q Okay. Do you have anything known as a
22 Large Loss Committee at State Auto, or did you in

18

1 2016?
2 **A 2016? I don't recall in 2016.**
3 Q Do you recall anything called a Large Loss
4 Committee being utilized by State Auto in or about
5 2016, 2017?
6 **A Yes.**
7 Q All right. Can you tell me what that is,
8 and what -- what the purpose of it is?
9 **A Large Loss Committee was a roundtable**
10 **discussion of claims that were large and complex,**
11 **and the reason -- it kind of falls in line with**
12 **the same answer I have given on titles because**
13 **that was -- that was initiated as part of that**
14 **leadership change I previously mentioned.**
15 Q Okay. So if Caroline Veahman indicated
16 that this claim was after a December 2016 meeting,
17 that she was attempting to maneuver this to be
18 placed in front of a Large Loss Committee, would
19 that suggest that the Large Loss Committee existed
20 as of December 2016?
21 **A I am not sure I understand your question.**
22 **It sounds -- I am not sure I understand that**

19

1 **question, could you repeat it?**
2 Q Well, did you have a Large Loss Committee
3 before this change in leadership?
4 **A Yes.**
5 Q Okay. So let's talk about December of
6 2016. If there was a desire by Caroline Veahman
7 to settle this claim, let's pick a number,
8 $800,000. That would have to go to the Large Loss
9 Committee, would it not? She couldn't settle it
10 herself?
11 **A She couldn't settle it for in excess of**
12 **her authority.**
13 Q Her authority was less than that?
14 **A She could not exceed her authority, that's**
15 **correct.**
16 Q And her authority was less than 750,
17 right?
18 **A Yes, yes.**
19 Q All right. And Scott Terra's authority
20 was less than 750?
21 **A Yes.**
22 Q And your authority was 750, right?

20

1 **A Yes.**
2 Q So if the desire was to obtain settlement
3 authority in $800,000 or up, what procedure would
4 Caroline Veahman have followed in December of
5 2016?
6 **A In December of 20 -- what was the date of**
7 **the -- of the occurrence, 2015 was it?**
8 Q The occurrence was 2/8/2015.
9 **A Yeah, so there isn't any single procedure.**
10 **It depends on the circumstance.**
11 Q Okay. Let's say she decides she wants to
12 take it to the Large Loss Committee, explain to me
13 how she would obtain authority above $750,000 as
14 of December 2016?
15 **A She would have to get that authority from**
16 **someone who had the adequate authority to grant**
17 **it.**
18 Q Okay. And would that authority require
19 going to the Large Loss Committee?
20 **A It could be, but it may not necessarily.**
21 Q Who had authority above you on the
22 Rod & Reel claim in 2016, any idea?

**21**

1    A 2016, it would have been whatever AVP that
2 I reported to at that point in time, would have
3 had more authority than myself.
4    Q So Large Loss Committee wouldn't have
5 figured into it at all?
6    A It may have, but it may not have.
7    Q Do you know, yourself, whether
8 Caroline Veahman had sought to put this on the
9 schedule for Large Loss Committee consideration?
10    A She may very well have.
11    Q All right. Do you recall whether you
12 interceded to take it off the Large Loss Committee
13 schedule for consideration?
14    A I don't recall that.
15    Q All right. Well, let's take a look at the
16 e-mail which is up on the screen. This is part of
17 King 24. And there was an e-mail from
18 Caroline Veahman to yourself, with a to
19 Scott Terra on December 21, 2016 at 9:24 a.m.
20 Do you see that?
21    A Yes, sir.
22    Q And let's look at the very first sentence.

**22**

1 It says: Hi Mark, this is the loss we conferenced
2 with Christian and Scott after our onsite meeting
3 with the insured. Did I read that correctly?
4    A Yes.
5    Q Okay. Now, were you part of a conference
6 with Christian, Scott and Caroline Veahman, which
7 occurred shortly before the December 21, 2016
8 e-mail?
9    A I don't remember.
10    Q You don't recall?
11    A I don't.
12    Q All right. Did you have any reason to
13 believe that Ms. Veahman referenced a conference
14 that didn't occur?
15    A No.
16    Q Okay. By the way, if there had been a
17 conference, would you have identified or put notes
18 in the claim file about that conference?
19    A If I was on the call.
20    Q If you were on the conference with
21 Christian, Scott and Caroline Veahman, regarding
22 the Rod & Reel in December 2016?

**23**

1    A No.
2    Q Why not?
3    A I'm not the claim handler. The claim
4 handler would typically put the notes in the file
5 documenting the conference.
6    Q Okay. And at this point in time, the
7 claim handler would have been Ms. Veahman,
8 correct?
9    A I would have to look at the -- at the file
10 document, the claim system documentation to see,
11 but I would have to -- I would have to look to see
12 to know.
13    Q Mr. Chenetski, do you realistically
14 believe that there was a claim handler other than
15 Caroline Veahman or Scott Terra in December 2016
16 on the Rod & Reel case?
17      MR. KREKSTEIN: Objection --
18      THE WITNESS: No.
19      MR. KREKSTEIN: -- to the form.
20      THE WITNESS: I am sorry. No.
21 BY MR. BROWN:
22    Q Okay. So it would have been either

**24**

1 Scott Terra or Caroline Veahman who would have put
2 notes in the file related to any conference,
3 correct?
4    A They were the two general adjusters who
5 were the claim handlers on this file, so I would
6 expect all of those notes to be made by either
7 Mr. Terra or Ms. Veahman.
8    Q Okay. Now, do you recall this, this
9 conference at all?
10      MR. KREKSTEIN: Objection to the form.
11      You can answer it.
12      THE WITNESS: Are you referring to the
13 specific conference call that's referenced?
14 BY MR. BROWN:
15    Q I'm relating -- I am referring to the
16 conference call that Ms. Veahman has identified in
17 the first sentence of her December 21, 2016 e-mail
18 to you?
19    A I don't recall being on any specific
20 conference call, but this definitely references a
21 conference call that took place between Caroline,
22 Christian and Scott.

**25**

1    Q  Before your deposition today what
2  documents did you review, Mr. Chenetski, if any?
3    **A  I reviewed some e-mails.  I reviewed the**
4  **Amended Complaint.  I reviewed file notes.**
5    Q  Did any of those documents refresh
6  your -- oh, any other documents that you reviewed?
7    **A  This is an e-mail that was in the file**
8  **notes of the documents that I reviewed.**
9    Q  Okay.  Anything else?
10   **A  No, that's it.**
11   Q  Now, did your review of any of those
12  documents, the e-mails, file notes, or anything
13  else, refresh your recollection as to
14  participating in a conference call with
15  Christian Fox, Steven Moore, Scott Terra from
16  State Auto, Caroline Veahman from State Auto, in
17  December 2016, shortly after they had an onsite
18  meeting with the insured?
19   **A  I think they were reference to a couple of**
20  **conference calls.  But again, you asked me if I**
21  **remembered this conference call, and my answer was**
22  **no.**

**26**

1    Q  Okay.  Did anything refresh your
2  recollection as to what happened in this
3  conference call?
4    MR. KREKSTEIN:  Objection to the form.
5    You can answer it.
6    THE WITNESS:  The conference calls were
7  around, I believe, the submission of the business
8  income damage model by the policyholder.
9  BY MR. BROWN:
10   Q  Okay.  Did anything in your review of
11  documents refresh your recollection as to
12  participating in these conference calls with
13  Christian Fox, Scott Terra and Caroline Veahman?
14   MR. KREKSTEIN:  Objection to the form.
15    You can answer.
16   THE WITNESS:  I believe one of the e-mails
17  referenced my being on a conference call.
18 BY MR. BROWN:
19   Q  Okay.  And did that refresh your
20  recollection as to, ah-ha, now I remember there
21  was a conference call that I participated in, or
22  you just have no recollection at all?

**27**

1    **A  No, I mean the e-mail had indicated I was**
2  **on a conference call.  You asked about the**
3  **specific conference call, I don't -- I don't**
4  **specifically remember being on a conference call**
5  **or any conference call, but it was referenced in**
6  **the e-mail, yes.**
7    Q  Do you recall whether Ms. Veahman was
8  seeking authority to try to settle the case at
9  this point in time, December 21, 2016, or about
10  that date?
11   **A  She was seeking to get some authority**
12  **following a call that took place, or meeting that**
13  **took place, between our accountants, the**
14  **policyholder's accountants and the policyholder's**
15  **representative, yes.**
16   Q  And do you recall how she was seeking the
17  authority, settlement authority, in this case?
18   **A  There was an e-mail where she had laid out**
19  **some damage, rough damage numbers, and inquiring**
20  **about reaching a compromised settlement.**
21   Q  Okay.  Let's take a look at this e-mail
22  chain.  If you would read this e-mail, sir, the

**28**

1  December 21st e-mail from Caroline Veahman to
2  yourself.
3    **A  So I have got three or four images that**
4  **cut off, maybe just a small part of the text.  Is**
5  **there any way to squeeze the background image down**
6  **so I can read all of the text?**
7    MR. KREKSTEIN:  You can move it to the
8  left, Tom, if that is possible.
9    MR. BROWN:  I am not sure it is.  Hang on.
10   THE WITNESS:  I may not be missing much.
11 I am not sure how much I am missing.
12   MR. BROWN:  Bear with me one second.  Is
13 there any way to see this on the screen?
14   MR. KREKSTEIN:  We are seeing it on the
15 screen.  The images of everybody who are
16 participating is on the right.  There you go.
17   THE WITNESS:  I've got the whole thing
18 now.  I apologize for getting closer to the screen
19 to read it.
20 BY MR. BROWN:
21   Q  I was trying to make it big enough for you
22 to see.

29

1    A  I appreciate that.  I just wanted to make
2  sure I wasn't missing any text.
3    Q  Okay.  That is fair enough.  I want you to
4  be able to see the whole thing.
5    A  Okay.
6    Q  Okay.  Now, do you recall receiving this
7  e-mail?
8    A  No.  But this is absolutely an e-mail
9  Caroline directed to my attention.
10    Q  Okay.  Would she have been trying to get
11  this file in front of the Large Loss Committee, at
12  or about this time, to obtain settlement
13  authority?
14      MR. KREKSTEIN:  Objection to the form.
15       You can answer.
16      THE WITNESS:  I don't know.  This looks,
17  to me, just like a quick e-mail outlining
18  information that flowed out of the onsite meeting
19  that had happened.
20  BY MR. BROWN:
21    Q  Okay.  Let me ask you, if she wanted to
22  put this in front of the Large Loss Committee, how

30

1  would she go about that, what document would she
2  send at State Auto internally to put this on for
3  consideration of settlement authority in front of
4  a Large Loss Committee?
5    A  She would have conversation with her
6  manager first to see about getting authority, and
7  if -- if the manager wanted to escalate it to the
8  Large Loss Committee, then she would prepare a
9  report and put it on the docket for the Large Loss
10  Committee.
11    Q  Okay.  And if Scott Terra wanted to put
12  this on in front of a Large Loss Committee, at or
13  about this time, what would he have done?
14    A  As the supervisor of the field group, he
15  probably would have escalated to his direct
16  supervisor.
17    Q  And who was his direct supervisor?
18    A  As a field manager, it would have been
19  Steve Pifer.
20    Q  Okay.  And what was Mr. Pifer's position
21  in the December of 2016, if you recall?
22    A  He would have been the leader of the field

31

1  managers.  His title was probably -- and again, I
2  don't remember when they changed titles, but he
3  would have been the leader of the various field
4  managers.
5    Q  Okay.  Do you know where Mr. Pifer is
6  today?
7    A  Retired.
8    Q  Do you know where he retired to?
9    A  He retired to the Lansing, Michigan area.
10    Q  Have you ever talked to Mr. Pifer about
11  the State Auto -- I mean the Rod & Reel claim?
12    A  Not that I recall.
13    Q  Okay.  What document would there be had
14  Scott Terra and/or Caroline Veahman sought to put
15  this on the docket before the Large Loss Committee
16  to obtain settlement authority?
17    A  Scott Terra probably would not have, as he
18  was leading a field team at the time.  And
19  typically the field teams -- the field managers
20  were not involved in large loss.  And, again, when
21  things were put on the docket to discuss at
22  Large Loss, there was a report format that was

32

1  used.
2    Q  Okay.  Did you have any discussions with
3  Caroline Veahman about the Large Loss Committee
4  and the Rod & Reel case?
5    A  The Rod & Reel case?
6    Q  The claim?  The claim, not the case.
7    A  Yeah, I mean, I don't remember if I had
8  any conversations with Caroline about Large Loss
9  Committee.
10    Q  After you got the e-mail, which is up on
11  the screen and it's part of King 24, and I will
12  scroll up so that you can see your response, okay,
13  what was your position with regard to the
14  Rod & Reel case?  Were you in charge of obtaining
15  the settlement authority for this case?
16    A  Well, we have hierarchy for settlement
17  authority that is built into the claims system.
18  So anything in excess of the handler's authority
19  would escalate to the manager.  Anything in excess
20  of the manager would escalate to the director, if
21  that's what my title was at that time.  Anything
22  in excess of the director would escalate to vice

33

1  president.  But that's for the purposes of the
2  system.  As far as settlement authority goes, once
3  a case is being worked and it's reserved and it's
4  being handled, then, you know, sometimes final
5  settlement authority would be or could be much
6  more informal than presenting it again at a Large
7  Loss Committee.
8      Q  Okay.  So let's talk about the chain of
9  hierarchy of authority, settlement authority on
10  the Rod & Reel case in December of 2016.  Tell me
11  who you -- I mean, is it fair to say that it
12  initially goes from Caroline Veahman to
13  Scott Terra; is that right?
14     A  No.
15         MR. KREKSTEIN:  Objection to the form.
16         THE WITNESS:  That would be wrong.
17  BY MR. BROWN:
18     Q  So it goes from Caroline Veahman, who is
19  the next above her with regard to settlement
20  authority?
21     A  At the time, it would have either been
22  myself or it could have potentially been

34

1  Jeff Fink.
2      Q  Okay.  And then above you or above
3  Mr. Fink at that time, who would it be?
4      A  Well, it wouldn't -- I was above Mr. Fink,
5  if -- if he was in the picture.
6      Q  Okay.
7      A  And then above me would have been the vice
8  president that had particular, my particular
9  property, whoever I was reporting to.  I reported
10  to three different vice presidents over a period
11  of a couple of years, so I don't remember the
12  exact dates of my reporting or who that would have
13  been next.
14     Q  Okay.  Well, tell me who the three vice
15  presidents were that potentially you reported to
16  in December of 2016?
17     A  First vice president I reported to would
18  have been Michele Rau, R-A-U.
19     Q  Okay.  Next?
20     A  Second would have been -- I am blanking on
21  his name -- Jay Carlton.
22     Q  Carlton?

35

1      A  Yes, Carlton.
2      Q  Who is the third one you potentially
3  reported to?
4      A  And the third one, I don't think that -- I
5  am going to leave it at those two.  I think the
6  third one was, probably, definitely after that
7  period of time.
8      Q  Now, where is Michele Rau today?
9      A  I don't know.
10     Q  When did she leave State Auto?
11     A  I don't remember that either.
12     Q  Approximately how long ago?
13     A  I don't know.  I don't know.  It's
14  sometime in the handling of the Rod & Reel matter.
15     Q  Okay.  And where did she go?
16     A  I believe she went to LYFT.
17     Q  LYFT, the car service?
18     A  Yes.
19     Q  All right.  And what circumstances, what
20  were the circumstance under which she left
21  State Auto?
22     A  New opportunity.

36

1      Q  All right.  She wasn't asked to?
2      A  I am sorry?
3      Q  She wasn't asked to leave State Auto?
4      A  Not that I know of.
5      Q  Okay.  How about Jay Carlton, where is he
6  today?
7      A  Jay Carlton is, I believe, working with an
8  excess and surplus line, either carrier or MGA.
9      Q  Which one?
10     A  I don't know.
11     Q  Do you know where?
12     A  I don't.
13     Q  And when was he last with State Auto?
14     A  Jay left State Auto last spring.
15     Q  And what were the circumstances of him
16  leaving State Auto?
17     A  New opportunity.
18     Q  Okay.  He was not asked to leave?
19     A  Not that I know of.
20     Q  Okay.  So do you recall whether
21  Ms. Veahman asked you for settlement authority on
22  this case, Rod & Reel case?

37

1      A   Beyond these e-mails, I don't know that
2  there was any formal request for authority.
3      Q   That's not my question.  My question is,
4  did she ask you for authority?  Not on the e-mails
5  just in any way, shape or form, did she seek your
6  authority to settle, settlement authority?
7      A   She indicated that there were discussions
8  around a potential global settlement in the case.
9      Q   Okay.  And did she seek any authority,
10 settlement authority from you?
11     A   She would have had to seek it from me.
12     Q   Okay.  So did she?
13     A   Well, I don't know that she ever submitted
14 any formal submission outlining what was being
15 proposed.
16     Q   My question though, it's much simpler than
17 that, Mr. Chenetski.  Did she ever request
18 settlement authority from you?  Not formally, not
19 in a letter, not an e-mail.  Did she say, I would
20 like to get some settlement authority to settle
21 this case?
22     A   She communicated that there had been a

38

1  meeting.  She communicated that there had been
2  discussions around the potential of a global
3  settlement of the claim, but I don't recall ever
4  seeing any sort of submission outlining the actual
5  specific numbers being proposed.
6      Q   So if Ms. Veahman stated that she
7  sought settlement authority from you, that would
8  not be accurate?
9      A   Can you rephrase that?
10     Q   If Ms. Veahman stated that she sought
11 settlement authority from you, that would not be
12 an accurate statement?
13     A   Caroline may very well believe she sought
14 authority, settlement authority from me.  So I
15 am -- I am thrown by the last part of your -- your
16 question.  Where you said that would not be an
17 accurate -- I am getting a little confused with
18 the way that you have presented the question.
19 Caroline may believe she requested authority from
20 me.
21     Q   Okay.  Do you believe she requested
22 authority from you?

39

1      A   I believe she reported back to me with
2  information arising from a meeting that she had.
3  I did not take it as a formal request for
4  authority to settle.
5      Q   Did she discuss with you a settlement
6  number or a range of settlement numbers in her
7  conversation with you following that meeting?
8      A   She presented information around, if
9  I -- if I recall correctly, I believe the main
10 area still in question or dispute following this
11 meeting was not the physical loss.  I believe the
12 physical loss had mostly been resolved.  I believe
13 the area in dispute or in question was the time
14 element loss.  And I believe that I was provided
15 information that there was a large discrepancy or
16 difference between our accountant's model of the
17 time element loss, and the policyholder's model of
18 the time element loss.
19     Q   Okay.
20     A   And that a global settlement had been
21 discussed.
22     Q   Let me reference King 24, December 22,

40

1  2016 e-mail from yourself, 11:09 a.m.
2  Caroline Veahman, cc to Scott Terra, Sheri King
3  and Mr. Krekstein.  And in that e-mail, your last
4  sentence says, quote:  "I am very comfortable with
5  the handling of the matter to date, but I am not
6  ready to compromise this claim without some
7  additional analysis of the insured's submission."
8      Did I read that correctly?
9      A   Yes.
10     Q   All right.  Was Ms. Veahman recommending
11 compromising this claim when she spoke to you?
12     A   I know that the global compromise was
13 mentioned, so I would say yes, they were
14 suggesting or she was suggesting compromising
15 claim.
16     Q   And was she suggesting that she wanted
17 settlement authority to comprise the claim in her
18 conversations with you?
19     A   In this e-mail?  I am not sure I
20 understand that last question.
21     Q   Was she seeking settlement authority from
22 you, in her conversations with you, to compromise

41

1  the Rod & Reel claim after the meeting that she
2  had in December of 2016?
3     **A  I don't know.  I had never been provided**
4  **enough information to consider settlement**
5  **authority at that point.  She might have thought**
6  **she was asking for settlement authority, but I**
7  **didn't, at that point, have enough information to**
8  **even consider granting settlement authority.**
9     Q  I get that, Mr. Chenetski.  My question is
10 really focussed on what Ms. Veahman was saying to
11 you.  Was she seeking settlement authority to
12 compromise the claim?
13    **A  You would have to ask Caroline that**
14 **question.**
15    Q  I am asking you the question.  I will ask
16 Caroline that question, so, but I want to ask you
17 since you are the other party in the conversation.
18    **A  Yes, I don't --**
19    Q  Did she seek settlement authority?
20    **A  I don't know.**
21    Q  Okay.  Why did you say you are not ready
22 to compromise the claim, if somebody hadn't

42

1  suggested compromising the claim?
2     **A  I don't know.**
3     Q  Do you know why you put this last sentence
4  in your e-mail on December 22nd at 11:09 a.m.,
5  where you said:  I am not ready to compromise the
6  claim?
7     **A  Potentially in response to another e-mail**
8  **or a conversation that was had where she asked to**
9  **compromise the claim.**
10    Q  All right.  Well, do you recall having a
11 conversation on December 21, 2016, between
12 9:24 a.m. and 11:09 a.m. with Ms. Veahman?
13    **A  No.**
14    Q  Is your e-mail in response to her e-mail?
15    **A  Is — is what e-mail in response to her**
16 **e-mail?**
17    Q  You wrote an e-mail on December 22, 2016
18 at 11:09 a.m. to Caroline Veahman, was that in
19 response to Caroline Veahman's e-mail to you on
20 the same day at 9:24 a.m.?  Both of them are up on
21 the screen right now.
22    **A  It appears to be, yes.**

43

1     (Break taken.)
2  BY MR. BROWN:
3     Q  Is Exhibit 24 back up there,
4  Mr. Chenetski?
5     **A  Yes, it is.**
6     Q  Okay, great.  Can you read the whole
7  thing?  Do I need to shrink it or make it bigger?
8     **A  No, it's fine.  I just may need to lean in**
9  **every once in a while to make sure I am reading**
10 **it.**
11    Q  That is fair.  Any time you need me to do
12 something with this, manipulate it, let me know.
13    **A  Will do, thank you.**
14    Q  Do you recall conversations with
15 Ms. Veahman and/or Mr. Terra and/or Sheri King in
16 or about December 22, 2016, related to Rod & Reel?
17    **A  Following the meeting, several days before**
18 **that, I would have had conversations with all of**
19 **them, I think.  I don't remember specific**
20 **conversations, but there were communications**
21 **coming out of that meeting.**
22    Q  Okay.  Now, at this point in

44

1  time -- strike that.
2     Are you familiar with the company called
3  Goodman-Gable-Gould?
4     **A  Yes, sir.**
5     Q  Do you recognize them as public adjusters?
6     **A  Yes.**
7     Q  Do you know what a public adjuster is?
8     **A  Yes.**
9     Q  Okay.  So public adjuster is an adjuster
10 that represents an insured, and they work on the
11 other side of the table from the insurance
12 company; is that fair to say?
13    **A  Yes, sir.**
14    Q  Okay.  Now, at this point in time, were
15 you in charge of any other claims in which
16 Goodman-Gable-Gould had been named as a public
17 adjuster?
18    **A  I don't remember, but I can't imagine that**
19 **the answer would be no.**
20    Q  Taking yourself back to 2016, did you
21 harbor any animus towards Goodman-Gable-Gould in
22 general or any of its public adjusters that worked

45

1 for them?

