# EXHIBIT 27



# Transcript of Caroline Veahman

**Date:** October 19, 2022

**Case:** Rod & Reel, Inc., et al. -v- State Automobile Mutual Insurance Company

**Planet Depos**

**Phone:** 888-433-3767

**Fax:** 888-503-3767

**Email:** transcripts@planetdepos.com

**www.planetdepos.com**

## 1

```
1   IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MARYLAND
3
4   ROD & REEL, INC., et al.    *
5                               *
6        Plaintiffs,  *  Case No:
7            vs.      *  PWG 20-cv-3388
8   STATE AUTOMOBILE MUTUAL     *
9      INSURANCE COMPANY,       *
10                              *
11          Defendant.  *
12
13       Videotaped deposition of CAROLINE VEAHMAN,
14  conducted virtually.
15            Wednesday, October 19, 2022
16                 10:03 a.m.
17
18  Job No.:  467780
19  Pages 1 - 60
20  Reported by:  Danielle Krautkramer
21
22
```

## 2

```
1        Videotaped deposition of CAROLINE VEAHMAN,
2   conducted virtually.
3
4
5
6
7        Pursuant to agreement, before Danielle
8   Krautkramer, Court Reporter and Electronic Notary
9   Public in and for the Commonwealth of Virginia.
10
11
12
13
14
15
16
17
18
19
20
21
22
```

## 3

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4       C. THOMAS BROWN, ESQUIRE
5       SILVER & BROWN, PC
6       10621 Jones Street
7       Suite 101
8       Fairfax, Virginia 22030
9       (703) 591-6666
10
11
12
13  ON BEHALF OF THE WITNESS, CAROLINE VEAHMAN:
14      ROBERT REVERSKI, ESQUIRE
15      MIDKIFF, MUNCIE & ROSS
16      300 Arboretum Place
17      Suite 420
18      Richmond, Virginia  23236
19      (804) 560-9600
20
21
22
```

## 4

```
1         A P P E A R A N C E S (CONT'D)
2
3    ON BEHALF OF THE DEFENDANT:
4        MATTHEW MALAMUD, ESQUIRE
5        HORST, KREKSTEIN & RUNYON
6        610 W. Germantown Pike
7        Suite 350
8        Plymouth Meeting, Pennsylvania 19462
9        (484) 243-6878
10
11
12
13   ALSO PRESENT:  Rachel Carrick, A/V Technician
14               Gabriel Martin, Videographer
15
16
17
18
19
20
21
22
```

**Page 5**

C O N T E N T S

EXAMINATION OF CAROLINE VEAHMAN    PAGE

   By Mr. Brown     9

   By Mr. Malamud     53


E X H I B I T S

(Attached to the Transcript)

VEAHMAN DEPOSITION EXHIBIT    PAGE

Exhibit 1     Subpoena     12

Exhibit 2     Log notes     13

Exhibit 3     E-mails     22

Exhibit 4     Loss summary     24

Exhibit 5     E-mails     28

Exhibit 6     E-mails     29

Exhibit 7     E-mails     34

**Page 6**

P R O C E E D I N G S

MR. BROWN: Before we go on, we just have some laundry items that us attorneys have to deal with and this concerns a confidentiality order that was prepared circulating among counsel for Ms. Veahman, counsel for State Auto, and myself as counsel for the Plaintiffs in this case.

We agreed on the order. We've submitted that order. We fully expect Judge Grimm to enter that order. The question is that Ms. Veahman had requested that her testimony be considered as confidential. She just doesn't want information to get out, as I understand it, to her current employer.

And I have no problem if it makes the witness more comfortable. So, my position is I don't have a problem designating the deposition of Ms. Veahman as confidential under the order that we've submitted, but it's obviously going to take agreement of all counsel to do that.

So, I will pass the baton initially to Mr. Reverski and ask him since he represents Ms. Veahman.

**Page 7**

MR. REVERSKI: Thank you, Tom. And I appreciate both you and Matthew getting that entered -- or not entered, but filed this morning primarily at our request. And to the extent that I have the ability to designate this transcript confidential under that anticipated order, then I'm doing it here.

Separate and apart from that, we discussed just generally keeping this deposition confidential. And I believe both counsel has agreed by e-mail to do so. And Mr. Malamud has agreed generally with the caveat that he wants to first hear what is said.

We just, as Tom mentioned, want to make sure that this deposition transcript remains within the confines of this case, to be used as needed in the case, and nowhere else, not disseminated beyond what is needed for this case. We certainly don't want to see this showing up on YouTube or otherwise used for the reasons that Mr. Brown has already put on the record. So, with that understanding, we will move forward today.

MR. MALAMUD: Just for the record, as we get started, I think that counsel adequately represented

**Page 8**

my position, which is that to the extent that State Auto's consent is required to designate this deposition transcript as confidential, I don't foresee any issues with it. And, generally speaking, I have no problem with designating the deposition and the transcript as confidential.

I need to reserve expressly giving that consent until after I heard the testimony absent some kind of proffer as to the types of information that are going to be disclosed that's being asked to be kept confidential.

MR. BROWN: Okay. With that, I think we are ready to go on the videographer's record and swear the witness and get rolling.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Caroline Veahman in the matter of Rod & Reel, et al., versus State Automobile Mutual Insurance Company, in the United States District Court for the District of Maryland, Case Number, PWG 20-cv-3388. Today's date is October 19, 2022 and the time on the video monitor is now 10:10 a.m. Eastern Standard Time.

9

1    The videographer today is Gabriel Martin
2 representing Planet Depos. For the record, will
3 counsel please voice identify themselves and state
4 whom they represent?
5    MR. BROWN: C. Thomas Brown, I represent Rod
6 & Reel, Inc. and the other Plaintiffs in this case.
7    MR. MALAMUD: Matthew Malamud, I represent
8 State Auto, Defendant.
9    MR. REVERSKI: Robert Reverski, I represent
10 the deponent, Caroline Veahman.
11    THE VIDEOGRAPHER: Thank you. The court
12 reporter today is Danielle Krautkramer representing
13 Planet Depos. Would the reporter please swear in the
14 witness?
15    (Whereupon, the witness was sworn.)
16    CAROLINE VEAHMAN
17    having been duly sworn, testified as follows:
18 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19 BY MR. BROWN:
20    Q   Good morning, Ms. Veahman, my name is Tom
21 Brown, if you didn't pick that up already. I
22 represent the Plaintiffs in this case. Have you ever

10

1 been deposed before?
2    **A   Yes.**
3    Q   Okay. So, you know the basic rules. I'm
4 going to ask you a series of questions. Wait for me
5 to finish my question before you answer and then I
6 will ask you for a response to allow Ms. Krautkramer
7 to get your testimony on the record.
8    If you don't understand my question, let me
9 know, because if you answer, I will assume you
10 understood it. It just makes for a cleaner record,
11 okay?
12    **A   Yes.**
13    Q   If you could state your name and give me
14 your address, please?
15    **A   Caroline Veahman, 19 Pendleton Road, Granby,**
16 **Connecticut 06035.**
17    Q   Ms. Veahman, I'm going to initially just
18 show you right off the bat Exhibit Number 1, which is
19 a copy of a subpoena to testify at a deposition in a
20 civil action. Is it up on the screen, by the way?
21 Can you see that?
22    **A   Yes.**

11

1    Q   And then attached to that is the notice of
2 deposition itself, which is the notice of a remote
3 videotaped deposition of yourself. Do you see that,
4 Ms. Veahman?
5    **A   Yes, sir.**
6    Q   And you were served with a subpoena to
7 appear today, correct?
8    **A   Yes.**
9    Q   And in accordance with that subpoena, you
10 have appeared and we're going to ask you a series of
11 questions related to a case known as Rod & Reel. Are
12 you familiar with that case?
13    **A   I am.**
14    Q   Okay. And let me just sort of jump right
15 into it. Can you tell me who you're currently
16 employed with and then I'm going to ask you who your
17 prior employer was?
18    **A   I'm currently employed with Central Mutual**
19 **Insurance Company.**
20    Q   Okay. And before Central Mutual, who were
21 you employed by?
22    **A   State Auto Mutual Insurance Company.**

12

1    Q   Okay. And with State Auto Mutual Insurance
2 Company, what was your position?
3    **A   When I left, I was a large loss property**
4 **manager, slash, executive general adjuster.**
5    Q   And as an executive general adjuster and
6 large loss manager, what were your job duties, what
7 did you do?
8    **A   I handled and oversaw large loss claims for**
9 **the company.**
10    (Veahman Deposition Exhibit Number 1 was
11 marked for identification and attached to the
12 transcript.)
13 BY MR. BROWN:
14    Q   I am trying to get a document up, so bear
15 with me one second if you would. I'm going to show
16 you what we're going to mark as Exhibit Number 2 in
17 this case and ask if you have ever -- what's up on
18 the screen? Are there log notes up there?
19    **A   Yes.**
20    Q   Okay. Good. Now, I'm going to go back to
21 the beginning of these log notes so that we can read
22 them from the back forward. I'm going to scroll

13

1  through them.  I want you to take a look at them.
2  Just generally, I'm going to ask you what they are,
3  and then I'm going to ask you some questions about
4  several of the entries that are made in these log
5  notes, okay?
6      A  Okay.
7          MR. REVERSKI:  Tom, are you making this an
8  exhibit?
9          MR. BROWN:  I am.  I'm going to call this
10 Exhibit Number 2.
11         (Veahman Deposition Exhibit Number 2 was
12 marked for identification and attached to the
13 transcript.)
14 BY MR. BROWN:
15     Q  So, this is a series of log notes which are
16 paginated on the bottom that's page 1 through 17.
17 They are Rod & Reel 1416 through Rod & Reel 1432.
18 And I'm just going to ask you, Ms. Veahman, what are
19 these that we're looking at?  Can you describe what
20 they are?
21     A  The claim notes.
22     Q  Okay.  And what are claim notes?

14

1      A  They're file notes.
2      Q  And what goes in a file note and what's the
3  purpose of them?
4      A  The activity of the file handling from the
5  file handler at the time.
6      Q  Okay.  And if we go to the top of these log
7  notes, you can see at the very top up here, and it
8  may be a little small, but it has a claim number, a
9  policy number, and then it says Rod & Reel, Inc.,
10 date of loss, 2/8/2015, do you see that?
11     A  Yes.
12     Q  Okay.  Were you familiar with the Rod & Reel
13 claim and policy, which is depicted on the top of
14 Exhibit Number 2?
15     A  I'm familiar with it, yes.
16     Q  Okay.  And how were you familiar with that?
17     A  The file was reassigned to me in 2016.
18     Q  Okay.  And before it was assigned to you,
19 who was it assigned to?
20     A  That would have been Scott Terra.
21     Q  Okay.  And let me take you through a couple
22 of these log notes so that we can kind of track that.

15

1  And I'm going to initially take you to page 15 of
2  Exhibit Number 2, the log note dated 2/11/15 by Scott
3  Terra; do you see that?
4      A  Yes.
5      Q  And that log note says that this was -- a
6  loss was reassigned, large loss reassigned to him, he
7  accepted the assignment on 2/10/2015; do you see
8  that?
9      A  Yes.
10     Q  And you obviously took the assignment from
11 Mr. Terra after this date, right?
12     A  Correct.
13     Q  Okay.  Now, did you understand this to be a
14 fire loss?
15     A  Yes.
16     Q  And as a fire loss, the claim involved both
17 damage to property, damage to personal property, and
18 business interruption and extra expenses, correct?
19     A  Correct.
20     Q  What I want to focus on today is the
21 business interruption claim primarily, because that's
22 primarily what's related to this case.  There is a

16

1  log note from you dated 5/31/2016.  Do you see that
2  on page 8 of the log notes, Exhibit Number 2?
3      A  Yes.
4      Q  Okay.  So, you were, at least as of this
5  time, involved with the case, correct?
6      A  Yes.
7      Q  And this one talks about a conference call
8  with Eric and Christian from Meaden & Moore, Mark
9  Chenetski, Scott Terra, and yourself; do you see
10 that?
11     A  Yes.
12     Q  Okay.  Let's just bear it out.  Who are all
13 these different people?  Who is the Eric that is
14 referred to in this log note, if you know?
15     A  I believe it would have been Eric Rapp and
16 Christian Fox.
17     Q  Okay.  And Mr. Fox worked for a company
18 called Meaden & Moore?
19     A  Yes.
20     Q  And what's his primary function in
21 connection with this claim?
22     A  A forensic CPA.

**17**

1  Q  So, he dealt with the business interruption
2  claim, correct?
3  **A  Correct.**
4  Q  And he assisted State Auto and yourself and
5  Mr. Terra in trying to measure that loss, correct?
6  **A  Correct.**
7  Q  And in the case, there's a Scott Terra.
8  What was your relationship with Mr. Terra as it
9  relates to this file?
10 **A  In 2016, I would have been working within**
11 **the branch the entire year for 2016. We had a change**
12 **in leadership, and in 2016, I you would have been**
13 **working under Scott Terra in the Eastern regional**
14 **office.**
15 Q  Okay. So, at least the pecking order at
16 this point in time, it would have been you working
17 for Scott. And who would have been above Scott
18 Terra?
19 **A  Steve Piper.**
20 Q  And what would Mr. Piper's position have
21 been if you know?
22 **A  He would have been -- I think he was maybe**

**18**

1  **the cat and field director. I can't remember what**
2  **his title was at the time, but he was cat and field,**
3  **I believe.**
4  Q  And when you say cat, we are not talking
5  about the animal cat, we are talking about a
6  catastrophe adjuster, correct?
7  **A  Yes.**
8  Q  Mark Chenetski is identified on here as
9  well. Can you tell me what Mr. Chenetski's role was
10 with this case and where he is in the pecking order?
11 **A  Chenetski would have been, I believe at that**
12 **time, commercial property director or manager. I**
13 **don't remember what his title was in 2016. I believe**
14 **they were managers at the time.**
15 Q  Okay. And he would have been above
16 Mr. Piper and Mr. Terra and yourself?
17 **A  No. He would have been on the same platform**
18 **as Piper.**
19 Q  Okay. Now, just so we can get it all
20 straightened out, did you have settlement authority
21 in 2016 with regard to State Auto?
22 **A  Yes.**

**19**

1  Q  And what would your settlement authority
2  have been?
3  **A  I believe, at that time, it would have been**
4  **half a million dollars.**
5  Q  Okay. And did Mr. Terra have settlement
6  authority? And, if so, do you know how much it was?
7  **A  I believe I actually had more settlement**
8  **authority than Scott Terra at the time because he was**
9  **within the branch. I believe I had more settlement**
10 **authority at the time.**
11 Q  And when you say within the branch, can you
12 just sort of describe what you're talking about?
13 **A  The regional office, they had the adjuster,**
14 **the supervisor, and then they had a manager, and I**
15 **was more of a hybrid. They moved me from the cluster**
16 **of large loss adjusters and they put one large loss**
17 **adjuster into each branch. And, at that time, I**
18 **would have been a large loss adjuster within that**
19 **branch.**
20 Q  And this branch was the one that
21 geographically covered this claim?
22 **A  Yes, the Eastern regional office.**

**20**

1  Q  Okay. Now, let me just take a step back.
2  Have you ever heard of the term public adjuster?
3  **A  Yes.**
4  Q  Have you ever heard of the term or the
5  company called Goodman-Gable-Gould company?
6  **A  Yes.**
7  Q  Is it okay if we just call them the G's?
8  **A  Yes.**
9  Q  What was your understanding of what public
10 adjusters were in connection with claims?
11 **A  They were the chosen representative of the**
12 **policyholder.**
13 Q  So, the policyholder would have a public
14 adjuster representing them, the insurance company
15 would have general adjusters or field adjusters or
16 property adjusters representing their interests,
17 right?
18 **A  Correct.**
19     MR. MALAMUD: Objection to form. You can
20 answer.
21 BY MR. BROWN:
22 Q  Did your branch have a number of claims with

---

**21**

1  Goodman-Gable-Gould in or about 2016?

2  **A   I know I specifically had claims with the**
3  **three G's as well, but I mean I wasn't the only**
4  **adjuster that would've had claims with any public**
5  **adjuster.**

6  Q   At this time, how many claims did you have
7  with Goodman-Gable-Gould?

8  **A   Oh, I don't know how many I've had.  I have**
9  **handled several dozen in the course of my career with**
10 **the three G's, Adjusters International, Globe**
11 **Midwest.  I think they're all the same affiliates.**

12 Q   Okay.  Let's move forward a little bit.
13 There is a note down here dated 5/30/2017 from a
14 Sherri King.  Do you know who Sherri King is?

15 **A   Yes.**

16 Q   Can you tell me who she is and her role as
17 it connects to this case?

18 **A   In 2017, she would have been a claims**
19 **examiner.**

20 Q   Okay.  And what is a claims examiner?

21 **A   A claims examiner at that time would have**
22 **been somebody who had handled coverage and**

---

**22**

1  **litigation.**

2  Q   Okay.  And from your point of view, when you
3  were on this file working with Mr. Terra on the Rod &
4  Reel case, were there coverage issues involved?

5  **A   No.**

6  Q   Was it fair to say that what was involved
7  was loss measurement issues?

8  **A   Correct.**

9  Q   Let me show you what we will mark as
10 Exhibit 3, which was also marked as Terra Exhibit 7.

11      (Veahman Deposition Exhibit Number 3 was
12 marked for identification and attached to the
13 transcript.)

14 BY MR. BROWN:

15 Q   Can you see that up on the screen,
16 Ms. Veahman?

17 **A   Yes.**

18 Q   And this is an e-mail from a fellow named
19 Neal Charkatz to Scott Terra with a cc to Jeremy
20 Hogue and Christian Fox.  And if you would take a
21 second to review that.

22 **A   Okay.**

---

**23**

1  Q   Now, can you tell me who Neal Charkatz was?

2  **A   He would have been the public adjuster**
3  **assigned to Rod & Reel.**

4  Q   And I know who Christian Fox was.  He was
5  the forensic accountant working with State Auto,
6  right?

7  **A   Yes.**

8  Q   Jeremy Hogue, do you recognize him as the
9  forensic accountant working with GGG on the claim for
10 the insured?

11 **A   Yeah, I remember the last name.  Yeah, I do**
12 **remember him being the CPA on their side.**

13 Q   Okay.  Now, let me show you what I'm going
14 to mark as exhibit number -- in Exhibit Number 3, the
15 April 12, 2016 e-mail indicates, enclosed, please
16 find an insured's claim of a $1,456,009 for lost
17 income.  Do you see that?

18 **A   Yes.**

19 Q   And let me show you what we will mark as
20 Exhibit Number 4.  This is a little small, so let me
21 see if I can make it bigger.

22 **A   I can see it.**

---

**24**

1      (Veahman Deposition Exhibit Number 4 was
2  marked for identification and attached to the
3  transcript.)

4  BY MR. BROWN:

5  Q   Do you recognize this as the actual claim
6  that goes with the million four e-mail that we were
7  just looking at?

8  **A   Yes.**

9  Q   Okay.  And, up here, the insured was
10 claiming a preliminary loss through April of 2016, do
11 you see that?

12 **A   Yes.**

13 Q   Is it fair to say that there was an issue
14 related to how long the period of loss was with
15 regard to the business interruption claim on this
16 claim?

17 **A   I'm sorry, restate that question.**

18 Q   Let me restate it.  It was not artfully
19 crafted.  In order to determine a business
20 interruption loss, you have to determine how long to
21 run the loss, right?

22 **A   Yes.**

---

**25**

1    Q   They call it the period of restoration or
2 the period of renovation, whichever you want to call
3 it, but you need to determine how long the loss
4 occurs, right?
5    **A   Correct.**
6    Q   Do you recall that at or about the time you
7 were working on the case that State Auto was carrying
8 a 12-month period of restoration and that the insured
9 was carrying a 14-month period of restoration?
10    **A  I remember the period of restoration or the**
11 **actual loss sustained limitation was like 12 months.**
12 **I do remember that.**
13    Q   Okay.  It was 12 months from the point of
14 view of State Auto, correct?
15    **A   It would have been what was on the**
16 **declaration page.  It would have been 12 months**
17 **maximum, right?**
18    Q   We can pull the policy back up.  I'm not
19 really sure.  I think it was actually longer than 12
20 months on the policy, but the claim that was
21 submitted was a 14-month claim.  Do you recognize
22 that?

---

**26**

1    **A   I see that.**
2    Q   Okay.  So, did there come a time when you
3 and -- hang on one second while I mark this and put
4 it in.  Bear with me one second.
5         Did there come a time when you and Mr. Terra
6 met with Mr. Charkatz and the insured and Mr. Fox in
7 December of 2016 in an attempt to resolve the claim?
8    **A  I do remember having a meeting with them**
9 **before the end of 2016.  Whether it was in December,**
10 **I'm not quite sure, but there would have been**
11 **something in the file that I met with him on a**
12 **certain day.**
13    Q   Okay.  Let's look at a series of e-mails.
14 It might refresh your recollection as to when that
15 happened.  I'm going to show you a couple of e-mails.
16 I want to take you to what we marked as 3195.
17         Let me initially focus on the November 1,
18 2016 e-mail from Neal Charkatz to Scott Terra where
19 Mr. Charkatz says, Scott, it is the insured's intent
20 to meet to try to settle the loss between
21 Thanksgiving and Christmas.  We are revising our
22 evaluation and getting the requested data and hope to

---

**27**

1 have it to you in the next two weeks.
2         Please advise if all parties are available a
3 specific week.  I want to get this on the books
4 around everyone's holiday plans ASAP.  Did I read
5 that correctly?
6    **A   Yes.**
7    Q   Okay.  And the response e-mail that came
8 back from -- it doesn't look like there's a response
9 e-mail, but there's a second e-mail from Mr. Charkatz
10 once again to Scott Terra with a cc to Christian Fox,
11 Jeremy Hogue, and yourself, which says Scott, it's my
12 understanding that Jeremy has sent basically some
13 documents out to the insured.
14         Going to the second one, he says there are a
15 lot of schedules to coordinate on this claim.  For us
16 all to meet, we want to have a date and we want
17 everybody to settle and he gives a bunch of dates out
18 to all of you.  Do you see that?
19    **A   Yes.**
20    Q   Do you recall the setup e-mail -- that
21 you'all were trying to setup a meeting to try and get
22 this claim settled?

---

**28**

1    **A   Correct.**
2    Q   And in the very top e-mail on here, there's
3 an e-mail from yourself dated November 22nd to Neal
4 Charkatz where you say, hi, Neal, I'm available on
5 12/12/2016 in the morning.  I would have to be on a
6 flight that afternoon to another appointment on
7 12/13/16.  If that works, let me know.  Do you see
8 that e-mail?
9    **A   Yes, I do.**
10    Q   Do you recall actually going out and meeting
11 on 12/12/2016?
12    **A  I do remember meeting them.**
13         (Veahman Deposition Exhibit Number 5 was
14 marked for identification and attached to the
15 transcript.)
16 BY MR. BROWN:
17    Q   I'm going to show you an e-mail which has
18 also been dated Terra Number 10.  We will make this
19 Exhibit Number 6 in this deposition.  I'd ask you if
20 you can recognize this e-mail from Neal Charkatz to
21 yourself, cc'd to Mr. Terra, Meaden and Moore, and
22 Jeremy Hogue.

29

