IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| ROD & REEL, INC., et al. | : | |
| | : | |
| v. | : | Civil Action No. DKC 20-3388 |
| | : | |
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this insurance case are the motion for summary judgment filed by Plaintiffs Rod & Reel, Inc., Chesapeake Beach Resort and Spa, Chesapeake Beach Hotel and Spa, Smokey Joe's Grill and Boardwalk Café, and Chesapeake Amusement, Inc. and the cross-motion for summary judgment filed by Defendant State Automobile Mutual Insurance Company. (ECF Nos. 49, 50). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion will be granted in part and denied in part, and Defendant's motion will be denied.

I. **Background**

A. **Factual Background**

Plaintiffs operate a variety of businesses at 4160 Mears Avenue in Chesapeake Beach, Maryland, including a hotel, restaurants, and entertainment venues. Plaintiffs also rent their

property as a wedding venue.  Plaintiffs insured their businesses with a Commercial Property insurance policy (the "Policy") issued by Defendant for the policy period from April 1, 2014, to April 1, 2015.  (ECF No. 49-3, at 3).  The Policy included blanket coverage for loss of business income and extra expenses.  (*Id.* at 24).  Specifically, the Policy provided that in the event of loss or damage to the covered property, Defendant would "pay for the actual loss of Business Income [that Plaintiffs] sustain due to the necessary 'suspension' of [their] 'operations' during the 'period of restoration'" and any "necessary expenses [they] incur during the 'period of restoration'" that they would not have otherwise incurred.  (*Id.* at 83).  The Policy defined the "period of restoration" as beginning immediately after the time of the loss or damage and ending on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location." (*Id.* at 90, 92).

The Policy provided that if the insured and insurer

> disagree on the amount of Net Income and
> operating expense or the amount of loss,
> either may make written demand for an
> appraisal of the loss.  In this event, each
> party will select a competent and impartial
> appraiser.  The two appraisers will select an
> umpire.  If they cannot agree, either may
> request that selection be made by a judge of
> a court having jurisdiction.  The appraisers

> will state separately the amount of Net Income
> and operating expense or amount of loss.  If
> they fail to agree, they will submit their
> differences to the umpire.  A decision agreed
> to by any two will be binding.

(ECF No. 49-3, at 86).

A fire occurred on February 8, 2015, at Smokey Joe's Grill and Boardwalk Café, one of the businesses Plaintiffs operated. (ECF No. 49-11, at 5).  The fire damaged the building and caused Plaintiffs to lose business income and to incur extra expenses. Plaintiffs filed a claim with Defendant to cover this loss and the extra expenses under the Policy.  Plaintiffs retained Goodman, Gable, and Gould, a public adjuster, to assist them with the claim. (*Id.* at 4-5).  Defendant assigned Scott Terra as claims manager to process and handle the claim.  (ECF No. 49-5, at 4, 10).  Caroline Veahman, a loss adjuster for Defendant, also worked on the claim. (*Id.* at 10).

In mid-April 2015, Plaintiffs asked for Defendant's approval to have the damaged building "shrink-wrapped" during the "wedding season," or the time between the spring and fall when Plaintiffs' property was used as a wedding venue.  (ECF No. 49-9).  Plaintiffs were concerned that the damaged building was "unsightly and smelly," which could interfere with their ability to use the rest of the property as a wedding venue, and shrink-wrapping the building, or sealing it with water-tight plastic, would mitigate this issue.  (ECF Nos. 49-11, at 7; 49-6, at 2).  No work could be

3

done to repair the building during the time it was shrink-wrapped. (ECF No. 49-8, at 8).

Defendant agreed to allow the building to be shrink-wrapped, and to incur the cost of doing so, for a period of six months—the duration of the wedding season—which was to be included in the building's restoration period.  (ECF No. 49-5, at 9; 49-8, at 8). The shrink-wrapping of the building began on April 27, 2015.  (ECF Nos. 49-7, at 3).  Defendant determined that the repairs necessary to restore the building to its original state could be completed in six months.  (ECF No. 49-8, at 10).  The building was ultimately not repaired to its original state but was instead replaced with a larger building.  (ECF No. 49-14, at 7).