2    A  No.

3    Q  Is there any reason why you would want to
4 teach them a lesson?

5    A  No.

6    Q  Do you recall ever telling anybody that
7 you wanted to teach Goodman-Gable-Gould a lesson?

8    A  No.

9    Q  Or that State Auto wanted teach
10 Goodman-Gable-Gould a lesson?

11    A  No.

12    Q  All right.  Who is Sheri King?

13    A  Sheri King was, at one point, a general
14 adjuster reporting to me, at another point a
15 property examiner reporting to me, and at another
16 point in time the leader of the property examiner
17 group reporting to me.

18    Q  Okay.  So let's take it back to
19 December 22, 2016.  Do you know if she was a
20 property examiner at that point in time?

21    A  I don't remember with certainty, but I
22 think she probably was a property examiner on that

46

1 date.

2    Q  Is it fair to say the property examiners
3 at State Auto deal with coverage issues, and
4 general adjusters deal with loss measurement
5 issues?

6    A  No.

7    Q  Okay.  Then tell me what a property
8 examiner does and how it's different from what a
9 general adjuster does?

10    A  General adjusters are primary handlers of
11 claims in the field, and property examiners handle
12 and oversee our largest, most complex claims from
13 a desk.

14    Q  So the difference is not the function of
15 the property examiner, but it's just where they
16 were, either in the field or in the office?

17    A  The property examiners would, again,
18 consult or directly handle our largest, most
19 complex claims.  They are predominantly
20 office-based staff.  Their primary function is not
21 to do field investigations, but at times they
22 would go out to the field and do inspections, to

47

1 do re-inspections, to meet with people just like a
2 general adjuster would.  The general adjuster is
3 an adjuster, an examiner, oversees large and
4 complex claims.

5    Q  Okay.  So is a property examiner in the
6 chain of authority with regard to Rod & Reels'
7 adjustment?

8    A  The property examiner could be.  I don't
9 know that they were in Rod & Reel.  So the claim
10 owner would report up, as far as authority levels,
11 claim owner would report up through there.  Direct
12 manager or supervisor would report up to their
13 direct manager or supervisor and so on.  Property
14 examiners, at times, have dotted-line affiliation
15 with claims and at other times are the owners of
16 claims.

17    Q  Okay.  How about on December 20 -- let's
18 say December 12th, the time the meeting occurred
19 between -- let's go back to Caroline Veahman's
20 December 21, 2016 e-mail to you, where she talks
21 about an onsite meeting with the insured, herself,
22 Christian Fox and Scott Terra.  At that point in

48

1 time, was her property examiner involved in the
2 Rod & Reel case?

3    A  At the time of the December 21st e-mail?

4    Q  Nope.  At the time the meeting occurred
5 onsite with the insured between Christian Fox,
6 Scott Terra, Caroline Veahman and insured.  The
7 one that's referenced in the first line of
8 Ms. Veahman's e-mail to you on December 21, 2016,
9 which is part of King 24.  At the time of that
10 meeting, that onsite meeting, was there a property
11 examiner involved?

12    A  I don't believe so.

13    Q  Okay.  When did a property examiner become
14 involved in the Rod & Reel case?

15    A  After that meeting.

16    Q  And why did a property examiner become
17 involved?

18    A  I asked for a property examiner to become
19 involved.

20    Q  And why did you do that?

21    A  Because of the huge disparity in damage
22 models between our — our forensic accountant and

49

1 the policyholder's forensic accountant, and
2 because there was reference to a potential global
3 settlement.
4    Q  So what does the reference to a potential
5 global settlement have to do with appointing a
6 property examiner?
7    A  Well, again, part of it is the huge delta
8 in damage models, and the other was a suggestion
9 that holdback should be paid before it's incurred.
10    Q  And that's the concept of a global
11 settlement that you referenced earlier, correct?
12    A  Well, I am not sure about your question.
13    Q  Well, you've used the term global
14 settlement a couple of times, in fact, you
15 indicated that is one of the reasons why a
16 property examiner was appointed here.  What do you
17 mean by global settlement?
18    A  A settlement of a disputed claim using a
19 policyholder release.
20    Q  Okay.  Which would mean it would settle
21 all portions of a policyholder claim, right?
22    A  Yes, sir.

50

1    Q  All right.  And you obviously understand
2 the difference between actual cash value and
3 replacement costs, right?
4    A  Yes, sir.
5    Q  And so a loss occurs, for example, in
6 Rod & Reel, the actual cash value or the
7 depreciated value of the property damage is paid
8 to the insurer without the insured having to do
9 any work, correct?
10    A  Correct.
11    Q  And in order to trigger the recoverable
12 depreciation that's been withheld from the
13 replacement costs, the insured has to replace the
14 property and spend the money, correct?
15    A  They have to incur the cost and comply
16 with all policy provisions.
17    Q  Okay.  Generally that requires them to
18 spend the money and do the replacement, correct?
19    A  Correct.
20    Q  All right.  Have you ever settled a case
21 where you have paid less than the full recoverable
22 depreciation, but paid some recoverable

51

1 depreciation in obtaining a policyholder release
2 on a claim?
3    A  I cannot sit here and think of specific
4 examples where I would answer the question yes.
5    Q  Okay.  Periodically, it happens.  That is,
6 when it comes to settling claims, sometimes the
7 insurance company pays more than they think the
8 claim is worth, and the insured takes less than
9 they think the claim is worth; would that be a
10 fair statement?
11    A  That is a method of resolving disputed
12 claims, yes.
13    Q  And that's what was being suggested here
14 at the meeting which is referenced in
15 Caroline Veahman's e-mail, when she, Scott Terra,
16 Christian Fox, met with the insured onsite in
17 early December 2016, right?
18    A  Correct.
19    Q  Okay.  Now, why did you appoint Ms. King
20 as a property examiner following -- strike that.
21       When did you appoint Ms. King as the
22 property examiner on this claim?

52

1    A  It would be around this time.
2    Q  Okay.  And why did you do it at this time,
3 and when you say this time, this is December 21,
4 2016 time, right?
5    A  Right.  It was around the time after the
6 meeting, and around the time of these e-mails, and
7 that was to just get some fresh eyes on it for an
8 additional point of view.
9    Q  Okay.  And was there any coverage issue at
10 the time?
11    A  I believe it was simply an issue of the
12 disparity in the damage models on the time
13 element, and then obviously suggestion of
14 releasing holdback funds before they are incurred
15 is, I guess, technically a coverage issues, yes.
16    Q  And how about this, now, you at this point
17 in time in your conversation, you understood that
18 there was going to be some payment of business
19 interruption coverage, right?
20       MR. KREKSTEIN:  Objection to the form.
21       You can answer.
22       THE WITNESS:  I understood that our

53

1 forensic accountant had projected some business
2 interruption damages.
3 BY MR. BROWN:
4    Q  Okay.  And did you hold back the payment
5 of the amount he projected in order to try to
6 reach a global settlement on that?
7       MR. KREKSTEIN:  Objection to the form.
8       You can answer.
9       THE WITNESS:  I don't know.
10 BY MR. BROWN:
11    Q  Are you with me, Mr. Chenetski?
12    **A  Yes.  I don't -- I don't know.  I don't**
13 **know the answer to that question as I sit here.**
14    Q  Well, does State Auto withhold the amount
15 that it believes is owed on a business
16 interruption plan in order to try to leverage a
17 better deal in resolving a business interruption
18 claim?
19       MR. KREKSTEIN:  Objection to the form.
20       THE WITNESS:  State Auto would typically
21 identify and release all amounts known as due and
22 payable under the policy, when they are due and

54

1 payable.
2 BY MR. BROWN:
3    Q  Okay.  And at this point in time when you
4 look at this claim, that is, when you get this
5 e-mail from Caroline Veahman, what information do
6 you have available in your position to look up;
7 can you tell what's been paid on the claim?
8    **A  Yes.**
9    Q  All right.  And can you tell what had been
10 recommended on the claim by the general adjuster?
11    **A  Yes.**
12    Q  Okay.  What documents would you be looking
13 at or what computer screen would you be looking at
14 to tell that?
15    **A  Well, in this case the document I probably**
16 **would have been looking at, mainly, would be the**
17 **damage models by the accountant.  Because, like I**
18 **said, I believe at this point the physical loss**
19 **was pretty much in agreement.**
20    Q  Okay.  Do you know when the business
21 income amount was actually paid based upon
22 State Auto's own damage model?

55

1    A  As I sit here, no.  I don't know the
2 answer to that.
3    Q  At the time that you were looking at these
4 e-mails, December of 2016, were you aware that not
5 a penny of business interruption claim had been
6 paid?
7    **A  I don't know that that's true or untrue.**
8 **I believe that these conversations all took place**
9 **shortly after the policyholder's damage model had**
10 **been presented.**
11    Q  Okay.  And do you know when the
12 policyholder's damage model was first presented?
13    **A  I think just a short period of time**
14 **preceding the meeting.**
15    Q  Hang on one second here.  I show you -- we
16 haven't marked this yet, but we can mark it.
17       This is an e-mail from Neil Charkatz,
18 dated April 12, 2016, to Scott Terra with a cc to
19 Jeremy Hogue, Christian Fox, regarding Rod & Reel
20 business income claim submission.  Do you see that
21 e-mail?
22    **A  Yes, sir.**

56

1    Q  Okay.  And at the time, Scott Terra was
2 for State Auto, correct?
3    **A  Correct.**
4    Q  So we know that at least as of April 12,
5 2016, the insured had submitted a claim to
6 State Auto for business income and extra expense,
7 correct?
8    **A  That's what the e-mail indicates.**
9    Q  And would you have this e-mail available
10 to you when you looked at the file?
11    **A  If it was in the file, yes.**
12       MR. BROWN:  Okay.  Let's mark this as -- I
13 have a bunch of other ones.  I am going to mark
14 this as Chenetski 7, can we do that?
15       (Exhibit Chenetski 7, E-mail dated May
16 19, 2022 Bates stamped Plaintiffs' Production of
17 Documents 000092 and 000093, was marked for
18 identification by the technician.)
19 BY MR. BROWN:
20    Q  And ask you, Mr. Chenetski, in
21 December were you aware that a claim had been made
22 in April of that year, eight months prior to

57

1  December?

2  **A  I was aware of the damage model, it was**

3  **much higher than our damage model —**

4  Q  So you were aware that a claim had been

5  made eight months prior, right?

6  **A  You have to let me finish my sentence.**

7  Q  Okay, go ahead.  I thought you were done,

8  sorry.

9  **A  No, I wasn't aware of when that was**

10  **received.**

11  Q  Okay.  Did you ever ask Scott Terra when a

12  claim had been received?

13  **A  No.**

14  Q  All right.

15  MR. KREKSTEIN:  Tom, what -- what are the

16  page numbers, the Bates numbers?

17  MR. BROWN:  Plaintiffs' Production 92 and

18  93.

19  MR. KREKSTEIN:  Thank you.

20  MR. BROWN:  And just so we can round it

21  out, this was Chenetski, did I say 7, is that what

22  I said?

58

1  MR. KREKSTEIN:  That's what you said.

2  MR. BROWN:  So this will be Chenetski 7.

3  And come on now.

4  I will show you what's been marked

5  as -- we will mark this as Chenetski 8, which is

6  Plaintiffs' Production 12 through 91.

7  (Exhibit Chenetski 8, Preliminary

8  business income and extra expense evaluation,

9  Bates stamped Plaintiffs' Production of Documents

10  000012 through 000091, was marked for

11  identification by the technician.)

12 BY MR. BROWN:

13  Q  All right.  And I ask you whether you are

14  aware of whether the Chenetski 8 was the actual

15  Preliminary Business Income and Extra Expense

16  Evaluation that had been submitted in April of

17  2016?

18  **A  I don't know.**

19  Q  You will note that this one says the

20  amount of 1,456,009, do you see that down here in

21  the corner?

22  **A  The part of it is cut off, but that**

59

1  **was -- is it the same number that was referred to**

2  **in the letter, I can confirm.**

3  Q  Okay.  So I am -- can you see it now?

4  **A  Yeah.**

5  Q  That is the problem, when I try to make it

6  smaller, it --

7  **A  1.456 million.**

8  Q  -009, correct?

9  **A  Yes.**

10  Q  Okay.

11  MR. KREKSTEIN:  You passed your eye test.

12  THE WITNESS:  I had to be three inches

13 from the screen, but I passed.

14 BY MR. BROWN:

15  Q  I believe that is the exact same amount

16  that was referenced in the e-mail that we were

17  just looking at, 1,456,009, correct?

18  **A  Yes.**

19  Q  Okay.  Now, when would you have expected

20  State Auto to have paid the amount of business

21  income that they had mentioned, that the insurance

22  company had measured, as the minimum amount of the

60

1  business interruption plan?

2  MR. KREKSTEIN:  Objection to the form.

3  THE WITNESS:  I would have expected that

4  when we had adequate documentation to support

5  those projections.

6  BY MR. BROWN:

7  Q  Okay.  Did you have adequate information

8  as of December 2016 to support the minimum amount

9  owed as measured by Meaden & Moore?

10  MR. KREKSTEIN:  Objection to the form.

11  THE WITNESS:  I don't know.

12 BY MR. BROWN:

13  Q  Okay.  By the way, there is nothing being

14  shared right now, is there?  I can't tell.

15  **A  No, not now.**

16  Q  Okay.  Thank you.  I am going to go back

17  to this e-mail that we were looking at earlier,

18  this e-mail chain.  Okay.  And in the December 22,

19  2016 e-mail, you initially indicate that you were

20  having difficulty understanding how a restaurant

21  fire caused significant gaming losses, correct?

22  **A  Correct.**

61

1    Q  You then said:  Let's get some fresh eyes
2  on this to be sure we understand exactly
3  where -- exactly what is going on time
4  element-wise.  What did you mean by that?
5    **A  Time element, the time element claim, the**
6  **business income, extra expense portion of the**
7  **claim.**
8    Q  The fresh eyes, is this another accountant
9  that you were looking for, somebody other than
10  Christian Fox and Meaden & Moore?
11    **A  This is one I would have referred over to**
12  **Sheri King, and then I think we also discussed**
13  **potentially using experts in gaming.**
14    MR. BROWN:  Can we take a short break?  I
15  have got the issue we talked about earlier.
16    MR. KREKSTEIN:  Yes.
17    (Break taken.)
18  BY MR. BROWN:
19    Q  Let's go back to the e-mail chain.  And we
20  are back on the King 24 and we are looking at your
21  e-mail, the penultimate paragraph starts with:
22  I've touched base with Sheri.  Do you see that?

62

1    **A  Yes.**
2    Q  You talk about finding another expert to
3  work with Christian to review the insured's most
4  recent submission in detail to determine the
5  accuracy.  Did you ever obtain another expert to
6  work with Christian on this, Christian Fox?
7    **A  I don't know.**
8    Q  And up above there is an e-mail, it looks
9  like from Scott Terra to yourself, Mr. Krekstein
10  and Sheri King, with a cc to himself, Christian
11  Fox and Caroline Veahman.  Do you see that e-mail?
12    **A  Yes.**
13    Q  Okay.  Can you read the whole thing or do
14  I need to make it smaller?
15    **A  I can read it.**
16    Q  Would that make it worse if I made it
17  smaller?
18    **A  No, I can read it.**
19    Q  This might be easier.
20    **A  You were fine before.  It is not covered**
21  **at all by the images.**
22    Q  Okay.  I will go back to it that way.

63

1    So Scott Terra responds back to you with
2  some specific information about the claim itself,
3  right?
4    **A  Yes.**
5    Q  All right.  And in his second paragraph,
6  he says:  We can all agree $1.4 million loss is
7  excessive.  And you agreed with that, right?
8    **A  I mean, I -- I didn't know at that point.**
9    Q  Okay.  It indicates there were two
10  independent forensic accountants that drew
11  different conclusions, and that would be the
12  accountant at Meaden & Moore and the accountant
13  being used by Goodman-Gable-Gould, right?
14    **A  Yes.**
15    Q  Down at the bottom, he says:  To sum this
16  up, we are looking at a difference of 7 percent
17  between our numbers and the insured.  7 percent.
18  This is normally not a huge variance between the
19  numbers, but because of the loss, it's big.  Do
20  you understand what he was saying by that?
21    **A  I don't -- I don't know at the time.  You**
22  **know, obviously he was referring to a delta of**

64

1  **7 percent, I think he was talking about a -- you**
2  **know, out of context, without having the document**
3  **he was referring to and several years later, I**
4  **don't -- I can't say I specifically knew what he**
5  **was talking about there.**
6    Q  At this point in time, Sheri King is on
7  these e-mail chains, you see that, right?
8    **A  Yes.**
9    Q  She's on this one, on your's.  So she's
10  been brought into the team, the State Auto team at
11  that point, correct?
12    **A  Correct.**
13    Q  Did there come a time when you removed
14  Scott Terra and Caroline Veahman from the team and
15  told Ms. King to run with it without them?
16    **A  Well, this particular time, Scott I don't**
17  **believe was the handler anymore, so there would**
18  **have been no reason to, quote/unquote, remove him.**
19  **Caroline, I am not certain if she was removed from**
20  **the case, or we simply engaged the examiner.  At**
21  **times, the examiners consult, at times, examiners**
22  **own the claim files.**

65

1    Q  Well, it is fair to say the examiner here,
2  Sheri King, didn't own this claim file, it had a
3  lot of mileage on it by December of 2016, didn't
4  it?
5    **A  It had been -- it had been, quote/unquote,**
6  **owned by several different individuals by the time**
7  **of this e-mail.**
8    Q  Okay.  So it had been owned by Scott Terra
9  and by Caroline Veahman, right?
10   **A  And originally by the field claim rep.**
11   Q  Okay.  Was Caroline Veahman removed from
12 adjusting this claim at or about sometime
13 subsequent to December 22, 2016?
14   **A  I don't -- I am not sure.  I am not sure**
15 **of your question.  There is no process of removing**
16 **anyone from a claim.  Typically, claims out here**
17 **are handled very collaboratively.  Exactly when or**
18 **if she was -- her name was removed as the owner of**
19 **the claim in the claim system, I don't know that**
20 **as I sit here.**
21   Q  Let's take a look.  I am going to show you
22 what we are going to mark as Chenetski 4.