```
1      A   Okay.
2          (Veahman Deposition Exhibit Number 6 was
3   marked for identification and attached to the
4   transcript.)
5   BY MR. BROWN:
6      Q   Now, this e-mail is a confirmatory e-mail.
7   It looks like Mr. Charkatz is trying to make sure
8   everybody is on the same page to begin a meeting, but
9   in the third paragraph, it indicates, we look forward
10  to meeting with you Monday morning at the loss
11  location.  Do you recall meeting with Mr. Charkatz at
12  the loss location following this e-mail?
13     A   Yes.
14     Q   Okay.  What was the purpose that you recall
15  that this meeting was about?  Why were you having a
16  meeting?
17     A   On this particular one, I had never been to
18  the site before, because I wasn't the original
19  handling adjuster.  And the accountant, Christian
20  Fox, we brought him out so that he could see the lay
21  of the land as well, because it was -- it wasn't like
22  your typical gambling casino that you would see in
```

30

```
1   like Vegas or something like that.  It had a lot of
2   machines that I wasn't familiar with, so we were able
3   to walk through and see what portions of the business
4   was down and how Smokey Joe's fit into the scheme of
5   the -- or the setup of the business.
6      Q   Okay.  Do you recall discussing attempting
7   to settle the claim?
8      A   Yes.
9      Q   And let's talk about the different
10  components of the claim.  At this point in time, you
11  had a property component, that is, the building
12  damages in business personal property, right?
13     A   Yes.
14     Q   You also had a business interruption extra
15  expense component, correct?
16     A   Correct.
17     Q   Do you recall discussions with Mr. Charkatz
18  where he suggested attempting to reach what I think
19  he called a walk-away settlement, that is, where the
20  insured would take something less than replacement
21  costs, but more than actual cash value, that the
22  insured would pay something more than actual cash
```

31

```
1   value, but less than replacement costs to just settle
2   that component of the claim?
3      A   I do remember being approached about a
4   global settlement and I was open to that.
5      Q   And do you recall discussing trying to
6   resolve the business interruption claim as well?
7      A   Yes.
8      Q   Was there any discussion about if the
9   business interruption claim couldn't be resolved,
10  that the parties would then go to an appraisal to
11  resolve that component of the claim?
12     A   Yes.
13     Q   Tell me about that and tell me what the
14  thought process is from your point of view as a
15  participant in the meeting?
16     A   We were -- I think at the time, we had an
17  agreement on the building.  We had some recoverable
18  depreciation holdback on it.  And then we had
19  business income and it was growth trends that we had
20  a difference of opinion on.  And I can't remember
21  what the percentage numbers were, but, you know, like
22  between four and eight or between six and ten or
```

32