Mr. Terra and Ms. Veahman met with Plaintiffs and Goodman, Gable, and Gould in December 2016 to discuss the claim and try to "settle the loss."  (ECF Nos. 49-28, at 2-5; 49-30, at 9).  In her deposition testimony, Ms. Veahman testified that after this meeting, she spoke with Mark Chenetski, the Director of Property for Defendant's Claim and Risk Engineering Commercial Lines, to request authority to settle Plaintiffs' claim.  (ECF Nos. 49-12, at 4, 9, 12; 49-30, at 12-13).  Mr. Chenetski sent an email to Ms. Veahman, Mr. Terra, and others, stating that he was "very comfortable with the handling of the matter to date" but was "not ready to compromise this claim without some additional analysis of the insured's submission."  (ECF No. 49-21, at 3).

4

The claim was subsequently assigned to Sherri King, one of Defendant's claims examiners. (ECF Nos. 49-4, at 5-6; 49-30, at 8, 13-14). Ms. Veahman testified that she had a conversation with Mr. Chenetski in which she asked why Ms. King had been assigned to the claim, given that claims examiners deal with issues of coverage and litigation, and Ms. Veahman believed that only loss measurement—not coverage—was at issue. (ECF No. 49-30, at 8, 13). Ms. Veahman testified that Mr. Chenetski told her that "the issues surrounding this claim w[ere] bigger than just [the] loss." (*Id.* at 13). He went on to explain that there were "[o]ther claims presented by" Goodman, Gable, and Gould "within the region," and Defendant could use this claim as "leverage against" the other claims to "try to get them resolved." (*Id.*). Mr. Chenetski testified in deposition that he did perceive there to be coverage issues involved in Plaintiffs' claim and that he did not recall saying those things to Ms. Veahman. (ECF No. 49-12, at 15, 22-23). He stated that he assigned the claim to Ms. King "to just get some fresh eyes on it for an additional point of view." (*Id.* at 15).

In his deposition testimony, Mr. Terra stated that he had a conversation with Mr. Chenetski in which he asked, "What's the deal with Rod & Reel?" and expressed that he thought it "was something that [Defendant] had the ability to resolve." (ECF No. 49-5, at 12). Mr. Terra testified that Mr. Chenetski told him,

"It's not about this one claim. There's a bigger overall issue," which was "that he wanted to teach [Goodman, Gable, and Gould] a lesson." (*Id.*). According to Mr. Terra, he had worked with Goodman, Gable, and Gould "quite often" during his time working for Defendant, and the firm was representing other insureds for other claims being reviewed by Defendant at the time. (*Id.* at 12-13). Mr. Chenetski testified that he did not recall having this conversation with Mr. Terra and that it was "not something that [he] would say." (ECF No. 49-12, at 21).

On January 20, 2017, Ms. King issued a letter to Plaintiffs, stating that Defendant had "determined the period of restoration [to be] from February 8, 2015 [to] February 7, 2016." (ECF No. 49-15, at 4). The letter stated that Defendant had already paid Plaintiffs an amount it had determined to be the business income loss for that period—$71,639—as well as the full amount due for the actual cash value of the damaged building. As Ms. King acknowledged later, the former amount had not yet been paid at that time, and the latter amount was $26,500 short. The payments of $71,639 and $26,500 were not made until May 30, 2017. (ECF Nos. 49-4, at 22-23; 49-17; 49-18).

On July 25, 2017, Plaintiffs demanded appraisal of the amount of the business income loss and extra expenses and selected an appraiser. (ECF No. 49-23). Defendant selected its own appraiser, and the two appraisers selected an umpire, pursuant to the Policy.

6

The umpire and appraisers issued an appraisal award on January 11, 2018, for a total of $671,638,[1] which was specifically for the period of restoration from February 2015 through April 2016. (ECF No. 49-24, at 2-3). The award broke down the lost business income into a month-by-month schedule. (*Id.* at 3). The amount of loss significantly varied each month.