66

1      (Exhibit Chenetski 4, Claim notes, was
2  marked for identification by the technician.)
3    Q  And I ask you if you recognize what the
4  form of these documents are?
5    **A  Those appear to be claim notes or log**
6  **notes.**
7    Q  Okay.
8      MR. KREKSTEIN:  Tom, can you read the
9  Bates numbers of those entire exhibit before we
10 start?
11     MR. BROWN:  Right.  And it's eight pages
12 long.  The last claim number is Rod & Reel 1726,
13 but it's also Rod & Reel 8, I am not sure why that
14 is.  And the first claim number is Rod & Reel 1720
15 and Rod & Reel 2.
16     MR. KREKSTEIN:  Okay.
17     MR. BROWN:  For what it's worth, let's
18 read these in reverse since that is in
19 chronological order.  We will go through the
20 oldest ones first.
21     THE WITNESS:  Can you enlarge them a
22 little bit?  I have some room in the margins and

67

1  it would help if they were a bit larger.
2      MR. BROWN:  Do you want to make it a
3  little bigger?  I can try to.
4      THE WITNESS:  That's better.
5  BY MR. BROWN:
6    Q  Can you still see it?
7    **A  I can, thank you.**
8    Q  If I go to the left does it block
9  anything?
10   **A  It doesn't.**
11   Q  Okay.  We will start there.  The first on
12 page 8, the bottom entry, is an entry by
13 Caroline Veahman on 5/31/2016, right?
14   **A  Correct.**
15   Q  And she talks about a conference call with
16 Eric and Christian from Meaden & Moore,
17 Mark Chenetski, Scott Terra and myself,
18 10:00 a.m., discuss documentation that has been
19 submitted to date, right?
20   **A  That's right.**
21   Q  So number one, who is Eric?
22   **A  Eric is probably an associate at Meaden &**

68

1  **Moore.**
2    Q  Okay.  And then we have a discussion with
3  Scott Terra and yourself and Christian Fox.  So do
4  you recall this status conference, or this
5  conference call?
6    **A  No.  But Caroline wouldn't put it in there**
7  **as a claim note if it hadn't happened.**
8    Q  Okay.  So --
9    **A  I think Mr. Brown froze on us.**
10     (Technical disruption.)
11   Q  Okay, okay.  I believe, Mr. Chenetski, we
12 were talking about this exhibit, which we are
13 going to call Chenetski, what did I say it was, 3
14 or 4?
15     MR. BROWN:  Bill, do you remember?
16     MR. KREKSTEIN:  4.
17 BY MR. BROWN:
18   Q  Chenetski 4, which are the log notes, and
19 ask if you recall a conference that you had with
20 Eric, Christian, Scott Terra and Caroline Veahman,
21 back in May 31st of 2016?
22   **A  And I said, I don't specifically recall**

69

1 the conference, but Caroline wouldn't have put
2 this note in here unless a conference like that
3 took place.
4    Q  All right. And at this point in time,
5 what was Caroline Veahman with regard to this
6 claim, can you tell?
7    A  From this note, I cannot tell.
8    Q  She had some involvement with the claim
9 though, did she not? We see a lot of notes from
10 her.
11    A  Yeah, I would assume that she was the
12 direct file handler, in that she's putting the
13 status note in and referencing the conference
14 call.
15    Q  And Scott Terra was also involved with
16 claim at that point, correct?
17    A  He was included in the conference call, it
18 appears.
19    Q  Okay. Now, we then have a note a little
20 bit later on, on 8/12/16 by Caroline Veahman, and
21 it says: Working with Steve PA and insured on a
22 BI loss. Right?

70

1    A  Correct.
2    Q  And then Caroline Veahman puts a note in
3 the file on 10/26/18, saying: The file open for
4 BI. What does that mean?
5    A  It means the file is still literally open
6 for business in common handling.
7    Q  Okay. And then we have, at least on this
8 log note, a log note from Sheri King, 12/27/2016,
9 which is put in here, but it's redacted. But we
10 know she was involved as of this date, correct?
11    A  Right after the meeting and that series of
12 e-mails we had spoken about earlier, yes.
13    Q  Okay. And I look through here, I see
14 Deborah Berry. Do you know who she is?
15    A  I believe Deborah Berry is an associate in
16 shared services for State Auto.
17    Q  And we have Sheri King, we have
18 Nicole Gonzalez and Sheri King, but I don't see
19 any more references to Caroline Veahman in these
20 notes after this. Can you tell me why that would
21 be, after Sheri King gets involved?
22    A  Well, the only thing I can say is because

71

1 Caroline didn't make any more notes.
2    Q  Okay. Well, was she still involved with
3 the adjustment of the Rod & Reel case?
4    A  I don't know.
5    Q  Caroline Veahman indicates that she was
6 removed from the case, would she be inaccurate?
7    A  I would have to look at the -- I would
8 have to see when the ownership of the case
9 changed.
10    Q  What would we look at to determine whether
11 the ownership of the claim changed?
12    A  Just the file ownership, who -- within the
13 claim system the files are owned by someone.
14 Like, if you go down through these notes, at the
15 time that the first note was entered by the field
16 rep, I am sure the file was owned by the field
17 rep. And then you see a series of notes where
18 Scott Terra was in there, I am sure at that time
19 he was the, quote/unquote, owner of the file.
20 Same thing with Caroline's notes, and then Sheri.
21 So it's possible that Sheri became the file owner.
22    Q  Is there a screen somewhere that just

72

1 identifies who was the owner and when and just
2 gives you the --
3    A  I don't --
4    Q  -- hierarchy?
5    A  I don't know the answer to that question.
6    Q  Let me stop screen sharing. We have taken
7 Mr. Terra's deposition. Have you read Mr. Terra's
8 deposition transcript?
9    A  No, sir.
10    Q  Okay. It has not been supplied to you?
11    A  No.
12    Q  I am going to put a couple of pages up on
13 the screen for us to peek at.
14      Okay. This is page 38 of Mr. Terra's
15 August 24, 2022 deposition. And Mr. Terra was
16 asked: After December 2016, when did you next
17 talk to Chenetski about the claim? And he says:
18 I went in for a supervisors' meeting, either late
19 January, early February, that's when State Auto
20 had all of their managers and supervisors in for
21 meetings.
22      Would you agree with that that's typically

73

1  what State Auto would do?
2     A  I don't know that we were on any regular
3  occasions, but on occasion we would bring managers
4  and supervisors in for meetings, yes.
5     Q  Okay.  Do you recall whether there was a
6  meeting in January or early February of 2017 that
7  involved both you and Mr. Terra?
8     A  I don't recall.
9     Q  Indicates that you were going out to
10 dinner, the office was right next to, at the time,
11 I think it was a Sheraton hotel, and I met with
12 Mark Chenetski prior to going to dinner.
13    Do you recall meeting with Mr. Terra in
14 2017, January or early 20 -- February, before
15 going to dinner?
16    A  Not specifically.  But the Sheraton was
17 right next to our office, our branch office in
18 Columbus.  It was the hotel where most people from
19 out of town would stay when they were in for
20 meetings.
21    Q  Okay.  Do you recall having a discussion
22 with Mr. Terra in which he asked you what's the

74

1  deal with Rod & Reel?
2     A  No.
3     Q  He says:  What is the deal with
4  Rod & Reel?  It was something we had the ability
5  to resolve.  As the claim manager with a large
6  loss adjuster, we had resolved bigger claims than
7  this one.
8     Do you recall him saying anything of that
9  nature to you?
10    A  No.  I remember and I don't remember
11 exactly when, but I think Scott was of the opinion
12 that this claim could have or should have been
13 resolved.
14    Q  Okay.  Fair to say that he was -- he was
15 looking for settlement authority back in December,
16 when we looked at those e-mails?
17    A  Scott was not the owner of the file and
18 wouldn't have been looking for settlement
19 authority, no.
20    Q  Well, Ms. Veahman would have been looking
21 for settlement authority in connection with this
22 claim, right?

75

1     A  She may have been looking for settlement
2  authority arising from the meeting that happened
3  prior to that series of e-mails.
4     Q  Okay.  He then says you said to him,
5  quote:  It is not about this one claim, there is a
6  bigger overall issue, and that he wanted to teach
7  3 Gs a lesson.  Do you recall that, saying that?
8     A  No.
9     Q  Is it possible that you said that and you
10 just don't recall it?
11    A  No.
12    Q  Why do you say it is not possible?
13    A  That's -- that's not something that I
14 would say.
15    Q  Did you say anything about the 3 Gs to
16 Mr. Terra in a meeting with him?
17    A  Not that I recall.
18    Q  Okay.  Do you recall meeting with him at
19 the Sheridan before the dinner?
20       MR. KREKSTEIN:  Objection to the form.
21       You can answer it.
22       THE WITNESS:  I don't specifically

76

1  remember the meeting, the dinner, or any of that.
2  I simply know that the Sheridan is a place where
3  people would stay when they are in from out of
4  town for meetings.
5  BY MR. BROWN:
6     Q  Well, do you dispute that Mr. Terra's
7  recollection is accurate in this regard when he
8  testified, under oath, that this is what you told
9  him?
10    A  I don't know why he would testify to that
11 under oath.
12    Q  Well, if he thought it was true, do you
13 dispute whether Mr. Terra was telling the truth?
14       MR. KREKSTEIN:  Objection to the form.
15       THE WITNESS:  Mr. Terra was under oath,
16 this is what he testified to, I can't speculate as
17 to why he would have done that.
18 BY MR. BROWN:
19    Q  Well, that's my question.  Do you know why
20 he would have done that if it was not the truth?
21    A  I don't live in Mr. Terra's head, I can't
22 respond to that.

**77**

1    Q  When he left State Auto, he left under
2  good circumstances; did he not?
3    **A  He wasn't reporting directly to me.  I**
4  **don't have the details of his leaving.  I**
5  **understand he had a good opportunity at another**
6  **carrier.**
7    Q  Okay.  And the same with Ms. Veahman when
8  she left, she had a good opportunity with another
9  carrier, correct?
10    **A  Yes.**
11    Q  Okay.  They weren't asked to leave,
12  neither one of them, correct?
13    **A  Not to my knowledge, no.**
14    Q  Okay.  So --
15    **A  I know Caroline wasn't asked to leave.  I**
16  **don't know on Scott, but to my knowledge, he was**
17  **not asked to leave.**
18    Q  Well, did you have, at this time, some
19  problems with the way GGG was adjusting claims
20  with State Auto, the manner in which they were
21  doing it?
22    **A  No.**

**78**

1    Q  Have you ever said anything to anybody
2  else about Goodman-Gable-Gould and the manner in
3  which they adjusted claims with State Auto?
4      MR. KREKSTEIN:  Objection to the form.
5      You can answer.
6      THE WITNESS:  We had many claims with
7  Goodman-Gable-Gould over the years, it is not
8  unusual to cross paths with them.  I am sure I
9  have had conversations with people about
10  Goodman-Gable-Gould, but I had no problems with
11  them at all.
12  BY MR. BROWN:
13    Q  Did you have any conversations with
14  Ms. Veahman in which you said that this claim was
15  going to be one where you wanted to teach GGG a
16  lesson?
17    **A  No.**
18    Q  Okay.  Do you deny that you ever said
19  that?
20      MR. KREKSTEIN:  Objection to the form.
21      You can answer.
22      THE WITNESS:  I don't recall ever having a

**79**

1  conversation like that with Caroline or with
2  Scott.
3  BY MR. BROWN:
4    Q  My question though is this, do you dispute
5  that you said that?
6      MR. KREKSTEIN:  Objection to the form.
7      THE WITNESS:  Do I dispute that I said
8  what?
9  BY MR. BROWN:
10    Q  Something akin to, it is not about this
11  one claim, there is a bigger overall issue, and
12  that you wanted teach the three Gs a lesson?
13      MR. KREKSTEIN:  Objection to the form.
14      THE WITNESS:  I dispute that I ever said I
15  wanted to teach the three Gs a lesson.
16  BY MR. BROWN:
17    Q  Okay.  Did you believe that this claim,
18  the Rod & Reel claim -- strike that.  Bad
19  question.
20      At this point in time, did you believe
21  that there was a bigger issue than getting the
22  Rod & Reel claim settled, and it had to do with

**80**

1  dealing with Goodman-Gable-Gould?
2      MR. KREKSTEIN:  Objection to the form.
3      You can answer.
4      THE WITNESS:  I am sorry, could you repeat
5  the question?
6  BY MR. BROWN:
7    Q  At or about January or February of 2017,
8  do you recall whether you wanted to utilize the
9  Rod & Reel case in some way to deal with
10  Goodman-Gable-Gould, whether that is to teach them
11  a lesson or any other manner?
12      MR. KREKSTEIN:  Same objection.
13      THE WITNESS:  Any conversations I would
14  have had around Goodman-Gable-Gould would have
15  been specific to any case pending with them, and
16  we probably had more than one case pending with
17  them at the time.
18  BY MR. BROWN:
19    Q  Okay.  And so you don't recall ever
20  telling anyone that there was a -- the
21  Rod & Reel -- that settlement of the Rod & Reel
22  wasn't about the Rod & Reel claim, it was about

81

1   something else?
2       MR. KREKSTEIN:  Objection to the form.
3       THE WITNESS:  No.
4   BY MR. BROWN:
5       Q   You don't recall anybody asking you,
6   whether it's Caroline or Scott Terra, what is the
7   deal with Rod & Reel?
8       **A   I am sure Scott asked me that question**
9   **because Scott was of the opinion that he could**
10  **have had that claim settled in a compromise.**
11      Q   He then said:  As the claim manager with a
12  large loss adjuster, we had resolved bigger claims
13  than this one.  In that statement, do you know who
14  he was referring to as the claims manager?
15      **A   I'm not sure.  Claims managers and large**
16  **loss adjusters have several claims larger than**
17  **that, but I really don't know specifically what he**
18  **would mean by that comment.**
19      Q   Were you the claims manager at the time?
20      **A   Again, that gets back to titles.  I don't**
21  **recall at the time if there — if the GAs were**
22  **reporting directly to me or if the GAs reported up**

82

1   **through Jeff Fink.  So I can -- ultimately, I**
2   **would have had settlement authority above the**
3   **handler, whether that was Mr. Fink between myself**
4   **and the handler or not.  And this was a large**
5   **enough claim that, ultimately, I would be the**
6   **decider.  So I don't know if that really answers**
7   **your question.  But...**
8       Q   In this case, later Mr. Terra was asked:
9   Okay.  And Mark Chenetski, at the time, what was
10  his position at State Auto?  And he said you were
11  the director of large loss.
12          Would you agree with that?
13      **A   Okay.  So that would have been, what he**
14  **just described would have been that -- the title**
15  **that I gave director of CARE property, commercial**
16  **lines.  But yes, that's -- that would indicate**
17  **probably there was a manager in between myself and**
18  **the claim handler.**
19      Q   Okay.  So give me the hierarchy with that
20  little bit of information, can you tell me what
21  the hierarchy was as of January or February 2017?
22      **A   Well, if there was a manager in the**

83

1   **general adjuster group on that, at that time, it**
2   **would have been myself, Jeff Fink and**
3   **Caroline Veahman.**
4       Q   Okay.  Were you the director of large loss
5   that would have included the Rod & Reel claim at
6   early 2017?
7       **A   Yes.**
8       Q   And Caroline Veahman, before Ms. King was
9   placed on this file, she would have been the
10  general adjuster on the claim, right?
11      **A   Yes.**
12      Q   And Scott Terra, before Ms. King was
13  placed on this file, would have been the direct
14  report for Ms. Veahman; is that correct?
15      MR. KREKSTEIN:  Objection to the form.
16  BY MR. BROWN:
17      Q   What would Terra's position have been?
18      **A   Scott Terra would have had no direct**
19  **hierarchal authority on the claim on that date.**
20      Q   Okay.  But he previously had had authority
21  on the claim, right?
22      **A   He was the original general adjuster, I**

84

1   **believe.**
2       Q   Okay.  And Scott Pifer was his boss,
3   correct?
4       **A   Steve Pifer was, yes.**
5       Q   And what was Steve Pifer's position?
6       **A   Director of property field and CAT**
7   **operations.**
8       Q   Director of property field?
9       **A   Yes.  And you know what, that's not his**
10  **official title, but that's kind of using — using**
11  **Scott Terra's description.  I am trying to give**
12  **you an analogous description of Steve Pifer, okay.**
13  **So Scott described me as director of large loss.**
14  **Steve Pifer would have been director of property,**
15  **field property, and catastrophe operations.**
16      Q   And he indicates that you were
17  Ms. Veahman's boss at that time?
18      **A   Okay.  Either I was or Jeff Fink was, one**
19  **of the two.  Again, there was -- there was a reorg**
20  **going on and I don't know the exact dates.**
21      Q   Well, he indicates -- it seems he
22  remembered, but he said you were her boss at the

**Page 85**

1 time, would you dispute that?

2    **A  I -- yeah, I am saying I don't remember,**

3 **so he's got a better memory than me. But it would**

4 **have either been myself or Jeff Fink.**

5    Q Got it. Now, you would agree with me that

6 if, in fact, you said that it's a bigger issue,

7 you wanted to teach GGG a lesson, that would be

8 improper, wouldn't it?

9     MR. KREKSTEIN: Objection to the form.

10     THE WITNESS: No, I wouldn't agree with

11 you.

12 BY MR. BROWN:

13    Q Under what circumstances would it be

14 proper to utilize a claim to teach a lesson to

15 Goodman-Gable-Gould?

16     MR. KREKSTEIN: Objection to the form.

17     THE WITNESS: Teaching lessons are not

18 even part of what we do. We investigate claims,

19 we apply policy, and we settle claims.

20 It's -- it's kind of a nonsense statement.

21 BY MR. BROWN:

22    Q So it would be improper to use a claim of

**Page 86**

1 an insured as a pawn for some other reason,

2 because you had a dispute with

3 Goodman-Gable-Gould, correct?

4     MR. KREKSTEIN: Objection to the form.

5     THE WITNESS: We had no dispute with

6 Goodman-Gable-Gould, other than the damage dispute

7 we were trying to work through.

8 BY MR. BROWN:

9    Q Do you know anybody at

10 Goodman-Gable-Gould?

11    **A I've never handled a claim directly with**

12 **anyone at Goodman-Gable-Gould. I know many of the**

13 **names at Goodman-Gable-Gould. Neal Charkatz is a**

14 **name that recurs, Randy Goodman is a name that**

15 **recurs. But I have no personal relationship with**

16 **anyone, or I am not sure that I have ever**

17 **personally met anyone at Goodman-Gable-Gould.**

18    Q Okay. Let me show you what was marked as

19 King 30, and I am going to make it bigger for you

20 here. See if we can. It seems to be a little bit

21 fuzzy, but it's King 30. Do you see that,

22 Mr. Chenetski?

**Page 87**

1    A Yes, sir.

2    Q Do you need me to make it bigger or can

3 you read it?

4    **A Maybe go one click larger.**

5    Q Let's try it. How is that?

6    **A That's still good, yes.**

7    Q Okay. Perfect. All right. Now, as of

8 January 2017, Ms. King was now involved with this

9 case, potentially the owner of the claim, right?

10 I'll show you down here, she is the one who signs

11 this.

12    **A Yeah. So if the communication went out**

13 **under her signature, I would say it was likely she**

14 **was the owner of the claim.**

15    Q And I assume, although I can't tell you,

16 but this is a copy of Rod & Reel 200. It says,

17 claims, I assume it says claims examiner.

18 Would you agree with that?

19    **A I would agree, it probably says examiner**

20 **and it probably says King as well.**

21    Q Yeah, I think you're probably right.

22 Okay. Now, we were looking at the -- let me pull

**Page 88**

1 it up real quick -- a little earlier. Do you see

2 claim notes up there again?

3    **A I do. Can you enlarge it a little bit?**

4    Q That is what I am doing. Thinking ahead.

5    **A That's good.**

6    Q Let's go back down here and see if we can

7 find this time period. And here we have

8 1/20/2017, status letter to an INS/PA. Do you

9 know what the INS is?

10    **A I would assume that is shorthand for**

11 **insured/public adjuster.**

12    Q Okay. And what is a status claim letter?

13    **A Letter. A claim status letter.**

14    Q What is the purpose of a status letter?

15    **A To communicate the status of a claim.**

16    Q Okay. You agree with me that when

17 State Auto sends out a status letter, it ought to

18 be accurate in what it says, correct?

19    **A Yes.**

20    Q All right. And at the time Ms. King sent

21 this status letter to the insured, she had

22 available to her the documents to know what

89

1 portions of the claim had been paid, correct?

2 **A She would have had access to anything that**
3 **was contained in the claim file at that time.**

4 Q Now, let's go back to King 30. Okay. And
5 the very first sentence says, very first
6 paragraph: We will continue to acknowledge your
7 claim submitted under the policy number -- it's
8 got the policy number -- having occurred on
9 2/8/15, and having been reported to us on 2/8/15.
10 Did I read that correctly?

11 **A Yes.**

12 Q So we are dealing with the Rod & Reel
13 claim, it identifies an actual cash value. Do you
14 see that?

15 **A Yes.**

16 Q And it says: We have paid the actual cash
17 value of the building repairs. Do you see that?

18 **A Yes.**

19 Q All right. And then we go down to the
20 bottom, and she says: As you are aware, we have
21 determined the period of restoration from
22 February 8, 2015, from February 7, 2016. We have

90

1 evaluated the business income loss for this period
2 and have paid that amount. Do you see that right
3 there?

4 **A Yes.**

5 Q All right. Now, you would agree with me
6 that if, in fact, you hadn't paid that amount, you
7 shouldn't write a letter to the insured saying you
8 had, correct?