```
1   something like that.
2          And we were trying to identify what the
3   growth trends were and how that was affecting the
4   business income loss.  And that's why I had brought
5   Christian Fox with me as well so that we could run
6   what we used to call back of the napkin or quick
7   business income calculations.  And it was easier if I
8   had my accountant there and if the insured had their
9   accountant there as well.
10     Q   And you, in fact, did have your accountant
11  there and the insured, in fact, did have their
12  accountant there, correct?
13     A   Yes.
14     Q   Okay.  Now, do you recall how long this
15  meeting occurred, how long it took?
16     A   I want to say that it wouldn't have taken
17  very long.  I don't remember there being like more
18  than a couple of hours.  I remember it being pretty
19  quick.  And if those -- you know, this is six years
20  ago.  But in that e-mail, it did say -- I had another
21  appointment the next day, so I would say it probably
22  took a couple of hours.
```

**33**

1  Q  Okay.  Now, at this point in time, let's
2  focus on the business interruption claim, did you
3  walk away from this meeting with the thought process
4  of, I've got a number that I'd like to try to get
5  approval for to get the claim settled?
6  **A  Yes.**
7  Q  Do you know approximately what that number
8  was?
9  **A  I don't remember what the number was, but I**
10 **do remember producing, you know, like my write-up of**
11 **the meeting.  I do remember producing that to**
12 **Chenetski, Mark Chenetski, so that he could take a**
13 **look at it as well.**
14 Q  Okay.  And let me take a shot at that.  Hang
15 tight one second.  Let me show you what's been marked
16 as Exhibit Number Terra 6.  I'm going to call it
17 Exhibit Veahman 7 in this case.  Let's roll through
18 this a little bit.
19      In the middle of this -- this is a series of
20 e-mails and it is Rod & Reel 3444 through Rod & Reel
21 3447.  And in the middle of this is an e-mail written
22 by you to mark Chenetski with a cc to Scott Terra, do

**34**

1  you see that?
2  **A  Yes.**
3      (Veahman Deposition Exhibit Number 7 was
4  marked for identification and attached to the
5  transcript.)
6  BY MR. BROWN:
7  Q  There you go.  Now, do you recognize this as
8  an e-mail you wrote on or about December 21, 2016 and
9  sent to Mark Chenetski and cc'd to Scott Terra?
10 **A  Yes.**
11 Q  Okay.  This followed your meeting, right?
12 **A  Yes.**
13 Q  And this says, hi, Mark, this is the loss we
14 conferenced with Christian and Scott after our
15 on-site meeting with the insured.  Did I read that
16 correctly?
17 **A  Yes.**
18 Q  Now, let me ask you about that.  You had
19 your meeting and then you conferenced with Mark
20 Chenetski and it looks like Christian Fox and Scott
21 Terra following the meeting you had to try to get the
22 case settled, right?

**35**

1  **A  Yes.**
2  Q  In connection with that conference, did you
3  prepare any e-mails, any reports, or anything else?
4  **A  As soon as that conference call happened --**
5  **we had that on the way back to the airport, I**
6  **believe.**
7  Q  Okay.
8  **A  And then I would have had like a handwritten**
9  **note.  And it says on here, the attached table can be**
10 **used to show how much impact.  I would've had that**
11 **table -- I would've taken a picture of it and I**
12 **would've either texted or e-mailed that over to Mark**
13 **Chenetski.**
14 Q  Okay.  Now, where are you talking about an
15 attached table?
16 **A  In the second paragraph, in order to find**
17 **some common ground, the attached table can be used to**
18 **show how much impact each percentage of growth makes**
19 **to the potential income loss.**
20 Q  Now, I will note with the documents produced
21 to us, we didn't see an attached table, so I don't
22 know what it looks like, but you prepared an attached

**36**

1  table, right?
2  **A  Yes.**
3  Q  Can you tell me what it looked like, so I
4  know what I'm looking for and then I'm going to ask
5  Mr. Malamud to go back to his files to see if they
6  can find them.
7  **A  It would have been a growth rate of**
8  **30 percent to 37 percent.  It would have showed --**
9  **applying the 37 percent growth rate numbers would**
10 **have been X, 31, 32, like that, all the way through**
11 **to 37.  Now, I do know that the insured's accountant**
12 **was in the room whenever we were putting this table**
13 **together as well.**
14     MR. MALAMUD:  Tom, before you go further,
15 and while we're on the record, and to the extent that
16 it was potentially suggested that we haven't produced
17 something, I would like the record to reflect that
18 the header on this e-mail does not include any
19 reference to there being an attachment.  From there,
20 you can continue your questioning.
21 BY MR. BROWN:
22 Q  I guess he's got a fair point.  Ms. Veahman,

**37**

1  did you -- are you sure you sent this attachment to
2  Mr. Chenetski somewhere along the line?
3      A  Yes, I'm positive.
4      Q  Did you discuss the attachment with
5  Mr. Chenetski?
6      A  Yes.
7      Q  Okay.
8          MR. BROWN:  I would ask you to go back and
9  look for it.  I've looked for it.  I couldn't find it
10 in here.  Maybe it's there, maybe it's not, but, you
11 know, you go back and look, we will go back and look,
12 and we will go through it, but I looked for that
13 again today and wasn't able to find it.
14 BY MR. BROWN:
15     Q  At this point in time, in order to settle a
16 case for the numbers that you -- strike that.
17         Did you have a number in mind that you
18 suggested to Mr. Chenetski that you thought you
19 should try to get the case settled for?
20     A  I believe the 320 plus some of the RC
21 holdback on the building according to that e-mail.
22     Q  RC holdback, which would be replacement cost

**38**

1  holdback, correct?
2      A  Yes.  It's noted in the e-mail that you're
3  showing me right now.
4      Q  What is the 320, is that part of the
5  replacement cost or is that --
6      A  No.  That was the business income part of
7  it.  That was using the 34 percent growth rate.
8      Q  Okay.  Now, in order to resolve a case at
9  $320,000, what would you have to do at this point in
10 time?
11         MR. MALAMUD:  Objection to form.  You can
12 answer.
13         THE WITNESS:  What do you mean?
14 BY MR. BROWN:
15     Q  I mean, is there -- did you have to obtain
16 settlement authority from Mr. Chenetski, from
17 somebody else?  How would you have gone about trying
18 to get an offer on the table to the insured?
19     A  Well, I would have the conversation at this
20 time -- because it was a commercial loss, Mark
21 Chenetski was the commercial manager at the time.  I
22 would've -- my manager, Steve Piper, would have

**39**

1  deferred to Mark Chenetski and I would have --
2  because of the amount that we paid underneath -- of
3  the building, we would've had to take this to
4  something called a large loss committee.
5      Q  Okay.
6      A  And what we would've done was, I would've
7  had this conversation with Mark, like I'm having
8  right here, and he could've done one of two things.
9  One, he could've gone to his boss, which would have
10 been Jay Carlton at the time, and they could have
11 done just a one-off and given me the authority and
12 call it a day, or they would have said let's take
13 this to the large loss committee and then we would
14 have presented that in front of our V.P. of claims,
15 Paul Stachura, at the time.
16     Q  Let me take a step back and let's get things
17 in order here.  So, you had your meeting, you
18 prepared an attached chart, you got in the car, you
19 were going to the airport with Scott Terra, and you
20 made a call to Mark Chenetski, right?
21     A  Yes, and Christian Fox, he was in the car
22 too.

**40**

1      Q  And Christian Fox.  Can you tell me what
2  the -- what you discussed in that meeting, in that
3  call?
4      A  We discussed exactly what that e-mail states
5  and then I would have sent him a copy of my worksheet
6  and we would -- I would have e-mailed it or texted it
7  to him depending on how the Internet was working or
8  the cellular service for my cell phone at the time,
9  one or the other.  At that point, he said he needs to
10 think about it.
11     Q  Okay.  So, you were asking for settlement
12 authority at that point?
13     A  Yes.  Oh, absolutely.
14     Q  And he said I wanted to think about it?
15     A  Yes.  He said that he needs more
16 information.
17     Q  Now, let's go to the next e-mail in this
18 chain.  Your e-mail is dated December 21, 2016, and
19 the next e-mail is an e-mail from Mark Chenetski
20 dated December 22, 2016 back to you, do you see that
21 e-mail?
22     A  Yes.

**41**

1    Q  Okay.  And this is an e-mail that responds
2 back following your telephone call with him and then
3 this e-mail that you sent to him, right?
4    A  Correct.
5    Q  Take a second to read that e-mail.
6    A  Okay.
7    Q  Okay.  Now, I want to take this e-mail from
8 the bottom up.  So, Mr. Chenetski tells you, Number
9 1, he's comfortable with the way the claim has been
10 handled to date, right?
11    A  Yes.
12    Q  He then says, I'm not ready to compromise
13 this claim without some additional analysis of Rod &
14 Reel's business interruption submission, correct?
15    A  Yes.
16    Q  Okay.  Clearly he is talking about a
17 compromise, that's because you had just previously
18 said, I want to compromise in X number, correct?
19      MR. MALAMUD:  Objection to form.  You can
20 answer.
21      THE WITNESS:  Yes.
22 BY MR. BROWN:

**42**

1    Q  You had suggested that you wanted to settle
2 the claim, right?
3    A  I did.
4    Q  Okay.  Did you have a call with
5 Mr. Chenetski following this e-mail to discuss with
6 him what he was talking about, why he thought he
7 needed somebody else to look at the claim?
8    A  Yes, we had a conversation after I received
9 this e-mail.
10    Q  Okay.  And can you tell me what that
11 conversation was?
12    A  I called Mark and I said, you owe me more of