On January 19, 2018, Plaintiffs filed a Proof of Loss, seeking payment of the amount awarded by the umpire and appraisers. (ECF No. 50-20, at 3). Defendant refused, arguing that it was improper for the appraisers to have decided a period of restoration that conflicted with Defendant's own determination that the period of restoration ran from February 2015 to February 2016. (*Id.*). On January 22, 2018, Defendant paid Plaintiffs $364,725, based on the sum of the loss amounts awarded by the appraisers for the months February 2015 through February 2016 (less the $71,639 already paid for the business income loss claim in May 2017). (*See* ECF Nos. 49-25; 54-2).

**B. Procedural History**

On February 2, 2018, Defendant filed suit in this court, seeking to modify or vacate the appraisal award. (Case No. 18-cv-340-PWG). Judge Paul W. Grimm, who has since retired, issued

---

[1] The appraisers erroneously reported the total award amount as $671,639, but the monthly loss amounts included in the award sum to $671,638. (*See* ECF Nos. 49-24, at 3; 49-25).

a memorandum opinion and order modifying the award to include only the month-to-month calculations, reasoning that the appraisers acted outside the scope of the referral in including the period of restoration in their award determination. *See State Auto. Mut. Ins. Co. v. Rod & Reel, Inc.*, No. 18-cv-340-PWG, 2018 WL 5830734, at *1 (D.Md. Nov. 7, 2018), *aff'd*, 774 F.App'x 168 (4th Cir. 2019). Judge Grimm opined,

> Notably, if the Award is modified to include only the month-to-month calculations, and it is determined that the period of restoration is February 2015 through April 2016, then the amount due under the Policy, according to the modified Award, will be $671,639. If the period of restoration is determined to be a lesser time frame, then the monthly calculations determined by the appraisers will allow the appropriate calculation of the total amount of the covered loss.

*Id*. at *8. Thus, it remained undetermined what the period of restoration and corresponding total amount of the loss should be.

Plaintiffs submitted another Proof of Loss to Defendant on December 11, 2019, this time requesting payment for business income lost from February 2015 through July 2016. (*See* ECF No. 22-18, at 2). Defendant denied this request on January 2, 2020, stating that there was no coverage for lost business income occurring after February 2016. (ECF No. 50-20, at 3).

Plaintiffs filed a complaint with the Maryland Insurance Administration ("MIA") on January 27, 2020, claiming that Defendant owed Plaintiffs additional payments and failed to act in

good faith in processing their claim.  (ECF No. 50-11, at 5-22).
The MIA determined that Plaintiffs had failed to demonstrate that
they were entitled to relief.  (ECF No. 50-15).

Having complied with the preliminary administrative procedure
required by Md. Code, Cts. & Jud. Proc. § 3-1701, Plaintiffs filed
a complaint in the Circuit Court for Calvert County.  Defendant
removed to this court on November 20, 2020, and the case was
initially assigned to Judge George Jarrod Hazel and then reassigned
to Judge Grimm.  (ECF Nos. 1).  Plaintiffs filed an amended
complaint, which includes two counts: a breach of insurance
contract claim and a claim for declaratory judgment. (ECF No. 22).
Each count alleges that Defendant breached the insurance contract
both through its "failure to adjust the loss in good faith" and
its "failure to pay the Claim in accordance with the Polic[y]."[2]
(*Id.* at ¶¶ 147, 154).  Defendant filed a motion to dismiss, arguing
that Plaintiffs' claims were barred by the doctrines of res
judicata and collateral estoppel, based on this court's prior
decision in Case No. 18-cv-340-PWG and the MIA's decision.  Judge
Grimm denied the motion, concluding that the claims are different
from those previously decided by this court, and a civil action

---

[2] It might have been clearer to articulate these claims
separately, or at least to specify which type of relief is sought
under each theory.  *See* Fed.R.Civ.P. 10(b).  In the breach of
contract count, Plaintiffs seek prejudgment interest at 10%, but
they seek 6% in the declaratory judgment count.  The form order
attached to their summary judgment motion seeks interest at 6%.

filed after an MIA decision is independent of the MIA proceedings. (ECF No. 26).  *See Rod & Reel, Inc. v. State Auto. Mut. Ins. Co.*, No. 20-cv-3388-PWG, 2022 WL 580867 (D.Md. Feb. 24, 2022).