9 MR. KREKSTEIN: Objection to the form.

10 You can answer.

11 THE WITNESS: I would -- I would say that
12 there's obviously typos in this paragraph.

13 BY MR. BROWN:

14 Q Well, that's not really a typo though, is
15 it? It's not where she said yes or no. This one
16 says, we paid you the amount of business income,
17 right?

18 **A But it says, it says a period of**
19 **restoration from February 8, 2015, from**
20 **February 27, 2016. So that is obviously a typo.**
21 **And yes, it does say we paid that amount, but it**
22 **doesn't make any sense because it is from a**

91

1 **date -- from a date, and I am not sure exactly**
2 **what that means.**

3 Q You are not sure what it means when it
4 says: We have evaluated the business income loss
5 for this period, and have paid that amount?

6 **A The period referred to makes no sense,**
7 **from February 8, '15, from February 7, '16**
8 **makes -- it makes no sense.**

9 Q So your understanding of this paragraph,
10 the second to the last paragraph on Exhibit 30,
11 from Ms. King, is that she is not saying that
12 State Auto had paid the business interruption that
13 it determined?

14 MR. KREKSTEIN: Objection to the form.

15 You can answer.

16 THE WITNESS: To me she is indicating some
17 business interruption has been paid, but the
18 portion outlining dates makes no sense to me.

19 BY MR. BROWN:

20 Q Well, let's assume that not a single penny
21 had been paid, that would be an improper thing to
22 put in a status letter to the insured, wouldn't

92

1 it?

2 **A That would be a mistake, for sure.**

3 Q Okay. Do you know what the response of
4 the insured was to this letter that went out?

5 **A No.**

6 (Exhibit Chenetski 28.1, E-mail dated
7 January 20, 2017, was marked for identification by
8 the technician.)

9 Q I am going to show you what we are going
10 to mark as Chenetski 28.1. By the way, don't get
11 bummed out, that doesn't mean I have 28 exhibits.
12 It's 28.1 because there was a 28 before that was
13 only a partial of this, and I want to make sure we
14 have the whole thing on the record here.

15 MR. BROWN: And, Bill, this is Rod & Reel
16 3519 through 3521. You will see there is an
17 e-mail from Neal Charkatz, same day as the letter,
18 dated Friday, January 20, 2017 at 12:14. And then
19 below that, you can see the e-mail from Sheri
20 King, Friday, January 20th at 11:50 a.m., saying
21 please see the attached. Okay.

22 THE WITNESS: Yes, sir.

93

1      MR. BROWN:  The letter that we just looked
2  at was also dated January '17, January 20, 2017.
3  BY MR. BROWN:
4      Q  All right.  Fair to say that Mr. Charkatz
5  is now responding to getting this letter from
6  Ms. King, correct?
7      **A  It appears to be, yes.**
8      Q  Okay.  He says:  Thank you for your
9  e-mail.  Are you aware of a meeting back in
10 December where Scott Terra, Caroline Veahman,
11 Christian Fox, came to the loss location and met
12 with us and the insured in an attempt to
13 settlement the claim.
14      Well, we have talked about that meeting,
15 right?
16     **A  Yes.**
17     Q  You were aware of it and Ms. King was
18 aware of it, and she was on all those e-mails,
19 right?
20     **A  We were aware of it towards the end of**
21 **December, after the meeting had taken place, yes.**
22     Q  Certainly aware of it in January of 2017,

94

1  right?
2      **A  Yes.**
3      Q  Okay.  It says:  Representations of a
4  potential future global settlement were made, I'd
5  like to discuss this with you at your earliest
6  convenience.
7      Do you see that?
8      **A  Yes.**
9      Q  Okay.  That is the global settlement that
10 you were talking about earlier, that had been
11 discussed with Mr. Terra and Ms. Veahman, correct?
12     **A  Yes.**
13     Q  Okay.  Now, let me go back to the status
14 letter.  And here is Sheri King, she returned the
15 call to the PA, which is, in this case the PA is
16 Neal Charkatz, right?
17     **A  That's who her status letter was addressed**
18 **to, yes.**
19     Q  And that's what the e-mail was saying,
20 please call me, right, we just looked at?
21     **A  Yes.**
22     Q  And I can pull it back up if you want to

95

1  see it.  All right.  And she told Mr. Charkatz
2  advised that I would like to talk to Christian
3  again and then follow-up with him later this week,
4  he was in agreement.  Do you see that?
5      **A  Yes.**
6      Q  Okay.  Now, you are aware that, at that
7  time, the insured -- excuse me, State Auto had not
8  paid the business income and extra expense claim
9  as represented in that letter, are you not?
10     MR. KREKSTEIN:  Objection to the form.
11     THE WITNESS:  I am -- I am not aware.  I
12 don't have that documentation in front of me.
13 BY MR. BROWN:
14     Q  Okay.  Well, let's take a look at it real
15 quick.  I think it's both in here, and it's
16 also -- let me see if it is.
17     Okay.  Let's look at the 5/30/2017 note.
18 We can agree that 5/30/2017 is several months
19 after January 2017, right?
20     **A  Yes.**
21     Q  Okay.  And here she indicates, quote:
22 "Randy Goodman called on 5/26 and reduced their

96

1  demand to 750,000 -- I believe that is -- told him
2  I would get back to him, paid the undisputed BIEE
3  that had not been paid and the additional ACV that
4  had not been paid.
5      Now, does that refresh your recollection
6  as to whether the BIEE had, in fact, not been paid
7  when the letter was written in January 2017?
8      MR. KREKSTEIN:  Objection to the form.
9      You can answer.
10     THE WITNESS:  It is what's indicated in
11 the note, but I don't have access to the financial
12 chronology in the file to be able to verify that.
13 So I don't -- I don't know the answer to that
14 question.
15 BY MR. BROWN:
16     Q  So you think, for some reason, Ms. King
17 would have put in a note saying she hadn't paid
18 the BIEE, but, in fact, she had?
19     **A  She wouldn't do that intentionally, no.**
20     Q  All right.  You have seen the check, have
21 you not?
22     **A  I have not seen any checks, no.**

**97**

1    Q  All right.  Let me show you what's been
2  marked as -- we will mark this as exhibit
3  Chenetski 5.  All right.
4        (Exhibit Chenetski 5, Check, was
5  marked for identification by the technician.)
6  BY MR. BROWN:
7    Q  And this check is the amount of $71,639.
8  Do you see that?
9    **A  Yes.**
10       MR. KREKSTEIN:  It's Bates stamp
11  Rod & Reel 0198.
12       MR. BROWN:  0198.  Let me make it bigger,
13  it makes it easier.  Can you see it now?
14       THE WITNESS:  Yes.
15  BY MR. BROWN:
16    Q  Okay.  The coverage up here is business
17  interruption, correct?
18    **A  Correct.**
19    Q  All right.  And the amount is 71,639?
20    **A  Yes, sir.**
21    Q  Correct.  Do you recognize that as the
22  undisputed amount of business interruption

**98**

1  coverage that was paid by State Auto on or about
2  5/30/17?  Do you see the date up there?
3    **A  I do.  But the answer is no.  All I**
4  **recognize it as is a partial business interruption**
5  **payment of 71,639, paid on date of issue is**
6  **5/30/17.**
7    Q  Are you aware of whether State Auto ever
8  corrected the letter that was sent, King 30, where
9  it said we have evaluated business income loss and
10  have paid that amount, when, in fact, that amount
11  had not been paid?  Did a letter of correction
12  ever go out?
13    **A  I don't know.**
14    Q  Did you ever have any discussions with
15  Ms. King related to being accurate in
16  representation and status letters to insureds?
17    **A  I am sorry, can you repeat the question?**
18    Q  Ever have any discussions with Ms. King in
19  which you addressed the need to be accurate in
20  status letters sent out to insureds?
21    **A  Not specifically.**
22    Q  Is it fair to say that State Auto does not

**99**

1  make a habit of sending out letters saying they've
2  made payments when they haven't made payments?
3        MR. KREKSTEIN:  Objection to the form.
4        THE WITNESS:  It's fair to say State Auto
5  would always encourage accurate communication.
6  BY MR. BROWN:
7    Q  Would you agree it is fair to say that the
8  insured, okay, here it is written to Rod & Reel,
9  care of Goodman-Gable-Gould, but it's also cc'd
10  directly to Rod & Reel, that they should be able
11  to rely upon letters that are written by
12  State Auto as to facts and figures within the
13  knowledge base of State Auto?
14       MR. KREKSTEIN:  Objection to the form.
15        You can answer.
16       THE WITNESS:  I am not sure your -- what
17  your question is.  We would communicate statuses,
18  we would always try to make them accurate and
19  correct.
20  BY MR. BROWN:
21    Q  And when you find a status letter is
22  inaccurate, do you correct it, do you send a

**100**

1  letter of correction?
2        MR. KREKSTEIN:  Objection to the form.
3        You can answer.
4        THE WITNESS:  At times, yes.  If we find
5  inaccuracies, we should correct mistakes.
6  BY MR. BROWN:
7    Q  Have you ever seen any communication
8  correcting the inaccuracy in the January 2017
9  letter from Ms. King, which is Exhibit Number 30,
10  as to the representation made by State Auto that
11  they had evaluated, determined and paid the
12  business interruption?
13    **A  I don't specifically recall seeing any**
14  **correction letter.**
15    Q  Did you speak to anybody in connection
16  with preparation for your deposition today?
17       MR. KREKSTEIN:  Other than his attorney?
18  BY MR. BROWN:
19    Q  Other than Mr. Krekstein?
20    **A  No.**
21    Q  And other than the documents that you told
22  us that you reviewed, which I believe were

**101**

1 e-mails, file notes, and I think you indicate, I
2 can't read my own handwriting, we had one other
3 category of documents you reviewed, do you
4 remember what that was?
5 **A E-mails, file notes, and the Amended**
6 **Complaint.**
7 Q And the Amended Complaint. Did you review
8 anything else?
9 **A No.**
10 Q Did you read any deposition transcripts?
11 **A No, sir.**
12 Q Were you provided any deposition
13 transcripts?
14 **A No.**
15 Q Did you speak to Ms. King?
16 **A No.**
17 Q When was the last time you had spoken to
18 Mr. Terra?
19 **A I don't remember.**
20 Q When Mr. Terra was working for State Auto,
21 did he do a good job, was he a competent -- good
22 at what he did?

**102**

1 **A Yes.**
2 Q How about Ms. Veahman when she worked at
3 State Auto, was she competent and good at what she
4 did?
5 **A Yes.**
6 Q And when was the last time you spoke to
7 Ms. Veahman, Caroline Veahman?
8 **A I don't remember.**
9 Q Was it before she left State Auto?
10 **A I know I talked to her at the time she was**
11 **leaving State Auto. I don't recall ever speaking**
12 **with her since then.**
13 Q All right. After she left State Auto, did
14 you ever speak with her about the Rod & Reel
15 claim?
16 **A No.**
17 Q After Scott Terra left State Auto, did you
18 ever speak with him about the Rod & Reel claim?
19 **A No.**
20 Q Real quick, I may be -- yeah, one second.
21 Did you review State Auto's Answers to
22 Interrogatories in connection with your review

**103**

1 today, Mr. Chenetski?
2 **A I am sorry, excuse me?**
3 Q Did you review State Auto's Answers to
4 Interrogatories?
5 **A Not before my deposition here today. I**
6 **can't say I didn't at some point when**
7 **litigation -- this has been in litigation for a**
8 **long time. But I have not reviewed any of that**
9 **in preparation for my deposition.**
10 MR. BROWN: Okay. Mr. Chenetski, that's
11 all I have today. Thank you very much. Your
12 lawyer may have some questions for you.
13 MR. KREKSTEIN: I don't. We will read and
14 sign.
15 THE COURT REPORTER: Can I have your
16 orders for the record, before we leave?
17 MR. BROWN: Just regular delivery, mini.
18 MR. KREKSTEIN: Same for me.
19 MR. BROWN: Yes, also give me a regular
20 sized.
21 (Proceeding concluded at 12:22 p.m.)
22

**104**

1 CERTIFICATE
2 I, MARY VAZQUEZ-JAIME, a Certified Court
3 Reporter of the State of New Jersey, do hereby
4 certify that prior to the commencement of the
5 examination MARK CHENETSKI agreed to the
6 stipulation to tell the truth.
7 I DO FURTHER CERTIFY that the foregoing is
8 a true and accurate transcript of the testimony as
9 taken stenographically by and before me at the
10 time, place and on the date hereinbefore set
11 forth.
12 I DO FURTHER CERTIFY that I am neither a
13 relative nor employee nor attorney nor counsel of
14 any of the parties to this action, and that I am
15 neither a relative nor employee of such attorney
16 or counsel, and that I am not financially
17 interested in the action.
18
19 *Mary Vazquez - Jamie*
20 My commission expires June 30, 2024
21 License No. XI00382
22 Dated: October 2, 2022

105

1      ACKNOWLEDGMENT OF DEPONENT

2     I, MARK CHENETSKI, do hereby acknowledge

3  that I have read and examined the foregoing

4  testimony and the same is a true, correct, and

5  complete transcription of the testimony given by

6  me and any corrections appear on the attached

7  errata sheet signed by me.

8

9  _____

10    (SIGNATURE)      (DATE)

11

12

13

14

15

16

17

18

19

20

21

22

## A

**ability**
74:4
**able**
29:4, 96:12,
99:10
**about**
9:3, 9:5,
11:15, 12:2,
13:11, 15:20,
16:20, 16:21,
18:4, 19:5,
22:18, 27:2,
27:9, 27:20,
29:12, 30:1,
30:6, 30:13,
31:10, 32:3,
32:8, 33:8,
36:5, 43:16,
47:17, 47:21,
49:12, 52:16,
61:15, 62:2,
63:2, 64:1,
64:5, 65:12,
67:15, 68:12,
70:12, 72:17,
75:5, 75:15,
78:2, 78:9,
79:10, 80:7,
80:22, 93:14,
94:10, 98:1,
102:2, 102:14,
102:18
**above**
20:13, 20:21,
33:19, 34:2,
34:4, 34:7,
62:8, 82:2
**absolutely**
17:20, 29:8
**access**
89:2, 96:11
**accountant**
48:22, 49:1,
53:1, 54:17,
61:8, 63:12
**accountant's**
39:16

**accountants**
27:13, 27:14,
63:10
**accuracy**
62:5
**accurate**
38:8, 38:12,
38:17, 76:7,
88:18, 98:15,
98:19, 99:5,
99:18, 104:8
**acknowledge**
5:6, 89:6,
105:2
**acknowledgment**
105:1
**acronym**
7:13
**action**
104:14, 104:17
**actual**
38:4, 50:2,
50:6, 58:14,
89:13, 89:16
**actually**
54:21
**acv**
96:3
**additional**
40:7, 52:8,
96:3
**address**
7:1, 7:2
**addressed**
94:17, 98:19
**adequate**
20:16, 60:4,
60:7
**adjusted**
9:2, 78:3
**adjuster**
8:9, 8:11,
9:12, 9:13,
9:18, 9:20,
11:5, 11:12,
12:3, 12:7,
13:14, 13:16,
13:18, 13:21,

14:15, 14:16,
14:18, 14:20,
15:5, 15:13,
15:16, 44:7,
44:9, 44:17,
45:14, 46:9,
47:2, 47:3,
54:10, 74:6,
81:12, 83:1,
83:10, 83:22,
88:11
**adjusters**
7:18, 7:19,
11:2, 11:6,
24:4, 44:5,
44:22, 46:4,
46:10, 81:16
**adjusting**
65:12, 77:19
**adjustment**
47:7, 71:3
**admissibility**
5:8
**advised**
95:2
**affiliation**
47:14
**after**
5:15, 18:16,
22:2, 25:17,
32:10, 35:6,
41:1, 48:15,
52:5, 55:9,
70:11, 70:20,
70:21, 72:16,
93:21, 95:19,
102:13, 102:17
**again**
12:6, 15:10,
16:21, 25:20,
31:1, 31:20,
33:6, 46:17,
49:7, 81:20,
84:19, 88:2,
95:3
**ago**
35:12
**agree**
5:14, 63:6,

72:22, 82:12,
85:5, 85:10,
87:18, 87:19,
88:16, 90:5,
95:18, 99:7
**agreed**
5:15, 5:22,
63:7, 104:5
**agreement**
54:19, 95:4
**agrees**
5:12
**ah-ha**
26:20
**ahead**
57:7, 88:4
**akin**
79:10
**al**
1:5
**all**
5:20, 7:21,
13:6, 14:6,
18:7, 19:19,
21:5, 21:11,
21:15, 22:12,
24:6, 24:9,
26:22, 28:6,
35:19, 36:1,
40:10, 42:10,
43:18, 45:12,
49:21, 50:1,
50:16, 50:20,
53:21, 54:9,
55:8, 57:14,
58:13, 62:21,
63:5, 63:6,
69:4, 72:20,
78:11, 87:7,
88:20, 89:19,
90:5, 93:4,
93:18, 95:1,
96:20, 97:1,
97:3, 97:19,
98:3, 102:13,
103:11
**also**
3:20, 61:12,

66:13, 69:15,
93:2, 95:16,
99:9, 103:19
**although**
87:15
**always**
99:5, 99:18
**amended**
25:4, 101:5,
101:7
**amount**
53:5, 53:14,
54:21, 58:20,
59:15, 59:20,
59:22, 60:8,
90:2, 90:6,
90:16, 90:21,
91:5, 97:7,
97:19, 97:22,
98:10
**amounts**
53:21
**analogous**
84:12
**analysis**
40:7
**animus**
44:21
**another**
16:16, 42:7,
45:14, 45:15,
61:8, 62:2,
62:5, 77:5, 77:8
**answer**
6:11, 6:15,
18:12, 24:11,
25:21, 26:5,
26:15, 29:15,
44:19, 51:4,
52:21, 53:8,
53:13, 55:2,
72:5, 75:21,
78:5, 78:21,
80:3, 90:10,
91:15, 96:9,
96:13, 98:3,
99:15, 100:3
**answers**
82:6, 102:21,

103:3
**any**
11:19, 14:1,
14:19, 15:21,
16:9, 20:9,
20:22, 22:12,
24:2, 24:19,
25:2, 25:5,
25:6, 25:11,
27:5, 28:5,
28:13, 29:2,
32:2, 32:8,
37:2, 37:5,
37:9, 37:14,
38:4, 43:11,
44:15, 44:21,
44:22, 45:3,
50:9, 52:9,
70:19, 71:1,
73:2, 76:1,
78:13, 80:11,
80:13, 80:15,
90:22, 96:22,
98:14, 98:18,
100:7, 100:13,
101:10, 101:12,
103:8, 104:14,
105:6
**anybody**
45:6, 78:1,
81:5, 86:9,
100:15
**anymore**
64:17
**anyone**
65:16, 80:20,
86:12, 86:16,
86:17
**anything**
12:5, 17:21,
18:3, 25:9,
25:12, 26:1,
26:10, 32:18,
32:19, 32:21,
67:9, 74:8,
75:15, 78:1,
89:2, 101:8
**apologize**
28:18

**appear**
66:5, 105:6
**appears**
42:22, 69:18,
93:7
**apply**
85:19
**appoint**
51:19, 51:21
**appointed**
49:16
**appointing**
49:5
**appreciate**
29:1
**approximately**
8:3, 17:10,
17:11, 35:12
**april**
55:18, 56:4,
56:22, 58:16
**area**
31:9, 39:10,
39:13
**arising**
39:2, 75:2
**around**
26:7, 37:8,
38:2, 39:8,
52:1, 52:5,
52:6, 80:14
**asked**
25:20, 27:2,
36:1, 36:3,
36:18, 36:21,
42:8, 48:18,
72:16, 73:22,
77:11, 77:15,
77:17, 81:8,
82:8
**asking**
41:6, 41:15,
81:5
**assigned**
14:15
**associate**
67:22, 70:15
**association**
14:2

**assume**
69:11, 87:15,
87:17, 88:10,
91:20
**attached**
92:21, 105:6
**attempt**
93:12
**attempting**
18:17
**attention**
29:9
**attorney**
100:17, 104:13,
104:15
**audible**
6:16
**august**
72:15
**authority**
17:6, 17:8,
17:12, 17:13,
17:17, 19:12,
19:13, 19:14,
19:16, 19:19,
19:22, 20:3,
20:13, 20:15,
20:16, 20:18,
20:21, 21:3,
27:8, 27:11,
27:17, 29:13,
30:3, 30:6,
31:16, 32:15,
32:17, 32:18,
33:2, 33:5,
33:9, 33:20,
36:21, 37:2,
37:4, 37:6,
37:9, 37:10,
37:18, 37:20,
38:7, 38:11,
38:14, 38:19,
38:22, 39:4,
40:17, 40:21,
41:5, 41:6,
41:8, 41:11,
41:19, 47:6,
47:10, 74:15,