13 an explanation as to why you're taking this file and
14 giving it to an examiner.  This has nothing to do
15 with coverage.  I would like to get it resolved.
16    Q  You say the claims examiner.  Let's go to
17 the ultimate paragraph, the one I have highlighted
18 here.  It says, I've touched base with Sherri,
19 Christian, and Bill and discussed finding another
20 expert, do you see that?
21    A  Yes.
22    Q  And Sherri would be who?

**43**

1    A  Sherri King, the examiner.
2    Q  And she basically would be a person who
3 deals with coverage issues?
4    A  Coverage and litigation.
5      MR. MALAMUD:  Objection to form.  You can
6 answer.
7 BY MR. BROWN:
8    Q  Christian is Christian Fox, right?
9    A  Correct.
10    Q  And Bill, is that Mr. Krekstein?
11    A  I'm assuming.  I never talked to Bill about
12 this claim.
13    Q  Okay.  Very good.  When you had your call
14 with Mr. Chenetski, and you said, why are you
15 bringing the claims examiner, what did he tell you?
16    A  He told me that this claim was bigger or the
17 issues surrounding this claim was bigger than just my
18 loss.
19    Q  What did you take that to mean?
20    A  I asked him what he meant by that and he
21 said that there were other claims with similar issues
22 that they can leverage against trying to get this

**44**

1 claim resolved with the other ones.
2    Q  When he said other claims, you mean other
3 claims by this insured?  Did he explain to you what
4 he was talking about?
5    A  Other claims within the region.
6    Q  Other claims presented by who?
7    A  Other claims presented by the three G's.
8    Q  Goodman-Gable-Gould?
9    A  Yes.
10    Q  All right.  So, he was expressing to you
11 that he wanted to leverage this claim in order to
12 resolve other claims in which GGG was representing
13 other insureds?
14    A  He explained to me that this claim was
15 bigger than -- the issue was bigger than this claim
16 and that there were other claims that they could use
17 to leverage their claims against, try to get them
18 resolved.
19    Q  Is it fair to say he wanted to use this
20 insured's claim as a pawn in dealing with other
21 claims of Goodman-Gable-Gould?
22      MR. MALAMUD:  Objection to form.

45

1      THE WITNESS:  That's a question for
2  Chenetski.
3  BY MR. BROWN:
4      Q   Did you ask him what he meant by that or why
5  he was taking that position?
6      A   I did not, because he said it in a manner
7  that made me understand that it was going to -- it
8  was going to go the direction he was taking it and I
9  asked to be removed from the claim completely.
10      Q   Okay.  Why did you ask to be removed from
11  the claim at that point?
12      A   Because I felt that I had a direction on the
13  claim that didn't involve any coverage or litigation
14  and I felt that I could resolve the claim directly
15  without any examiner or attorney involvement.
16      Q   Did you have concerns that Rod & Reel, the
17  insured, was not being treated with good faith at
18  that point in time?
19      MR. MALAMUD:  Objection to form.
20      THE WITNESS:  I handled the claim in good
21  faith with Rod & Reel.
22  BY MR. BROWN:

46

1      Q   I'm not talking about your handling of the
2  claim.  I'm talking about from that point forward
3  after Mr. Chenetski told you it's bigger than this
4  claim, he wants to leverage this claim with other
5  claims being submitted by Goodman-Gable-Gould.
6      Did you have concerns that the insured was
7  not going to be treated with good faith going
8  forward?
9      MR. MALAMUD:  Objection to form.
10      THE WITNESS:  He was my manager and it was
11  his decision to take the claim away from me.  I
12  didn't have a recourse to get it back, so I left it
13  at that point.
14  BY MR. BROWN:
15      Q   You asked to be removed?
16      A   Yes.  I didn't have any need to be involved
17  anymore if they were going to take it with Sherri
18  King as the examiner.
19      Q   Now, you will notice your e-mail is
20  December 22 at 11:09 a.m., do you see that?
21      A   Yes.
22      Q   And then there's an e-mail above that from

47

1  Scott Terra to Mark Chenetski dated the same day, but
2  it's a little bit later, it's at 12:05 p.m., do you
3  see that?
4      A   Yes.
5      Q   Okay.  And, on this one, he sends a number
6  of attachments it looks like, but I'm not sure what
7  those attachments are, but it doesn't really matter.
8  If you can take a second to read this e-mail.
9      A   Yes.
10      Q   Now, after you had your conversation with
11  Mr. Chenetski -- after you sent your e-mail -- and I
12  want to go back to that.  After Mr. Chenetski sent
13  his e-mail to you, how long was it before you had a
14  conversation with him?
15      A   Immediately afterwards.
16      Q   Okay.  It was before this e-mail from
17  Mr. Terra?
18      A   I don't remember reading Scott Terra's
19  e-mail prior to me having a conversation with Mark
20  Chenetski.
21      Q   Did you have a conversation with Mr. Terra
22  following your conversation with Mr. Chenetski?

48

1      A   Yes.
2      Q   Can you tell me about that conversation?
3      A   It was just -- you know, I could have gotten
4  it resolved.  It should have stayed with me, but they
5  were going in a different direction.
6      Q   Did you explain what direction they were
7  going in?
8      A   No.  That conversation with Scott Terra at
9  the time, no.
10      Q   Was Scott Terra surprised?
11      A   Well, I assume so, given the e-mail that he
12  wrote.
13      MR. MALAMUD:  Objection to form.
14  BY MR. BROWN:
15      Q   Following this, have you had any
16  conversations with anybody -- strike that.
17      At the time you had your conversation, you
18  were working with State Auto, right?
19      A   Yes.
20      Q   Scott Terra was working with State Auto,
21  correct?
22      A   Yes.

49

1    Q    And Mark Chenetski was working with State
2  Auto, right?
3    **A    Yes.**
4    Q    You asked to be removed from the file on
5  December 22, 2016, correct?
6    **A    Yes.**
7    Q    And you were removed, right?
8    **A    Yes.  There was no reason for me to remain**
9  **involved since it was going to an examiner.**
10   Q    What's the difference between an examiner
11 and your position as a claims adjuster?
12   **A    Mark Chenetski would be better suited to**
13 **answer that question other than the fact that he**
14 **elected to give it back to Sherri or give it to**
15 **Sherri King to explore whatever they did after the**
16 **claim was pulled from me.**
17   Q    Okay.  Did you have any other conversations
18 with Mr. Chenetski or anybody else at State Auto
19 related to Goodman-Gable-Gould following this
20 December 22, 2016 e-mail?
21   **A    As it relates to this claim or any claim in**
22 **general, because I had other claims that were with**

50

1  **Goodman-Gable-Gould that were moving along smoothly.**
2  **This particular one, I wouldn't have had any more**
3  **direct involvement with the loss.**
4    Q    Okay.  So, you had no other conversations
5  related to the use of this claim in connection with
6  other claims presented by Goodman-Gable-Gould
7  following the December 22nd e-mail?
8       MR. MALAMUD:  Objection to form.
9       THE WITNESS:  The conversation we had was
10 after he sent the e-mail that he was going to work
11 with the examiner and an attorney.
12 BY MR. BROWN:
13   Q    Did you ask him why he was doing that?
14   **A    He wanted to go in a different direction.**
15 **He was very clear he wanted to go in a different**
16 **direction.**
17   Q    Okay.
18   **A    I do remember him saying that he did not**
19 **feel that Christian Fox had a lot of gaming**
20 **experience in his forensics CPA role.  I know that**
21 **they were looking at bringing somebody else in that**
22 **could run the numbers based on whatever gaming**

51

1  **placement, strategic placement of machines.  I**
2  **remember him wanting to go through that, but he**
3  **specifically made it clear to me that the claim was**
4  **bigger than this issue.**
5    Q    Did you have other problems with
6  Goodman-Gable-Gould presenting claims while working
7  at State Auto following this?
8    **A    No, I think -- I've actually had a very good**
9  **track record with Goodman-Gable-Gould.**
10   Q    Was there something about this -- strike
11 that.  In your dealings with Goodman-Gable-Gould with
12 regard to this claim, did you see anything that was
13 presented that was untoward, anything that you
14 thought was out of bounds?
15      MR. MALAMUD:  Objection to form.  You can
16 answer.
17 BY MR. BROWN:
18   Q    -- presented by Goodman-Gable-Gould?
19      MR. MALAMUD:  Objection to form.  You can
20 answer.
21      THE WITNESS:  No, I typically always handled
22 claims with public adjusters because of the

52

1  complexity of the claims that I had and the large
2  amount.  I don't remember singling out
3  Goodman-Gable-Gould as being a difficult public
4  adjusting firm to work with.
5  BY MR. BROWN:
6    Q    Now, you left State Auto at some point,
7  correct?
8    **A    Yes.**
9    Q    Did you leave on good terms?
10   **A    I did.  I left in October of 2020.**
11   Q    Okay.  And you left on your own accord?
12   **A    Yes.**
13   Q    You weren't asked to leave or anything by
14 State Auto, correct?
15   **A    I was not.  In fact, I was offered more**
16 **money and a change in title if I wanted.  They didn't**
17 **want me to leave.**
18   Q    And why did you leave?
19   **A    I had a better opportunity at a new company.**
20      MR. BROWN:  That's all I have, Ms. Veahman.
21 Thank you very much.
22      THE WITNESS:  Thank you.

**53**

1      MR. MALAMUD:  Ms. Veahman, I'm going to have
2  a couple questions for you.  Why don't we take a
3  five-minute break so I can just get my thoughts in
4  order and we can move through this as quickly as
5  possible, if that's okay with everyone.
6      THE WITNESS:  Okay.
7      THE VIDEOGRAPHER:  Going off the record at
8  11:03 a.m.
9      (A brief recess was taken.)
10      THE VIDEOGRAPHER:  We are back on the record
11 at 11:10 a.m.