The parties conducted discovery, and Plaintiffs filed a motion for summary judgment on February 2, 2023.  (ECF No. 49). Defendant filed a cross-motion for summary judgment and opposition to Plaintiffs' motion on March 3, 2023.  (ECF No. 50).  Plaintiffs responded in opposition to Defendant's motion, and Defendant replied.  (ECF Nos. 54, 58).  Upon Judge Grimm's retirement, the case was reassigned to Judge Deborah L. Boardman and then to the undersigned.

## II.  Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Interprofession du Gruyere v. U.S. Dairy Exp. Council*, 61 F.4th 407, 415 (4th Cir. 2023) (internal quotation marks omitted) (quoting *Liberty Lobby*, 477 U.S. at 248).  "A mere

10

scintilla of proof . . . will not suffice to prevent summary judgment[.]" *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). The court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

## III. Analysis

### A. Breach of Insurance Contract

Plaintiffs contend that it is undisputed that the period of restoration for their claim under the Policy ran from February 2015 to April 2016. Thus, Plaintiffs argue that they are entitled to judgment as a matter of law as to their breach of contract claims based on Defendant's failure to pay the full amount the appraisers determined was due for that period. Defendant argues

11

that it is entitled to judgment as a matter of law on Plaintiffs'
claims that it breached the insurance contract because the period
of restoration required under the Policy ended twelve months after
the date of the loss.  Thus, Defendant contends that it has more
than satisfied its obligations under the contract by paying for
the losses incurred over the thirteen-month period between
February 2015 and February 2016.

The parties make clear in their motions that there is no
dispute as to the following facts: (1) Defendant has satisfied its
obligations for the months between February 2015 to February 2016
(ECF Nos. 49-1, at 8; 50-1, at 16, n.3; 54, at 24); (2) Defendant
agreed to pay for a six-month period of shrink-wrapping during the
wedding season (ECF Nos. 49-1, at 16; 50-1, at 17);[3] and (3) repairs
at a reasonable speed and of similar quality should have been
completed in six months (ECF Nos. 49-1, at 31; 50-1, at 17; 58, at
2).  The only issue that the parties seem to disagree about is

---

[3] The parties quibble over the exact timing of the wedding
season, with Plaintiffs suggesting it may have ended sometime
between mid-October and November 1.  (ECF Nos. 49-1, at 16; 54, at
5; 58, at 6).  For the purpose of resolving Plaintiffs' motion for
summary judgment, however, it is appropriate to assume, as
Defendant contends, that Defendant agreed to exactly six months of
shrink-wrapping.  This would mean that the shrink-wrapping was
authorized from April 27 (the date the shrink-wrapping began) to
October 27, 2015.  Even if it is assumed that the period of
authorized shrink-wrapping started on the date the shrink-wrapping
was approved—April 14, 2015—the six-month period would end in mid-
October.  (*See* ECF No. 49-1, at 16).  Neither of these results is
inconsistent with Plaintiffs' version of events.

whether the six months of repairs was to include February 2015 through April 2015 or whether the six-month repair period was to begin after the shrink-wrapping was removed.  A review of the record, however, reveals that there is no genuine issue for trial and that the period of restoration was from February 2015 through April 2016.