74:19, 74:21,
75:2, 82:2,
83:19, 83:20
**auto**
7:6, 9:2,
14:12, 16:10,
17:22, 18:4,
25:16, 30:2,
31:11, 35:10,
35:21, 36:3,
36:13, 36:14,
36:16, 45:9,
46:3, 53:14,
53:20, 56:2,
56:6, 59:20,
64:10, 70:16,
72:19, 73:1,
77:1, 77:20,
78:3, 82:10,
88:17, 91:12,
95:7, 98:1,
98:7, 98:22,
99:4, 99:12,
99:13, 100:10,
101:20, 102:3,
102:9, 102:11,
102:13, 102:17
**auto's**
54:22, 102:21,
103:3
**automobile**
1:8
**available**
54:6, 56:9,
88:22
**avp**
21:1
**aware**
8:5, 8:8, 8:22,
9:1, 9:6, 55:4,
56:21, 57:2,
57:4, 57:9,
58:14, 89:20,
93:9, 93:17,
93:18, 93:20,
93:22, 95:6,
95:11, 98:7

**B**

**back**
39:1, 43:3,

44:20, 45:18,
47:19, 53:4,
60:16, 61:19,
61:20, 62:22,
63:1, 68:21,
74:15, 81:20,
88:6, 89:4,
93:9, 94:13,
94:22, 96:2
**background**
28:5
**bad**
79:18
**base**
61:22, 99:13
**based**
5:9, 54:21
**bates**
4:9, 4:14,
56:16, 57:16,
58:9, 66:9,
97:10
**bear**
28:12
**became**
8:5, 8:8,
11:13, 14:22,
71:21
**because**
10:20, 14:3,
18:12, 48:21,
49:2, 54:17,
63:19, 70:22,
81:9, 86:2,
90:22, 92:12
**become**
8:18, 8:22,
9:1, 48:13,
48:16, 48:18
**been**
6:5, 7:22, 9:6,
9:15, 9:18,
9:20, 10:2,
11:17, 12:13,
12:14, 13:7,
13:17, 15:9,
15:12, 15:13,
15:19, 15:22,

17:1, 17:15,
17:20, 21:1,
22:16, 23:7,
23:22, 29:10,
30:18, 30:22,
31:3, 33:21,
33:22, 34:7,
34:13, 34:18,
34:20, 37:22,
38:1, 39:12,
39:20, 41:3,
44:16, 50:12,
54:7, 54:9,
54:16, 55:5,
55:10, 56:21,
57:4, 57:12,
58:4, 58:16,
64:10, 64:18,
65:5, 65:8,
67:18, 72:10,
74:12, 74:18,
74:20, 75:1,
80:15, 82:13,
82:14, 83:2,
83:9, 83:13,
83:17, 84:14,
85:4, 89:1,
89:9, 91:17,
91:21, 94:10,
96:3, 96:4,
96:6, 97:1,
98:11, 103:7
**before**
2:9, 6:5, 6:10,
7:21, 14:7,
19:3, 22:7,
25:1, 31:15,
43:17, 49:9,
52:14, 62:20,
66:9, 73:14,
75:19, 83:8,
83:12, 92:12,
102:9, 103:5,
103:16, 104:9
**beginning**
7:11, 9:7
**behalf**
3:2, 3:11

**being**
9:2, 18:4,
24:19, 26:17,
27:4, 33:3,
33:4, 37:14,
38:5, 51:13,
60:13, 63:13,
98:15
**believe**
14:4, 14:15,
14:17, 15:4,
16:4, 16:22,
22:13, 23:14,
26:7, 26:16,
35:16, 36:7,
38:13, 38:19,
38:21, 39:1,
39:9, 39:11,
39:12, 39:14,
48:12, 52:11,
54:18, 55:8,
59:15, 64:17,
68:11, 70:15,
79:17, 79:20,
84:1, 96:1,
100:22
**believes**
53:15
**below**
92:19
**berry**
70:14, 70:15
**better**
53:17, 67:4,
85:3
**between**
11:5, 13:7,
24:21, 27:13,
39:16, 42:11,
47:19, 48:5,
48:22, 50:2,
63:17, 63:18,
82:3, 82:17
**beyond**
37:1
**bi**
69:22, 70:4
**biee**
96:2, 96:6,

**96:18**

**big**
28:21, 63:19

**bigger**
43:7, 67:3,
74:6, 75:6,
79:11, 79:21,
81:12, 85:6,
86:19, 87:2,
97:12

**bill**
5:21, 10:12,
68:15, 92:15

**bit**
66:22, 67:1,
69:20, 82:20,
86:20, 88:3

**blanking**
34:20

**block**
67:8

**boiled**
13:5

**boss**
84:2, 84:17,
84:22

**both**
42:20, 73:7,
95:15

**bottom**
63:15, 67:12,
89:20

**branch**
73:17

**break**
43:1, 61:14,
61:17

**brief**
6:9

**bring**
73:3

**brought**
64:10

**brown**
3:3, 3:4, 4:4,
5:12, 5:19, 6:1,
9:5, 9:8, 23:21,
24:14, 26:9,

26:18, 28:9,
28:12, 28:20,
29:20, 33:17,
43:2, 53:3,
53:10, 54:2,
56:12, 56:19,
57:17, 57:20,
58:2, 58:12,
59:14, 60:6,
60:12, 61:14,
61:18, 66:11,
66:17, 67:2,
67:5, 68:9,
68:15, 68:17,
76:5, 76:18,
78:12, 79:3,
79:9, 79:16,
80:6, 80:18,
81:4, 83:16,
85:12, 85:21,
86:8, 90:13,
91:19, 92:15,
93:1, 93:3,
95:13, 96:15,
97:6, 97:12,
97:15, 99:6,
99:20, 100:6,
100:18, 103:10,
103:17, 103:19

**building**
89:17

**built**
32:17

**bummed**
92:11

**bunch**
56:13

**business**
4:12, 26:7,
52:18, 53:1,
53:15, 53:17,
54:20, 55:5,
55:20, 56:6,
58:8, 58:15,
59:20, 60:1,
61:6, 70:6,
90:1, 90:16,
91:4, 91:12,

91:17, 95:8,
97:16, 97:22,
98:4, 98:9,
100:12

**C**

**c-a-r-e**
7:13

**call**
22:19, 24:13,
24:16, 24:20,
24:21, 25:14,
25:21, 26:3,
26:17, 26:21,
27:2, 27:3,
27:4, 27:5,
27:12, 67:15,
68:5, 68:13,
69:14, 69:17,
94:15, 94:20

**called**
11:19, 11:21,
18:3, 44:2,
95:22

**calls**
25:20, 26:6,
26:12

**came**
9:17, 93:11

**can't**
44:18, 60:14,
64:4, 76:16,
76:21, 87:15,
101:2, 103:6

**cannot**
51:3, 69:7

**capacity**
7:7, 7:15

**car**
35:17

**care**
7:8, 7:13,
10:16, 10:22,
11:4, 11:20,
11:21, 82:15,
99:9

**carlton**
34:21, 34:22,

35:1, 36:5, 36:7

**caroline**
10:11, 12:2,
12:14, 13:11,
13:21, 15:3,
17:6, 18:15,
19:6, 20:4,
21:8, 21:18,
22:6, 22:21,
23:15, 24:1,
24:21, 25:16,
26:13, 28:1,
29:9, 31:14,
32:3, 32:8,
33:12, 33:18,
38:13, 38:19,
40:2, 41:13,
41:16, 42:18,
42:19, 47:19,
48:6, 51:15,
54:5, 62:11,
64:14, 64:19,
65:9, 65:11,
67:13, 68:6,
68:20, 69:1,
69:5, 69:20,
70:2, 70:19,
71:1, 71:5,
77:15, 79:1,
81:6, 83:3,
83:8, 93:10,
102:7

**caroline's**
71:20

**carrier**
16:17, 36:8,
77:6, 77:9

**case**
1:6, 8:6, 8:8,
8:11, 8:15,
8:19, 9:1,
23:16, 27:8,
27:17, 32:4,
32:5, 32:6,
32:14, 32:15,
33:3, 33:10,
36:22, 37:8,
37:21, 48:2,

48:14, 50:20,
54:15, 64:20,
71:3, 71:6,
71:8, 80:9,
80:15, 80:16,
82:8, 87:9,
94:15
**cash**
50:2, 50:6,
89:13, 89:16
**cat**
84:6
**catastrophe**
84:15
**category**
101:3
**caused**
60:21
**cc**
10:11, 40:2,
55:18, 62:10
**cc'd**
99:9
**ccr**
1:22
**cease**
14:20
**centralized**
7:17
**certain**
64:19
**certainly**
93:22
**certainty**
45:21
**certificate**
104:1
**certified**
2:10, 104:2
**certify**
104:4, 104:7,
104:12
**chain**
12:18, 12:20,
12:22, 13:4,
14:6, 27:22,
33:8, 47:6,
60:18, 61:19

**chains**
64:7
**change**
10:21, 10:22,
11:3, 11:7,
18:14, 19:3
**changed**
11:7, 31:2,
71:9, 71:11
**charge**
32:14, 44:15
**charkatz**
55:17, 86:13,
92:17, 93:4,
94:16, 95:1
**check**
4:20, 96:20,
97:4, 97:7
**checks**
96:22
**chenetski**
1:14, 2:1, 4:3,
4:8, 4:12, 4:17,
4:18, 4:20,
5:11, 5:14,
5:15, 6:2, 6:6,
7:2, 7:4, 9:1,
23:13, 25:2,
37:17, 41:9,
43:4, 53:11,
56:14, 56:15,
56:20, 57:21,
58:2, 58:5,
58:7, 58:14,
65:22, 66:1,
67:17, 68:11,
68:13, 68:18,
72:17, 73:12,
82:9, 86:22,
92:6, 92:10,
97:3, 97:4,
103:1, 103:10,
104:5, 105:2
**christian**
22:2, 22:6,
22:21, 24:22,
25:15, 26:13,
47:22, 48:5,

51:16, 55:19,
61:10, 62:3,
62:6, 62:10,
67:16, 68:3,
68:20, 93:11,
95:2
**chronological**
66:19
**chronology**
96:12
**chubb**
16:5, 16:18
**circumstance**
20:10, 35:20
**circumstances**
16:14, 35:19,
36:15, 77:2,
85:13
**city**
7:3
**claims**
13:15, 13:16,
17:7, 18:10,
32:17, 44:15,
46:11, 46:12,
46:19, 47:4,
47:15, 47:16,
51:6, 51:12,
65:16, 74:6,
77:19, 78:3,
78:6, 81:12,
81:14, 81:15,
81:16, 81:19,
85:18, 85:19,
87:17
**clear**
6:19
**click**
87:4
**closer**
28:18
**collaboratively**
65:17
**columbus**
73:18
**come**
58:3, 64:13
**comes**
51:6

**comfortable**
40:4
**coming**
43:21
**command**
12:18, 12:20,
13:1, 13:4
**commencement**
104:4
**comment**
81:18
**commercial**
7:8, 7:9, 7:10,
7:17, 82:15
**commission**
104:20
**committee**
17:22, 18:4,
18:9, 18:18,
18:19, 19:2,
19:9, 20:12,
20:19, 21:4,
21:9, 21:12,
29:11, 29:22,
30:4, 30:8,
30:10, 30:12,
31:15, 32:3,
32:9, 33:7
**common**
70:6
**communicate**
88:15, 99:17
**communicated**
37:22, 38:1
**communication**
87:12, 99:5,
100:7
**communications**
43:20
**company**
1:10, 7:6,
44:2, 44:12,
51:7, 59:22
**competent**
101:21, 102:3
**complaint**
25:4, 101:6,
101:7

**complete**
105:5
**complex**
13:16, 18:10,
46:12, 46:19,
47:4
**comply**
50:15
**comprise**
40:17
**compromise**
40:6, 40:12,
40:22, 41:12,
41:22, 42:5,
42:9, 81:10
**compromised**
27:20
**compromising**
40:11, 40:14,
42:1
**computer**
54:13
**concept**
49:10
**concluded**
103:21
**conclusions**
63:11
**conference**
22:5, 22:13,
22:17, 22:18,
22:20, 23:5,
24:2, 24:9,
24:13, 24:16,
24:20, 24:21,
25:14, 25:20,
25:21, 26:3,
26:6, 26:12,
26:17, 26:21,
27:2, 27:3,
27:4, 27:5,
67:15, 68:4,
68:5, 68:19,
69:1, 69:2,
69:13, 69:17
**conferenced**
22:1
**confirm**
59:2

**confused**
38:17
**connection**
74:21, 100:15,
102:22
**consider**
41:4, 41:8
**consideration**
21:9, 21:13,
30:3
**consult**
46:18, 64:21
**contact**
14:10, 14:11,
14:13, 16:9
**contained**
89:3
**context**
64:2
**continue**
89:6
**continued**
11:3
**convenience**
94:6
**conversation**
30:5, 39:7,
41:17, 42:8,
42:11, 52:17,
79:1
**conversations**
32:8, 40:18,
40:22, 43:14,
43:18, 43:20,
55:8, 78:9,
78:13, 80:13
**copy**
87:16
**corner**
58:21
**correct**
8:16, 8:17,
12:8, 19:15,
23:8, 24:3,
49:11, 50:9,
50:10, 50:14,
50:18, 50:19,
51:18, 56:2,

56:3, 56:7,
59:8, 59:17,
60:21, 60:22,
64:11, 64:12,
67:14, 69:16,
70:1, 70:10,
77:9, 77:12,
83:14, 84:3,
86:3, 88:18,
89:1, 90:8,
93:6, 94:11,
97:17, 97:18,
97:21, 99:19,
99:22, 100:5,
105:4
**corrected**
98:8
**correcting**
100:8
**correction**
98:11, 100:1,
100:14
**corrections**
105:6
**correctly**
6:3, 22:3,
39:9, 40:8,
89:10
**cost**
50:15
**costs**
50:3, 50:13
**could**
13:7, 19:1,
19:14, 20:20,
33:5, 33:22,
47:8, 74:12,
80:4, 81:9
**couldn't**
19:9, 19:11
**counsel**
5:3, 5:7, 5:11,
5:13, 104:13,
104:16
**couple**
25:19, 34:11,
49:14, 72:12
**court**
1:1, 2:10,

103:15, 104:2
**coverage**
46:3, 52:9,
52:15, 52:19,
97:16, 98:1
**covered**
62:20
**cross**
4:2, 78:8
**current**
11:17
**currently**
7:4
**cut**
28:4, 58:22
**cv**
1:7

**D**

**damage**
26:8, 27:19,
48:21, 49:8,
50:7, 52:12,
54:17, 54:22,
55:9, 55:12,
57:2, 57:3, 86:6
**damages**
53:2
**date**
11:16, 12:21,
17:9, 17:12,
20:6, 27:10,
40:5, 46:1,
67:19, 70:10,
83:19, 91:1,
98:2, 98:5,
104:10, 105:10
**dated**
4:8, 4:18,
55:18, 56:15,
92:6, 92:18,
93:2, 104:22
**dates**
13:6, 13:8,
15:11, 34:12,
84:20, 91:18
**day**
13:2, 42:20,

92:17
**days**
43:17
**deal**
46:3, 46:4,
53:17, 74:1,
74:3, 80:9, 81:7
**dealing**
80:1, 89:12
**deborah**
70:14, 70:15
**december**
11:15, 12:15,
12:18, 13:1,
14:11, 15:20,
16:20, 17:13,
18:16, 18:20,
19:5, 20:4,
20:6, 20:14,
21:19, 22:7,
22:22, 23:15,
24:17, 25:17,
27:9, 28:1,
30:21, 33:10,
34:16, 39:22,
41:2, 42:4,
42:11, 42:17,
43:16, 45:19,
47:17, 47:18,
47:20, 48:3,
48:8, 51:17,
52:3, 55:4,
56:21, 57:1,
60:8, 60:18,
65:3, 65:13,
72:16, 74:15,
93:10, 93:21
**decider**
82:6
**decides**
20:11
**defendant**
1:11, 3:11,
5:13
**define**
8:20
**definitely**
24:20, 35:6

**delivery**
103:17
**delta**
49:7, 63:22
**demand**
96:1
**deny**
78:18
**depends**
9:16, 20:10
**deponent**
105:1
**deposed**
6:5
**deposition**
1:14, 1:15,
2:1, 5:20, 14:8,
25:1, 72:7,
72:8, 72:15,
100:16, 101:10,
101:12, 103:5,
103:9
**depreciated**
50:7
**depreciation**
50:12, 50:22,
51:1
**described**
82:14, 84:13
**description**
4:7, 84:11,
84:12
**desire**
19:6, 20:2
**desk**
7:18, 46:13
**detail**
62:4
**details**
77:4
**determine**
62:4, 71:10
**determined**
89:21, 91:13,
100:11
**difference**
39:16, 46:14,
50:2, 63:16

**different**
13:8, 34:10,
46:8, 63:11,
65:6
**difficulty**
60:20
**dinner**
73:10, 73:12,
73:15, 75:19,
76:1
**direct**
4:2, 6:1, 11:5,
30:15, 30:17,
47:11, 47:13,
69:12, 83:13,
83:18
**directed**
29:9
**directly**
11:1, 11:13,
14:6, 46:18,
77:3, 81:22,
86:11, 99:10
**director**
7:9, 7:10,
9:21, 32:20,
32:22, 82:11,
82:15, 83:4,
84:6, 84:8,
84:13, 84:14
**discrepancy**
39:15
**discuss**
31:21, 39:5,
67:18, 94:5
**discussed**
39:21, 61:12,
94:11
**discussion**
18:10, 68:2,
73:21
**discussions**
32:2, 37:7,
38:2, 98:14,
98:18
**disparity**
48:21, 52:12
**dispute**
39:10, 39:13,

**different** 76:6, 76:13,
79:4, 79:7,
79:14, 85:1,
86:2, 86:5, 86:6
**disputed**
49:18, 51:11
**disruption**
68:10
**district**
1:1, 1:2
**docket**
30:9, 31:15,
31:21
**document**
23:10, 30:1,
31:13, 54:15,
64:2
**documentation**
23:10, 60:4,
67:18, 95:12
**documenting**
23:5
**documents**
4:10, 4:16,
25:2, 25:5,
25:6, 25:8,
25:12, 26:11,
54:12, 56:17,
58:9, 66:4,
88:22, 100:21,
101:3
**doing**
6:19, 77:21,
88:4
**done**
30:13, 57:7,
76:17, 76:20
**door**
9:17
**dotted-line**
47:14
**down**
12:4, 28:5,
58:20, 63:15,
71:14, 87:10,
88:6, 89:19
**drew**
63:10

**due**
53:21, 53:22
**during**
15:10, 15:18
**duties**
7:16, 13:12

**E**

**e-mail**
4:8, 4:18,
10:10, 10:19,
11:10, 11:18,
12:4, 21:16,
21:17, 22:8,
24:17, 25:7,
27:1, 27:6,
27:18, 27:21,
27:22, 28:1,
29:7, 29:8,
29:17, 32:10,
37:19, 40:1,
40:3, 40:19,
42:4, 42:7,
42:14, 42:15,
42:16, 42:17,
42:19, 47:20,
48:3, 48:8,
51:15, 54:5,
55:17, 55:21,
56:8, 56:9,
56:15, 59:16,
60:17, 60:18,
60:19, 61:19,
61:21, 62:8,
62:11, 64:7,
65:7, 92:6,
92:17, 92:19,
93:9, 94:19
**e-mails**
17:3, 25:3,
25:12, 26:16,
37:1, 37:4,
52:6, 55:4,
70:12, 74:16,
75:3, 93:18,
101:1, 101:5
**each**
6:12

**earlier**
49:11, 60:17,
61:15, 70:12,
88:1, 94:10
**earliest**
94:5
**early**
16:13, 51:17,
72:19, 73:6,
73:14, 83:6
**easier**
8:14, 62:19,
97:13
**eight**
56:22, 57:5,
66:11
**either**
8:10, 9:17,
15:9, 15:12,
23:22, 24:6,
33:21, 35:11,
36:8, 46:16,
72:18, 84:18,
85:4
**element**
39:14, 39:17,
39:18, 52:13,
61:5
**element-wise**
61:4
**else**
25:9, 25:13,
78:2, 81:1,
101:8
**employed**
7:5
**employee**
16:7, 104:13,
104:15
**encourage**
99:5
**end**
93:20
**engaged**
64:20
**engineering**
7:14
**enlarge**
66:21, 88:3

**enough**
28:21, 29:3,
41:4, 41:7, 82:5
**entered**
71:15
**entire**
66:9
**entry**
67:12
**eric**
67:16, 67:21,
67:22, 68:20
**errata**
105:7
**escalate**
30:7, 32:19,
32:20, 32:22
**escalated**
13:17, 14:16,
30:15
**escalation**
14:18
**esquire**
3:3, 3:12
**et**
1:4
**evaluated**
90:1, 91:4,
98:9, 100:11
**evaluation**
4:14, 58:8,
58:16
**even**
41:8, 85:18
**ever**
31:10, 37:13,
37:17, 38:3,
45:6, 50:20,
57:11, 62:5,
78:1, 78:18,
78:22, 79:14,
80:19, 86:16,
98:7, 98:12,
98:14, 98:18,
100:7, 102:11,
102:14, 102:18
**every**
43:9