12 EXAMINATION BY COUNSEL FOR THE DEFENDANT
13 BY MR. MALAMUD:
14     Q  Good morning, Mr. Veahman.  I don't think we
15 formally met.  My name is Matt Malamud.  I represent
16 State Auto in this litigation.  How are you?
17     A  I'm doing well.  Thank you.
18     Q  Ms. Veahman, in preparing for today's
19 deposition, did you review any documents?
20     A  No, I did not.
21     Q  Prior to today's deposition, have you ever
22 had any discussions with Attorney Brown?

**54**

1      A  I did.
2      Q  Can you tell me how many discussions you
3  had?
4      A  Two.
5      Q  And can you tell me what was discussed
6  during those discussions?
7      A  The first one was he wanted to issue a
8  subpoena for my deposition and I had said -- I
9  believe I said that was fine.  I think he asked me if
10 I remembered something about the claim, and I said, I
11 remember Rod & Reel, but the specifics of it, I don't
12 remember going through anything with him on that.
13      And then on the second one, he had reached
14 out to me about noticing me for my deposition.  I
15 explained that I did ask State Auto to provide me
16 with counsel.  If Bill Krekstein's office was not
17 going to represent me, I wanted to have my own
18 separate counsel to be present.  And I had said that
19 I was waiting for that.
20      And then I believe shortly after I had that
21 conversation with Mr. Brown, I received an e-mail to
22 Bill Krekstein from Tom Brown wanting to notice my

**55**

1  deposition and that -- again, I said I was waiting
2  for counsel, I believe, which would be Mr. Reverski.
3      Q  At any point during those conversations, did
4  you discuss the substance of your testimony today
5  with Mr. Brown?
6      A  I did not.
7      Q  Okay.  Aside from Mr. Brown, have you had
8  any conversations with anyone else from Mr. Brown's
9  office?
10     A  No.
11     Q  Okay.  Prior to your deposition today, did
12 you have any discussions with Scott Terra regarding
13 the deposition specifically?
14     A  I asked him if he had counsel at his
15 deposition and he said no.  I asked him why he didn't
16 have one and he said that he thought -- you know, he
17 thought he was going to be given one, but he was not.
18     Q  Did you have any other discussions with
19 Mr. Terra regarding your deposition?
20     A  That I was giving a deposition today?
21     Q  Yes.
22     A  I explained to my employer that I was having

**56**

1  my deposition taken today.
2      Q  Did you have any discussions with Scott
3  Terra regarding the subject matter of your testimony
4  today?
5      A  No.
6      Q  Did you ask Mr. Terra at all about what he
7  testified to during his deposition?
8      A  No.  I asked him about how it went without
9  him being represented by counsel.  I was concerned
10 about that.  Being a former employee in good standing
11 with the company not being provided with counsel was
12 shocking for me.
13     Q  Did Mr. Terra tell you anything about what
14 he testified to or what testimony he provided?
15     A  No.
16     Q  Prior to today, did you have -- and after
17 leaving State Auto, have you had any discussions with
18 Neal Charkatz regarding this claim?
19     A  No.
20     Q  After leaving State Auto and prior to today,
21 have you had any discussions with Wesley Donovan
22 regarding this claim?

57

1    A  I do not know who Wesley Donovan is.
2    Q  Okay.  And after leaving State Auto and
3 prior to today's deposition, have you had any
4 discussions with any other representative of Rod &
5 Reel regarding the claim?
6    A  No.
7    Q  Towards the conclusion of your testimony
8 with Mr. Brown, you were shown an e-mail from
9 Mr. Chenetski referring to getting a set of fresh
10 eyes on the claim; do you recall that?
11    A  I remember him showing me an e-mail from
12 Chenetski, yes.
13    Q  And I believe that it was your testimony
14 that after receiving that e-mail, you called Mr.
15 Chenetski?
16    A  Yes.
17    Q  Okay.  While you were employed with State
18 Auto, did you have a company issued cell phone?
19    A  I did.
20    Q  Okay.  And is that the cell phone that you
21 called Mr. Chenetski on?
22    A  It would have been.

58

1       MR. MALAMUD:  Okay.  Ms. Veahman, I have no
2 further questions.  Thank you very much for your time
3 today.
4       MR. BROWN:  I have no further questions
5 based on that.
6       MR. REVERSKI:  We will read.
7       THE VIDEOGRAPHER:  We are going off the
8 record at 11:16 a.m.  This is the end of the
9 deposition of Caroline Veahman.
10       THE COURT REPORTER:  Do you want a copy of
11 the transcript?
12       MR. BROWN:  I want a copy of the transcript
13 right now, just a mini is fine.
14       MR. MALAMUD:  A mini is fine.
15       MR. REVERSKI:  I will just have the read and
16 sign copy.
17         (Signature having not been waived, the
18 deposition of CAROLINE VEAHMAN was concluded at 11:16
19 a.m.)
20
21
22

59

1          * * *
2       ACKNOWLEDGMENT OF DEPONENT
3       I, CAROLINE VEAHMAN, do hereby acknowledge
4 that I have read and examined the foregoing
5 testimony, and the same is a true, correct and
6 complete transcription of the testimony given by me
7 and any corrections appear on the attached Errata
8 sheet signed by me.
9
10
11 _____      _____
12    (DATE)              (SIGNATURE)
13
14
15
16
17
18
19
20
21
22

60

1 CERTIFICATE OF SHORTHAND REPORTER/ELECTRONIC NOTARY
2 PUBLIC
3       I, Danielle Krautkramer, Court Reporter,
4 the officer before whom the foregoing proceedings
5 were taken, do hereby certify that the foregoing
6 transcript is a true and correct record of the
7 proceedings; that said proceedings were taken by me
8 stenographically and thereafter reduced to
9 typewriting under my supervision; that reading and
10 signing was requested; and that I am neither counsel
11 for, related to, nor employed by any of the parties
12 to this case and have no interest, financial or
13 otherwise, in its outcome.
14       IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 1st day of
16 November 2022.
17 Notary Registration Number:  103807
18 My Commission Expires:  August 31, 2024
19
20 Danielle Krautkramer
21 ELECTRONIC NOTARY PUBLIC IN AND FOR
22 THE COMMONWEALTH OF VIRGINIA

**A**

**ability**
7:5
**able**
30:2, 37:13
**about**
13:3, 16:7,
18:5, 19:12,
21:1, 25:6,
29:15, 30:9,
31:3, 31:8,
31:13, 34:8,
34:18, 35:14,
38:17, 40:10,
40:14, 41:16,
42:6, 43:11,
44:4, 46:1,
46:2, 48:2,
51:10, 54:10,
54:14, 56:6,
56:8, 56:10,
56:13
**above**
17:17, 18:15,
46:22
**absent**
8:8
**absolutely**
40:13
**accepted**
15:7
**accord**
52:11
**accordance**
11:9
**according**
37:21
**accountant**
23:5, 23:9,
29:19, 32:8,
32:9, 32:10,
32:12, 36:11
**acknowledge**
59:3
**acknowledgment**
59:2
**action**
10:20

**activity**
14:4
**actual**
24:5, 25:11,
30:21, 30:22
**actually**
19:7, 25:19,
28:10, 51:8
**additional**
41:13
**address**
10:14
**adequately**
7:22
**adjuster**
12:4, 12:5,
18:6, 19:13,
19:17, 19:18,
20:2, 20:14,
21:4, 21:5,
23:2, 29:19,
49:11
**adjusters**
19:16, 20:10,
20:15, 20:16,
21:10, 51:22
**adjusting**
52:4
**advise**
27:2
**affecting**
32:3
**affiliates**
21:11
**affixed**
60:15
**after**
8:8, 15:11,
34:14, 42:8,
46:3, 47:10,
47:11, 47:12,
49:15, 50:10,
54:20, 56:16,
56:20, 57:2,
57:14
**afternoon**
28:6
**afterwards**
47:15

**again**
27:10, 37:13,
55:1
**against**
43:22, 44:17
**ago**
32:20
**agreed**
6:8, 7:9, 7:10
**agreement**
2:7, 6:18,
31:17
**airport**
35:5, 39:19
**al**
1:4, 8:17
**all**
6:19, 16:12,
18:19, 21:11,
27:2, 27:16,
27:18, 36:10,
44:10, 52:20,
56:6
**allow**
10:6
**along**
37:2, 50:1
**already**
7:18, 9:21
**also**
4:13, 22:10,
28:18, 30:14
**always**
51:21
**among**
6:5
**amount**
39:2, 52:2
**analysis**
41:13
**animal**
18:5
**another**
28:6, 32:20,
42:19
**answer**
10:5, 10:9,
20:20, 38:12,

**41:20, 43:6,**
49:13, 51:16,
51:20
**anticipated**
7:6
**any**
8:4, 21:4,
31:8, 35:3,
36:18, 45:13,
45:15, 46:16,
48:15, 49:17,
49:21, 50:2,
53:19, 53:22,
55:3, 55:8,
55:12, 55:18,
56:2, 56:17,
56:21, 57:3,
57:4, 59:7,
60:11
**anybody**
48:16, 49:18
**anymore**
46:17
**anyone**
55:8
**anything**
35:3, 51:12,
51:13, 52:13,
54:12, 56:13
**apart**
7:7
**appear**
11:7, 59:7
**appeared**
11:10
**applying**
36:9
**appointment**
28:6, 32:21
**appraisal**
31:10
**appreciate**
7:2
**approached**
31:3
**approval**
33:5
**approximately**
33:7

**april**
23:15, 24:10
**arboretum**
3:16
**around**
27:4
**artfully**
24:18
**asap**
27:4
**aside**
55:7
**asked**
8:10, 43:20,
45:9, 46:15,
49:4, 52:13,
54:9, 55:14,
55:15, 56:8
**asking**
40:11
**assigned**
14:18, 14:19,
23:3
**assignment**
15:7, 15:10
**assisted**
17:4
**assume**
10:9, 48:11
**assuming**
43:11
**attached**
5:8, 11:1,
12:11, 13:12,
22:12, 24:2,
28:14, 29:3,
34:4, 35:9,
35:15, 35:17,
35:21, 35:22,
39:18, 59:7
**attachment**
36:19, 37:1,
37:4
**attachments**
47:6, 47:7
**attempt**
26:7
**attempting**
30:6, 30:18

**attorney**
45:15, 50:11,
53:22
**attorneys**
6:3
**august**
60:18
**authority**
18:20, 19:1,
19:6, 19:8,
19:10, 38:16,
39:11, 40:12
**auto**
6:6, 9:8,
11:22, 12:1,
17:4, 18:21,
23:5, 25:7,
25:14, 48:18,
48:20, 49:2,
49:18, 51:7,
52:6, 52:14,
53:16, 54:15,
56:17, 56:20,
57:2, 57:18
**auto's**
8:2
**automobile**
1:8, 8:18
**available**
27:2, 28:4
**away**
33:3, 46:11

**— B —**

**back**
12:20, 12:22,
20:1, 25:18,
27:8, 32:6,
35:5, 36:5,
37:8, 37:11,
39:16, 40:20,
41:2, 46:12,
47:12, 49:14,
53:10
**base**
42:18
**based**
50:22, 58:5

**basic**
10:3
**basically**
27:12, 43:2
**bat**
10:18
**baton**
6:20
**bear**
12:14, 16:12,
26:4
**because**
10:9, 15:21,
19:8, 29:18,
29:21, 38:20,
39:2, 41:17,
45:6, 45:12,
49:22, 51:22
**been**
9:17, 10:1,
14:20, 16:15,
17:10, 17:12,
17:16, 17:17,
17:21, 17:22,
18:11, 18:15,
18:17, 19:2,
19:3, 19:18,
21:18, 21:22,
23:2, 25:15,
25:16, 26:10,
28:18, 29:17,
33:15, 36:7,
36:10, 39:10,
41:9, 57:22,
58:17
**before**
2:7, 6:2, 10:1,
10:5, 11:20,
14:18, 26:9,
29:18, 36:14,
47:13, 47:16,
60:4
**begin**
29:8
**beginning**
12:21
**begins**
8:15

**behalf**
3:3, 3:13, 4:3
**being**
8:10, 23:12,
31:3, 32:17,
32:18, 36:19,
45:17, 46:5,
50:6, 52:3,
56:9, 56:10,
56:11
**believe**
7:9, 16:15,
18:3, 18:11,
18:13, 19:3,
19:7, 19:9,
35:6, 37:20,
54:9, 54:20,
55:2, 57:13
**better**
49:12, 52:19