The parties rely on the reports and deposition testimonies of their experts for their timing estimates.  Plaintiffs' expert, Thomas Turner, estimated the period of restoration to include a six-month period of shrink-wrapping from May 2015 through October 2015, a removal of the shrink-wrap at the beginning of November 2015, demolition of the building immediately after the removal in November 2015, and reconstruction from that point through April 2016.[4]  (ECF No. 50-9, at 38, 42).  Defendant's expert, Kevin Collier, concluded that "[t]he total estimated duration of repair from the start of shrink-wrapping to the completion of repair and reconstruction work is approximately twelve (12) months."  (ECF No. 49-22, at 6).  Although Mr. Collier did not specify which months the shrink-wrapping and repair work were to take place, it is undisputed that the shrink-wrapping did not occur until mid or

---

[4] Plaintiffs' expert estimated a total period of restoration of seventeen or eighteen months, but it is unclear why he included May 2016 through July 2016 in this estimate, given that he approximated that the reconstruction should have been completed in April 2016.  (*See* ECF No. 50-9, at 42).  In any event, Plaintiffs are no longer seeking coverage beyond April 2016.

late April 2015.   Additionally, both experts agree that the building needed to be demolished prior to the start of repairs, which confirms that their repair time estimates could not have included the months prior to the shrink-wrapping when the building had not yet been demolished.  (*See* ECF Nos. 49-22, at 5-6, 14; 50-9, at 14).   Thus, the parties' experts agree that the period of restoration spanned from the date of the loss in February 2015 through the projected completion of repairs in April 2016.

Defendant's favored twelve-month restoration period only works if its expert's estimate of a twelve-month repair period is taken out of context.   Because the amount of monthly loss calculated by the appraisers varies each month, it is not enough to determine the number of months included in the period of restoration—it also must be determined specifically which months were included.[5]  Under the clear language of the Policy, the period of restoration begins immediately after the loss incident—February 2015—and ends when the repairs should have been completed.   The parties agreed to shrink-wrap the building from approximately April to October 2015, and the six months of repairs could not have begun until after the shrink-wrap was removed.   Therefore, the twelve-month period to which Defendant's expert referred must

---

[5] This is supported by the Policy's language as well because it contemplates a specific end "date" of the period of restoration, not a general length of time.  (*See* ECF No. 49-3, at 90).

have spanned from April 2015 to April 2016—not February 2015 to February 2016.  Defendant has not presented any evidence that contradicts this conclusion.

In sum, the evidence submitted by both parties establishes that the period of restoration began on the date of the loss in February 2015, included the six months of shrink-wrapping (mid/late April 2015 to mid/late October 2015), and ended six months after the shrink-wrap was removed (mid/late April 2016).[6] Under the loss schedule awarded by the appraisers, which the parties agree (and Judge Grimm determined) applies, Plaintiffs are entitled to payment by Defendant in the amount of $235,274, which represents the total amount of loss from February 2015 through April 2016 ($671,638) minus the $436,364 already paid by Defendant.[7]  Accordingly, Plaintiffs' motion for summary judgment will be granted on this issue, and Defendant's motion will be denied on this issue.

---

[6] Neither party argues that the period of restoration should be determined on a daily or weekly rather than on a monthly basis for the purpose of calculating the business income losses (which is the way the appraisers' award is structured).

[7] Likely due to the appraiser's miscalculation of the total award amount, *see supra* note 1, Defendant overpaid for the months of February 2015 through February 2016 by one dollar.  Thus, it owes one dollar less than the amount Plaintiffs are seeking, which is the sum of the appraised loss amounts for March 2016 and April 2016.  (*See* ECF No. 49-25).

**B. Lack of Good Faith**

Plaintiffs contend that the undisputed facts establish that Defendant failed to act in good faith when processing Plaintiffs' claim, in violation of Md. Code, Cts. & Jud. Proc. § 3-1701 and Ins. § 27-1001.  Plaintiffs argue that Defendant failed to act in good faith because it reassigned the claim to a claims examiner despite there being no coverage issues involved, prevented the claim from being settled in order to "teach a lesson" to Plaintiffs' public adjuster, and misrepresented that it had paid Plaintiffs the undisputed portion of the business income loss and actual cash value of the repairs approximately four months before it actually did so.[8]  Defendant argues that even if Plaintiffs' version of events is accepted as true, which it does not concede, there is insufficient evidence to support a claim for lack of good faith.   Specifically,  it  argues  that  even  if  Defendant  had