**everybody**
28:15
**exact**
15:11, 34:12,
59:15, 84:20
**exactly**
16:12, 61:2,
61:3, 65:17,
74:11, 91:1
**examination**
6:1, 104:5
**examined**
5:16, 105:3
**examiner**
45:15, 45:16,
45:20, 45:22,
46:8, 46:15,
47:3, 47:5,
47:8, 48:1,
48:11, 48:13,
48:16, 48:18,
49:6, 49:16,
51:20, 51:22,
64:20, 65:1,
87:17, 87:19
**examiners**
7:20, 46:2,
46:11, 46:17,
47:14, 64:21
**example**
50:5
**examples**
51:4
**exceed**
19:14
**excess**
19:11, 32:18,
32:19, 32:22,
36:8
**excessive**
63:7
**excuse**
95:7, 103:2
**exhibit**
12:6, 43:3,
56:15, 58:7,
66:1, 66:9,
68:12, 91:10,

92:6, 97:2,
97:4, 100:9
**exhibits**
92:11
**existed**
18:19
**expect**
24:6
**expected**
59:19, 60:3
**expense**
4:13, 56:6,
58:8, 58:15,
61:6, 95:8
**expert**
62:2, 62:5
**experts**
61:13
**expires**
104:20
**explain**
20:12
**extra**
4:13, 56:6,
58:8, 58:15,
61:6, 95:8
**eye**
59:11
**eyes**
52:7, 61:1,
61:8

**F**

**fact**
5:10, 49:14,
85:6, 90:6,
96:6, 96:18,
98:10
**facts**
99:12
**fair**
12:11, 29:3,
33:11, 43:11,
44:12, 46:2,
51:10, 65:1,
74:14, 93:4,
98:22, 99:4,
99:7

**fairfax**
3:7
**fallen**
9:15
**falls**
18:11
**familiar**
8:15, 44:2
**far**
33:2, 47:10
**february**
72:19, 73:6,
73:14, 80:7,
82:21, 89:22,
90:19, 90:20,
91:7
**field**
11:14, 12:1,
13:15, 13:17,
14:4, 14:15,
15:1, 30:14,
30:18, 30:22,
31:3, 31:18,
31:19, 46:11,
46:16, 46:21,
46:22, 65:10,
71:15, 71:16,
84:6, 84:8,
84:15
**figure**
9:11
**figured**
21:5
**figures**
99:12
**file**
14:7, 14:9,
22:18, 23:4,
23:9, 24:2,
24:5, 25:4,
25:7, 25:12,
29:11, 56:10,
56:11, 65:2,
69:12, 70:3,
70:5, 71:12,
71:16, 71:19,
71:21, 74:17,
83:9, 83:13,

89:3, 96:12,
101:1, 101:5
**files**
64:22, 71:13
**filtered**
13:5
**final**
33:4
**financial**
96:11
**financially**
104:16
**find**
88:7, 99:21,
100:4
**finding**
62:2
**fine**
43:8, 62:20
**finish**
57:6
**fink**
15:13, 15:14,
15:15, 16:1,
16:2, 16:4,
16:9, 34:1,
34:3, 34:4,
82:1, 82:3,
83:2, 84:18,
85:4
**fire**
60:21
**first**
8:5, 8:8, 8:18,
10:10, 21:22,
24:17, 30:6,
34:17, 48:7,
55:12, 66:14,
66:20, 67:11,
71:15, 89:5
**flowed**
29:18
**focussed**
41:10
**follow-up**
95:3
**followed**
20:4

**following**
27:12, 39:7,
39:10, 43:17,
51:20
**follows**
5:17
**foregoing**
104:7, 105:3
**forensic**
48:22, 49:1,
53:1, 63:10
**form**
23:19, 24:10,
26:4, 26:14,
29:14, 33:15,
37:5, 52:20,
53:7, 53:19,
60:2, 60:10,
66:4, 75:20,
76:14, 78:4,
78:20, 79:6,
79:13, 80:2,
81:2, 83:15,
85:9, 85:16,
86:4, 90:9,
91:14, 95:10,
96:8, 99:3,
99:14, 100:2
**formal**
37:2, 37:14,
39:3
**formally**
5:4, 37:18
**format**
31:22
**forth**
104:11
**four**
28:3
**fox**
25:15, 26:13,
47:22, 48:5,
51:16, 55:19,
61:10, 62:6,
62:11, 68:3,
93:11
**fresh**
52:7, 61:1,

61:8
**friday**
92:18, 92:20
**front**
18:18, 29:11,
29:22, 30:3,
30:12, 95:12
**froze**
68:9
**full**
50:21
**function**
11:7, 46:14,
46:20
**funds**
52:14
**further**
104:7, 104:12
**future**
94:4
**fuzzy**
86:21

**G**

**gaming**
60:21, 61:13
**gas**
81:21, 81:22
**gave**
82:15
**general**
7:19, 8:9,
8:11, 9:12,
9:13, 9:18,
11:1, 11:4,
11:6, 11:12,
12:3, 12:7,
13:14, 13:16,
13:18, 13:21,
14:16, 14:18,
14:20, 15:5,
15:12, 15:16,
24:4, 44:22,
45:13, 46:4,
46:9, 46:10,
47:2, 54:10,
83:1, 83:10,
83:22

**generally**
50:17
**germantown**
3:15
**getting**
28:18, 30:6,
38:17, 79:21,
93:5
**ggg**
77:19, 78:15,
85:7
**give**
6:16, 6:22,
15:7, 82:19,
84:11, 103:19
**given**
18:12, 105:5
**gives**
72:2
**global**
37:8, 38:2,
39:20, 40:12,
49:2, 49:5,
49:10, 49:13,
49:17, 53:6,
94:4, 94:9
**go**
6:8, 8:13,
9:10, 11:18,
19:8, 28:16,
30:1, 35:15,
46:22, 47:19,
57:7, 60:16,
61:19, 62:22,
66:19, 67:8,
71:14, 87:4,
88:6, 89:4,
89:19, 94:13,
98:12
**goes**
10:10, 33:2,
33:12, 33:18
**going**
6:8, 6:9,
20:19, 35:5,
52:18, 56:13,
60:16, 61:3,
65:21, 65:22,

68:13, 72:12,
73:9, 73:12,
73:15, 78:15,
84:20, 86:19,
92:9
**gonzalez**
70:18
**good**
6:2, 77:2,
77:5, 77:8,
87:6, 88:5,
101:21, 102:3
**goodman**
86:14, 95:22
**goodman-gable-go-
uld**
44:3, 44:16,
44:21, 45:7,
45:10, 63:13,
78:2, 78:7,
78:10, 80:1,
80:10, 80:14,
85:15, 86:3,
86:6, 86:10,
86:12, 86:13,
86:17, 99:9
**grant**
20:16
**granting**
41:8
**great**
43:6
**group**
11:14, 30:14,
45:17, 83:1
**gs**
75:7, 75:15,
79:12, 79:15
**guess**
5:19, 9:21,
52:15

**H**

**habit**
99:1
**handle**
46:11, 46:18
**handled**
33:4, 65:17,

86:11
**handler**
13:7, 23:3,
23:4, 23:7,
23:14, 64:17,
69:12, 82:3,
82:4, 82:18
**handler's**
32:18
**handlers**
24:5, 46:10
**handling**
9:19, 9:20,
13:15, 35:14,
40:5, 70:6
**handwriting**
101:2
**hang**
28:9, 55:15
**happened**
26:2, 29:19,
68:7, 75:2
**happens**
51:5
**harbor**
44:21
**head**
6:17, 76:21
**held**
2:1
**help**
10:17, 11:19,
67:1
**here**
10:8, 12:4,
49:16, 51:3,
51:13, 53:13,
55:1, 55:15,
58:20, 65:1,
65:16, 65:20,
69:2, 70:9,
70:13, 86:20,
87:10, 88:6,
88:7, 92:14,
94:14, 95:15,
95:21, 97:16,
99:8, 103:5
**hereby**
104:3, 105:2

**hereinbefore**
104:10
**herself**
19:10, 47:21
**hi**
22:1
**hierarchal**
83:19
**hierarchy**
32:16, 33:9,
72:4, 82:19,
82:21
**higher**
57:3
**himself**
11:20, 62:10
**hogue**
55:19
**hold**
53:4
**holdback**
49:9, 52:14
**horst**
3:13
**hotel**
73:11, 73:18
**huge**
48:21, 49:7,
63:18

**I**

**idea**
15:21, 20:22
**identification**
56:18, 58:11,
66:2, 92:7, 97:5
**identified**
22:17, 24:16
**identifies**
10:16, 72:1,
89:13
**identify**
53:21
**image**
28:5
**images**
28:3, 28:15,
62:21

**imagine**
44:18
**improper**
85:8, 85:22,
91:21
**inaccuracies**
100:5
**inaccuracy**
100:8
**inaccurate**
71:6, 99:22
**inc**
1:4
**inches**
59:12
**included**
69:17, 83:5
**income**
4:12, 26:8,
54:21, 55:20,
56:6, 58:8,
58:15, 59:21,
61:6, 90:1,
90:16, 91:4,
95:8, 98:9
**incur**
50:15
**incurred**
49:9, 52:14
**independent**
63:10
**index**
4:1
**indicate**
60:19, 82:16,
101:1
**indicated**
18:15, 27:1,
37:7, 49:15,
96:10
**indicates**
56:8, 63:9,
71:5, 73:9,
84:16, 84:21,
95:21
**indicating**
91:16
**individuals**
65:6

**informal**
33:6
**information**
29:18, 39:2,
39:8, 39:15,
41:4, 41:7,
54:5, 60:7,
63:2, 82:20
**initially**
14:14, 33:12,
60:19
**initiated**
18:13
**initiation**
8:11
**inquiring**
27:19
**ins**
88:8, 88:9
**inspections**
46:22
**instead**
5:5
**insurance**
1:9, 7:6, 16:5,
44:11, 51:7,
59:21
**insured**
22:3, 25:18,
44:10, 47:21,
48:5, 48:6,
50:8, 50:13,
51:8, 51:16,
56:5, 63:17,
69:21, 86:1,
88:11, 88:21,
90:7, 91:22,
92:4, 93:12,
95:7, 99:8
**insured's**
40:7, 62:3
**insureds**
98:16, 98:20
**insurer**
50:8
**intentionally**
96:19
**interceded**
21:12

**interested**
104:17
**internally**
30:2
**interrogatories**
102:22, 103:4
**interruption**
52:19, 53:2,
53:16, 53:17,
55:5, 60:1,
91:12, 91:17,
97:17, 97:22,
98:4, 100:12
**investigate**
85:18
**investigating**
13:15
**investigations**
46:21
**involved**
8:5, 8:18,
8:20, 8:21,
31:20, 48:1,
48:11, 48:14,
48:17, 48:19,
69:15, 70:10,
70:21, 71:2,
73:7, 87:8
**involvement**
69:8
**issue**
52:9, 52:11,
61:15, 75:6,
79:11, 79:21,
85:6, 98:5
**issues**
46:3, 46:5,
52:15
**itself**
63:2

**J**

**january**
4:18, 72:19,
73:6, 73:14,
80:7, 82:21,
87:8, 92:7,
92:18, 92:20,

93:2, 93:22,
95:19, 96:7,
100:8
**jay**
34:21, 36:5,
36:7, 36:14
**jeff**
15:13, 15:14,
15:15, 16:1,
16:2, 16:4,
34:1, 82:1,
83:2, 84:18,
85:4
**jeremy**
55:19
**jersey**
2:11, 104:3
**job**
1:20, 7:16,
13:12, 101:21
**jones**
3:5
**julio**
3:21
**june**
104:20

**K**

**kind**
18:11, 84:10,
85:20
**king**
10:2, 10:6,
10:9, 10:10,
10:12, 21:17,
32:11, 39:22,
40:2, 43:15,
45:12, 45:13,
48:9, 51:19,
51:21, 61:12,
61:20, 62:10,
64:6, 64:15,
65:2, 70:8,
70:17, 70:18,
70:21, 83:8,
83:12, 86:19,
86:21, 87:8,
87:20, 88:20,

89:4, 91:11,
92:20, 93:6,
93:17, 94:14,
96:16, 98:8,
98:15, 98:18,
100:9, 101:15
**knew**
64:4
**know**
6:15, 8:7,
12:22, 13:10,
14:1, 14:5,
14:10, 14:19,
15:8, 15:11,
15:22, 16:3,
16:6, 16:14,
17:10, 17:11,
17:12, 17:16,
21:7, 23:12,
29:16, 31:5,
31:8, 33:4,
35:9, 35:13,
36:4, 36:10,
36:11, 36:19,
37:1, 37:13,
40:12, 41:3,
41:20, 42:2,
42:3, 43:12,
44:7, 45:19,
47:9, 53:9,
53:12, 53:13,
54:20, 55:1,
55:7, 55:11,
56:4, 58:18,
60:11, 62:7,
63:8, 63:21,
63:22, 64:2,
65:19, 70:10,
70:14, 71:4,
72:5, 73:2,
76:2, 76:10,
76:19, 77:15,
77:16, 81:13,
81:17, 82:6,
84:9, 84:20,
86:9, 86:12,
88:9, 88:22,
92:3, 96:13,

98:13, 102:10
**knowledge**
77:13, 77:16,
99:13
**known**
17:21, 53:21
**krekstein**
3:12, 3:13,
5:13, 5:18,
5:22, 9:3,
10:12, 23:17,
23:19, 24:10,
26:4, 26:14,
28:7, 28:14,
29:14, 33:15,
40:3, 52:20,
53:7, 53:19,
57:15, 57:19,
58:1, 59:11,
60:2, 60:10,
61:16, 62:9,
66:8, 66:16,
68:16, 75:20,
76:14, 78:4,
78:20, 79:6,
79:13, 80:2,
80:12, 81:2,
83:15, 85:9,
85:16, 86:4,
90:9, 91:14,
95:10, 96:8,
97:10, 99:3,
99:14, 100:2,
100:17, 100:19,
103:13, 103:18

**L**

**l-i-l-i-u-m**
7:3
**laid**
27:18
**lansing**
31:9
**large**
13:15, 17:22,
18:3, 18:9,
18:10, 18:18,
18:19, 19:2,

19:8, 20:12,
20:19, 21:4,
21:9, 21:12,
29:11, 29:22,
30:4, 30:8,
30:9, 30:12,
31:15, 31:20,
31:22, 32:3,
32:8, 33:6,
39:15, 47:3,
74:5, 81:12,
81:15, 82:4,
82:11, 83:4,
84:13
**larger**
67:1, 81:16,
87:4
**largest**
46:12, 46:18
**last**
16:8, 36:13,
36:14, 38:15,
40:3, 40:20,
42:3, 66:12,
91:10, 101:17,
102:6
**late**
72:18
**later**
11:13, 64:3,
69:20, 82:8,
95:3
**lawyer**
103:12
**lead**
7:17
**leader**
30:22, 31:3,
45:16
**leadership**
10:21, 10:22,
11:2, 18:14,
19:3
**leading**
11:22, 31:18
**lean**
43:8
**least**
10:18, 12:15,

56:4, 70:7
**leave**
35:5, 35:10,
36:3, 36:18,
77:11, 77:15,
77:17, 103:16
**leaving**
36:16, 77:4,
102:11
**left**
16:10, 16:15,
16:16, 28:8,
35:20, 36:14,
67:8, 77:1,
77:8, 102:9,
102:13, 102:17
**less**
17:19, 17:20,
19:13, 19:16,
19:20, 50:21,
51:8
**lesson**
45:4, 45:7,
45:10, 75:7,
78:16, 79:12,
79:15, 80:11,
85:7, 85:14
**lessons**
85:17
**let's**
10:4, 11:9,
11:18, 16:20,
19:5, 19:7,
20:11, 21:15,
21:22, 27:21,
33:8, 45:18,
47:17, 47:19,
56:12, 61:1,
61:19, 65:21,
66:17, 87:5,
88:6, 89:4,
91:20, 95:14,
95:17
**letter**
37:19, 59:2,
88:8, 88:12,
88:13, 88:14,
88:17, 88:21,

90:7, 91:22,
92:4, 92:17,
93:1, 93:5,
94:14, 94:17,
95:9, 96:7,
98:8, 98:11,
99:21, 100:1,
100:9, 100:14
**letters**
98:16, 98:20,
99:1, 99:11
**levels**
47:10
**leverage**
53:16
**license**
104:21
**lieu**
5:4
**likely**
14:22, 87:13
**likewise**
6:11
**lilium**
7:3
**line**
18:11, 36:8,
48:7
**lines**
7:8, 7:9, 7:10,
17:3, 82:16
**listed**
14:3
**literally**
70:5
**litigation**
9:4, 103:7
**little**
38:17, 66:22,
67:3, 69:19,
82:20, 86:20,
88:1, 88:3
**live**
76:21
**location**
93:11
**log**
66:5, 68:18,

70:8
**long**
7:22, 35:12,
66:12, 103:8
**look**
11:9, 21:15,
21:22, 23:9,
23:11, 27:21,
54:4, 54:6,
65:21, 70:13,
71:7, 71:10,
95:14, 95:17
**looked**
14:7, 56:10,
74:16, 93:1,
94:20
**looking**
54:12, 54:13,
54:16, 55:3,
59:17, 60:17,
61:9, 61:20,
63:16, 74:15,
74:18, 74:20,
75:1, 87:22
**looks**
14:2, 29:16,
62:8
**loss**
17:22, 18:3,
18:9, 18:18,
18:19, 19:2,
19:8, 20:12,
20:19, 21:4,
21:9, 21:12,
22:1, 29:11,
29:22, 30:4,
30:8, 30:9,
30:12, 31:15,
31:20, 31:22,
32:3, 32:8,
33:7, 39:11,
39:12, 39:14,
39:17, 39:18,
46:4, 50:5,
54:18, 63:6,
63:19, 69:22,
74:6, 81:12,
81:16, 82:11,

83:4, 84:13,
90:1, 91:4,
93:11, 98:9
**losses**
60:21
**lot**
15:10, 65:3,
69:9
**lyft**
35:16, 35:17

---

**M**

**made**
24:6, 56:21,
57:5, 62:16,
94:4, 99:2,
100:10
**main**
14:10, 14:11,
39:9
**mainly**
54:16
**make**
6:11, 28:21,
29:1, 43:7,
43:9, 59:5,
62:14, 62:16,
67:2, 71:1,
86:19, 87:2,
90:22, 92:13,
97:12, 99:1,
99:18
**makes**
91:6, 91:8,
91:18, 97:13
**manager**
8:10, 8:12,
9:19, 10:16,
11:1, 11:4,
15:13, 15:17,
30:6, 30:7,
30:18, 32:19,
32:20, 47:12,
47:13, 74:5,
81:11, 81:14,
81:19, 82:17,
82:22
**managers**
31:1, 31:4,

31:19, 72:20,
73:3, 81:15
**maneuver**
18:17
**manipulate**
43:12
**manner**
77:20, 78:2,
80:11
**many**
78:6, 86:12
**margins**
66:22
**mark**
1:14, 2:1, 4:3,
5:11, 5:15, 7:2,
9:1, 22:1,
55:16, 56:12,
56:13, 58:5,
65:22, 67:17,
73:12, 82:9,
92:10, 97:2,
104:5, 105:2
**marked**
10:2, 55:16,
56:17, 58:4,
58:10, 66:2,
86:18, 92:7,
97:2, 97:5
**mary**
1:22, 2:9,
104:2
**maryland**
1:2
**matter**
35:14, 40:5
**maybe**
8:13, 10:4,
28:4, 87:4
**meaden**
60:9, 61:10,
63:12, 67:16,
67:22
**mean**
8:20, 27:1,
31:11, 32:7,
33:11, 49:17,
49:20, 61:4,

63:8, 70:4,
81:18, 92:11
**means**
70:5, 91:2,
91:3
**measured**
59:22, 60:9
**measurement**
46:4
**meet**
47:1
**meeting**
3:16, 18:16,
22:2, 25:18,
27:12, 29:18,
38:1, 39:2,
39:7, 39:11,
41:1, 43:17,
43:21, 47:18,
47:21, 48:4,
48:10, 48:15,
51:14, 52:6,
55:14, 70:11,
72:18, 73:6,
73:13, 75:2,
75:16, 75:18,
76:1, 93:9,
93:14, 93:21
**meetings**
72:21, 73:4,
73:20, 76:4
**memory**
85:3
**mendieta**
3:21
**mentioned**
18:14, 40:13,
59:21
**met**
51:16, 73:11,
86:17, 93:11
**method**
51:11
**mga**
36:8
**michele**
34:18, 35:8
**michigan**
31:9

**might**
8:13, 41:5,
62:19
**mileage**
65:3
**million**
59:7, 63:6
**mini**
103:17
**minimum**
59:22, 60:8
**missing**
28:10, 28:11,
29:2
**mistake**
92:2
**mistakes**
100:5
**model**
26:8, 39:16,
39:17, 54:22,
55:9, 55:12,
57:2, 57:3
**models**
48:22, 49:8,
52:12, 54:17
**money**
50:14, 50:18
**months**
56:22, 57:5,
95:18
**moore**
25:15, 60:9,
61:10, 63:12,
67:16, 68:1
**more**
17:19, 21:3,
33:6, 51:7,
70:19, 71:1,
80:16
**morning**
6:2
**most**
46:12, 46:18,
62:3, 73:18
**mostly**
39:12
**move**
10:8, 28:7