**between**
26:20, 31:22,
49:10
**beyond**
7:15
**bigger**
23:21, 43:16,
43:17, 44:15,
46:3, 51:4
**bill**
42:19, 43:10,
43:11, 54:16,
54:22
**bit**
21:12, 33:18,
47:2
**books**
27:3
**boss**
39:9
**both**
7:2, 7:9, 15:16
**bottom**
13:16, 41:8
**bounds**
51:14
**branch**
17:11, 19:9,

19:11, 19:17,
19:19, 19:20,
20:22
**break**
53:3
**brief**
53:9
**bringing**
43:15, 50:21
**brought**
29:20, 32:4
**brown**
3:4, 3:5, 5:3,
6:2, 7:18, 8:12,
9:5, 9:19, 9:21,
12:13, 13:9,
13:14, 20:21,
22:14, 24:4,
28:16, 29:5,
34:6, 36:21,
37:8, 37:14,
38:14, 41:22,
43:7, 45:3,
45:22, 46:14,
48:14, 50:12,
51:17, 52:5,
52:20, 53:22,
54:21, 54:22,
55:5, 55:7,
57:8, 58:4,
58:12
**brown's**
55:8
**building**
30:11, 31:17,
37:21, 39:3
**bunch**
27:17
**business**
15:18, 15:21,
17:1, 24:15,
24:19, 30:3,
30:5, 30:12,
30:14, 31:6,
31:9, 31:19,
32:4, 32:7,
33:2, 38:6,
41:14

**C**

**calculations**
32:7
**call**
13:9, 16:7,
20:7, 25:1,
25:2, 32:6,
33:16, 35:4,
39:12, 39:20,
40:3, 41:2,
42:4, 43:13
**called**
16:18, 20:5,
30:19, 39:4,
42:12, 57:14,
57:21
**came**
27:7
**can't**
18:1, 31:20
**car**
39:18, 39:21
**career**
21:9
**carlton**
39:10
**caroline**
1:13, 2:1,
3:13, 5:2, 8:16,
9:10, 9:16,
10:15, 58:9,
58:18, 59:3
**carrick**
4:13
**carrying**
25:7, 25:9
**case**
1:6, 6:7, 7:14,
7:15, 7:16,
8:20, 9:6, 9:22,
11:11, 11:12,
12:17, 15:22,
16:5, 17:7,
18:10, 21:17,
22:4, 25:7,
33:17, 34:22,
37:16, 37:19,

38:8, 60:12
**cash**
30:21, 30:22
**casino**
29:22
**cat**
18:1, 18:2,
18:4, 18:5
**catastrophe**
18:6
**caveat**
7:11
**cc**
22:19, 27:10,
33:22
**cc'd**
28:21, 34:9
**cell**
40:8, 57:18,
57:20
**cellular**
40:8
**central**
11:18, 11:20
**certain**
26:12
**certainly**
7:16
**certificate**
60:1
**certify**
60:5
**chain**
40:18
**change**
17:11, 52:16
**charkatz**
22:19, 23:1,
26:6, 26:18,
26:19, 27:9,
28:4, 28:20,
29:7, 29:11,
30:17, 56:18
**chart**
39:18
**chenetski**
16:9, 18:8,
18:11, 33:12,

33:22, 34:9,
34:20, 35:13,
37:2, 37:5,
37:18, 38:16,
38:21, 39:1,
39:20, 40:19,
41:8, 42:5,
43:14, 45:2,
46:3, 47:1,
47:11, 47:12,
47:20, 47:22,
49:1, 49:12,
49:18, 57:9,
57:12, 57:15,
57:21
**chenetski's**
18:9
**chosen**
20:11
**christian**
16:8, 16:16,
22:20, 23:4,
27:10, 29:19,
32:5, 34:14,
34:20, 39:21,
40:1, 42:19,
43:8, 50:19
**christmas**
26:21
**circulating**
6:5
**civil**
10:20
**claim**
13:21, 13:22,
14:8, 14:13,
15:16, 15:21,
16:21, 17:2,
19:21, 23:9,
23:16, 24:5,
24:15, 24:16,
25:20, 25:21,
26:7, 27:15,
27:22, 30:7,
30:10, 31:2,
31:6, 31:9,
31:11, 33:2,
33:5, 41:9,

41:13, 42:2,
42:7, 43:12,
43:16, 43:17,
44:1, 44:11,
44:14, 44:15,
44:20, 45:9,
45:11, 45:13,
45:14, 45:20,
46:2, 46:4,
46:11, 49:16,
49:21, 50:5,
51:3, 51:12,
54:10, 56:18,
56:22, 57:5,
57:10
**claiming**
24:10
**claims**
12:8, 20:10,
20:22, 21:2,
21:4, 21:6,
21:18, 21:20,
21:21, 39:14,
42:16, 43:15,
43:21, 44:2,
44:3, 44:5,
44:6, 44:7,
44:12, 44:16,
44:17, 44:21,
46:5, 49:11,
49:22, 50:6,
51:6, 51:22,
52:1
**cleaner**
10:10
**clear**
50:15, 51:3
**clearly**
41:16
**cluster**
19:15
**come**
26:2, 26:5
**comfortable**
6:15, 41:9
**commercial**
18:12, 38:20,
38:21

**commission**
60:18
**committee**
39:4, 39:13
**common**
35:17
**commonwealth**
2:9, 60:22
**company**
1:9, 8:18,
11:19, 11:22,
12:2, 12:9,
16:17, 20:5,
20:14, 52:19,
56:11, 57:18
**complete**
59:6
**completely**
45:9
**complexity**
52:1
**component**
30:11, 30:15,
31:2, 31:11
**components**
30:10
**compromise**
41:12, 41:17,
41:18
**concerned**
56:9
**concerns**
6:4, 45:16,
46:6
**concluded**
58:18
**conclusion**
57:7
**conducted**
1:14, 2:2
**conference**
16:7, 35:2,
35:4
**conferenced**
34:14, 34:19
**confidential**
6:12, 6:17,
7:5, 7:8, 8:3,

8:6, 8:11
**confidentiality**
6:4
**confines**
7:14
**confirmatory**
29:6
**connecticut**
10:16
**connection**
16:21, 20:10,
35:2, 50:5
**connects**
21:17
**consent**
8:2, 8:8
**considered**
6:11
**cont'd**
4:1
**continue**
36:20
**conversation**
38:19, 39:7,
42:8, 42:11,
47:10, 47:14,
47:19, 47:21,
47:22, 48:2,
48:8, 48:17,
50:9, 54:21
**conversations**
48:16, 49:17,
50:4, 55:3, 55:8
**coordinate**
27:15
**copy**
10:19, 40:5,
58:10, 58:12,
58:16
**correct**
11:7, 15:12,
15:18, 15:19,
16:5, 17:2,
17:3, 17:5,
17:6, 18:6,
20:18, 22:8,
25:5, 25:14,
28:1, 30:15,

30:16, 32:12,
38:1, 41:4,
41:14, 41:18,
43:9, 48:21,
49:5, 52:7,
52:14, 59:5,
60:6
**corrections**
59:7
**correctly**
27:5, 34:16
**cost**
37:22, 38:5
**costs**
30:21, 31:1
**could**
10:13, 29:20,
32:5, 33:12,
39:10, 44:16,
45:14, 48:3,
50:22
**could've**
39:8, 39:9
**couldn't**
31:9, 37:9
**counsel**
6:5, 6:6, 6:7,
6:19, 7:9, 7:22,
9:3, 9:18,
53:12, 54:16,
54:18, 55:2,
55:14, 56:9,
56:11, 60:10
**couple**
14:21, 26:15,
32:18, 32:22,
53:2
**course**
21:9
**court**
1:1, 2:8, 8:19,
9:11, 58:10,
60:3
**coverage**
21:22, 22:4,
42:15, 43:3,
43:4, 45:13
**covered**
19:21

**cpa**
16:22, 23:12, 50:20
**crafted**
24:19
**current**
6:13
**currently**
11:15, 11:18
**cv**
1:7, 8:20

**D**

**damage**
15:17
**damages**
30:12
**danielle**
1:20, 2:7, 9:12, 60:3
**data**
26:22
**date**
8:20, 14:10, 15:11, 27:16, 41:10, 59:12
**dated**
15:2, 16:1, 21:13, 28:3, 28:18, 40:18, 40:20, 47:1
**dates**
27:17
**day**
26:12, 32:21, 39:12, 47:1, 60:15
**deal**
6:3
**dealing**
44:20
**dealings**
51:11
**deals**
43:3
**dealt**
17:1
**december**
26:7, 26:9,

34:8, 40:18, 40:20, 46:20, 49:5, 49:20, 50:7
**decision**
46:11
**declaration**
25:16
**defendant**
1:11, 4:3, 9:8, 53:12
**deferred**
39:1
**depending**
40:7
**depicted**
14:13
**deponent**
9:10, 59:2
**depos**
9:2, 9:13
**deposed**
10:1
**deposition**
1:13, 2:1, 5:9, 6:16, 7:8, 7:13, 8:3, 8:5, 8:16, 10:19, 11:2, 11:3, 12:10, 13:11, 22:11, 24:1, 28:13, 28:19, 29:2, 34:3, 53:19, 53:21, 54:8, 54:14, 55:1, 55:11, 55:13, 55:15, 55:19, 55:20, 56:1, 56:7, 57:3, 58:9, 58:18
**depreciation**
31:18
**describe**
13:19, 19:12
**designate**
7:5, 8:2
**designating**
6:16, 8:5

**determine**
24:19, 24:20, 25:3
**difference**
31:20, 49:10
**different**
16:13, 30:9, 48:5, 50:14, 50:15
**difficult**
52:3
**direct**
50:3
**direction**
45:8, 45:12, 48:5, 48:6, 50:14, 50:16
**directly**
45:14
**director**
18:1, 18:12
**disclosed**
8:10
**discuss**
37:4, 42:5, 55:4
**discussed**
7:7, 40:2, 40:4, 42:19, 54:5
**discussing**
30:6, 31:5
**discussion**
31:8
**discussions**
30:17, 53:22, 54:2, 54:6, 55:12, 55:18, 56:2, 56:17, 56:21, 57:4
**disseminated**
7:15
**district**
1:1, 1:2, 8:19
**document**
12:14
**documents**
27:13, 35:20,

53:19
**doing**
7:6, 50:13, 53:17
**dollars**
19:4
**done**
39:6, 39:8, 39:11
**donovan**
56:21, 57:1
**down**
21:13, 30:4
**dozen**
21:9
**duly**
9:17
**during**
54:6, 55:3, 56:7
**duties**
12:6

**E**

**e-mail**
7:9, 22:18, 23:15, 24:6, 26:18, 27:7, 27:9, 27:20, 28:2, 28:3, 28:8, 28:17, 28:20, 29:6, 29:12, 32:20, 33:21, 34:8, 36:18, 37:21, 38:2, 40:4, 40:17, 40:18, 40:19, 40:21, 41:1, 41:3, 41:5, 41:7, 42:5, 42:9, 46:19, 46:22, 47:8, 47:11, 47:13, 47:16, 47:19, 48:11, 49:20, 50:7, 50:10, 54:21, 57:8, 57:11,

57:14
**e-mailed**
35:12, 40:6
**e-mails**
5:12, 5:14,
5:15, 5:16,
26:13, 26:15,
33:20, 35:3
**each**
19:17, 35:18
**easier**
32:7
**eastern**
8:22, 17:13,
19:22
**eight**
31:22
**either**
35:12
**elected**
49:14
**electronic**
2:8, 60:1,
60:21
**else**
7:15, 35:3,
38:17, 42:7,
49:18, 50:21,
55:8
**employed**
11:16, 11:18,
11:21, 57:17,
60:11
**employee**
56:10
**employer**
6:13, 11:17,
55:22
**enclosed**
23:15
**end**
26:9, 58:8
**enter**
6:9
**entered**
7:2, 7:3
**entire**
17:11

**entries**
13:4
**eric**
16:8, 16:13,
16:15
**errata**
59:7
**esquire**
3:4, 3:14, 4:4
**et**
1:4, 8:17
**evaluation**
26:22
**ever**
9:22, 12:17,
20:2, 20:4,
53:21
**everybody**
27:17, 29:8
**everyone**
53:5
**everyone's**
27:4
**exactly**
40:4
**examination**
5:2, 9:18,
53:12
**examined**
59:4
**examiner**
21:19, 21:20,
21:21, 42:14,
42:16, 43:1,
43:15, 45:15,
46:18, 49:9,
49:10, 50:11
**executive**
12:4, 12:5
**exhibit**
5:9, 5:10,
5:11, 5:12,
5:13, 5:14,
5:15, 5:16,
10:18, 12:10,
12:16, 13:8,
13:10, 13:11,
14:14, 15:2,

16:2, 22:10,
22:11, 23:14,
23:20, 24:1,
28:13, 28:19,
29:2, 33:16,
33:17, 34:3
**expect**
6:9
**expense**
30:15
**expenses**
15:18
**experience**
50:20
**expert**
42:20
**expires**
60:18
**explain**
44:3, 48:6
**explained**
44:14, 54:15,
55:22
**explanation**
42:13
**explore**
49:15
**expressing**
44:10
**expressly**
8:7
**extent**
7:4, 8:1, 36:15
**extra**
15:18, 30:14
**eyes**
57:10

**F**

**fact**
32:10, 32:11,
49:13, 52:15
**fair**
22:6, 24:13,
36:22, 44:19
**fairfax**
3:8
**faith**
45:17, 45:21,

46:7
**familiar**
11:12, 14:12,
14:15, 14:16,
30:2
**feel**
50:19
**fellow**
22:18
**felt**
45:12, 45:14
**field**
18:1, 18:2,
20:15
**file**
14:1, 14:2,
14:4, 14:5,
14:17, 17:9,
22:3, 26:11,
42:13, 49:4
**filed**
7:3
**files**
36:5
**financial**
60:12
**find**
23:16, 35:16,
36:6, 37:9,
37:13
**finding**
42:19
**fine**
54:9, 58:13,
58:14
**finish**
10:5
**fire**
15:14, 15:16
**firm**
52:4
**first**
7:11, 54:7
**fit**
30:4
**five-minute**
53:3
**flight**
28:6

focus
15:20, 26:17,
33:2
**followed**
34:11
**following**
29:12, 34:21,
41:2, 42:5,
47:22, 48:15,
49:19, 50:7,
51:7
**follows**
9:17
**foregoing**
59:4, 60:4,
60:5
**forensic**
16:22, 23:5,
23:9
**forensics**
50:20
**foresee**
8:4
**form**
20:19, 38:11,
41:19, 43:5,
44:22, 45:19,
46:9, 48:13,
50:8, 51:15,
51:19
**formally**
53:15
**former**
56:10
**forward**
7:20, 12:22,
21:12, 29:9,
46:2, 46:8
**four**
24:6, 31:22
**fox**
16:16, 16:17,
22:20, 23:4,
26:6, 27:10,
29:20, 32:5,
34:20, 39:21,
40:1, 43:8,
50:19

**fresh**
57:9
**front**
39:14
**fully**
6:9
**function**
16:20
**further**
36:14, 58:2,
58:4

### G

**g's**
20:7, 21:3,
21:10, 44:7
**gabriel**
4:14, 9:1
**gambling**
29:22
**gaming**
50:19, 50:22
**general**
12:4, 12:5,
20:15, 49:22
**generally**
7:8, 7:10, 8:4,
13:2
**geographically**
19:21
**germantown**
4:6
**getting**
7:2, 26:22,
57:9
**ggg**
23:9, 44:12
**give**
10:13, 49:14
**given**
39:11, 48:11,
55:17, 59:6
**gives**
27:17
**giving**
8:7, 42:14,
55:20
**global**
31:4

**globe**
21:10
**go**
6:2, 8:13,
12:20, 14:6,
31:10, 34:7,
36:5, 36:14,
37:8, 37:11,
37:12, 40:17,
42:16, 45:8,
47:12, 50:14,
50:15, 51:2
**goes**
14:2, 24:6
**going**
6:18, 8:10,
10:4, 10:17,
11:10, 11:16,
12:15, 12:16,
12:20, 12:22,
13:2, 13:3,
13:9, 13:18,
15:1, 23:13,
26:15, 27:14,
28:10, 28:17,
33:16, 36:4,
39:19, 45:7,
45:8, 46:7,
46:17, 48:5,