---

[8] Plaintiffs also argue that Defendant's failure to produce in discovery a document that Ms. Veahman had prepared and provided to Mr. Chenetski is an additional basis for their lack of good faith claim.  (ECF No. 49-1, at 43).  They cite no authority in support of the notion that a discovery issue during the litigation of a lack of good faith claim can form part of the basis of the lack of good faith claim itself, and it defies logic to suggest that a lack of good faith claim under Md. Code, Cts. & Jud. Proc. § 3-1701 and Ins. § 27-1001, can encompass actions beyond the processing of insurance claims.  *Cf. All Class Constr., LLC v. Mut. Benefit Ins. Co.*, 3 F.Supp.3d 409, 416 (D.Md. 2014) ("[T]he determination as to good faith focuses on the time at which the insurer's decision was made, not at a later point in subsequent litigation when all involved have the benefit of additional evidence.").

reassigned the claim to a claims examiner to teach Plaintiffs' public adjuster a lesson, there would be no lack of good faith because Ms. King handled the claim just as Mr. Terra would have handled the claim.  It adds that the so-called "misrepresentations" about the payments were the result of mistakes and misunderstandings, not bad faith.[9]

A claim for lack of good faith under Md. Code, Cts. & Jud. Proc. § 3-1701 and Ins. § 27-1001, is a claim "that an insurer did not act in good faith when it handled [an insured's] insurance claim." *Barry v. Nationwide Mut. Ins. Co.*, 298 F.Supp.3d 826, 829 (D.Md. 2018).  The statute defines "good faith" as "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim."  Md. Code, Cts. & Jud. Proc. § 3-1701(a)(4).  Whether the insurer acted with sufficient honesty and diligence is judged in light of the totality of the circumstances, including considerations such as

> [(1)] efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds; [(2)] the substance of the coverage dispute or the weight of legal authority on the coverage issue; [and] [(3)] the insurer's diligence and thoroughness in

---

[9] Defendant's other argument—that a lack of good faith claim cannot be sustained if there was no breach of the insurance contract—while an accurate reading of the law, *see Barry v. Nationwide Mut. Ins. Co.*, 298 F.Supp.3d 826, 830 (D.Md. 2018), is precluded by the court's ruling on the breach of contract issue.

> investigating the facts specifically
> pertinent to coverage.

*Barry*, 298 F.Supp.3d at 830 (alterations in original) (quoting *All Class Constr., LLC v. Mut. Benefit Ins. Co.*, 3 F.Supp.3d 409, 416 (D.Md. 2014)).

There are too many disputed facts to resolve this claim on a summary judgment motion.  It is disputed whether Mr. Chenetski truly discussed with Mr. Terra and Ms. Veahman that Defendant's handling of Plaintiffs' claim was guided by Defendant's desire to leverage Plaintiffs' claim against claims of other insureds and to teach Plaintiffs' public adjuster a lesson and whether Defendant's actions truly were motivated by those goals.  It is also disputed whether there were genuine coverage issues involved in the evaluation of Plaintiffs' claim.  If Plaintiffs' version of the facts is true, it would be a clear indication of Defendant's lack of good faith in processing the insurance claim.  It is irrelevant whether Ms. King handled the claim just as Mr. Terra planned to handle it—another disputed fact—because a lack of good faith claim is about the insurer's honesty and diligence in processing an insurance claim, not about the outcome of the claim.  *See id.* (explaining that a lack of good faith claim must be based on something other than an insured's disagreement with the insurer's resolution of his claim).  It is also disputed whether Defendant knowingly misrepresented that it had made payments that it had not

yet made or whether, as Defendant contends, the delay in payment was the result of a good faith mistake or misunderstanding. These facts may be relevant in determining Defendant's diligence in processing the claim.

Because disputed facts prevent resolution of Plaintiffs' lack of good faith claim as a matter of law, both parties' motions for summary judgment will be denied as to that issue.

**IV.  Conclusion**

For the foregoing reasons, Plaintiffs' motion for summary judgment will be granted as to the breach of contract aspect of their claim and denied as to the lack of good faith. Defendant's motion for summary judgment will be denied. A separate order will follow.

                                    /s/
                            DEBORAH K. CHASANOW
                            United States District Judge