**much**
28:10, 28:11,
33:5, 37:16,
54:19, 57:3,
103:11
**mutual**
1:9
**myself**
11:5, 15:9,
15:12, 15:22,
21:3, 33:22,
67:17, 82:3,
82:17, 83:2,
85:4

**N**

**name**
6:3, 6:22, 7:2,
12:5, 15:8,
34:21, 65:18,
86:14
**named**
44:16
**names**
86:13
**nature**
74:9
**nd**
42:4
**neal**
86:13, 92:17,
94:16
**necessarily**
20:20
**need**
43:7, 43:8,
43:11, 62:14,
87:2, 98:19
**neil**
55:17
**neither**
77:12, 104:12,
104:15
**never**
41:3, 86:11
**new**
2:11, 35:22,
36:17, 104:3

next
33:19, 34:13,
34:19, 72:16,
73:10, 73:17
nicole
70:18
nonsense
85:20
nope
48:4
normally
63:18
northeast
12:1
note
58:19, 68:7,
69:2, 69:7,
69:13, 69:19,
70:2, 70:8,
71:15, 95:17,
96:11, 96:17
notes
4:17, 22:17,
23:4, 24:2,
24:6, 25:4,
25:8, 25:12,
66:1, 66:5,
66:6, 68:18,
69:9, 70:20,
71:1, 71:14,
71:17, 71:20,
88:2, 101:1,
101:5
nothing
60:13
notice
2:9
number
4:7, 16:22,
17:2, 19:7,
39:6, 59:1,
66:12, 66:14,
67:21, 89:7,
89:8, 100:9
numbers
27:19, 38:5,
39:6, 57:16,
63:17, 63:19,

66:9

**O**

oath
76:8, 76:11,
76:15
object
5:8
objection
23:17, 24:10,
26:4, 26:14,
29:14, 33:15,
52:20, 53:7,
53:19, 60:2,
60:10, 75:20,
76:14, 78:4,
78:20, 79:6,
79:13, 80:2,
80:12, 81:2,
83:15, 85:9,
85:16, 86:4,
90:9, 91:14,
95:10, 96:8,
99:3, 99:14,
100:2
obtain
20:2, 20:13,
29:12, 31:16,
62:5
obtaining
32:14, 51:1
obviously
50:1, 52:13,
63:22, 90:12,
90:20
occasion
73:3
occasions
73:3
occur
22:14
occurred
22:7, 47:18,
48:4, 89:8
occurrence
20:7, 20:8
occurs
50:5

october
104:22
office
46:16, 73:10,
73:17
office-based
46:20
official
14:2, 84:10
oh
25:6
ohio
7:3
oldest
66:20
once
16:21, 33:2,
43:9
one
11:12, 26:16,
28:12, 35:2,
35:4, 35:6,
36:9, 45:13,
48:7, 49:15,
55:15, 58:19,
61:11, 64:9,
67:21, 74:7,
75:5, 77:12,
78:15, 79:11,
80:16, 81:13,
84:18, 87:4,
87:10, 90:15,
101:2, 102:20
ones
56:13, 66:20
only
70:22, 92:13
onsite
22:2, 25:17,
29:18, 47:21,
48:5, 48:10,
51:16
open
70:3, 70:5
opened
15:19
operations
84:7, 84:15

opinion
74:11, 81:9
opportunity
16:16, 35:22,
36:17, 77:5,
77:8
or's
9:22
order
50:11, 53:5,
53:16, 66:19
orders
103:16
original
83:22
originally
65:10
other
6:12, 12:9,
23:14, 25:6,
41:17, 44:11,
44:15, 47:15,
49:8, 56:13,
61:9, 80:11,
86:1, 86:6,
100:17, 100:19,
100:21, 101:2
ought
88:17
out
6:10, 9:11,
27:18, 29:18,
43:21, 46:22,
57:21, 64:2,
65:16, 73:9,
73:19, 76:3,
87:12, 88:17,
92:4, 92:11,
98:12, 98:20,
99:1
outlining
29:17, 37:14,
38:4, 91:18
over
6:8, 6:12,
10:8, 34:10,
61:11, 78:7
overall
12:12, 75:6,

79:11
**oversee**
46:12
**oversees**
47:3
**owed**
53:15, 60:9
**own**
54:22, 64:22,
65:2, 101:2
**owned**
65:6, 65:8,
71:13, 71:16
**owner**
47:10, 47:11,
65:18, 71:19,
71:21, 72:1,
74:17, 87:9,
87:14
**owners**
47:15
**ownership**
71:8, 71:11,
71:12

**P**

**pa**
69:21, 88:8,
94:15
**page**
4:7, 10:9,
10:10, 57:16,
67:12, 72:14
**pages**
1:21, 66:11,
72:12
**paid**
49:9, 50:7,
50:21, 50:22,
54:7, 54:21,
55:6, 59:20,
89:1, 89:16,
90:2, 90:6,
90:16, 90:21,
91:5, 91:12,
91:17, 91:21,
95:8, 96:2,
96:3, 96:4,

96:6, 96:17,
98:1, 98:5,
98:10, 98:11,
100:11
**paragraph**
61:21, 63:5,
89:6, 90:12,
91:9, 91:10
**part**
18:13, 21:16,
22:5, 28:4,
32:11, 38:15,
48:9, 49:7,
58:22, 85:18
**partial**
92:13, 98:4
**participated**
26:21
**participating**
25:14, 26:12,
28:16
**particular**
12:21, 13:2,
34:8, 64:16
**parties**
104:14
**party**
41:17
**passed**
59:11, 59:13
**paths**
78:8
**pawn**
86:1
**payable**
53:22, 54:1
**payment**
52:18, 53:4,
98:5
**payments**
99:2
**pays**
51:7
**peek**
72:13
**penalty**
5:7
**pending**
80:15, 80:16

**pennsylvania**
3:16
**penny**
55:5, 91:20
**penultimate**
61:21
**people**
11:10, 47:1,
73:18, 76:3,
78:9
**percent**
63:16, 63:17,
64:1
**perfect**
87:7
**period**
13:8, 15:18,
34:10, 35:7,
55:13, 88:7,
89:21, 90:1,
90:18, 91:5,
91:6
**periodically**
51:5
**perjury**
5:7
**personal**
86:15
**personally**
86:17
**physical**
39:11, 39:12,
54:18
**pick**
19:7
**picture**
34:5
**pifer**
30:19, 31:5,
31:10, 84:2,
84:4, 84:12,
84:14
**pifer's**
30:20, 84:5
**pike**
3:15
**place**
24:21, 27:12,

27:13, 55:8,
69:3, 76:2,
93:21, 104:10
**placed**
18:18, 83:9,
83:13
**plain**
7:3
**plaintiff**
5:12
**plaintiffs**
1:6, 3:2, 4:9,
4:15, 56:16,
57:17, 58:6,
58:9
**plan**
53:16, 60:1
**players**
13:7
**please**
5:3, 92:21,
94:20
**plymouth**
3:16
**point**
6:18, 11:8,
11:22, 14:6,
21:2, 23:6,
27:9, 41:5,
41:7, 43:22,
44:14, 45:13,
45:14, 45:16,
45:20, 47:22,
52:8, 52:16,
54:3, 54:18,
63:8, 64:6,
64:11, 69:4,
69:16, 79:20,
103:6
**policy**
50:16, 53:22,
85:19, 89:7,
89:8
**policyholder**
26:8, 49:19,
49:21, 51:1
**policyholder's**
27:14, 39:17,

49:1, 55:9,
55:12
**portion**
61:6, 91:18
**portions**
14:9, 49:21,
89:1
**position**
8:1, 8:2, 8:4,
9:14, 9:16,
10:18, 13:11,
30:20, 32:13,
54:6, 82:10,
83:17, 84:5
**possible**
28:8, 71:21,
75:9, 75:12
**potential**
37:8, 38:2,
49:2, 49:4, 94:4
**potentially**
33:22, 34:15,
35:2, 42:7,
61:13, 87:9
**pr**
17:1
**preceding**
55:14
**predominantly**
46:19
**preliminary**
4:12, 58:7,
58:15
**preparation**
100:16, 103:9
**prepare**
30:8
**present**
3:20
**presented**
38:18, 39:8,
55:10, 55:12
**presenting**
33:6
**president**
33:1, 34:8,
34:17
**presidents**
34:10, 34:15

**pretty**
54:19
**previously**
10:2, 18:14,
83:20
**primary**
46:10, 46:20
**prior**
8:8, 10:21,
14:11, 56:22,
57:5, 73:12,
75:3, 104:4
**probably**
11:22, 30:15,
31:1, 31:17,
35:6, 45:22,
54:15, 67:22,
80:16, 82:17,
87:19, 87:20,
87:21
**problem**
59:5
**problems**
77:19, 78:10
**procedure**
20:3, 20:9
**proceeding**
5:9, 103:21
**process**
65:15
**production**
4:10, 4:15,
56:16, 57:17,
58:6, 58:9
**projected**
53:1, 53:5
**projections**
60:5
**proper**
85:14
**property**
7:9, 7:10,
7:18, 7:19,
7:20, 11:14,
11:22, 14:5,
34:9, 45:15,
45:16, 45:20,
45:22, 46:2,

46:7, 46:11,
46:15, 46:17,
47:5, 47:8,
47:13, 48:1,
48:10, 48:13,
48:16, 48:18,
49:6, 49:16,
50:7, 50:14,
51:20, 51:22,
82:15, 84:6,
84:8, 84:14,
84:15
**proposed**
37:15, 38:5
**provided**
39:14, 41:3,
101:12
**provisions**
50:16
**public**
44:5, 44:7,
44:9, 44:16,
44:22, 88:11
**pull**
87:22, 94:22
**purpose**
18:8, 88:14
**purposes**
33:1
**pursuant**
2:9
**put**
21:8, 22:17,
23:4, 24:1,
29:22, 30:2,
30:9, 30:11,
31:14, 31:21,
42:3, 68:6,
69:1, 70:9,
72:12, 91:22,
96:17
**puts**
70:2
**putting**
69:12
**pwg**
1:7

**Q**

**question**
6:10, 18:21,

19:1, 37:3,
37:16, 38:16,
38:18, 39:10,
39:13, 40:20,
41:9, 41:14,
41:15, 41:16,
49:12, 51:4,
53:13, 65:15,
72:5, 76:19,
79:4, 79:19,
80:5, 81:8,
82:7, 96:14,
98:17, 99:17
**questions**
6:10, 103:12
**quick**
29:17, 88:1,
95:15, 102:20
**quickly**
14:16
**quote**
40:4, 64:18,
65:5, 71:19,
75:5, 95:21

**R**

**r-a-u**
34:18
**randy**
86:14, 95:22
**range**
39:6
**rather**
6:16
**rau**
34:18, 35:8
**re-inspections**
47:1
**reach**
53:6
**reaching**
27:20
**read**
22:3, 27:22,
28:6, 28:19,
40:8, 43:6,
62:13, 62:15,
62:18, 66:8,

66:18, 72:7,
87:3, 89:10,
101:2, 101:10,
103:13, 105:3
**reading**
43:9
**ready**
40:6, 41:21,
42:5
**real**
88:1, 95:14,
102:20
**realistically**
23:13
**really**
41:10, 81:17,
82:6, 90:14
**reason**
18:11, 22:12,
45:3, 64:18,
86:1, 96:16
**reasons**
49:15
**recall**
18:2, 18:3,
21:11, 21:14,
22:10, 24:8,
24:19, 27:7,
27:16, 29:6,
30:21, 31:12,
36:20, 38:3,
39:9, 42:10,
43:14, 45:6,
68:4, 68:19,
68:22, 73:5,
73:8, 73:13,
73:21, 74:8,
75:7, 75:10,
75:17, 75:18,
78:22, 80:8,
80:19, 81:5,
81:21, 100:13,
102:11
**received**
57:10, 57:12
**receiving**
29:6
**recent**
62:4

**recognize**
44:5, 66:3,
97:21, 98:4
**recollection**
10:17, 25:13,
26:2, 26:11,
26:20, 26:22,
76:7, 96:5
**recommended**
54:10
**recommending**
40:10
**record**
6:19, 92:14,
103:16
**recoverable**
50:11, 50:21,
50:22
**recross**
4:2
**recurs**
86:14, 86:15
**redacted**
70:9
**redirect**
4:2
**reduced**
95:22
**reel**
1:4, 8:5, 8:8,
8:15, 8:19,
10:15, 12:19,
13:12, 14:12,
14:21, 16:22,
20:22, 22:22,
23:16, 31:11,
32:4, 32:5,
32:14, 33:10,
35:14, 36:22,
41:1, 43:16,
47:9, 48:2,
48:14, 50:6,
55:19, 66:12,
66:13, 66:14,
66:15, 71:3,
74:1, 74:4,
79:18, 79:22,
80:9, 80:21,

80:22, 81:7,
83:5, 87:16,
89:12, 92:15,
97:11, 99:8,
99:10, 102:14,
102:18
**reels**
47:6
**reference**
25:19, 39:22,
49:2, 49:4
**referenced**
17:2, 22:13,
24:13, 26:17,
27:5, 48:7,
49:11, 51:14,
59:16
**references**
24:20, 70:19
**referencing**
69:13
**referred**
59:1, 61:11,
91:6
**referring**
12:6, 24:12,
24:15, 63:22,
64:3, 81:14
**refresh**
25:5, 25:13,
26:1, 26:11,
26:19, 96:5
**regard**
12:19, 13:12,
32:13, 33:19,
47:6, 69:5, 76:7
**regarding**
22:21, 55:19
**regular**
73:2, 103:17,
103:19
**related**
24:2, 43:16,
98:15
**relating**
24:15
**relationship**
9:9, 11:11,

13:20, 86:15
**relative**
104:13, 104:15
**release**
49:19, 51:1,
53:21
**releasing**
52:14
**rely**
99:11
**remember**
11:16, 16:12,
17:8, 22:9,
26:20, 27:4,
31:2, 32:7,
34:11, 35:11,
43:19, 44:18,
45:21, 68:15,
74:10, 76:1,
85:2, 101:4,
101:19, 102:8
**remembered**
25:21, 84:22
**remote**
1:15
**remotely**
2:1
**remove**
64:18
**removed**
64:13, 64:19,
65:11, 65:18,
71:6
**removing**
65:15
**reorg**
84:19
**reorganization**
11:3
**rep**
65:10, 71:16,
71:17
**repairs**
89:17
**repeat**
19:1, 80:4,
98:17
**rephrase**
38:9

| | | | |
|---|---|---|---|
| **replace** | **resolved** | 49:21, 50:1, | 80:21, 80:22, |
| 50:13 | 39:12, 74:6, | 50:3, 50:20, | 81:7, 83:5, |
| **replacement** | 74:13, 81:12 | 51:17, 52:4, | 87:16, 89:12, |
| 50:3, 50:13, | **resolving** | 52:5, 52:19, | 92:15, 97:11, |
| 50:18 | 51:11, 53:17 | 54:9, 57:5, | 99:8, 99:10, |
| **report** | **respect** | 57:14, 58:13, | 102:14, 102:18 |
| 15:7, 30:9, | 9:11 | 60:14, 63:3, | **room** |
| 31:22, 47:10, | **respond** | 63:5, 63:7, | 66:22 |
| 47:11, 47:12, | 76:22 | 63:13, 64:7, | **rough** |
| 83:14 | **responding** | 65:9, 66:11, | 27:19 |
| **reported** | 93:5 | 67:13, 67:19, | **round** |
| 1:22, 14:14, | **responds** | 67:20, 69:4, | 57:20 |
| 15:5, 21:2, | 63:1 | 69:22, 70:11, | **roundtable** |
| 34:9, 34:15, | **response** | 73:10, 73:17, | 18:9 |
| 34:17, 35:3, | 6:16, 32:12, | 74:22, 83:10, | **rules** |
| 39:1, 81:22, | 42:7, 42:14, | 83:21, 87:7, | 6:9 |
| 89:9 | 42:15, 42:19, | 87:9, 87:21, | **run** |
| **reporter** | 92:3 | 88:20, 89:19, | 64:15 |
| 2:10, 5:3, 5:5, | **restaurant** | 90:2, 90:5, | **runyon** |
| 103:15, 104:3 | 60:20 | 90:17, 93:4, | 3:13 |
| **reporting** | **restoration** | 93:15, 93:19, | |
| 11:13, 34:9, | 89:21, 90:19 | 94:1, 94:16, | **S** |
| 34:12, 45:14, | **retired** | 94:20, 95:1, | **said** |
| 45:15, 45:17, | 31:7, 31:8, | 95:19, 96:20, | 7:11, 15:14, |
| 77:3, 81:22 | 31:9 | 97:1, 97:3, | 38:16, 42:5, |
| **representation** | **returned** | 97:19, 102:13 | 54:18, 57:22, |
| 98:16, 100:10 | 94:14 | **risk** | 58:1, 61:1, |
| **representations** | **reverse** | 7:14 | 68:22, 75:4, |
| 94:3 | 66:18 | **rod** | 75:9, 78:1, |
| **representative** | **review** | 1:4, 8:5, 8:8, | 78:14, 78:18, |
| 27:15 | 25:2, 25:11, | 8:15, 8:19, | 79:5, 79:7, |
| **represented** | 26:10, 62:3, | 10:15, 12:19, | 79:14, 81:11, |
| 95:9 | 101:7, 102:21, | 13:12, 14:12, | 82:10, 84:22, |
| **represents** | 102:22, 103:3 | 14:21, 16:22, | 85:6, 90:15, |
| 44:10 | **reviewed** | 20:22, 22:22, | 98:9 |
| **request** | 14:9, 25:3, | 23:16, 31:11, | **same** |
| 37:2, 37:17, | 25:4, 25:6, | 32:4, 32:5, | 18:12, 42:20, |
| 39:3 | 25:8, 100:22, | 32:14, 33:10, | 59:1, 59:15, |
| **requested** | 101:3, 103:8 | 35:14, 36:22, | 71:20, 77:7, |
| 38:19, 38:21 | **right** | 41:1, 43:16, | 80:12, 92:17, |
| **require** | 9:4, 18:7, | 47:6, 47:9, | 103:18, 105:4 |
| 20:18 | 19:17, 19:19, | 48:2, 48:14, | **say** |
| **requires** | 19:22, 21:11, | 50:6, 55:19, | 6:2, 12:11, |
| 50:17 | 21:15, 22:12, | 66:12, 66:13, | 20:11, 33:11, |
| **reserved** | 28:16, 33:13, | 66:14, 66:15, | 37:19, 40:13, |
| 33:3 | 35:19, 36:1, | 71:3, 74:1, | 41:21, 44:12, |
| **resolve** | 40:10, 42:10, | 74:4, 79:18, | 46:2, 47:18, |
| 74:5 | 42:21, 45:12, | 79:22, 80:9, | 52:3, 57:21, |

64:4, 65:1,
68:13, 70:22,
74:14, 75:12,
75:14, 75:15,
87:13, 90:11,
90:21, 93:4,
98:22, 99:4,
99:7, 103:6
**saying**
41:10, 63:20,
70:3, 74:8,
75:7, 85:2,
90:7, 91:11,
92:20, 94:19,
96:17, 99:1
**says**
10:5, 22:1,
40:4, 58:19,
63:6, 63:15,
69:21, 72:17,
74:3, 75:4,
87:16, 87:17,
87:19, 87:20,
88:18, 89:5,
89:16, 89:20,
90:16, 90:18,
91:4, 93:8, 94:3
**schedule**
21:9, 21:13
**scott**
10:12, 11:11,
12:13, 12:14,
13:19, 14:17,
14:20, 17:16,
19:19, 21:19,
22:2, 22:6,
22:21, 23:15,
24:1, 24:22,
25:15, 26:13,
30:11, 31:14,
31:17, 33:13,
40:2, 47:22,
48:6, 51:15,
55:18, 56:1,
57:11, 62:9,
63:1, 64:14,
64:16, 65:8,
67:17, 68:3,

68:20, 69:15,
71:18, 74:11,
74:17, 77:16,
79:2, 81:6,
81:8, 81:9,
83:12, 83:18,
84:2, 84:11,
84:13, 93:10,
102:17
**screen**
21:16, 28:13,
28:15, 28:18,
32:11, 42:21,
54:13, 59:13,
71:22, 72:6,
72:13
**scroll**
32:12
**second**
10:9, 28:12,
34:20, 55:15,
63:5, 91:10,
102:20
**see**
10:4, 10:9,
10:13, 17:3,
21:20, 23:10,
23:11, 28:13,
28:22, 29:4,
30:6, 32:12,
55:20, 58:20,
59:3, 61:22,
62:11, 64:7,
67:6, 69:9,
70:13, 70:18,
71:8, 71:17,
86:20, 86:21,
88:1, 88:6,
89:14, 89:17,
90:2, 92:16,
92:19, 92:21,
94:7, 95:1,
95:4, 95:16,
97:8, 97:13,
98:2
**seeing**
28:14, 38:4,
100:13