48:7, 49:9,
50:10, 53:1,
53:7, 54:12,
54:17, 55:17,
58:7
**gone**
38:17, 39:9
**good**
9:20, 12:20,
43:13, 45:17,
45:20, 46:7,
51:8, 52:9,
53:14, 56:10
**goodman-gable-go-
uld**
20:5, 21:1,
21:7, 44:8,
44:21, 46:5,
49:19, 50:1,

50:6, 51:6,
51:9, 51:11,
51:18, 52:3
**gotten**
48:3
**granby**
10:15
**grimm**
6:9
**ground**
35:17
**growth**
31:19, 32:3,
35:18, 36:7,
36:9, 38:7
**guess**
36:22

### H

**half**
19:4
**hand**
60:15
**handled**
12:8, 21:9,
21:22, 41:10,
45:20, 51:21
**handler**
14:5
**handling**
14:4, 29:19,
46:1
**handwritten**
35:8
**hang**
26:3, 33:14
**happened**
26:15, 35:4
**header**
36:18
**hear**
7:11
**heard**
8:8, 20:2, 20:4
**here**
7:6, 8:15,
14:7, 18:8,
21:13, 24:9,

28:2, 35:9,
37:10, 39:8,
39:17, 42:18
**hereby**
59:3, 60:5
**hereunto**
60:14
**hi**
28:4, 34:13
**highlighted**
42:17
**hogue**
22:20, 23:8,
27:11, 28:22
**holdback**
31:18, 37:21,
37:22, 38:1
**holiday**
27:4
**hope**
26:22
**horst**
4:5
**hours**
32:18, 32:22
**hybrid**
19:15

**I**

**identification**
12:11, 13:12,
22:12, 24:2,
28:14, 29:3,
34:4
**identified**
18:8
**identify**
9:3, 32:2
**immediately**
47:15
**impact**
35:10, 35:18
**inc**
1:4, 9:6, 14:9
**include**
36:18
**income**
23:17, 31:19,

32:4, 32:7,
35:19, 38:6
**indicates**
23:15, 29:9
**information**
6:12, 8:9,
40:16
**initially**
6:20, 10:17,
15:1, 26:17
**insurance**
1:9, 8:18,
11:19, 11:22,
12:1, 20:14
**insured**
23:10, 24:9,
25:8, 26:6,
27:13, 30:20,
30:22, 32:8,
32:11, 34:15,
38:18, 44:3,
45:17, 46:6
**insured's**
23:16, 26:19,
36:11, 44:20
**insureds**
44:13
**intent**
26:19
**interest**
60:12
**interests**
20:16
**international**
21:10
**internet**
40:7
**interruption**
15:18, 15:21,
17:1, 24:15,
24:20, 30:14,
31:6, 31:9,
33:2, 41:14
**involve**
45:13
**involved**
15:16, 16:5,
22:4, 22:6,

46:16, 49:9
**involvement**
45:15, 50:3
**issue**
24:13, 44:15,
51:4, 54:7
**issued**
57:18
**issues**
8:4, 22:4,
22:7, 43:3,
43:17, 43:21
**items**
6:3
**itself**
11:2

**J**

**jay**
39:10
**jeremy**
22:19, 23:8,
27:11, 27:12,
28:22
**job**
1:18, 12:6
**joe's**
30:4
**jones**
3:6
**judge**
6:9
**jump**
11:14

**K**

**keeping**
7:8
**kept**
8:11
**kind**
8:9, 14:22
**king**
21:14, 43:1,
46:18, 49:15
**know**
10:3, 10:9,
16:14, 17:21,

19:6, 21:2,
21:8, 21:14,
23:4, 28:7,
31:21, 32:19,
33:7, 33:10,
35:22, 36:4,
36:11, 37:11,
48:3, 50:20,
55:16, 57:1
**known**
11:11
**krautkramer**
1:20, 2:8,
9:12, 10:6, 60:3
**krekstein**
4:5, 43:10,
54:22
**krekstein's**
54:16

**L**

**land**
29:21
**large**
12:3, 12:6,
12:8, 15:6,
19:16, 19:18,
39:4, 39:13,
52:1
**last**
23:11
**later**
47:2
**laundry**
6:3
**lay**
29:20
**leadership**
17:12
**least**
16:4, 17:15
**leave**
52:9, 52:13,
52:17, 52:18
**leaving**
56:17, 56:20,
57:2
**left**
12:3, 46:12,

52:6, 52:10,
52:11
**less**
30:20, 31:1
**let's**
16:12, 21:12,
26:13, 30:9,
33:1, 33:17,
39:12, 39:16,
40:17, 42:16
**leverage**
43:22, 44:11,
44:17, 46:4
**limitation**
25:11
**line**
37:2
**litigation**
22:1, 43:4,
45:13, 53:16
**little**
14:8, 21:12,
23:20, 33:18,
47:2
**location**
29:11, 29:12
**log**
5:11, 12:18,
12:21, 13:4,
13:15, 14:6,
14:22, 15:2,
15:5, 16:1,
16:2, 16:14
**long**
24:14, 24:20,
25:3, 32:14,
32:15, 32:17,
47:13
**longer**
25:19
**look**
13:1, 26:13,
27:8, 29:9,
33:13, 37:9,
37:11, 42:7
**looked**
36:3, 37:9,
37:12

**looking**
13:19, 24:7,
36:4, 50:21
**looks**
29:7, 34:20,
35:22, 47:6
**loss**
5:13, 12:3,
12:6, 12:8,
14:10, 15:6,
15:14, 15:16,
17:5, 19:16,
19:18, 22:7,
24:10, 24:14,
24:20, 24:21,
25:3, 25:11,
26:20, 29:10,
29:12, 32:4,
34:13, 35:19,
38:20, 39:4,
39:13, 43:18,
50:3
**lost**
23:16
**lot**
27:15, 30:1,
50:19

---

### M

**machines**
30:2, 51:1
**made**
13:4, 39:20,
45:7, 51:3
**make**
7:12, 23:21,
28:18, 29:7
**makes**
6:14, 10:10,
35:18
**making**
13:7
**malamud**
4:4, 5:4, 7:10,
7:21, 9:7,
20:19, 36:5,
36:14, 38:11,
41:19, 43:5,

44:22, 45:19,
46:9, 48:13,
50:8, 51:15,
51:19, 53:1,
53:13, 53:15,
58:1, 58:14
**manager**
12:4, 12:6,
18:12, 19:14,
38:21, 38:22,
46:10
**managers**
18:14
**manner**
45:6
**many**
21:6, 21:8,
54:2
**mark**
12:16, 16:8,
18:8, 22:9,
23:14, 23:19,
26:3, 33:12,
33:22, 34:9,
34:13, 34:19,
35:12, 38:20,
39:1, 39:7,
39:20, 40:19,
42:12, 47:1,
47:19, 49:1,
49:12
**marked**
12:11, 13:12,
22:10, 22:12,
24:2, 26:16,
28:14, 29:3,
33:15, 34:4
**martin**
4:14, 9:1
**maryland**
1:2, 8:19
**matt**
53:15
**matter**
8:17, 47:7,
56:3
**matthew**
4:4, 7:2, 9:7

**maximum**
25:17
**maybe**
17:22, 37:10
**meaden**
16:8, 16:18,
28:21
**mean**
21:3, 38:13,
38:15, 43:19,
44:2
**meant**
43:20, 45:4
**measure**
17:5
**measurement**
22:7
**media**
8:15
**meet**
26:20, 27:16
**meeting**
4:8, 26:8,
27:21, 28:10,
28:12, 29:8,
29:10, 29:11,
29:15, 29:16,
31:15, 32:15,
33:3, 33:11,
34:11, 34:15,
34:19, 34:21,
39:17, 40:2
**mentioned**
7:12
**met**
26:6, 26:11,
53:15
**middle**
33:19, 33:21
**midkiff**
3:15
**midwest**
21:11
**might**
26:14
**million**
19:4, 24:6
**mind**
37:17

mini
58:13, 58:14
monday
29:10
money
52:16
monitor
8:21
month
25:8, 25:9,
25:21
months
25:11, 25:13,
25:16, 25:20
moore
16:8, 16:18,
28:21
more
6:15, 19:7,
19:9, 19:15,
30:21, 30:22,
32:17, 40:15,
42:12, 50:2,
52:15
morning
7:3, 9:20,
28:5, 29:10,
53:14
move
7:19, 21:12,
53:4
moved
19:15
moving
50:1
much
19:6, 35:10,
35:18, 52:21,
58:2
muncie
3:15
mutual
1:8, 8:18,
11:18, 11:20,
11:22, 12:1
myself
6:6

**N**

name
9:20, 10:13,

23:11, 53:15
named
22:18
napkin
32:6
nd
28:3, 50:7
neal
22:19, 23:1,
26:18, 28:3,
28:4, 28:20,
56:18
need
8:7, 25:3,
46:16
needed
7:14, 7:16,
42:7
needs
40:9, 40:15
neither
60:10
never
29:17, 43:11
new
52:19
next
27:1, 32:21,
40:17, 40:19
notarial
60:15
notary
2:8, 60:1,
60:17, 60:21
note
14:2, 15:2,
15:5, 16:1,
16:14, 21:13,
35:9, 35:20
noted
38:2
notes
5:11, 12:18,
12:21, 13:5,
13:15, 13:21,
13:22, 14:1,
14:7, 14:22,
16:2

nothing
42:14
notice
11:1, 11:2,
46:19, 54:22
noticing
54:14
november
26:17, 28:3,
60:16
nowhere
7:15
number
8:15, 8:20,
10:18, 12:10,
12:16, 13:10,
13:11, 14:8,
14:9, 14:14,
15:2, 16:2,
20:22, 22:11,
23:14, 23:20,
24:1, 28:13,
28:18, 28:19,
29:2, 33:4,
33:7, 33:9,
33:16, 34:3,
37:17, 41:8,
41:18, 47:5,
60:17
numbers
31:21, 36:9,
37:16, 50:22

**O**

objection
20:19, 38:11,
41:19, 43:5,
44:22, 45:19,
46:9, 48:13,
50:8, 51:15,
51:19
obtain
38:15
obviously
6:18, 15:10
occurred
32:15
occurs
25:4

october
1:15, 8:21,
52:10
offer
38:18
offered
52:15
office
17:14, 19:13,
19:22, 54:16,
55:9
officer
60:4
oh
21:8, 40:13
okay
8:12, 10:3,
10:11, 11:14,
11:20, 12:1,
12:20, 13:5,
13:6, 13:22,
14:6, 14:12,
14:16, 14:18,
14:21, 15:13,
16:4, 16:12,
16:17, 17:15,
18:15, 18:19,
19:5, 20:1,
20:7, 21:12,
21:20, 22:2,
22:22, 23:13,
24:9, 25:13,
26:2, 26:13,
27:7, 29:1,
29:14, 30:6,
32:14, 33:1,
33:14, 34:11,
35:7, 35:14,
37:7, 38:8,
39:5, 40:11,
41:1, 41:6,
41:7, 41:16,
42:4, 42:10,
43:13, 45:10,
47:5, 47:16,
49:17, 50:4,
50:17, 52:11,
53:5, 53:6,

55:7, 55:11,
57:2, 57:17,
57:20, 58:1
**on-site**
34:15
**once**
27:10
**one**
12:15, 16:7,
19:16, 19:20,
26:3, 26:4,
27:14, 29:17,
33:15, 39:8,
39:9, 40:9,
42:17, 47:5,
50:2, 54:7,
54:13, 55:16,
55:17
**one-off**
39:11
**ones**
44:1
**only**
21:3
**open**
31:4
**opinion**
31:20
**opportunity**
52:19
**order**
6:4, 6:8, 6:9,
6:10, 6:17, 7:6,
17:15, 18:10,
24:19, 35:16,
37:15, 38:8,
39:17, 44:11,
53:4
**original**
29:18
**other**
9:6, 40:9,
43:21, 44:1,
44:2, 44:5,
44:6, 44:7,
44:12, 44:13,
44:16, 44:20,
46:4, 49:13,

49:17, 49:22,
50:4, 50:6,
51:5, 55:18,
57:4
**otherwise**
7:17, 60:13
**out**
6:13, 16:12,
18:20, 27:13,
27:17, 28:10,
29:20, 51:14,
52:2, 54:14
**outcome**
60:13
**over**
35:12
**oversaw**
12:8
**owe**
42:12
**own**
52:11, 54:17

### P

**page**
5:2, 5:9,
13:16, 15:1,
16:2, 25:16,
29:8
**pages**
1:19
**paginated**
13:16
**paid**
39:2
**paragraph**
29:9, 35:16,
42:17
**part**
38:4, 38:6
**participant**
31:15
**particular**
29:17, 50:2
**parties**
27:2, 31:10,
60:11
**pass**
6:20

**paul**
39:15
**pawn**
44:20
**pay**
30:22
**pc**
3:5
**pecking**
17:15, 18:10
**pendleton**
10:15
**pennsylvania**
4:8
**people**
16:13
**percent**
36:8, 36:9,
38:7
**percentage**
31:21, 35:18
**period**
24:14, 25:1,
25:2, 25:8,
25:9, 25:10
**person**
43:2
**personal**
15:17, 30:12
**phone**
40:8, 57:18,
57:20
**pick**
9:21
**picture**
35:11
**pike**
4:6
**piper**
17:19, 18:16,
18:18, 38:22
**piper's**
17:20
**place**
3:16
**placement**
51:1
**plaintiffs**
1:6, 3:3, 6:7,

9:6, 9:18, 9:22
**planet**
9:2, 9:13
**plans**
27:4
**platform**
18:17
**please**
9:3, 9:13,
10:14, 23:15,
27:2
**plus**
37:20
**plymouth**
4:8
**point**
17:16, 22:2,
25:13, 30:10,
31:14, 33:1,
36:22, 37:15,
38:9, 40:9,
40:12, 45:11,
45:18, 46:2,
46:13, 52:6,
55:3
**policy**
14:9, 14:13,
25:18, 25:20
**policyholder**
20:12, 20:13
**portions**
30:3
**position**
6:15, 8:1,
12:2, 17:20,
45:5, 49:11
**positive**
37:3
**possible**
53:5
**potential**
35:19
**potentially**
36:16
**preliminary**
24:10
**prepare**
35:3

prepared
6:5, 35:22,
39:18
preparing
53:18
present
4:13, 54:18
presented
39:14, 44:6,
44:7, 50:6,
51:13, 51:18
presenting
51:6
pretty
32:18
previously
41:17
primarily
7:3, 15:21,
15:22
primary
16:20
prior
11:17, 47:19,
53:21, 55:11,
56:16, 56:20,
57:3
probably
32:21
problem
6:14, 6:16, 8:5
problems
51:5
proceedings
60:4, 60:7
process
31:14, 33:3
produced
35:20, 36:16
producing
33:10, 33:11
proffer
8:9
property
12:3, 15:17,
18:12, 20:16,
30:11, 30:12
provide
54:15

provided
56:11, 56:14
public
2:9, 20:2,
20:9, 20:13,
21:4, 23:2,
51:22, 52:3,
60:2, 60:21
pull
25:18
pulled
49:16
purpose
14:3, 29:14
pursuant
2:7
put
7:18, 19:16,
26:3
putting
36:12
pwg
1:7, 8:20

**Q**

question
6:10, 10:5,
10:8, 24:17,
45:1, 49:13
questioning
36:20
questions
10:4, 11:11,
13:3, 53:2,
58:2, 58:4
quick
32:6, 32:19
quickly
53:4
quite
26:10

**R**

rachel
4:13
rapp
16:15
rate
36:7, 36:9,

38:7
rc
37:20, 37:22
reach
30:18
reached
54:13
read
12:21, 27:4,
34:15, 41:5,
47:8, 58:6,
58:15, 59:4
reading
47:18, 60:9
ready
8:13, 41:12
really
25:19, 47:7
reason
49:8
reasons
7:18
reassigned
14:17, 15:6
recall
25:6, 27:20,
28:10, 29:11,
29:14, 30:6,
30:17, 31:5,
32:14, 57:10
received
42:8, 54:21
receiving
57:14
recess
53:9
recognize
23:8, 24:5,
25:21, 28:20,
34:7
recollection
26:14
record
7:19, 7:21,
8:13, 9:2, 10:7,
10:10, 36:15,
36:17, 51:9,
53:7, 53:10,

58:8, 60:6
recourse
46:12
recoverable
31:17
reduced
60:8
reel
1:4, 8:17, 9:6,