**seek**
37:5, 37:9,
37:11, 41:19
**seeking**
27:8, 27:11,
27:16, 40:21,
41:11
**seems**
84:21, 86:20
**seen**
96:20, 96:22,
100:7
**send**
30:2, 99:22
**sending**
99:1
**sends**
88:17
**sense**
90:22, 91:6,
91:8, 91:18
**sent**
88:20, 98:8,
98:20
**sentence**
21:22, 24:17,
40:4, 42:3,
57:6, 89:5
**september**
1:16
**series**
6:9, 70:11,
71:17, 75:3
**service**
35:17
**services**
70:16
**set**
104:10
**settle**
19:7, 19:9,
19:11, 27:8,
37:6, 37:20,
39:4, 49:20,
85:19
**settled**
50:20, 79:22,
81:10

**settlement**
20:2, 27:17,
27:20, 29:12,
30:3, 31:16,
32:15, 32:16,
33:2, 33:5,
33:9, 33:19,
36:21, 37:6,
37:8, 37:10,
37:18, 37:20,
38:3, 38:7,
38:11, 38:14,
39:5, 39:6,
39:20, 40:17,
40:21, 41:4,
41:6, 41:8,
41:11, 41:19,
49:3, 49:5,
49:11, 49:14,
49:17, 49:18,
53:6, 74:15,
74:18, 74:21,
75:1, 80:21,
82:2, 93:13,
94:4, 94:9
**settling**
17:6, 51:6
**seven**
8:3
**several**
43:17, 64:3,
65:6, 81:16,
95:18
**shake**
6:17
**shape**
37:5
**shared**
60:14, 70:16
**sharing**
72:6
**sheet**
105:7
**sheraton**
73:11, 73:16
**sheri**
10:12, 40:2,
43:15, 45:12,

45:13, 61:12,
61:22, 62:10,
64:6, 65:2,
70:8, 70:17,
70:18, 70:21,
71:20, 71:21,
92:19, 94:14
**sheridan**
75:19, 76:2
**short**
55:13, 61:14
**shorthand**
88:10
**shortly**
22:7, 25:17,
55:9
**should**
49:9, 74:12,
99:10, 100:5
**shouldn't**
90:7
**show**
10:1, 55:15,
58:4, 65:21,
86:18, 87:10,
92:9, 97:1
**shrink**
43:7
**side**
44:11
**sign**
103:14
**signature**
87:13, 105:10
**signature-zrhbi**
104:18
**signed**
105:7
**significant**
60:21
**signs**
87:10
**silver**
3:4
**simpler**
37:16
**simply**
52:11, 64:20,

76:2
**since**
15:19, 41:17,
66:18, 102:12
**single**
20:9, 91:20
**sir**
6:21, 7:1,
17:4, 21:21,
27:22, 44:4,
44:13, 49:22,
50:4, 55:22,
72:9, 87:1,
92:22, 97:20,
101:11
**sit**
51:3, 53:13,
55:1, 65:20
**sized**
103:20
**small**
28:4
**smaller**
59:6, 62:14,
62:17
**some**
6:8, 6:17,
11:7, 11:9,
25:3, 27:11,
27:19, 37:20,
40:6, 50:22,
52:7, 52:18,
53:1, 61:1,
63:2, 66:22,
69:8, 77:18,
80:9, 86:1,
91:16, 96:16,
103:6, 103:12
**somebody**
41:22, 61:9
**someone**
20:16, 71:13
**something**
7:11, 43:12,
74:4, 75:13,
79:10, 81:1
**sometime**
15:18, 35:14,

65:12
**sometimes**
33:4, 51:6
**somewhere**
71:22
**sorry**
23:20, 36:2,
57:8, 80:4,
98:17, 103:2
**sort**
38:4
**sought**
21:8, 31:14,
38:7, 38:10,
38:13
**sounds**
18:22
**speak**
100:15, 101:15,
102:14, 102:18
**speaking**
102:11
**specific**
24:13, 24:19,
27:3, 38:5,
43:19, 51:3,
63:2, 80:15
**specifically**
27:4, 64:4,
68:22, 73:16,
75:22, 81:17,
98:21, 100:13
**speculate**
76:16
**spend**
50:14, 50:18
**spoke**
40:11, 102:6
**spoken**
70:12, 101:17
**spring**
16:13, 36:14
**squeeze**
28:5
**st**
28:1, 48:3,
68:21
**staff**
46:20

**stamp**
97:10
**stamped**
4:9, 4:14,
56:16, 58:9
**start**
66:10, 67:11
**starts**
61:21
**state**
1:8, 2:10,
6:22, 7:6, 9:2,
14:12, 16:6,
16:10, 17:22,
18:4, 25:16,
30:2, 31:11,
35:10, 35:21,
36:3, 36:13,
36:14, 36:16,
45:9, 46:3,
53:14, 53:20,
54:22, 56:2,
56:6, 59:20,
64:10, 70:16,
72:19, 73:1,
77:1, 77:20,
78:3, 82:10,
88:17, 91:12,
95:7, 98:1,
98:7, 98:22,
99:4, 99:12,
99:13, 100:10,
101:20, 102:3,
102:9, 102:11,
102:13, 102:17,
102:21, 103:3,
104:3
**stated**
38:6, 38:10
**statement**
38:12, 51:10,
81:13, 85:20
**states**
1:1
**status**
11:17, 68:4,
69:13, 88:8,
88:12, 88:13,

88:14, 88:15,
88:17, 88:21,
91:22, 94:13,
94:17, 98:16,
98:20, 99:21
**statuses**
99:17
**stay**
73:19, 76:3
**stenographically**
104:9
**steve**
30:19, 69:21,
84:4, 84:5,
84:12, 84:14
**steven**
25:15
**still**
15:5, 39:10,
67:6, 70:5,
71:2, 87:6
**stipulate**
5:4
**stipulation**
5:16, 104:6
**stipulations**
5:18, 5:19
**stop**
72:6
**street**
3:5
**strike**
12:10, 44:1,
51:20, 79:18
**string**
11:10
**subject**
17:2
**submission**
26:7, 37:14,
38:4, 40:7,
55:20, 62:4
**submitted**
37:13, 56:5,
58:16, 67:19,
89:7
**subsequent**
65:13

**suggest**
18:19
**suggested**
42:1, 51:13
**suggesting**
40:14, 40:16
**suggestion**
49:8, 52:13
**suite**
3:6, 3:14
**sum**
63:15
**supervised**
9:20, 11:1,
14:4, 15:2
**supervising**
9:13, 9:18,
9:19, 12:12
**supervision**
11:6
**supervisor**
11:5, 11:14,
11:20, 11:21,
14:4, 14:22,
30:14, 30:16,
30:17, 47:12,
47:13
**supervisors**
72:18, 72:20,
73:4
**supplied**
72:10
**support**
60:4, 60:8
**sure**
12:20, 18:21,
18:22, 28:9,
28:11, 29:2,
40:19, 43:9,
49:12, 61:2,
65:14, 66:13,
71:16, 71:18,
78:8, 81:8,
81:15, 86:16,
91:1, 91:3,
92:2, 92:13,
99:16
**surplus**
36:8

**swearing**
5:4
**system**
23:10, 32:17,
33:2, 65:19,
71:13

## T

**table**
44:11
**take**
11:9, 20:12,
21:12, 21:15,
27:21, 39:3,
45:18, 61:14,
65:21, 95:14
**taken**
43:1, 61:17,
72:6, 93:21,
104:9
**takes**
51:8
**taking**
5:20, 44:20
**talk**
14:13, 16:20,
19:5, 33:8,
62:2, 72:17,
95:2
**talked**
31:10, 61:15,
93:14, 102:10
**talking**
6:12, 9:3, 9:5,
16:21, 64:1,
64:5, 68:12,
94:10
**talks**
47:20, 67:15
**teach**
45:4, 45:7,
45:9, 75:6,
78:15, 79:12,
79:15, 80:10,
85:7, 85:14
**teaching**
85:17
**team**
7:17, 7:18,

7:19, 12:1,
14:5, 14:16,
15:1, 15:6,
31:18, 64:10,
64:14
**teams**
7:19, 13:17,
13:18, 31:19
**technical**
68:10
**technically**
52:15
**technician**
3:21, 56:18,
58:11, 66:2,
92:8, 97:5
**tell**
5:16, 12:17,
13:3, 13:10,
17:5, 18:7,
33:10, 34:14,
46:7, 54:7,
54:9, 54:14,
60:14, 69:6,
69:7, 70:20,
82:20, 87:15,
104:6
**telling**
45:6, 76:13,
80:20
**term**
49:13
**terra**
10:12, 11:11,
12:9, 12:13,
12:14, 14:17,
14:20, 21:19,
23:15, 24:1,
24:7, 25:15,
26:13, 30:11,
31:14, 31:17,
33:13, 40:2,
43:15, 47:22,
48:6, 51:15,
55:18, 56:1,
57:11, 62:9,
63:1, 64:14,
65:8, 67:17,

68:3, 68:20,
69:15, 71:18,
72:15, 73:7,
73:13, 73:22,
75:16, 76:13,
76:15, 81:6,
82:8, 83:12,
83:18, 93:10,
94:11, 101:18,
101:20, 102:17

**terra's**
13:19, 17:16,
19:19, 72:7,
72:14, 76:6,
76:21, 83:17,
84:11

**test**
59:11

**testified**
5:17, 76:8,
76:16

**testify**
76:10

**testimony**
5:6, 104:8,
105:4, 105:5

**text**
28:4, 28:6,
29:2

**th**
47:18, 92:20

**thank**
43:13, 57:19,
60:16, 67:7,
93:8, 103:11

**thing**
10:5, 28:17,
29:4, 43:7,
62:13, 70:22,
71:20, 91:21,
92:14

**things**
7:22, 31:21

**think**
16:12, 25:19,
35:4, 35:5,
43:19, 45:22,
51:3, 51:7,

51:9, 55:13,
61:12, 64:1,
68:9, 73:11,
74:11, 87:21,
95:15, 96:16,
101:1

**thinking**
88:4

**third**
35:2, 35:4,
35:6

**thomas**
3:3

**thought**
41:5, 57:7,
76:12

**three**
28:3, 34:10,
34:14, 59:12,
79:12, 79:15

**through**
15:5, 47:11,
58:6, 58:10,
66:19, 70:13,
71:14, 82:1,
86:7, 92:16

**thrown**
38:15

**thursday**
1:16

**time**
6:18, 10:18,
11:12, 13:9,
13:20, 14:5,
14:17, 14:19,
15:11, 15:18,
16:8, 21:2,
23:6, 27:9,
29:12, 30:13,
31:18, 32:21,
33:21, 34:3,
35:7, 39:13,
39:17, 39:18,
43:11, 44:1,
44:14, 45:16,
45:20, 47:18,
48:1, 48:3,
48:4, 48:9,

52:1, 52:2,
52:3, 52:4,
52:5, 52:6,
52:10, 52:12,
52:17, 54:3,
55:3, 55:13,
56:1, 61:3,
61:5, 63:21,
64:6, 64:13,
64:16, 65:6,
69:4, 71:15,
71:18, 73:10,
77:18, 79:20,
80:17, 81:19,
81:21, 82:9,
83:1, 84:17,
85:1, 88:7,
88:20, 89:3,
95:7, 101:17,
102:6, 102:10,
103:8, 104:10

**times**
46:21, 47:14,
47:15, 49:14,
64:21, 100:4

**title**
7:8, 8:2, 8:7,
8:9, 8:10,
10:20, 10:22,
11:4, 11:6,
14:3, 31:1,
32:21, 82:14,
84:10

**titles**
18:12, 31:2,
81:20

**today**
14:8, 16:2,
16:5, 25:1,
31:6, 35:8,
36:6, 100:16,
103:1, 103:5,
103:11

**told**
64:15, 76:8,
95:1, 96:1,
100:21

**tom**
5:18, 9:4,

28:8, 57:15,
66:8

**took**
14:18, 24:21,
27:12, 27:13,
55:8, 69:3

**top**
6:12

**touched**
61:22

**towards**
44:21, 93:20

**town**
73:19, 76:4

**transcript**
5:9, 72:8,
104:8

**transcription**
105:5

**transcripts**
101:10, 101:13

**transition**
15:10

**transitioned**
11:2

**trigger**
50:11

**true**
5:7, 55:7,
76:12, 104:8,
105:4

**truth**
5:16, 76:13,
76:20, 104:6

**try**
6:11, 9:11,
27:8, 53:5,
53:16, 59:5,
67:3, 87:5,
99:18

**trying**
28:21, 29:10,
84:11, 86:7

**two**
7:18, 9:21,
24:4, 35:5,
63:9, 84:19

**type**
13:16

**typically**
23:4, 31:19,
53:20, 65:16,
72:22
**typo**
90:14, 90:20
**typos**
90:12

**U**

**ultimately**
13:4, 13:6,
82:1, 82:5
**under**
5:7, 9:16,
16:15, 35:20,
53:22, 76:8,
76:11, 76:15,
77:1, 85:13,
87:13, 89:7
**underneath**
12:12, 12:13
**understand**
18:21, 18:22,
40:20, 50:1,
61:2, 63:20,
77:5
**understanding**
60:20, 91:9
**understood**
52:17, 52:22
**undisputed**
96:2, 97:22
**united**
1:1
**unless**
69:2
**unquote**
64:18, 65:5,
71:19
**untrue**
55:7
**unusual**
78:8
**use**
85:22
**using**
49:18, 61:13,

84:10
**usual**
5:18, 5:19
**utilize**
80:8, 85:14
**utilized**
18:4

**V**

**value**
50:2, 50:6,
50:7, 89:13,
89:17
**variance**
63:18
**various**
31:3
**vazquez-jaime**
1:22, 2:9,
104:2
**veahman**
10:11, 12:2,
12:10, 12:14,
13:21, 15:3,
18:15, 19:6,
20:4, 21:8,
21:18, 22:6,
22:13, 22:21,
23:7, 23:15,
24:1, 24:7,
24:16, 25:16,
26:13, 27:7,
28:1, 31:14,
32:3, 33:12,
33:18, 36:21,
38:6, 38:10,
40:2, 40:10,
41:10, 42:12,
42:18, 43:15,
48:6, 54:5,
62:11, 64:14,
65:9, 65:11,
67:13, 68:20,
69:5, 69:20,
70:2, 70:19,
71:5, 74:20,
77:7, 78:14,
83:3, 83:8,

83:14, 93:10,
94:11, 102:2,
102:7
**veahman's**
13:11, 17:6,
42:19, 47:19,
48:8, 51:15,
84:17
**verified**
5:10
**verify**
96:12
**vice**
32:22, 34:7,
34:10, 34:14,
34:17
**view**
52:8
**virginia**
3:7
**virtual**
16:7

**W**

**want**
29:3, 41:16,
45:3, 67:2,
92:13, 94:22
**wanted**
29:1, 29:21,
30:7, 30:11,
40:16, 45:7,
45:9, 75:6,
78:15, 79:12,
79:15, 80:8,
85:7
**wants**
20:11
**way**
5:9, 7:3, 8:13,
9:10, 11:19,
22:16, 28:5,
28:13, 37:5,
38:18, 60:13,
62:22, 77:19,
80:9, 92:10
**week**
95:3

**went**
35:16, 72:18,
87:12, 92:4
**weren't**
77:11
**whatever**
21:1
**whether**
21:7, 21:11,
27:7, 36:20,
58:13, 58:14,
71:10, 73:5,
76:13, 80:8,
80:10, 81:6,
82:3, 96:6, 98:7
**whoever**
34:9
**whole**
28:17, 29:4,
43:6, 62:13,
92:14
**william**
3:12
**withheld**
50:12
**withhold**
53:14
**within**
71:12, 99:12
**without**
40:6, 50:8,
64:2, 64:15
**witness**
4:2, 5:5, 5:6,
5:10, 5:15, 9:6,
23:18, 23:20,
24:12, 26:6,
26:16, 28:10,
28:17, 29:16,
33:16, 52:22,
53:9, 53:20,
59:12, 60:3,
60:11, 66:21,
67:4, 75:22,
76:15, 78:6,
78:22, 79:7,
79:14, 80:4,
80:13, 81:3,

85:10, 85:17,
86:5, 90:11,
91:16, 92:22,
95:11, 96:10,
97:14, 99:4,
99:16, 100:4
**work**
44:10, 50:9,
62:3, 62:6, 86:7
**worked**
33:3, 44:22,
102:2
**working**
36:7, 69:21,
101:20
**worse**
62:16
**worth**
51:8, 51:9,
66:17
**wouldn't**
21:4, 34:4,
68:6, 69:1,
74:18, 85:8,
85:10, 91:22,
96:19
**write**
90:7
**written**
96:7, 99:8,
99:11
**wrong**
33:16
**wrote**
42:17

| X |
| --- |

**xi**
104:21

| Y |
| --- |

**yeah**
20:9, 32:7,
59:4, 69:11,
85:2, 87:12,
87:21, 102:20
**year**
56:22

**years**
8:3, 34:11,
64:3, 78:7
**your's**
64:9
**yourself**
10:11, 12:9,
21:7, 21:18,
28:2, 40:1,
44:20, 62:9,
68:3

| $ |
| --- |

**$1.4**
63:6
**$71,639**
97:7
**$750,000**
17:15, 17:19,
20:13
**$800,000**
19:8, 20:3

| 0 |
| --- |

**00**
67:18
**000012**
4:16, 58:10
**000091**
4:16, 58:10
**000092**
4:11, 56:17
**000093**
4:11, 56:17
**00382**
104:21
**009**
59:8
**0198**
97:11, 97:12
**04**
1:17
**083485**
17:1
**09**
40:1, 42:4,
42:12, 42:18

| 1 |
| --- |

**1,456,009**
58:20, 59:17

**1.456**
59:7
**10**
1:17, 67:18,
70:3
**101**
3:6
**105**
1:21
**10621**
3:5
**11**
40:1, 42:4,
42:12, 42:18,
92:20
**12**
47:18, 55:18,
56:4, 58:6,
69:20, 70:8,
92:18, 103:21
**14**
92:18
**15**
91:7
**16**
69:20, 91:7
**17**
88:8, 92:7,
92:18, 93:2,
98:2, 98:6
**1720**
66:14
**1726**
66:12
**18**
70:3
**19**
4:8, 56:16
**19462**
3:16

| 2 |
| --- |

**2/8/15**
89:9
**2/8/2015**
20:8
**20**
1:7, 1:16,

**4:18, 20:6,**
47:17, 73:14,
88:8, 92:7,
92:18, 92:20,
93:2
**200**
87:16
**2015**
20:7, 89:22,
90:19
**2016**
11:15, 12:15,
12:18, 13:1,
14:11, 15:20,
16:21, 17:14,
18:1, 18:2,
18:5, 18:16,
18:20, 19:6,
20:5, 20:14,
20:22, 21:1,
21:19, 22:7,
22:22, 23:15,
24:17, 25:17,
27:9, 30:21,
33:10, 34:16,
40:1, 41:2,
42:11, 42:17,
43:16, 44:20,
45:19, 47:20,
48:8, 51:17,
52:4, 55:4,
55:18, 56:5,
58:17, 60:8,
60:19, 65:3,
65:13, 67:13,
68:21, 70:8,
72:16, 89:22,
90:20
**2017**
4:19, 18:5,
73:6, 73:14,
80:7, 82:21,
83:6, 87:8,
88:8, 92:7,
92:18, 93:2,
93:22, 95:17,
95:18, 95:19,
96:7, 100:8

**2022**
1:16, 4:8,
56:16, 72:15,
104:22
**2024**
104:20
**21**
21:19, 22:7,
24:17, 27:9,
28:1, 42:11,
47:20, 48:3,
48:8, 52:3
**22**
1:16, 11:15,
16:13, 39:22,
42:4, 42:17,
43:16, 45:19,
60:18, 65:13,
103:21
**22030**
3:7
**24**
10:2, 10:6,
10:9, 10:10,
21:17, 21:19,
32:11, 39:22,
42:12, 42:20,
43:3, 48:9,
61:20, 72:15
**243**
3:17
**26**
70:3, 95:22
**27**
70:8, 90:20
**28**
92:11, 92:12
**28.1**
4:18, 92:6,
92:10, 92:12

**3**

**30**
86:19, 86:21,
89:4, 91:10,
95:17, 95:18,
98:2, 98:6,
98:8, 100:9,

104:20
**31**
67:13, 68:21
**3388**
1:7
**3444**
10:15
**3445**
10:16
**350**
3:14
**3519**
92:16
**3521**
92:16
**38**
72:14

**4**

**459761**
1:20
**484**
3:17

**5**

**50**
92:20
**56**
4:8
**58**
4:12
**591**
3:8

**6**

**610**
3:15
**66**
4:17
**6666**
3:8
**6862**
3:17

**7**

**703**
3:8
**71,639**
97:19, 98:5

**750**
19:16, 19:20,
19:22
**750,000**
96:1

**8**

**8180**
7:3

**9**

**9**
21:19, 42:12,
42:20
**91**
58:6
**92**
4:18, 57:17
**93**
57:18
**97**
4:20