11:11, 13:17,
14:9, 14:12,
22:4, 23:3,
33:20, 45:16,
45:21, 54:11,
57:5
reel's
41:14
reference
36:19
referred
16:14
referring
57:9
reflect
36:17
refresh
26:14
regard
18:21, 24:15,
51:12
regarding
55:12, 55:19,
56:3, 56:18,
56:22, 57:5
region
44:5
regional
17:13, 19:13,
19:22
registration
60:17
related
11:11, 15:22,
24:14, 49:19,
50:5, 60:11
relates
17:9, 49:21
relationship
17:8

remain
49:8
remains
7:13
remember
18:1, 18:13,
23:11, 23:12,
25:10, 25:12,
26:8, 28:12,
31:3, 31:20,
32:17, 32:18,
33:9, 33:10,
33:11, 47:18,
50:18, 51:2,
52:2, 54:11,
54:12, 57:11
remembered
54:10
remote
11:2
removed
45:9, 45:10,
46:15, 49:4,
49:7
renovation
25:2
replacement
30:20, 31:1,
37:22, 38:5
reported
1:20
reporter
2:8, 9:12,
9:13, 58:10,
60:1, 60:3
reports
35:3
represent
9:4, 9:5, 9:7,
9:9, 9:22,
53:15, 54:17
representative
20:11, 57:4
represented
7:22, 56:9
representing
9:2, 9:12,
20:14, 20:16,

44:12
represents
6:21
request
7:4
requested
6:11, 26:22,
60:10
required
8:2
reserve
8:7
resolve
26:7, 31:6,
31:11, 38:8,
44:12, 45:14
resolved
31:9, 42:15,
44:1, 44:18,
48:4
responds
41:1
response
10:6, 27:7,
27:8
restate
24:17, 24:18
restoration
25:1, 25:8,
25:9, 25:10
reverski
3:14, 6:21,
7:1, 9:9, 13:7,
55:2, 58:6,
58:15
review
22:21, 53:19
revising
26:21
richmond
3:18
right
10:18, 11:14,
15:11, 20:17,
23:6, 24:21,
25:4, 25:17,
30:12, 34:11,
34:22, 36:1,

38:3, 39:8,
39:20, 41:3,
41:10, 42:2,
43:8, 44:10,
48:18, 49:2,
49:7, 58:13
road
10:15
robert
3:14, 9:9
rod
1:4, 8:17, 9:5,
11:11, 13:17,
14:9, 14:12,
22:3, 23:3,
33:20, 41:13,
45:16, 45:21,
54:11, 57:4
role
18:9, 21:16,
50:20
roll
33:17
rolling
8:14
room
36:12
ross
3:15
rules
10:3
run
24:21, 32:5,
50:22
runyon
4:5

**S**

said
7:11, 39:12,
40:9, 40:14,
40:15, 41:18,
42:12, 43:14,
43:21, 44:2,
45:6, 54:8,
54:9, 54:10,
54:18, 55:1,
55:15, 55:16,

60:7
same
18:17, 21:11,
29:8, 47:1, 59:5
say
18:4, 19:11,
22:6, 24:13,
28:4, 32:16,
32:20, 32:21,
42:16, 44:19
saying
50:18
says
14:9, 15:5,
26:19, 27:11,
27:14, 34:13,
35:9, 41:12,
42:18
schedules
27:15
scheme
30:4
scott
14:20, 15:2,
16:9, 17:7,
17:13, 17:17,
19:8, 22:19,
26:18, 26:19,
27:10, 27:11,
33:22, 34:9,
34:14, 34:20,
39:19, 47:1,
47:18, 48:8,
48:10, 48:20,
55:12, 56:2
screen
10:20, 12:18,
22:15
scroll
12:22
seal
60:15
second
12:15, 22:21,
26:3, 26:4,
27:9, 27:14,
33:15, 35:16,
41:5, 47:8,

see
7:17, 10:21, 11:3, 14:7, 14:10, 15:3, 15:7, 16:1, 16:9, 22:15, 23:17, 23:21, 23:22, 24:11, 26:1, 27:18, 28:7, 29:20, 29:22, 30:3, 34:1, 35:21, 36:5, 40:20, 42:20, 46:20, 47:3, 51:12
sends
47:5
sent
27:12, 34:9, 37:1, 40:5, 41:3, 47:11, 47:12, 50:10
separate
7:7, 54:18
series
10:4, 11:10, 13:15, 26:13, 33:19
served
11:6
service
40:8
set
57:9, 60:14
settle
26:20, 27:17, 30:7, 31:1, 37:15, 42:1
settled
27:22, 33:5, 34:22, 37:19
settlement
18:20, 19:1, 19:5, 19:7, 19:9, 30:19, 31:4, 38:16, 40:11

setup
27:20, 27:21, 30:5
several
13:4, 21:9
sheet
59:8
sherri
21:14, 42:18, 42:22, 43:1, 46:17, 49:14, 49:15
shocking
56:12
shorthand
60:1
shortly
54:20
shot
33:14
should
37:19, 48:4
show
10:18, 12:15, 22:9, 23:13, 23:19, 26:15, 28:17, 33:15, 35:10, 35:18
showed
36:8
showing
7:17, 38:3, 57:11
shown
57:8
side
23:12
sign
58:16
signature
58:17, 59:12
signature-oso
60:19
signed
59:8
signing
60:10
silver
3:5

similar
43:21
since
6:21, 49:9
singling
52:2
sir
11:5
site
29:18
six
31:22, 32:19
slash
12:4
small
14:8, 23:20
smokey
30:4
smoothly
50:1
some
6:3, 8:8, 13:3, 27:12, 31:17, 35:17, 37:20, 41:13, 52:6
somebody
21:22, 38:17, 42:7, 50:21
something
26:11, 30:1, 30:20, 30:22, 32:1, 36:17, 39:4, 51:10, 54:10
somewhere
37:2
soon
35:4
sorry
24:17
sort
11:14, 19:12
speaking
8:4
specific
27:3
specifically
21:2, 51:3,

55:13
specifics
54:11
stachura
39:15
standard
8:22
standing
56:10
started
7:22
state
1:8, 6:6, 8:1, 8:17, 9:3, 9:8, 10:13, 11:22, 12:1, 17:4, 18:21, 23:5, 25:7, 25:14, 48:18, 48:20, 49:1, 49:18, 51:7, 52:6, 52:14, 53:16, 54:15, 56:17, 56:20, 57:2, 57:17
states
1:1, 8:19, 40:4
stayed
48:4
stenographically
60:8
step
20:1, 39:16
steve
17:19, 38:22
straightened
18:20
strategic
51:1
street
3:6
strike
37:16, 48:16, 51:10
subject
56:3
submission
41:14

submitted
6:8, 6:18,
25:21, 46:5
subpoena
5:10, 10:19,
11:6, 11:9, 54:8
substance
55:4
suggested
30:18, 36:16,
37:18, 42:1
suite
3:7, 3:17, 4:7
suited
49:12
summary
5:13
supervision
60:9
supervisor
19:14
sure
7:12, 25:19,
26:10, 29:7,
37:1, 47:6
surprised
48:10
surrounding
43:17
sustained
25:11
swear
8:13, 9:13
sworn
9:15, 9:17

**T**

table
35:9, 35:11,
35:15, 35:17,
35:21, 36:1,
36:12, 38:18
take
6:18, 13:1,
14:21, 15:1,
20:1, 22:20,
26:16, 30:20,
33:12, 33:14,

39:3, 39:12,
39:16, 41:5,
41:7, 43:19,
46:11, 46:17,
47:8, 53:2
taken
32:16, 35:11,
53:9, 56:1,
60:5, 60:7
taking
42:13, 45:5,
45:8
talk
30:9
talked
43:11
talking
18:4, 18:5,
19:12, 35:14,
41:16, 42:6,
44:4, 46:1, 46:2
talks
16:7
technician
4:13
telephone
41:2
tell
11:15, 18:9,
21:16, 23:1,
31:13, 36:3,
40:1, 42:10,
43:15, 48:2,
54:2, 54:5,
56:13
tells
41:8
ten
31:22
term
20:2, 20:4
terms
52:9
terra
14:20, 15:3,
15:11, 16:9,
17:5, 17:7,
17:8, 17:13,

17:18, 18:16,
19:5, 19:8,
22:3, 22:10,
22:19, 26:5,
26:18, 27:10,
28:18, 28:21,
33:16, 33:22,
34:9, 34:21,
39:19, 47:1,
47:17, 47:21,
48:8, 48:10,
48:20, 55:12,
55:19, 56:3,
56:6, 56:13
terra's
47:18
testified
9:17, 56:7,
56:14
testify
10:19
testimony
6:11, 8:8,
10:7, 55:4,
56:3, 56:14,
57:7, 57:13,
59:5, 59:6
texted
35:12, 40:6
thank
7:1, 9:11,
52:21, 52:22,
53:17, 58:2
thanksgiving
26:21
themselves
9:3
thereafter
60:8
things
39:8, 39:16
think
7:22, 8:12,
17:22, 21:11,
25:19, 30:18,
31:16, 40:10,
40:14, 51:8,
53:14, 54:9

third
29:9
thomas
3:4, 9:5
thought
31:14, 33:3,
37:18, 42:6,
51:14, 55:16,
55:17
thoughts
53:3
three
21:3, 21:10,
44:7
through
13:1, 13:16,
13:17, 14:21,
24:10, 30:3,
33:17, 33:20,
36:10, 37:12,
51:2, 53:4,
54:12
tight
33:15
time
8:21, 8:22,
14:5, 16:5,
17:16, 18:2,
18:12, 18:14,
19:3, 19:8,
19:10, 19:17,
21:6, 21:21,
25:6, 26:2,
26:5, 30:10,
31:16, 33:1,
37:15, 38:10,
38:20, 38:21,
39:10, 39:15,
40:8, 45:18,
48:9, 48:17,
58:2
title
18:2, 18:13,
52:16
today
7:20, 9:1,
9:12, 11:7,
15:20, 37:13,

55:4, 55:11,
55:20, 56:1,
56:4, 56:16,
56:20, 58:3
**today's**
8:20, 53:18,
53:21, 57:3
**together**
36:13
**told**
43:16, 46:3
**tom**
7:1, 7:12,
9:20, 13:7,
36:14, 54:22
**took**
15:10, 32:15,
32:22
**top**
14:6, 14:7,
14:13, 28:2
**touched**
42:18
**towards**
57:7
**track**
14:22, 51:9
**transcript**
5:8, 7:5, 7:13,
8:3, 8:6, 12:12,
13:13, 22:11,
24:3, 28:15,
29:4, 34:5,
58:11, 58:12,
60:6
**transcription**
59:6
**treated**
45:17, 46:7
**trends**
31:19, 32:3
**true**
59:5, 60:6
**try**
26:20, 27:21,
33:4, 34:21,
37:19, 44:17
**trying**
12:14, 17:5,

27:21, 29:7,
31:5, 32:2,
38:17, 43:22
**two**
27:1, 39:8,
54:4
**types**
8:9
**typewriting**
60:9
**typical**
29:22
**typically**
51:21

### U
**ultimate**
42:17
**under**
6:17, 7:6,
17:13, 60:9
**underneath**
39:2
**understand**
6:13, 10:8,
15:13, 45:7
**understanding**
7:19, 20:9,
27:12
**understood**
10:10
**united**
1:1, 8:18
**until**
8:8
**untoward**
51:13
**use**
44:16, 44:19,
50:5
**using**
38:7

### V
**value**
30:21, 31:1
**veahman**
1:13, 2:1,

3:13, 5:2, 5:9,
6:6, 6:10, 6:17,
6:22, 8:16,
9:10, 9:16,
9:20, 10:15,
10:17, 11:4,
12:10, 13:11,
13:18, 22:11,
22:16, 24:1,
28:13, 29:2,
33:17, 34:3,
36:22, 52:20,
53:1, 53:14,
53:18, 58:1,
58:9, 58:18,
59:3
**vegas**
30:1
**versus**
8:17
**video**
8:21
**videographer**
4:14, 8:15,
9:1, 9:11, 53:7,
53:10, 58:7
**videographer's**
8:13
**videotaped**
1:13, 2:1,
8:16, 11:3
**view**
22:2, 25:14,
31:14
**virginia**
2:9, 3:8, 3:18,
60:22
**virtually**
1:14, 2:2
**voice**
9:3
**vs**
1:7

### W
**wait**
10:4
**waiting**
54:19, 55:1

**waived**
58:17
**walk**
30:3, 33:3
**walk-away**
30:19
**want**
6:12, 7:12,
7:16, 13:1,
15:20, 25:2,
26:16, 27:3,
27:16, 32:16,
41:7, 41:18,
47:12, 52:17,
58:10, 58:12
**wanted**
40:14, 42:1,
44:11, 44:19,
50:14, 50:15,
52:16, 54:7,
54:17
**wanting**
51:2, 54:22
**wants**
7:11, 46:4
**way**
10:20, 35:5,
36:10, 41:9
**we're**
11:10, 12:16,
13:19, 36:15
**we've**
6:8, 6:17
**wednesday**
1:15
**week**
27:3
**weeks**
27:1
**went**
56:8
**weren't**
52:13
**wesley**
56:21, 57:1
**whatever**
49:15, 50:22
**whenever**
36:12

**whereof**
60:14
**whereupon**
9:15
**whether**
26:9
**whichever**
25:2
**within**
7:13, 17:10,
19:9, 19:11,
19:18, 44:5
**without**
41:13, 45:15,
56:8
**witness**
3:13, 6:15,
8:14, 9:14,
9:15, 38:13,
41:21, 45:1,
45:20, 46:10,
50:9, 51:21,
52:22, 53:6,
60:14
**work**
50:10, 52:4
**worked**
16:17
**working**
17:10, 17:13,
17:16, 22:3,
23:5, 23:9,
25:7, 40:7,
48:18, 48:20,
49:1, 51:6
**works**
28:7
**worksheet**
40:5
**would've**
21:4, 35:10,
35:11, 35:12,
38:22, 39:3,
39:6
**wouldn't**
32:16, 50:2
**write-up**
33:10

**written**
33:21
**wrote**
34:8, 48:12

**Y**

**yeah**
23:11
**year**
17:11
**years**
32:19
**you'all**
27:21
**yourself**
11:3, 16:9,
17:4, 18:16,
27:11, 28:3,
28:21
**youtube**
7:17

**$**

**$1,456,009**
23:16
**$320,000**
38:9

**0**

**03**
1:16, 53:8
**05**
47:2
**06035**
10:16
**09**
46:20

**1**

**10**
1:16, 8:22,
15:7, 28:18,
53:11
**101**
3:7
**103807**
60:17
**10621**
3:6

**11**
15:2, 46:20,
53:8, 53:11,
58:8, 58:18
**12**
5:10, 23:15,
25:8, 25:11,
25:13, 25:16,
25:19, 28:5,
28:7, 28:11,
47:2
**13**
5:11, 28:7
**14**
25:9, 25:21
**1416**
13:17
**1432**
13:17
**15**
15:1, 15:2
**16**
28:7, 58:8,
58:18
**17**
13:16
**19**
1:15, 8:21,
10:15
**19462**
4:8
**1st**
60:15

**2**

**2/8/2015**
14:10
**20**
1:7, 8:20
**2015**
15:7
**2016**
14:17, 16:1,
17:10, 17:11,
17:12, 18:13,
18:21, 21:1,
23:15, 24:10,
26:7, 26:9,

26:18, 28:5,
28:11, 34:8,
40:18, 40:20,
49:5, 49:20
**2017**
21:13, 21:18
**2020**
52:10
**2022**
1:15, 8:21,
60:16
**2024**
60:18
**21**
34:8, 40:18
**22**
5:12, 28:3,
40:20, 46:20,
49:5, 49:20,
50:7
**22030**
3:8
**23236**
3:18
**24**
5:13
**243**
4:9
**28**
5:14
**29**
5:15

**3**

**30**
21:13, 36:8
**300**
3:16
**31**
16:1, 36:10,
60:18
**3195**
26:16
**32**
36:10
**320**
37:20, 38:4
**3388**
1:7, 8:20

**34**
5:16, 38:7
**3444**
33:20
**3447**
33:21
**350**
4:7
**37**
36:8, 36:9,
36:11

---
**4**

**420**
3:17
**467780**
1:18
**484**
4:9

---
**5**

**53**
5:4
**560**
3:19
**591**
3:9

---
**6**

**60**
1:19
**610**
4:6
**6666**
3:9
**6878**
4:9

---
**7**

**703**
3:9
**74**
60:19

---
**8**

**804**
3:19

---
**9**

**9600**
3:19